UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:

PATRIOT NATIONAL, INC., et al.,          Case No.

          Debtors.                       18-10189 (KG)

- - - - - - - - - - - - - - - - - - - - -x

United States Bankruptcy Court

824 North Market Street

Wilmington, Delaware

February 28, 2018

10:09 AM

B E F O R E:

HON. KEVIN GROSS

U.S. BANKRUPTCY JUDGE

ECR OPERATOR:  GINGER MACE

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to Pay (I) All Pre-Petition Employee Obligations, (II) Pre-Petition Withholding Obligations, and (III) Post-Petition Employee Obligations In the Ordinary Course, and (B) Authorizing Banks to Honor Related Transfers (Docket No. 6).

Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay Pre-Petition Claims of Critical Vendors; (B) Authorizing Banks to Honor and Process Related Checks and Electronic Transfers; and (C) Granting Related Relief (Docket No. 8).

Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. Sections 105(a) and 366 (I) Prohibiting Utilities From Altering, Refusing, or Discontinuing Services on Account of Pre-Petition Invoices, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment (Docket No. 11).

Debtors' First Omnibus Motion to (I) Reject Unexpired Leases Nunc Pro Tunc to the Petition Date, and (II) Abandon Any Personal Property that Remains at the Leased Property (Docket No. 14).

Debtors' Motion for Interim and Final Orders (I) Authorizing the Continued Use of Cash Management System, Bank Accounts and Business Forms, (II) Extending the Debtors' Time to Comply With Section 345(b) of the Bankruptcy Code, (III) Approving Continuation of Ordinary Course Intercompany Transactions and (IV) Granting Related Relief (Docket No. 7).

Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to Continue Their Pre-Petition Practices With Respect to Their Pass-Through Bank Account and (B) Directing Banks to Honor Related Transfers (Docket No. 12).

Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors and Debtors-In-Possession to Obtain Post-Petition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Super-Priority Claims, (IV) Granting Adequate Protection to Pre-Petition Secured Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief (Docket No. 18).

Debtors' Motion to (I) Compel Mediation of Claims Against the Debtors' Directors and Officers and (II) Temporarily Stay Related Litigation Pending the Outcome of Mediation (Docket No. 93).

Application of the Debtors to (I) Retain Duff & Phelps, LLC to Provide the Debtors a Chief Restructuring Officer and Certain Additional Personnel and (II) Designate James S. Feltman as Chief Restructuring Officer for the Debtors Nunc Pro Tunc to the Petition Date (Docket No. 95).

Debtors' Motion for Leave to File Late Omnibus Reply in Further Support of Motion for Entry of Interim and Final Orders (I) Authorizing Debtors and Debtors-In-Possession to Obtain Post-Petition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Super-Priority Claims, (IV) Granting Adequate Protection to Pre-Petition Secured Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief (Docket No. 239).

Plaintiff's Motion for Temporary Restraining Order [Filed: 2/28/18] (Adv. No. 18-50297; Docket No. 2).

Transcribed by:  Clara Rubin

A P P E A R A N C E S :

HUGHES HUBBARD & REED LLP

        Attorneys for Debtors

BY:    KATHRYN A. COLEMAN, ESQ.

        CHRISTOPHER GARTMAN, ESQ.

        JACOB GARTMAN, ESQ.

        ERIN DIERS, ESQ.

PACHULSKI STANG ZIEHL & JONES LLP

        Attorneys for Debtors

BY:    LAURA DAVIS JONES, ESQ.

        PETER KEANE, ESQ.

        JAMES E. O'NEILL, ESQ.

UNITED STATES DEPARTMENT OF JUSTICE

        Office of the United States Trustee

BY:    LINDA CASEY, ESQ.

ASHBY & GEDDES, P.A.

        Attorneys for Austin Shanfelter

BY:    RICARDO PALACIO, ESQ.

6

BALLARD SPAHR LLP

        Attorneys for CVI Investments, Inc.

BY:   MATTHEW G. SUMMERS, ESQ.


BAST AMRON, LLP

        Attorneys for MCMC & York Risk Services

BY:   DANA R. QUICK, ESQ. (TELEPHONICALLY)


BAYARD, P.A.

        Attorneys for Trinidad Navarro, Insurance Commissioner of

         the State of Delaware, as Receiver of Ullico Casualty

         Company in Liquidation

BY:   NEIL B. GLASSMAN, ESQ.

        GIANCLAUDIO FINIZIO, ESQ.

        EVAN T. MILLER, ESQ.


BERGER & MONTAGUE, P.C.

        Attorneys for Gingello SDNY II

BY:   LAWRENCE DEUTSCH, ESQ.

BLACK & GERNGROSS, P.C.

     Attorneys for the Receivers

BY:   JAMES J. BLACK, III, ESQ.

     JEFFREY B. MICELI, ESQ.


CAHILL GORDON & REINDEL LLP

     Attorneys for Certain of the Members of the Board of

     Directors

BY:   JOEL H. LEVITIN, ESQ. (TELEPHONICALLY)

     RICHARD A. STIEGLITZ, JR., ESQ. (TELEPHONICALLY)


CARLTON FIELDS JORDEN BURT, P.A.

     Attorneys for Fifth Third Bank

BY:   DONALD R. KIRK, ESQ. (TELEPHONICALLY)


CONRAD & SCHERER LLP

     Attorneys for Steven Mariano

BY:   WILLIAM SCHERER, ESQ.

     ALEXANDER V. MASOTTI, ESQ.

CROSS & SIMON, LLC

Attorneys for CareWorks Managed Care Services f/k/a MCMC
LLC

BY:   KEVIN SCOTT MANN, ESQ.

DENTONS US LLP

Attorneys for The Travelers Indemnity Company

BY:   SAM J. ALBERTS, ESQ.

GELLERT SCALI BUSENKELL & BROWN, LLC

For Fifth Third Bank

BY:   MICHAEL BUSENKELL, ESQ.

KILPATRICK TOWNSEND & STOCKTON LLP

Attorneys for Official Committee of Unsecured Creditors

BY:   DAVID M. POSNER, ESQ.

9

KILPATRICK TOWNSEND & STOCKTON LLP

    Attorneys for Trinidad Navarro, Insurance Commissioner of

     the State of Delaware, as Receiver of Ullico Casualty

     Company in Liquidation

BY:   GIANFRANCO FINIZIO, ESQ.

LANDIS RATH & COBB LLP

    Attorneys for Cerberus Business Finance, LLC

BY:   ADAM G. LANDIS, ESQ.

LATHAM & WATKINS LLP

    Attorneys for Hudson Bay Master Fund Ltd.

BY:   MATTHEW L. WARREN, ESQ.

    JEFFREY MISPAGEL, ESQ.

LEVI & KORSINSKY LLP

    Attorneys for Henry Wasik and Aric McIntire

BY:   AMY MILLER, ESQ.

MARGOLIS EDELSTEIN

    Attorneys for Gingello SDNY II

BY:   JAMES E. HUGGETT, ESQ.

MCCARTER & ENGLISH, LLP

    Attorneys for Henry Wasik and Aric McIntire

BY:   SHANNON DOUGHERTY HUMISTON, ESQ.

MORRIS JAMES LLP

    Proposed Counsel to Official Committee of Unsecured

     Creditors

BY:   CARL N. KUNZ, III, ESQ.

REID COLLINS & TSAI LLP

    Attorneys for Mbago Kaniki

BY:   ANGELA J. SOMERS, ESQ. (TELEPHONICALLY)

ROSENTHAL MONHAIT & GODDESS, P.A.

    Attorneys for Mbago Kaniki

BY:   NORMAN M. MONHAIT, ESQ.

SCHULTE ROTH & ZABEL LLP

     Attorneys for Cerberus Business Finance, LLC

BY:   ADAM C. HARRIS, ESQ.

      TAE KIM, ESQ.

SHAW FISHMAN GLANTZ & TOWBIN LLC

     Attorneys for Hudson Bay Master Fund Ltd.

BY:   THOMAS M. HORAN, ESQ.

SMITH, KATZENSTEIN & JENKINS LLP

     Attorneys for Steve Mariano

BY:   KATHLEEN M. MILLER, ESQ.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

     Attorneys for Quentin Smith, Charles H. Walsh, and

      Christopher Pesch

BY:   JAMES L. PATTON, ESQ.

      KARA HAMMOND COYLE, ESQ.

ALSO PRESENT:

     JONATHAN LANDERS, ESQ., Independent Director for the

      Debtors

P R O C E E D I N G S

THE CLERK:  Please rise.

THE COURT:  Good morning, everyone.  You may be seated.

UNIDENTIFIED SPEAKER:  Good morning.

THE COURT:  I was wanting to say "Good morning, fight fans" because I think we have a number of issues here today, but I decided not to.

MS. COLEMAN:  It's on in the Octagon, Your Honor.

THE COURT:  That's right.  Ms. Coleman, good morning.

MS. COLEMAN:  Good morning, Your Honor.  Kathryn Coleman of Hughes Hubbard & Reed for the debtors, Patriot National.  I'm here with co-counsel Laura Davis Jones of the Pachulski firm, and with my colleagues Christopher Gartman, Jacob Gartman, and Erin Diers.

THE COURT:  Yes.

MS. COLEMAN:  Your Honor, we're -- as you know, we have a pretty full agenda here, but I thought it would be helpful, since we're at the second-day hearing where the rubber really meets the road -- it's all fun and games until people actually find out that you filed -- to go into a little bit of the details and the background that we didn't really have time for at the first-day, if Your Honor would indulge me.

THE COURT:  That would be fine.

MS. COLEMAN:  So, Your Honor, before we get into the

details, I thought that we should address sort of the context and the overall timing of the case, which, as Your Honor knows, is quite tightly drawn.  There is a reason for that beyond simply trying to get over with, and the reason is really the nature of the business and what the debtors are trying to accomplish through this Chapter 11 process.

Your Honor, this is a business that until November of 2017 -- so really quite recently -- was a 200-million-dollar-plus enterprise that largely depended on related-party transactions.  Well over half of this revenue came from related parties.  That related-party business fell away completely, starting in November of last year when Patriot's principal customer, its affiliate Guarantee Insurance Company, was placed in receivership in Florida.

THE COURT:  Yes.

MS. COLEMAN:  So Patriot lost in one fell swoop about fifty-five percent of its revenues from that one relationship alone.  The activities with the second largest customer, which was also a related party, declined as well.

So the loss of all of that related-party business meant that Patriot really had to figure out kind of the size of its business going forward and what its business really looked like going forward.  That was the first step.  Once it did that, then Patriot had to figure out how to downsize its cost structure to reflect the much smaller size of the business.

And just as an example, Your Honor, the projected revenue for 2018 is sixty million dollars.

So Patriot has two goals, really, in this case:  to restructure its operations to tailor them to that new reality, and also to recapitalize its debt.  So as Your Honor knows, Cerberus and TCW, the lenders, hold all of Patriot's debt capital.  In November of 2017, Patriot entered into an agreement with the lenders, as Your Honor knows, resulting in the restructuring-support agreement, by which Patriot could achieve its dual goals through a pre-negotiated Chapter 11 case.

One of the critical features of that agreement was that the Chapter 11 case would proceed on an expedited schedule.  A very simple reason for that, Your Honor:  The insurance service and brokerage business is completely relationship-based, and success in that business requires getting and keeping customers' confidence.  It is not the kind of business that can withstand a long time in Chapter 11 -- maybe none of them can, but this one is particularly sensitive -- let alone prosper while in Chapter 11.

So Patriot, with support of its lenders, who, luckily for all of us, recognize that reality, carefully planned these cases in consideration of the business conditions in effect at the time.  They timed the filing to maximize the value of the business and, therefore, the value to all the stakeholders.

Now, part of that planning included Patriot and its lenders meeting with major business partners, which I found really quite extraordinary, to provide both advanced notice of the filing and to discuss the customers' concerns in advance, because it was important to find out if customers were simply going to abandon ship once the case was filed, and obviously did everything we could, and Cerberus did everything they could, to assist in that not happening.

So in addition to that careful planning, the lenders and Patriot also agreed that the value would be maximized by -- instead of doing a 363 sale, by transferring ownership of the business through a plan of reorganization.  Now, if we were doing this, Your Honor, as a 363, the timing would be well within what debtors and everybody in the Chapter 11 business has come to expect.  Nobody would bat an eye at a ninety-day sale process.

So our view, Your Honor, is that Patriot should not be penalized for choosing to reorganize through a plan, particularly where there are significant benefits to doing it through a plan.  The lenders have agreed to support recovery to unsecured creditors, which would be in doubt otherwise. Employees' jobs are preserved.  And the lenders have created a mechanism, this litigation trust, for investigating and pursuing any claims these debtors may have against third parties.  And that's going to become very important because the

litigation-trust structure obviates the need to stretch out the case itself for investigating any of these claims.  And this starts to come up when you talk about the context of the case, and we'll talk about the 341 in a second, which was opened yesterday.

So we would ask the Court to consider this context when parties ask to extend the agreed-upon time frame for the case, because it does matter and there are severe consequences to the business, from delay.  When you're balancing the potential for harm, there's no upside to delay and there's significant downside to delay, and you have to look at what's likely to result from stretching out the agreed-upon time frame that we're all proceeding down.

So on the other hand, if we do stick with the currently contemplated timing, that gives Patriot the best chance of preserving the business, retaining the lenders' continued support without which none of this would be possible in the first place.  And there's no harm to any stakeholder for proceeding on the timetable that we've set forth.  To the contrary, all the debtors' rights as against third parties that I just said are preserved through that litigation-trust structure.

So I want to emphasize that because there've been some fairly reckless statements made, both on and off the record, regarding bad acts associated with these cases.  And these are

nothing more than that; these are simply just reckless statements; they're made with the goal of gaining litigation advantage both in this court and the multiple other courts that we're dealing with.  None of it relates to today's situation. It's all forensic, it's all encapsulated and, most importantly, it's all pre-petition.

Where we are today is a group of debtors with an independent CRO:  Mr. Feltman.  We have an independent member of the board of directors, with no previous contact with Patriot:  Mr. Landers.  We have an independent EVP of Finance: Mr. MacKenzie.  And we have the support of the lenders, who are holding the overwhelming share of the economic interest in this enterprise and, as I said before, are also -- have been -- are also willing to share it, and they've proven that by proposing the plan that they have agreed that they will support if the debtors propose it.

So again, there's no attempt to wipe away any third-party liability for pre-petition acts.  On the contrary, the plan not only preserves but also supports the ability to hold those third parties accountable.  So there's no sweeping anything under the rug here.

So returning to the related question of timing and to generally address the committee's request to delay resolution of most of the matters before the Court today, I would again emphasize there's simply no demonstrated benefit to that delay.

The debtors have already provided substantial information to the committee; they will absolutely continue to do so.  Indeed, there's an in-person meeting at the company headquarters, set up for tomorrow, for exactly that purpose:  what information will be shared.  And we'll walk through questions and answer everything that we can.

THE COURT:  I saw that.  Yes.

We also filed our voluminous statement of financial affairs and schedules --

THE COURT:  I saw that.  Yes.

MS. COLEMAN:  -- last night, so --

THE COURT:  Yes.

MS. COLEMAN:  Yes.  -- much to the chagrin of all the trees in the world, as they're about eight inches tall when you print them out.  And we have agreed, Your Honor, to continuances of the matters where it makes sense and, where there're some legitimate questions that need to be answered, we've agreed to continue until the next hearing, which is March 8th, which sounds a long time away, because it's still only February, but it's actually next week.

THE COURT:  Right.

MS. COLEMAN:  So there's another point as well, which is that the debtors' customers and/or competitors very, very closely monitor this process closely to see whether we determine -- whether we're making process as we have planned to do.  And customers have expressly told us that their

willingness to continue to use the debtors' services is really dependent on our progress toward exiting Chapter 11 and our having continued access to financing.  That's very, very important to them.  So simply saying, well, you might not need this DIP and so you should delay it really doesn't address the point of customers being comfortable dealing with us, because they know that we have continued access to financing.

So under these circumstances, Your Honor, to grant a delay for no demonstrated benefit, which really is to risk the value of this enterprise -- not to be too dramatic about it -- but not to mention the debtors' ability to continue to use cash collateral and their access to DIP -- because, of course, "extension" means that we would be at risk of going into default under our DIP, which is something that would really be very detrimental to the business.

So that concludes my introductory remarks.  I just wanted to set the context.  I'm now going to turn it over to my colleague Mr. Gartman, who's going to walk Your Honor through the number of continued matters and the number of matters that have been resolved, and then talk about a few of the matters that are still going forward.

THE COURT:  All right.

MS. COLEMAN:  Thank you, Your Honor.

THE COURT:  And then I will hear from the committee.

MR. POSNER:  Thank you, Your Honor.

THE COURT:  Yes.

Good morning.

MR. C. GARTMAN:  Good morning, Your Honor. Christopher Gartman from Hughes Hubbard, for the debtors.

THE COURT:  Yes.

MR. C. GARTMAN:  Your Honor, on the amended notice of agenda that was filed, I guess, this morning, the continued matters are matters 1 through 3.

THE COURT:  Yes.  That hasn't changed from the original --

MR. C. GARTMAN:  Correct.

THE COURT:  -- agenda.  Yes.

MR. C. GARTMAN:  And we have -- now had orders entered on matters 4 through 11 --

THE COURT:  Yes.

MR. C. GARTMAN:  -- which brings us to the contested matters going forward; the first one is number 12, which is the employee-wage motion.  The only response received was from the committee, which filed a reservation of rights.  I had spoken with committee counsel but, obviously, to the extent they want to make any statements, they can obviously do so.

Just to run through some of the points that were raised.  Obviously, Ms. Coleman said we're going to be providing information to the committee to the extent that it's reasonable and unburdensome (sic) to do so.  The -- both the

employee and the independent contractor that they requested information for that exceeded the --

THE COURT:  Yes.

MR. C. GARTMAN:  -- priority cap, we are not seeking to pay them above the priority cap.  Just to make that clear.

The -- similarly, the -- we have provided the committee with the following, which is on the expense reimbursements:  The expense reimbursements that are outstanding -- I believe that the objection -- or the reservation of rights stated that they were concerned about expenses being paid to, I guess, people who were subject to allegations of misconduct.

THE COURT:  Yes.

MR. C. GARTMAN:  I have been informed and will confirm that the expenses that are sought to be paid are not for any such people; they're for current employees, officers.

And unless -- I believe that covers their objections, but I'll let them speak on that one.

MR. POSNER:  Your Honor, just for the record -- David Posner --

THE COURT:  Yes, Mr. Posner.

MR. POSNER:  -- Kilpatrick Townsend & Stockton, proposed counsel for the committee.

I do want to address the Court, but my colleague Mr. Finizio is going to address some of these other pending motions

other than the DIP and the mediation and my overall comments.

THE COURT:  All right, very well.  And, Mr. Gartman, do you want them to now address the motion that you proposed --

MR. C. GARTMAN:  Well --

THE COURT:  -- or were you going through them?

MR. C. GARTMAN:  Do you want to go one by one, or -- how do you want to handle it?

THE COURT:  I thought you were going to go through them and let me know -- but I take it, none of these motions is being adjourned.  Is that right?

MR. C. GARTMAN:  Well, the only one -- so on both cash management and pass-through, we're just seeking to continue on an interim basis.

THE COURT:  All right.

MR. C. GARTMAN:  So that would be the one change; not for cash management, because I believe we noted that.  But the one change is that on the pass-through, since it seems like there are issues to work through in terms of information requests and that type of thing, we would be requesting to continue that on an interim basis --

THE COURT:  I see.

MR. C. GARTMAN:  -- to the March 8th hearing.

THE COURT:  All right.  All right, that's fine.

Well, why don't I hear now from the committee.  Mr. Finizio.  Good morning.

MR. GF FINIZIO:  Good morning.  Gianfranco Finizio, Kilpatrick Townsend, proposed counsel for the committee.

As Debtors' counsel noted, we were told, I believe yesterday, that they will not be seeking to pay any employee or the independent service provider above the cap.

THE COURT:  Right.

MR. GF FINIZIO:  We did ask for information at the outset of the committee's retention of Kilpatrick.  And again, the committee was formed a mere twelve days ago with professionals retained from the beginning to mid last week.  We did ask for information as to who the employee was and who the independent service provider was.  Those requests in terms of identity are still outstanding, unfortunately.  But if they make clear in the order that those two will not be paid in excess of the cap, we're okay with that portion of it, but we would still want to know the identity of those two.

And on the reimbursement of expenses, there's about 75,000 dollars in amounts that have to be reimbursed, and Debtors' counsel made a representation that, of those monies, none are due to former Ds and Os who are the targets of litigation.

THE COURT:  Right.

MR. GF FINIZIO:  I would take that representation at face value, but we would still want, at a minimum, just an accounting as to -- for those expenses, who are the Ds and the

Os, whether present or former.  We're not asking for rank-and-file types who submitted de minimis expenses.  We're just asking for the Ds and the O types.

And I note that in the motion it says that there are certain employees who have not yet submitted -- or there are forthcoming expense reimbursements.

THE COURT:  Yes.

MR. GF FINIZIO:  So the representation that no D&O or D&O with allegation of bad acts will be paid, I guess, is still a question mark insomuch as it involves expenses that have not yet been submitted.

So again, I guess there's a threshold for those amounts being paid.  At a minimum, we just want our own -- to do our own due diligence as to whether those amounts are appropriate.  Again, I take the debtors' representation at face value.  But we've asked -- and I'd also highlight, we've asked for this information at our -- outset of our engagement.  So we're nine, ten days still without this information.

So that's, I guess, my commentary as it relates to the wage motion.

THE COURT:  Mr. Gartman, will this information be provided to the committee at your meeting tomorrow?

MR. C. GARTMAN:  We can.

THE COURT:  All right, I think you should.  And as well, on the forthcoming expenses, those also should not be

paid to former officers and directors. But with that in mind, Mr. Finizio, do you have any objection to the motion itself at this point?

MR. GF FINIZIO: We have no --

THE COURT: Perhaps the order could be amended, if you want?

MR. GF FINIZIO: Yeah. I would request that there is at least a reservation of rights to the extent that, from our review of the chart of reimbursable expenses, if we believe that there's something inappropriate in there that either was paid or is proposed to be paid, that the committee has an ability to either --

THE COURT: Seek a callback?

MR. GF FINIZIO: -- come back to court -- yes. Exactly. That's right.

THE COURT: All right. Mr. Gartman, does that work for you?

MR. C. GARTMAN: That seems fine.

THE COURT: Okay. And --

MR. C. GARTMAN: I would just note, though, Your Honor, on another point that was made, paragraph 4 of the order does --

THE COURT: Yes.

MR. C. GARTMAN: -- provide that no payment to any employee or independent contractor will exceed the priority

cap.  So just to --

THE COURT:  Okay.  Well, that's fine.  That's great.

MR. C. GARTMAN:  -- just to close that loop.

MR. GF FINIZIO:  Great.

THE COURT:  All right, and then if that -- if we just have that amendment to the order that Mr. Finizio has requested and you give them the information at your meeting tomorrow, I think we'll have it covered.

MR. GF FINIZIO:  Yeah.  Just let us -- give us a copy of the revised proposed order; we'll review it promptly and we'll get that one done.

THE COURT:  All right.  Very well.  Thank you.

Mr. Gartman, number 13, right:  critical vendors?

MR. C. GARTMAN:  Yes.  So on critical vendors, again, this is an information-related response from the creditors' committee, and they have requested a couple of other provisions be added to the order.  So in terms of the -- I can provide an update on the critical vendors, in terms of the information.  We've provided this to committee counsel prior to the hearing.

THE COURT:  Okay.

MR. C. GARTMAN:  But as of today, we're at approximately a million dollars that has been paid.  A million-three is what is paid and accrued.  So basically 300,000 dollars being accrued that's in the pipeline.  Okay.

THE COURT:  And I think you had leave for two million

dollars; is that correct?

MR. C. GARTMAN:  Two million.  Correct.

THE COURT:  Yeah.

MR. C. GARTMAN:  And then another ten -- that's in commissions to the subproducers.

THE COURT:  Right.

MR. C. GARTMAN:  And then another 10,000 dollars has been paid to two (ph.) traditional vendors that provide software-related assistance to the services that we need to do to, obviously, operate the business.

So in terms of what has been paid, that's where we're at.

The committee has also requested notice of two particular items; one is if we're going to grant any preference waivers.  And I believe we discussed a three-day notice period before that.  That's acceptable to us.  The second point is, similarly, such notice before any payment is made that exceeds 100,000 dollars, on that one we're willing to provide reporting on a weekly or semi-weekly basis of payments that are made, but there are times where we have to pay commissions prior to that time period and we need the flexibility to be able to make those payments to continue to run the business.

THE COURT: All right.  Mr. Finizio, why don't I hear from you.

MR. GF FINIZIO:  Thanks, Your Honor.  Again for the

record, Gianfranco Finizio, proposed counsel to the committee.

Counsel's right; we did make this request, which is fairly standard in cases of this size --

THE COURT:  Yes.

MR. GF FINIZIO:  -- of implementing a protocol that -- again, we're not looking to cause chaos for de minimis amounts. But for amounts that are exceeding what we thought was a reasonable number of 100,000 dollars, we'd be happy to work with counsel in potentially adjusting the number and adjusting the notice period.  But again, I emphasize, this protocol was proposed two days after Kilpatrick was retained.  And for the first time today, this morning, we were told that there may be issues with the proposed notice period and the proposed amounts.

Again, willing to work with Debtors' counsel in establishing what is Creditors' Committee 101 protocol on critical vendors, but we need to have some ability to object -- again, open to discussing the time period and the amounts.  So we would object to entry of an order that did not have some kind of protocol in there similar to what was discussed on the record.  But again, happy to work with the debtors in making something that works for both sides.

THE COURT:  Well, I agree with you, Mr. Finizio. There has to be open communication, as open as it can be, between a debtor and the committee.  And it sounds to me like

that's what you've requested here.

MR. GF FINIZIO:  Yes.

THE COURT:  And I think it's a reasonable request. And I think the 100,000-dollar amount is certainly a large amount and significant and something that ought to be shared with the committee.

So I don't know everything that's in the protocol --

MR. GF FINIZIO:  Uh-huh.  Well, the protocol --

THE COURT:  -- but there ought to be -- there ought to be some feature of it.

MR. GF FINIZIO:  The protocol, just to be clear, is quite simple.  It's, for payments over 100,000 dollars --

THE COURT:  Yes.

MR. GF FINIZIO:  -- or any payments that also result in a preference waiver, we want -- we propose three days to review and, if necessary, to object.  That --

THE COURT:  Okay.

MR. GF FINIZIO:  That is the substance of the protocol, with the underscore that we've also just asked, again, at the outset of our retention, for the list, on a confidential basis of course, of the critical vendors.  That's still outstanding.

THE COURT:  All right.  Is that something you'll discuss tomorrow, Mr. Gartman?

MR. C. GARTMAN:  It is.  And I would note, they keep

saying they've requested this at the outset of their engagement.

THE COURT:  Yes.

MR. C. GARTMAN:  These were requested at the end of last week, and we're working to provide the information as quickly as we can.

THE COURT:  Okay.  All right, well, hopefully that will be provided to you, then, Mr. Finizio.

MR. GF FINIZIO:  Thanks, Your Honor.

THE COURT:  Yes.  Okay.  So is there going to be an amendment to the order, then, Mr. Gartman?

MR. C. GARTMAN:  It sounds like there will have to be.

THE COURT:  Yes.  Okay, good.

MR. C. GARTMAN:  So agenda number (sic) 14 is docket number 11, the --

THE COURT:  Yes.

MR. C. GARTMAN:  -- utilities motion.  There were minimal changes to that proposed order from the filed proposed final order.  The first set of those just incorporates the U.S. Trustee's comments from the interim --

THE COURT:  Right.

MR. C. GARTMAN:  -- hearing.  And the second set is just that the creditors' committee requested to be added as a notice party for --

THE COURT:  That's right.

MR. C. GARTMAN:  -- adequate-assurance purposes.

THE COURT:  And that's in there now?

MR. C. GARTMAN:  That is in there now.

THE COURT:  Okay, good.

MR. C. GARTMAN:  And I have a revised form of proposed order on that one.  If I can approach?

THE COURT:  Yes, you may.  Thank you.

Thank you, Mr. Gartman.  Great.  All right.  And with that representation, I will sign the order.

All right.  Signed.

MR. C. GARTMAN:  Thank you, Your Honor.  Agenda item number 15 is docket number 14.

THE COURT:  Yes.

MR. C. GARTMAN:  It's the first omnibus motion to reject certain leases.  The only response that was -- informal response that I'd like to highlight is -- we received a request from a landlord just to add some language regarding the abandoned property, and it simply -- I'll just read it out loud.  It simply says that "the landlords for the rejected leases are authorized to dispose of such abandoned property without notice or liability to the debtors or any third parties.  The landlords' rights, if any, to file claims for the costs of disposal of abandoned property are fully reserved, as are the rights of all parties-in-interest to object to such claims."  And --

THE COURT:  All right, and I think the committee was also asking to be notified of requests for adequate assurance. Is that right?

THE COURT:  I seem to recall that in the --

MR. C. GARTMAN:  That was for utilities.

THE COURT:  I'm sorry.  I'm sorry.

MR. C. GARTMAN:  Yeah.

THE COURT:  You're -- that's right.

MR. GF FINIZIO:  We did -- Your Honor, we did have another --

THE COURT:  You wanted information.

MR. GF FINIZIO:  Yeah.  On this one.

Sorry to interrupt.

MR. C. GARTMAN:  Yeah, go ahead.

MR. GF FINIZIO:  Again, on this one, this is more of an outstanding informational request.  I don't expect the committee to be able to supplant the debtors' business judgment --

THE COURT:  Right.

MR. GF FINIZIO:  -- in rejecting these.  So I'm not going to fight that fight.  I just want to underscore, again, whether it was the middle of last week or late last week, we asked for, again, something very basic for a rejection motion that's filed on the first day, what are the anticipated rejection damages.  That request, like many others, is still

outstanding.  And we would have thought -- again, we weren't asking for a precise number.  An estimate would have been fine.

So I don't object to the motion per se but want to underscore that we've asked for this information in order to do some diligence on --

THE COURT:  Yes.

MR. GF FINIZIO:  -- whether the rejections make sense at this early outset.  We haven't been provided with that information.  So it's difficult to take a position on the proposed rejections, without that.

THE COURT:  Understood.

Mr. Gartman, that should be provided to the committee.

MR. C. GARTMAN:  Yeah.  And I know that that's, again, the information that is being worked on, compiled, and will be provided to them promptly.

THE COURT:  Okay, great.

MR. GF FINIZIO:  I'd also ask, Your Honor, just to be clear, there's also a second rejection motion that has been continued, I think, to --

MR. C. GARTMAN:  That's right.

MR. GF FINIZIO:  -- to March 8th.

THE COURT:  Right.

MR. GF FINIZIO:  So we would request, both here on the record and we'll ask after the hearing, for the same request of being provided with the estimated rejection damages.  I think,

for the second omnibus rejection, unlike the first, which only deals with approximately ten leases, the second one is upwards of sixty.  So now you're talking potential big dollars.

THE COURT:  Yes.

MR. GF FINIZIO:  So again, if that could be provided, that would be good.

THE COURT:  All right.

MR. GF FINIZIO:  Thanks, Your Honor.

MR. C. GARTMAN:  And as to all information requests, we're happy to stipulate, if the requests were made, we are working as hard as we can to get the information.  We will provide the information to the extent we're able to provide that to them.

THE COURT:  Okay.  All right.

MR. C. GARTMAN:  On these leases that are subject to this motion, I just wanted to highlight, because we are requesting nunc pro tunc relief to the petition date --

THE COURT:  That's right.

MR. C. GARTMAN:  -- these are leases that we abandoned prior to the petition date.  We followed the appropriate protocol.  We handed back any keys, to the extent that there were keys.

THE COURT:  I saw that.  Yes.

MR. C. GARTMAN:  We delivered notices that said that we were clearly and unequivocally abandoning the property.  And

we included the waiver, in the motion, of any right to withdraw the requested relief.

THE COURT:  And other than the one comment from one of the landlords, there's been no objection?

MR. C. GARTMAN:  Correct.

THE COURT:  Yes.  All right, I'll be pleased to sign that order, then, Mr. Gartman.

MR. C. GARTMAN:  Thank you.  And I do have a copy of that as well.

THE COURT:  All right.

Thank you.  Thank you.

Okay.  That language change is fine and I will sign the order.

All right.  Thank you, Mr. Gartman.

MR. C. GARTMAN:  The next motion is the cash-management motion, which is --

THE COURT:  Yes.

MR. C. GARTMAN:  -- docket number -- sorry -- agenda item number 16, docket number 7.

THE COURT:  Right.

MR. C. GARTMAN:  This is one of the two that we would like to continue on an interim basis through the March 8th hearing.  And on this one, I believe that the continuance actually provides for through March 9th, in terms of the 345 waiver.

THE COURT:  Okay.

MR. C. GARTMAN:  And that's to continue to work with the United States Trustee's office with respect to UDA and other issues, and also just, again, to comply with information requests from the creditors' committee.  I do understand that they would like some language to be added to the order as well as to the pass-through-account order that would provide that any amounts that were paid to people in error would be subject to disgorgement.

I assume that we can work through some type of appropriate language on that point and submit a revised form of interim order.  We're going to have to submit a revised interim order on the pass-through-account motion in any event.  So unless they would like to say anything, we'd request that it be entered on an interim basis.

THE COURT:  All right.  Let me hear from -- I see Mr. Glassman who's risen, and I'll ask to hear from him.

MR. GLASSMAN:  Would you like to go first?

UNIDENTIFIED SPEAKER:  Go ahead.

MR. GLASSMAN:  Thank you.

Good morning, Your Honor.

THE COURT:  Good morning, Mr. Glassman.  You're here for the insurance commissioner.

MR. GLASSMAN:  I am, Your Honor.

THE COURT:  Yes.

MR. GLASSMAN:  And I would bring with me, actually -- I don't mean to complicate things, but there's another Finizio in the courtroom.

THE COURT:  Yes, there is.  I was --

MR. GLASSMAN:  So just to --

THE COURT:  I was curious about that when I saw the name.

MR. GLASSMAN:  And I'm sure appropriate disclosure's been made.

THE COURT:  Yes.

MR. GLASSMAN:  And also with me is our co-counsel, Jim Black -- James Black and Jeff Miceli from Black & Gerngross, who are longtime litigation counsel for the receivers --

THE COURT:  Yes.

MR. GLASSMAN:  -- who are, in serial way, the insurance commissioners.  We brought them here just in case, because we got Mr. Feltman's declaration very late last night. We thought we might need to pull some of the threads apart by way of cross-examination.  So --

THE COURT:  Yes.

MR. GLASSMAN:  -- ultimately if the declaration's proffered, we will want to reserve rights.

Having said that, I'm here for Trinidad Navarro, who is the receiver of Ullico Casualty Company.  And there's a long background.  I'm representing an estate, too, just as Jones is

and purported -- proposed committee counsel.

THE COURT:  Yes.

MR. GLASSMAN:  And the estate -- the insolvency estate of Ullico is substantial in that the Guarantee funds have paid out more than 300 million.

THE COURT:  I -- yes, I was amazed --

MR. GLASSMAN:  So --

THE COURT:  -- to see that number.

MR. GLASSMAN:  Yeah.  This is -- our concern primarily is that Patriot --

THE COURT:  And you're talking about for the various states, I assume, the Guarantee?

MR. GLASSMAN:  Well, yes.  And of course, that's funded by policyholders' premiums in part --

THE COURT:  Yes.

MR. GLASSMAN:  -- small part, in unrelated covers -- unrelated insurance.

The -- so there's a long history.  And I'll try to keep this short, because there's good news and there's -- in the sense that we finally had a conversation with Mr. Feltman, the CRO, just before the hearing started.  We did get a call last night from general counsel of the debtors, and we understand their position that there is no Ullico assets in these debtors, which had been renamed, or not so much renamed but have taken the name Patriot, whereas the old Guarantee --

or the Guarantee entities took the name Guarantee.  It's -- and I recognize that Mr. Feltman is here to help further the reorganization.

We're not trying to be critical of anything that he has said or done, but we do have questions still his declaration doesn't answer for us -- or doesn't give us assurance that some of the money that used to be collateral for Ullico when the Patriot entities had the pen, and the collateral was to cover the deductible -- because dollar one had to be paid by the insurer.  And also, there was collateral to secure reinsurance obligations from Captives (sic), some of which were, as I understand it, singular for the insureds, and some of which were more globally used to cover multiple risks.  That's just my understanding.

The -- there has been a dispute with respect to -- or not an understanding with respect to whether or not that collateral is really the Ullico estate's assets or the insured's, because, as I understand it, with this business model, Patriot's customers, to a certain extent, at least were the insureds --

THE COURT:  Right.

MR. GLASSMAN:  -- and they needed somebody to -- so Patriot was doing most of the insurance stuff, except not putting its own capital at risk.  The insurance companies that -- Guarantee, Ullico, it was their capital that was at

risk.

THE COURT:  Right.

MR. GLASSMAN:  So in 2013, Ullico was placed into rehabilitation and then liquidation and, very soon after that same year, Patriot underwent the restructuring.

Eventually, Ullico went into liquidation.  Vice Chancellor Laster presides over that insolvency proceeding. He's ordered everybody to make an accounting.

THE COURT:  Right.

MR. GLASSMAN:  So why am I here?  Well, we're concerned that Ullico's assets are collateral that were transferred to any Patriot account, including but not limited to the restricted accounts, might have come -- they might -- frankly, might have been improperly transferred.  That is the concern.

The entities that were moved from the nondebtor Guarantee Insurance Company silo of the Patriot org structure to the Patriot Services silo suggests that assets or collateral may have been moved as well.  We don't know -- well, for example, take Mr. Feldman's (sic) deposition -- declaration. His declaration is that, based upon his knowledge or the books and records or the fact that the liquidation preceded the establishment of the restricted accounts, that there couldn't be any of these assets.  Well, I don't think he was there then, so it was (sic) --

THE COURT:  No.

MR. GLASSMAN:  -- personal knowledge.  The books and records, we're concerned, may show what we believe to be Ullico collateral to be the insureds' assets, because the insureds were the customers and then you see they got a new insurance carrier to issue the policies.  But we don't know what happened to the money in those accounts, because those accounts -- some of them were titled in the name of Patriot.

THE COURT:  Okay.

MR. GLASSMAN:  So that's the -- we're not trying to --

THE COURT:  Yes.

MR. GLASSMAN:  -- stop anything here.  The reason why we wanted an accounting is because we wanted to know the source of those revenues.  There's twenty-two to twenty-six million dollars missing.

THE COURT:  Twenty-two to twenty-six million?  You --

MR. GLASSMAN:  Yes.  So that's why we said don't use the restricted accounts until we get an accounting.  Now, we've been told that would be burdensome.  Okay, but your interim order already says that they can trace it to the insurers.  So we just want to see where the money came from.

I almost served discovery yesterday and I said, wait a second, you know what, I'm going to wait till I get the hearing before the judge.

THE COURT:  Right.  Right.

MR. GLASSMAN:  In our conversations with Mr. Feltman, he said he'll work with us.  Okay.  That's helpful.  This is a fast-track bankruptcy.  Well, I question whether or not it's really a melting ice cube the way -- okay.  But it shouldn't be that hard to tell us where the money came from in these accounts.  It just shouldn't be that hard, I don't think.

But we aren't trying to stop the train.  And if this is being done on an interim basis, let us have the accounting before it goes final.  We'll work with them.  We probably will interpose some discovery just so it's formal, but we'll work --

THE COURT:  Right.

MR. GLASSMAN:  -- with them.  And if we have to come to Your Honor, we'll come back.

I would like in the order a decretal paragraph that says Ullico's assets can't be used.  I understand there's going to be a disgorgement provision.  The order already says they're not -- that what's in there is not property of the estate.  So if they don't have Ullico's assets, then I don't see how it hurts to put in the order that they won't use any Ullico assets.

Let's see.  What else do I need to say to you?  I think that's about it.

THE COURT:  All right, let's hear what -- let's hear what the debtor has to -- debtors have to say.  Someone else wishes to be heard?

Thank you, Mr. Glassman.

MR. GLASSMAN:  Thank you, Your Honor.

THE COURT:  Good morning.

MR. ALBERTS:  Good morning, Your Honor.  Sam Alberts from Dentons, on behalf of Travelers.

THE COURT:  Yes.

MR. ALBERTS:  This has to do with just item number 17 on the agenda, which is the pass-through.

THE COURT:  The pass-through.  Yes.

MR. ALBERTS:  Travelers does not oppose another interim order being entered until March 8th, which is when I understand a final hearing will be held.

THE COURT:  Right.

MR. ALBERTS:  That's fine with us.  We would, if there are any changes to the order other than the date, like to see a copy of it before it's entered.  There was a statement made about disgorgement.  It is Travelers' position -- and I wouldn't be surprised if it isn't all of the other insureds' -- that this isn't property of the estate, so there's nothing to disgorge.

But that's an issue that we can take up.  We do want to see a copy of the order before it's proposed to enter, unless it's just going to change the dates, and then we're fine with it.

THE COURT:  And you're certainly entitled to see that,

Mr. Alberts, and I'm sure the debtor will show it to you and they'll get that to you.  And then if you have a concern with it, you'll raise it with me.

MR. ALBERTS:  Exactly.

THE COURT:  All right.

MR. ALBERTS:  Thank you, Your Honor.

THE COURT:  That's fine, Mr. Alberts.  Thank you.

Mr. Gartman, how about Mr. Glassman's request that there be a paragraph that says Ullico -- basically, Ullico's assets can't be used here?

MR. C. GARTMAN:  Well, I think it begs the question and continu -- since we were just continuing this, I thought that we would just allow them to reserve their rights for now and we would deal with any issues at the March 8th hearing.

I would like to respond in general to some of the points that were made.

THE COURT:  Yes.

MR. C. GARTMAN:  Obviously, we filed the supplemental Feltman declaration last night.  To the extent that there is any desire to cross-examine on that, I would suggest that that be held until the March 8th hearing.  But we would like to move that into evidence at this point, subject to that reservation.

THE COURT:  Any objection, Mr. Glassman or anyone else, to admitting the Feltman declaration into evidence?

MR. GLASSMAN:  No, Your Honor.

THE COURT:  All right, it is admitted.

(Declaration of James Feltman was hereby received into evidence as a Debtors' exhibit, as of this date.)

MR. C. GARTMAN:  Thank you, Your Honor.

So I guess the question that we have is why is Ullico here.  They have -- we tried to talk to them yesterday.  I understand there were some further discussions this morning.

THE COURT:  Yes.

MR. C. GARTMAN:  We asked what evidence do you have that would suggest that we have any of your property.  Remember, these are -- we're now five years after this entity was put into receivership.  These are restricted accounts, a pass-through account, that hold property for an incredibly short period of time; we're talking days to a month.

The pass-through account is an account that we didn't even acquire until late 2015, early 2016, from a third party that had nothing to do with a debtor entity or a Guarantee Insurance entity.  So there's literally no possibility that that account, which is funded by third parties, would have any property from an entity that went into receivership and has been under supervision for five years.

Same thing, frankly, with the restricted accounts, due to the fact that -- as the motion describes, the way that those accounts operate and the fact that these are amounts that are being essentially passed through, similar to the pass-through

account, for a short period of time and a limited purpose, from Party A to Party B.

THE COURT:  Yes.

MR. C. GARTMAN:  This isn't debtor funds that are being held in there.  And this -- we said this in the declaration as well, but Patriot National, Inc. was not even formed until 2014 after the receivership proceedings began. The fact that there are Patriot entities that are now part of Guarantee, those are not -- and there happen to maybe one or two entities that have the same name currently in the Patriot structure, that's a coincidence.  I mean, these aren't the same entities.  They're not debtor entities.

So as far as we're concerned, there isn't even standing to raise these issues.  Okay, this is nondebtor issues.  When we asked what prompted this, the response was that they are owed around twenty-two million dollars and the restricted accounts happen to have around twenty-two million dollars and, therefore, that must be the answer.  Well, just because an account has a certain dollar amount in it and you owe me that -- or I owe you that amount or somebody owes you that amount does not mean that that is the same property. They've offered absolutely no basis whatsoever to suggest that we are holding their property.

We have now put in a sworn affidavit that says we are not -- none of the property in those accounts is Ullico

property.  We think that's more than sufficient but, like I said, we believe that's an issue that should be reserved for the final hearing.

THE COURT:  Mr. Glassman, I -- as I hear what Mr. Glassman is telling me, they have concerns and they've been directed to obtain accountings from various entities.  And that's what they're looking for from Patriot at this point.

MR. C. GARTMAN:  But an accounting, Your Honor, of, what, five years' worth of 300 accounts' worth of transfers?  I mean, we're talking about an incredibly expensive, incredibly time-consuming, burdensome process that would frankly last longer than these entire cases.  We need to operate these accounts in order to let the business proceed.  And if these accounts can't operate, we're going to be facing liquidation.

So basically what they're trying to do is halt the entire proceedings here to account for property that they have shown absolutely no basis even might remotely be in these accounts.

THE COURT:  All right.

Mr. Glassman, I assume you're talking about a more confined period of time than five years.

MR. GLASSMAN:  Yes, but I don't think getting a list of the sources of the funds into those accounts, the names, necessarily is as burdensome as counsel suggests.  If we really wanted to try to hold it up, we'd be saying please don't use

these accounts until they give us the accounting.  We're not saying that right now.  We're trying to work with them.  And, for example, if one of the sources of the accounts was Guarantee Insurance Company, we got issues.  Doesn't mean that the money was misappropriated, necessarily, but we'd like to know -- we have to ask, Your Honor.

THE COURT:  All right.

MR. GLASSMAN:  Thank you.

THE COURT:  All right.  I think -- am I right, Mr. Glassman, this is -- these are issues that can wait until the final hearing and that you can be having discussions in the meantime?

MR. GLASSMAN:  Well, yes.  We -- look, if they give us the wrong data, we'll do the forensic accounting.  The receiver's professionals will do that --

THE COURT:  All right.

MR. GLASSMAN:  -- if need be.  We will work as quickly as we can.  We just don't know.  Yes, neither -- the absence of data is not dispositive on whether or not we should be allowed to get data, not under the Code at least.

THE COURT:  Right.

MR. GLASSMAN:  Thank you, Your Honor.

MR. C. GARTMAN:  Your Honor, let me just --

THE COURT:  Yes, Mr. Gartman.

MR. C. GARTMAN:  So I just spoke with Mr. Feltman and

he reiterated that we're willing to work with Ullico between now and the March 8th hearing, and we'll do our best to provide the information that would identify the sources of the funds in these accounts.  Again, even that is an incredibly big ask, but we're willing to do our best in that time period and see if we can work this out.

THE COURT:  All right.

MR. C. GARTMAN:  The current source of funds in the accounts presently, not five years' worth of -- going back through thousands and thousands of transactions.

THE COURT:  Well, we'll find out, of course, if that's sufficient for the insurance commissioner, for the receiver.

Yes, Mr. Finizio.

MR. GF FINIZIO:  Gianfranco Finizio, proposed counsel to the committee.

Just wanted to clarify that, with the disgorgement language in the second interim order, the committee would be okay with just one other -- should be noncontroversial ask, which I highlight I did not -- this has not been previewed yet, but it should not be controversial.

Weekly or bi-weekly reporting of post-petition intercompany transfers -- willing to work with the company on whether it's weekly or bi-weekly.  Again, not trying to slow -- make things difficult for you.  But we could decide on something following the hearing.  And I think that, with those

two changes -- the disgorgement and weekly reporting -- the committee would be okay with the order.

THE COURT:  Okay.  All right.  And that will of course, I assume, wait for the final order.  Is that correct, Mr. Finizio?  That's to be in the final order --

MR. GF FINIZIO:  We --

THE COURT:  -- the bi-weekly or weekly reporting?

MR. GF FINIZIO:  The final order would be okay but, just to be clear, we're talking about cash management, right?

THE COURT:  Yes.

MR. GF FINIZIO:  Right?  Okay, because we were going --

THE COURT:  Well --

MR. GF FINIZIO:  -- back and forth between --

THE COURT:  That's right.

MR. GF FINIZIO:  -- pass-through -- so with cash management, disgorgement language, and some weekly or bi-weekly reporting on intercompany movement of funds, committee would be okay with cash management.

THE COURT:  Okay.  All right, thank you.

Ms. Casey, are you all right with the cash-management interim order?  I know that the U.S. Trustee had issues, and --

MS. CASEY:  Yes, Your Honor.  The U.S. Trustee is the one who asked that it be another further interim order --

THE COURT:  Okay.

MS. CASEY:  -- because we do have banks that have not executed UDAs yet and we need --

THE COURT:  Right.

MS. CASEY:  -- time to continue to work with the debtors and the banks to determine the position of the U.S. Trustee.

THE COURT:  Okay, great.

MS. CASEY:  Thank you.

THE COURT:  Thank you.

MR. C. GARTMAN:  Just a second, Your Honor.

THE COURT:  Of course.

(Pause)

MR. C. GARTMAN:  Thank you, Your Honor.  So on the reporting of the intercompanies, what I just discussed with committee counsel is that we'll work with them after the hearing to come up with some appropriate language.  But the bottom line is that all such transactions flow up through -- under the payment system that we have -- the accounting system that we have, flow up through the main entity.

And so it may not be the issue that the committee believes it is, but we're happy to discuss that with them after the hearing and provide some type of reporting that makes sense.

THE COURT:  Okay.  That's fine.

MR. GF FINIZIO:  Fine with that, Your Honor.

THE COURT:  Great.  Thank you, Mr. Finizio.

MR. C. GARTMAN:  So other than that issue, Your Honor, I mean, I don't believe there are any other issues on the cash management.  And subject to those changes, we would request that that be approved on an interim basis.

THE COURT:  Subject to those changes, certainly I will approve the interim order.

MR. C. GARTMAN:  Okay.  Thank you.

I believe, effectively, we just dealt with the next --

THE COURT:  That's right, the pass-through.

MR. C. GARTMAN:  -- item as well.

THE COURT:  Absolutely.

MR. C. GARTMAN:  So --

THE COURT:  Exactly.

MR. C. GARTMAN:  -- unless Your Honor has any questions on that one, I propose the same protocol.

THE COURT:  That's fine.

MR. C. GARTMAN:  Okay, so the next agenda item is the DIP motion --

THE COURT:  Yes.

MR. C. GARTMAN:  -- which is agenda item number 18, docket number 18.  We did file last night an omnibus reply and a motion for relief to file that reply late, and we did need to do so because of the extensions that were provided to various parties to file objections through Monday.

THE COURT:  That's right.

MR. C. GARTMAN:  And we got another one yesterday, which was a late reply from Mr. Mariano, and so we wanted to include that as well.  So that is the purpose and the reason that we waited to file the omnibus reply.  So we --

THE COURT:  I understood that, yes.

MR. C. GARTMAN:  Okay.  With respect to the DIP motion itself --

THE COURT:  I think Mr. -- is this time that we should hear Mr. Posner?

MR. C. GARTMAN:  Sure.

THE COURT:  I think he wants an adjournment of this motion and we might as well hear from him now.

MR. C. GARTMAN:  Sure.

THE COURT:  Okay.

MR. C. GARTMAN:  Thank you, Your Honor.

THE COURT:  Yes.

MR. POSNER:  Again for the record, David Posner, Kilpatrick Townsend and Stockton, proposed counsel to the committee.

Let me set the table from the committee's perspective, Your Honor, and maybe provide an alternative version to what you heard from Ms. Coleman.  And I listened to what Ms. Coleman said and I think she had two themes to her presentation. Perhaps the Court will agree, perhaps Ms. Coleman will

disagree, with what I heard the themes are.  The first, she stressed, was demonstrated benefit.  She said no one has shown a demonstrated benefit for why an adjournment of the milestones or the timing are necessary.  And then the second, sort of, overall theme was it's all okay because we have this trust and this trust is going to go into place and that's going to deal with all of these claims and litigations, and everybody should feel -- my words -- warm and fuzzy about that, because we have this mechanism.

Your Honor, I don't think the standard is demonstrated benefit.  I don't think there's a standard of demonstrated benefit anywhere.  The committee is a fiduciary; it was appointed; it has a fiduciary duty to discharge.  It -- on the current fast track, when the plan confirms, the committee automatically dissolves.  So I don't get any warm-and-fuzzies out of the trust, from a perspective of discharging my fiduciary duty on behalf of my client.

Further, Your Honor, when that trust goes into place, Cerberus, under the current contemplation of the plan, appoints two of the three members of that board.

THE COURT:  Right.

MR. POSNER:  And the trustee is selected by a majority vote of the members of that board, so effectively by Cerberus.  And then that's the mechanism which then goes forward.

And so, again, I don't think, from the perspective of

the committee discharging its fiduciary duty, while the trust, I think, is a beneficial thing overall -- and the committee's not opposed to the concept of a trust; it's nice to see already baked into a proposed plan.  I don't think it gets there in terms of us doing what needs to be done in the Chapter 11.

And so I circle back on I don't think the standard is demonstrated benefit.  The committee was appointed on the 16th in the evening; that was a Friday of President's Day Weekend. The committee convened and met on President's Day, had interviews for counsel and selected Kilpatrick Townsend.  We then promptly convened a call of the committee on Tuesday and decided to interview financial advisors on Wednesday, and we selected Province (ph.); that was the 21st.  That was a week ago, Your Honor.

Since the hiring of those professionals, on last Thursday we sent out to the debtors and the lenders' counsel a DIP-issues list and we sent out a list of questions and comments to all of the first-day motions.  Since that time, we had almost no substantial conversations with the debtors' professionals on the pending motions.  In fact, if I hadn't called Mr. Margolin and Mr. Gartman yesterday to find out what the lay of the land was for today, I'm not sure they would have talked to us about cash management, wages, critical vendors, or the pass-through account, before this hearing.

We had one conversation with Ms. Coleman right after

we were hired; I don't think that was largely a substantive conversation other than to tell her we were hired, to tell her that -- that was on Wednesday -- to tell her that Province was selected, to tell her that Province's offices were ten minutes from the company's offices and we'd love to get in there the next day to hit the ground running.

We had a conversation on Monday about the topic of a fee examiner because the U.S. Trustee's office inquired and we discussed it with the debtor because the U.S. Trustee was asking about it.  I'd say, Your Honor, that that's probably the last hair on the tail that's wagging the dog in terms of importance.  But for the record, committee's not in favor of a fee examiner, and we can talk to Ms. Casey about that.

So we've -- and we've had no conversation with the debtors' professional about the DIP or our DIP-issues list at all.  Our financial advisor has yet to get an audience with the debtors or their professionals, despite, as I said, being ten minutes away.  And our financial advisor -- although we've gotten access to a data room, we've had -- gotten very little financial information.  And as you've heard, Province is first meeting with the debtors and Duff & Phelps tomorrow, Your Honor.

We have had a conversation with the lenders' counsel regarding the DIP issues; that occurred on Friday.  I thought it was a productive call that we had with Mr. Harris.

Obviously, he's an experienced professional like we are.  I don't think any of our issues came as a surprise to him. Indeed, he said as much.  And he said he was going to need to speak with his client, and then we didn't hear anything until we got a marked order last night, which largely doesn't address any of our major issues.  And Mr. Harris made a proposal to me this morning, which, in the spirit of cooperation and productiveness, was welcome, but I have to say I haven't had a chance to talk to my client about it, let alone the committee's financial advisor.

We did actually attend the 341 meeting yesterday, Your Honor.  Pretty unusual for a committee to do that.  Usually the 341 isn't in a timingwise -- but given that we were largely getting radio silence from the debtors, we thought we'd attend. And we -- Mr. Feltman was there and we actually questioned him. I'm not sure when the last time committee got an opportunity to do that.

We didn't find out very much about the various motions yesterday or about what was going to happen today, but we did learn -- we did learn, consistent with the record that was made at the first-day hearing, that it's not clear that the debtors need the DIP approved today other than to provide assurances to the market.  And Mr. Feltman testified at the 341 that they need to make a draw next week, but that's to repay the pre-petition collateral advances of five million dollars that were

made and which the lenders want to roll up, essentially.  Mr. Feltman said there weren't any other draws on the DIP to date. And so we did learn that -- we did learn that today.

As the Court knows, the case is moving on an incredibly fast track, and that's -- and when you couple that with the lack, so far, of meaningful dialogue with the debtors, it makes it virtually impossible for the committee to discharge its fiduciary duty.  And quite frankly, Your Honor, it runs the risk of perverting the Chapter 11 process.

I think a little more context is warranted, Your Honor.  I think it's in all the papers but I don't know that it's all been said in court:  this case didn't just fall from the sky in a freefall; there was an RSA that was filed with an 8-K back in November, which means probably that that RSA was worked on prior to it being filed with the 8-K.  So at least at some point in November, the broad parameters of what this Chapter 11 was going to ultimately look like were being agreed upon.

The RSA has a no-shop provision, Your Honor, and it also requires the debtor to make reasonable efforts to obtain approval of the DIP, the disclosure statement, and the plan. Not uncommon provisions for an RSA, with exception maybe of no-shop versus go-shop.

So effectively the debtors have been locked up since November.  The debtors couldn't shop for an alternative DIP and

they couldn't look for an alternative transaction other than the transaction that was on the tables.  By their own admission, at the first-day hearing the debtors didn't shop the DIP.  I think it's a little bit disingenuous and a misnomer to say the evidence, as they say in their supplemental declaration filed last night, established that there were no other DIP alternatives.  But there was no contrary evidence presented at the first-day hearing.  They affirmatively said, we didn't go out and shop for a DIP.  And they explained why from their perspective it didn't make sense to.

So since November, Your Honor, they've known the path, yet inexplicably they waited until the end of January to file for Chapter 11.  When we asked Mr. Feltman why that was yesterday at the 341 meeting, there, I'm told, was about a thirty- to forty-second dead silence before Mr. Feltman gave an answer which, no offense to Mr. Feltman, I would characterize as a wax-on, wax-off, obfuscated response to that question, recognizing there probably was some attorney-client privilege there as well.

So they file, and here we are at the second-day hearing with not a lot of informational progress.  We got an NDA for the first time, last night, after asking last week whether the debtors wanted to go with an NDA or would be satisfied with the confidentiality provisions in our bylaws, which we promptly sent them.  We got the NDA back to them last

night and we haven't heard yet whether it's acceptable.

There's a disclosure-statement objection due tomorrow, Your Honor, because there is a disclosure-statement hearing set for March 8th.

THE COURT:  Right.

MR. POSNER:  And as we stand here today, though the SOFAs and the schedules were filed late last night/early this morning, there is no valuation information on file, there is no liquidation analysis on file, and there are no pro forma P&Ls on file.  The disclosure statement, in our view, has gaping infirmities and it won't be a surprise to you, Your Honor, that we're going to file an objection tomorrow.

Yesterday at the 341 when we asked Mr. Feltman when would those items be filed, the valuation and the liquidation analysis, he said they'd be filed shortly to meet the required deadline.  I'm not exactly sure what that means, Your Honor.

But again, Your Honor, I mean, the path and pace at which this case is moving, and our inability to discharge our fiduciary duty, runs the risk, we think, of possibly an abuse of the Chapter 11 process.

This is a sophisticated committee, Your Honor; you're not dealing with a bunch of trade vendors who are participating in their first rodeo.  We have bankruptcy profess -- sophisticated bankruptcy professionals who are representing their clients on the committee, and so it won't come as any

surprise that they're experienced, they've seen this movie before, and no one's pulling the wool over their eyes.

When you cut through it, here's what we know -- what we think is going on here.  And we could be wrong and be proved wrong as we get further into it with information.  Service (sic), for reasons it understands, and it only stands -- it understands only -- appears to want this asset, wants to keep the company alive.  The debtors, perhaps in an effort to avoid liquidation and preserve jobs, has largely rolled over.  Like I said, there's a no-shop and they didn't look for an alternative DIP.

Under the current plan on file, when you sort of cut through it and parse it, Your Honor, Cerberus acquires the equity on a fast track and they get repaid or they get covered the following items before unsecured creditors see any part of that twenty percent portion of the trust:  They get the litigation-trust expenses back.  They get the litigation-trust facility repaid.  They get the DIP and the exit facility repaid.  They get all other admin and priority amounts that aren't already covered in some way, shape, or form in the budget, paid.  And by the way, the litigation trust has to bear the cost and expense of any claim's objections that the plan administrator decides to pursue.

So maybe creditors see something here and maybe they're not (sic).  Cerberus gets all the upside if they sell

after the Chapter 11.  And oh, by the way, our financial advisor tells us there's perhaps as much as a seventy- to a hundred-million-dollar NOL which gets preserved.

So basically, other than converting their debt into equity, if the causes of action are as valuable as perhaps people think they are, the case doesn't end up costing Cerberus anything, other than, of course, converting their debt to equity, which I don't want to totally pooh-pooh, because it's not an insignificant amount of money.

You could ask yourself, Your Honor, why do they need a Chapter 11; they could have just foreclosed on their collateral outside of Chapter 11.  Of course, that doesn't necessarily preserve the NOL.  It doesn't provide a possible vehicle to tame the, quote-unquote, "chaotic litigation".  And obviously, it doesn't provide them with releases, which they get under the plan.  And the debtor has stipulated under the DIP, subject to the challenge rights, that there are no claims or causes of action against the lenders.

So, Judge, if they want a Chapter 11 process, it's got to be done right, it's got to provide creditors with an opportunity to discharge their fiduciary duty, and they have to pay the freight.  And so -- I know in our papers we had asked for a two-week adjournment of the DIP.  I think the record at the first-day hearing and Mr. Feltman's testimony at the 341 substantiate the fact that this does not need to go final

today, other than it's everybody's desire for it, other than ours, for it to go final today.

I would like to continue to have a dialogue with Mr. Harris to see if we could resolve our differences on the DIP. Not going to be able to do it this morning on the fly without the ability to talk to my client and my financial advisor, since part of his proposal affects them as well as us in terms of dollars and cents in the budget.

And so I think at a minimum, a one-week adjournment to the 8th makes sense. A two-week adjournment would be better. But obviously a draw has to be made. Other than the draw, we pay the five-million-dollar collateral advance, because we're not yet convinced that that's warranted. But if other draws are necessary -- and no one's looking to shut the company down or make it impossible for them to operate.

The other -- I have a whole laundry list of DIP items.

THE COURT: I know you do. Yes.

MR. POSNER: And so before I launch into them -- because I don't want to take the Court's time and everybody's time if we're going to --

THE COURT: And they may -- some of them may be resolved if we --

MR. POSNER: Yeah.

THE COURT: -- grant the adjournment.

MR. POSNER: Correct, if we get the adjournment. I

mean, the only other overall thing is, Your Honor, we did take the position in our papers -- this comes -- circles back on my opening remark about demonstrated benefit.  I --

THE COURT:  Yes.

MR. POSNER:  I don't know how I could possibly, notwithstanding the fact that it's not the standard, demonstrate a benefit when I'm still largely operating in a vacuum.

We think all the milestones and deadlines should be rolled ninety days to give sufficient time for us to discharge our fiduciary duty.  I know everybody's up in arms over that. We're reasonable people.  That's an ask.  We'd obviously be willing to consider something else.  But the current trajectory makes it very hard.  There's a lot of -- as Your Honor knows and has read in the papers, there's a lot of stuff here.  And while maybe we don't have to flyspeck every aspect of every litigation that's going on, we have to have some basic understanding as it relates to value and the value of this company and the value of what's going in the trust, and it's very hard to do that with that massive amount of information, on the timetable that this case is on.

And my last comment, Your Honor, is I don't think the standard here is a 363 standard in the sense that Ms. Coleman said, well, if we came in here on a 363, everybody wouldn't be making this noise.  (a) I don't know whether I would be making

that noise if we came in here on a 363, and (b) even on a 363, the case gets out of Dodge somehow, Your Honor.  And so even if this were teed up as a 363 sale on a ninety-day time frame, whether that's an appropriate time frame or not, you'd still have to dispose of the Chapter 11 case, whether it's by conversion or confirming a liquidating plan.  And there would be work for a committee to do in that regard.

And so I don't think just making the argument that, gee, if we were coming in here on a 363, we wouldn't be having this conversation is appropriate.  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Posner.

Ms. Jones.

MS. JONES:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. JONES:  Laura Davis Jones of Pachulski Stang Ziehl & Jones.  Your Honor, I rise just on a very narrow but important point, and I'm going to yield to Ms. Coleman with respect to the other issues.

Your Honor, I rise because the characterizations of Mr. Feltman's responses at the 341 are just not accurate.  Your Honor, neither Mr. Posner, Mr. Finizio, or frankly anyone from the Kilpatrick firm, attended that 341 meeting.  I did attend it with Mr. Feltman.  Mr. Feltman's a very thoughtful professional.  Unlike some of us who are asked a question and start answering before the person even gets the question asked,

he listens to a full question.  He's very polite.  And when he fin -- question's finished, then he responds.

So if you want to make that a thirty-second obfuscation, whatever the words were, then I think, to echo a word we said earlier, reckless assertions on this record, Your Honor, it's really unfortunate to have reckless characterizations of a professional.

Mr. Feltman has come in.  He's been the CRO of this company.  Your Honor has seen his declaration.  I'm sure Your Honor has probably seen him in other cases.  And, Your Honor, to tell you how we tried to work through any issues the committee had yesterday, despite the Kilpatrick firm not being there, I received a compliment from Ms. Casey at the end that she admired my patience.

So, Your Honor, that's unusual for me.  I'm not known to be too patient at a 341, given my litigation training.  And, Your Honor, we gave them all the time in the world.  The fact that Mr. Feltman doesn't speak as quickly as I do, frankly, I see as a compliment to him and not something that should have been so rudely put on the record.

THE COURT:  All right.

MS. JONES:  And, Your Honor, I'm going to yield to Ms. Coleman.

THE COURT:  All right.

Ms. Coleman, yes.

MS. COLEMAN:  Thank you, Your Honor.  Your Honor, I don't think we have -- really have time to -- for me to address everything that Mr. Posner raised.  He obviously doesn't like a whole lot of things about this whole case.  And I appreciate that when you're a hammer, everything looks like a nail.  I get that.  We're here on a DIP motion, Your Honor.  The debtor is seeking approval of financing which it needs, which it needs now.  You don't have to take my word for it, Your Honor, if you don't want to.  We've got evidence on the record supporting that.  And I think that we should go to the merits of that.

And I don't believe that Mr. Posner has either articulated or offered any evidence to the contrary that the debtor needs this financing.  And this case is not about structuring it so that the committee has plenty of time to investigate a bunch of causes of action that there is already provision to be investigated and handled and indeed may constitute significant assets of the estate.

So there's no reason that either the debtor or Cerberus, for that matter, would want to give those things up.  That's not what we're talking about here.  We're talking about the -- we're talking about the DIP motion.  And I understand Mr. Posner had to make a statement, had to make a speech, and I appreciate that.  I could dispute a lot of the things that he said, but I'm not going to take the Court's time with doing that.  I think we should proceed with going forward with the

DIP motion and if there are any issues that are raised with respect to the DIP motion.

What I know for sure, Your Honor, is that on March 6, which, last time I checked, comes before March 8th, I go into default if I don't have a final order. That's in the DIP milestones. So -- and I have not -- I have neither asked Mr. Harris if his client will agree to waive that, but I have to respect that, Your Honor. And I cannot stand here and tell you that it would be a good thing for the estate or for -- frankly, for Mr. Posner's constituency, for this debtor, to go into default and have all the consequences that could result from going into default on March 6.

THE COURT: Well, my concern here, Ms. Coleman is the lack of information that's been provided to the committee. And I don't know how they contest the debtor-in-possession financing without that information available to them.

When you come in with a fast-paced case, you have to be prepared to be fast-paced in providing information. And I don't think that the debtor has done that -- the debtors have done that. And if I'm wrong, please tell me.

MS. COLEMAN: Well, I think, Your Honor, you have gotten information that isn't a complete picture. For example, immediately upon the appointment of the committee, we provided the results of the lien search. Immediately upon the appointment of the committee, Mr. Harris, in fact before the

committee was -- well, when the committee was appointed, even before they chose counsel, Mr. Harris was putting together -- and he can speak for himself, obviously, as well, but he was putting together a package of all of the financing documents to provide to counsel and financial advisor to the committee as soon as they were appointed, which we did -- which he did.  We provided the lien-search results.  I think Mr. Harris probably provided his lien searches as -- lien-search results as well.

It's disingenuous for Mr. Posner to say that we didn't talk about the DIP-issues list.  We didn't talk about the DIP-issues list with him because those are Cerberus' issues, not the debtors' issues, to deal with.  He did have a long substantive conversation with Mr. Harris, as he said, on Friday of last week.  But the fact that there wasn't a conversation with the debtor, those are not -- those are not issues for me to deal with, and I can't provide any substantive results to those.  And those discussions obviously continue.

But it's not accurate to say that we have not provided information, Your Honor.  We have engaged with them.  In fact, the committee still has not agreed to our form of nondisclosure agreement, which obviously we need before we can provide. However, notwithstanding that, because of the Delaware Local Rule, we were able to open up the entire data room, which we did last week, right after the committee was appointed.

So it's not true to say that we have been stonewalling

or that we haven't provided information.  There've been some items of information where they've asked for information in a form that does not exist and that has to be created.  And Mr. Feltman's team is in the process of trying to create the information in the form the committee's asking for it.  But I think full access to the data room and the financing documents and the lien searches is certainly a very good start.

So it's not true to say that we did not provide information.  They certainly have the ability -- and as you can see, they certainly had the ability to come up with their DIP-issues list, which was a couple of pages long.  So they had information from that.  All you need to do to come up with that list is to read the DIP agreement.  So I don't think that's -- and you can read the transcript of the first-day hearing, where Ms. Casey very ably raised a bunch of the same -- of the same concerns.

So I do need to push back on the concept that the debtors have not provided information, because that's simply not true.  We haven't given them everything they've asked for, yet, but the stuff we haven't given them is stuff that either doesn't exist or that is irrelevant to the DIP.  I don't think they would argue that the need for a list of reimbursement expenses that's been asked for is part of the DIP.  That's part of the employee motion.  We've dealt with that otherwise.

THE COURT:  Well, let me say this to you:  Very often,

lenders will come into court and they'll say, this is the deal and, if you don't like it, Judge, we're sorry, we'll walk.  And that always concerns me.  And I cave in on a lot of the issues. I'm less concerned with that here, given the nature of this transaction.  And I have some issues, myself, with the DIP financing.  I don't know that some time wouldn't be helpful.  I think it would be helpful here.  If you insist on going forward, we will go forward.  But I have to tell you, I'm unlikely to approve the DIP financing in its present form, which means there is some discussion to be had.

MS. COLEMAN:  I think that would be productive, Your Honor.

THE COURT:  And I don't know that you want to have it today; if you want to have it over the week; if you want to come back on March the 8th.  I mean, I can ask Mr. Harris if they will be willing to waive that cause.  But those are real concerns that I've got with going forward today.

MS. COLEMAN:  No, I understand, Your Honor, and I don't mean in any way to minimize those concerns.  I was simply pushing back on the concept that we had not provided information.

I do think we're missing a very important person at the podium.

THE COURT:  Yes.  Yes.

MR. POSNER:  Let me -- Your Honor, just --

THE COURT:  Mr. Posner.  Yes, sir.

MR. POSNER:  Yeah, just briefly.  Ms. Coleman is correct; we got access to a data room.  Ms. Coleman is correct that we got the lien searches from Hughes Hubbard & Reed, and we did get a disk from Mr. Harris.  Leave aside the data room for a minute.  There is a lot in the data room; Ms. Coleman is correct.  The lien searches on the disk is somewhat self-serving, Your Honor, in the sense that we have the sixty-day time period within which to complete a review of the liens and all other challenges besides -- that's one of my issues with the DIP, but I won't launch into that.  And we have a 25,000-dollar budget to do that.  That's all, I think, provided for in the Local Rule.

So yes, it is true, we got that information promptly, but that in my mind is a little bit self-serving because, ticktock, the clock was running and, if they hadn't given it to us, you'd hear me -- you would have probably heard me coming and saying, Judge, we don't even have the stuff we need to do the lien review.  But we did get it, and so we've commenced the lien review.

As far as other information, Your Honor, we need our FAs to get in there.  We got a budget with some backup, but they really need to understand it and get into it, and that's the point of meeting with the debtors' professionals, and that's not happening till tomorrow.

I'm going to turn the podium over to Mr. Harris, who's been waiting patiently.

THE COURT:  All right.

Mr. Harris, it's good to see you again.

MR. HARRIS:  Good to see you, Your Honor.  Always a pleasure to be here.

Your Honor, I'm going to -- I'm going to hold my tongue on characterizations, which both sides have thrown out here.  And even the history of how we got here since the committee was appointed on the 16th and the discussions that have been had since then, I think I can get into more later if need be.

But I will say this, Your Honor, and you can look at this transaction and the proposal that's in front of Your Honor in a lot of different ways.  And clearly, I feel like Cerberus is a little bit leading with its chin here, because we -- since the demise of GIC in November --

THE COURT:  Yes.

MR. HARRIS:  -- we have basically been doing everything we possibly can to help this business survive.  We have provided financing to help it right-size its infrastructure for a business that is now maybe a quarter of the size that we expected it to be or that it was, going into November of last year.  We have a team of operations people who are working with management, at no cost to the company, to

basically help this business deal with its customers, its brokers, the regulators, insurance issues, to basically, again, help it survive, because, frankly, we are looking to maximize value because we have a very parochial interest in doing that.

THE COURT:  That's right.

MR. HARRIS:  There comes a point, Your Honor, at which chasing new money after old money no longer makes economic sense.  And if the financial condition and performance of this business can't be stabilized and turned, with no disrespect to Your Honor's comment, it becomes economically unjustifiable to put another dollar into it, which I think would be a huge mistake and problem not only for my client -- 230 million dollars is nothing to sneeze at, and I'm glad Mr. Posner didn't pooh-pooh that.  But it's a loss we'll live with if we have to.

We don't think that's the right result.  We don't think that we should be putting 400 employees out of work.

THE COURT:  No.

MR. HARRIS:  We don't think that that's a necessary outcome here.  But time is not the friend of this business, by any stretch of the imagination, Your Honor.

So what I'm going to suggest, if Your Honor is okay with it and Mr. Posner's okay with it and Ms. Coleman is okay with it, is that rather than us all standing up here and starting to argue about what we could argue about if we went forward, that we take a break and let's see if the proposal I

made to Mr. Posner can generate any legs to result in something consensual.  If not, we'll make a decision about whether we go forward today or not.

It would be -- I think there are elements of -- that the objection that we've addressed in a manner that is consistent with precedent in this court -- there're certain aspects of the proposal that we just can't agree to, Your Honor.  We cannot agree to extend milestones for ninety days, for the reason I just articulated.

But I will say one other thing, Your Honor, before we talk about my suggestion, and see whether it's something people want to do, and that's this:  Fundamentally, when you read the plan and the disclosure statement and the transaction that we've outlined here, nobody but us is going to own this business and operate it, nobody is going to put money into it, and nobody is going to help management deal with customers and counterparties and carriers and brokers.  Nobody's going to be able to provide the financial assurance to the community to keep this business intact --

THE COURT:  Right.

MR. HARRIS:  -- certainly not the members of the committee, who until yesterday and until this morning were not exactly acting like the most supportive people in the world, at least the one that decided to cut off services.  And the only people who have real interest in the future viability of this

business is really us.  And we've tried to make it clear to the committee that, while they're certainly entitled to information, right, the focus here really needs to be for their recoveries on pursuing these causes of action, making sure that they're comfortable with the allocation split on recoveries and the waterfall.  I understand Mr. Posner's got questions and issues on that.  Happy to talk about those.  They're all plan issues, Your Honor, including what the size is of my client's deficiency claim.

And without belaboring that point, based upon the information that I've seen to date, it appears that that deficiency claim is going to be multiples of the balance of the unsecured-creditor pool here.  So technically we're his largest client.

So we want to work with him.  We have -- our incentives on pursuing those causes of action are absolutely aligned.  There's no reason why we would do -- want to do anything other than maximize the value of those causes of action for the benefit of everybody.

But again, it's a parochial interest in some respects, but I think our interest and those of other unsecured creditors here do dovetail.  And we do want to do this pursuant to a plan.  We didn't walk in here with a 363, trying to buy all the assets and leave a potentially administratively insolvent estate.  We didn't do that at all.  Again, some of that was for

reasons of the benefit of us, but it also benefits the estate, the courts, the whole administration here.  And we set up a mechanism which we thought was appropriate.

We all need to keep our eye on the ball, Your Honor. I mean, a lot of times, creditors, lenders get criticized for focusing on process and intercreditor disputes and forgetting what we're really here to do is make sure the business reorganizes and can continue to employ people and be an important part of the economy.  Conversely, that's exactly what we're focused on today, maybe to a fault, but that's exactly what we're trying to do here today.

So my suggestion, Your Honor, would be if we could maybe break for a couple hours.  I don't know what Your Honor's schedule looks like this afternoon.

THE COURT:  I'm clear.  I'm clear.

MR. HARRIS:  Let us speak to Mr. Posner and Ms. Coleman, see if there's any legs to our proposal.  If there is, great; maybe we come back with a resolution.  If not, we can come back and decide whether we're going forward today or, if Your Honor thinks an adjournment's appropriate, Your Honor will tell us that.

THE COURT:  All right.

Mr. Posner, does that work for you?  In other words, this would be discussion of your points --

MR. POSNER:  Your Honor --

THE COURT:  If you --

MR. POSNER:  -- I'm always happy to talk and I'm willing to take the time to try and do it.  I --

THE COURT:  Yeah.

MR. POSNER:  I -- honestly, I think it would be more productive to have a conversation after our financial advisor gets in there tomorrow.  But I'm happy to try and resolve something today if that's possible, assuming I can get representatives of my client on the phone and my financial advisor on the phone.

THE COURT:  Well, why don't we do this:  It's now 11:30.  We have some other issues, too, to address today that will take some time, I know.  And is 1:30 enough time for people?  That's about two hours.

MR. HARRIS:  Your Honor, maybe --

THE COURT:  Mr. Harris?

MR. HARRIS:  -- maybe we should address the mediation motion before we break, and then we can take a break at that point and try and resolve the DIP issues.  But it may --

MS. COLEMAN:  I was --

MR. HARRIS:  -- may make sense to deal with the motion for the mediation beforehand.

THE COURT:  That's true.  All right.

MS. COLEMAN:  Yeah, I was going to suggest that as well, Your Honor, because I think there are many people who are

here just for that.  So --

THE COURT:  All right.  Well, why don't we do this: Let's take a ten-minute break now.  We'll come back, we'll address the mediation issues, we'll see how long that takes, and then we'll know where we are with the DIP.

MS. COLEMAN:  Thank you, Your Honor.

(Recess at 11:36 a.m. until 11:50 a.m.)

THE CLERK:  Please rise.

THE COURT:  You may be seated.

Ms. Coleman, yes.  I know we have an important motion now to consider.

MS. COLEMAN:  Your Honor, I'd also like to -- Ms. Jones reminded me that we also have two matters that have been resolved that people might want to say a couple of words about them, and those are the Duff & Phelps retention application and the TRO --

THE COURT:  Yes.

MS. COLEMAN:  -- that was filed overnight.  Those have been resolved, but why don't we -- I mean, I might suggest that, after we finish with mediation, maybe we'll do those two so that anybody who's here for those --

THE COURT:  Absolutely.

MS. COLEMAN:  -- doesn't have to stick around for the afternoon session.

THE COURT:  Yes.

MS. COLEMAN:  So that brings us -- that brings us, Your Honor, to the debtors' motion to compel mediation and temporarily stay the related litigation --

THE COURT:  Yes.

MS. COLEMAN:  -- in these cases.  Your Honor, this might be an all-time record for me; I don't think I've ever filed anything that's gotten seven responses.  It's --

THE COURT:  Yes.

MS. COLEMAN:  Now I know how to get people to come to my next party.

THE COURT:  It was a lot to read.

MS. COLEMAN:  Yes, Your Honor.  So, Your Honor, the debtor's not intending to attract a lot of attention here, but what we're trying to do is to propose something that's constructive and also equitable to a real problem in this case, which is that the competing litigants in all of these cases, not out of bad faith or anything like that, but it's really been nearly daily efforts in numerous litigations in multiple courts to access the wasting proceeds of the debtors' D&O policies.

If you just look at footnote 7 to our reply, which is docket number 179, that is a now partial, because it's been a couple of days and so there's more, list of the activity that we've had to undertake.  And it's not a very short footnote; it's kind of long.  To me, Your Honor, the level of interest in

this motion and the level of activity kind of proves -- as detailed in footnote 7, kind of proves the need for the relief that we're asking for here.

So, Your Honor, there's really two components to the requested relief:  Number one, the debtors are asking the Court to compel the parties to mediate.  Second, the debtors are asking the Court to temporarily, for ninety days, stay pending litigation to allow that mediation to proceed without the interruption from the other courts.

Your Honor, I want to -- I want to kind of accentuate the positive here.  We obviously received a number of responses.  We gave our reply to those responses, in the reply that we filed last night at docket number 179.  I'd be happy to address, but I don't think it would be very productive just to go down each of those, because I think they can be broken down into several pretty simple themes which we stated in our reply, which isn't very long, except for that one footnote which is very long.

But I kind of wanted to talk about the -- what we're trying to do as opposed to all the reasons that other parties are articulating why it can't be done.  And I should say that, except for the Hudson Bay plaintiffs, I don't think anybody else said, we don't want mediation.  They just said, I want my mediation with sprinkles on it and I would like some hot fudge sauce on my mediation.  You can tell it's getting to be

lunchtime.

So they want different embellishments, most of which are not really before this Court procedurally properly, so we're not taking a position on them.  But everybody says mediation's a good idea, but there are some sort of little buts there, with the big exception of Big Hudson.  So I want to -- given the nature of the responses, I though I would talk about kind of what we're trying to do here.

So our view is that it's a low-risk and potentially very high-reward kind of a proposition.  It's designed to get all of the parties with claims that are covered by the D&O policies, whether they're direct claims or derivative claims -- you don't have to decide that now, we're not asking for substantive determination of that -- at the same table, with a neutral third-party mediator in order to attempt to resolve these hundreds of millions of dollars of claims, without undertaking unnecessary expense, which of course is coming from the same pot that is there to satisfy the claims in the first place.

Most of these relevant parties, as I just said, do support the mediation, including the D&O insurers, the plaintiffs in the shareholders actions, the majority of the directors and officers, Cerberus, and the committee.  Notably, the only people that object to the mediation are doing so because they're trying to get the first bite at that finite

pool of the D&O proceeds.  I mean, there's substantial D&O here, but at some point the party has to end.

So, Your Honor, there was -- as pointed out by several of the parties, there was a prior mediation of these actions, and it almost got there prior to these cases being filed.  And in fact, it almost got there to such an extent that we are using the same mediator, who seems to command the respect of everybody in the case.  Everybody thinks that Mr. Meyer is a great mediator.  He's willing to continue to work with us.  And --

THE COURT:  And who is it, again, Ms. Coleman?  Who's --

MS. COLEMAN:  His name is Bob Meyer, Your Honor.  He's a partner at Loeb & Loeb and he's --

THE COURT:  Okay.

MS. COLEMAN:  -- based in California.  But he is -- and Mr. Richardson, if asked, could give a detailed statement of the previous mediations, which, as I said, I am told -- I wasn't involved but I'm told -- that almost got there.

Now we have the additional -- the landscape has changed.  I think the existence of the previous mediation and the parties' universal respect for the mediator is actually not -- as opposed to being a reason not to do it, is a reason to do it, because the landscape really has changed here.  We have the bankruptcy, we have the automatic stay that protects

the debtors, and, more importantly, I think, because we keep getting these -- well, the automatic stay doesn't apply to -- fill in the blank.  It doesn't apply to claims against the officers and directors.  Well, of course it doesn't; they're not debtors.  It doesn't apply to litigation of Debtors' counterclaims.  Well, it doesn't apply to litigation of Debtors' counterclaims under (a)(1) because it doesn't say "counterclaims".  But it does under apply (a)(3) because --

THE COURT:  Yes.

MS. COLEMAN:  -- those counterclaims are clearly property of the estate.

And even more universally, the D&O policies are assets of the estate.  There may be some competing claims to the proceeds of those policies, depending on whether they're Side A or Side A-B-C.  But there are different stacks.  There's drop-down policies.  It's very complicated.  Has to be on a spreadsheet and you have to be able to use Excel to be able to really understand it.  And it's a complicated process that the parties have put a lot of time and effort, including Mr. Meyer, the mediator -- had put a lot of time and effort into understanding, and it would be a shame to let that -- to let that go to waste and let what's happening now, which is parties who are trying to get advantage -- we had a hearing yesterday, for example, in federal court in Judge Ramos' court in the Southern District of New York; there is a hearing scheduled

tomorrow in front of Judge Daniels in the Southern District of New York; all because parties are arguing as to various holes in the stay.  It's like Swiss cheese.  And of course it's stayed as against Patriot, but there're all these other parties, and people are trying to proceed against them.  But the universal fact that's the case is that all of those things are chomping up the D&O coverage, which of course is our point here is that we're trying to preserve that for everybody.

So let me address Hudson Bay for a moment.  They're the only party to actually question this Court's jurisdiction to --

THE COURT:  Well, that -- yes.

MS. COLEMAN:  -- to compel mediation.

THE COURT:  Yes, that's a concern, of course.

MS. COLEMAN:  Yeah.  So let me get to that, Your Honor.  First of all, the debtors are not asking this Court to resolve that district-court and those state-court actions or otherwise exercise jurisdiction over that action or over parties that it doesn't already have jurisdiction over.

As we said in our reply, Hudson Bay has appeared in this case; they had filed claims against the debtor.  And their claims -- although they are claims in connection with the acquisition of securities, so they're simply subordinated under 510(b) -- are direct claims against the company.  There's no question that this Court has jurisdiction over the Hudson Bay

plaintiffs.

Second of all, the claims are at least related-to, and they follow the related-to standard under the Third Circuit law.  Hudson Bay filed claims against the debtors and the directors and the officers.  The debtors have agreed to indemnify those officers and directors.

So you can't argue that resolution of those claims would either -- would not, quote, "alter" the debtor's rights and liabilities, which is the standard in the Third Circuit, as we set forth with case-law support, of course, in our motion and our reply.

So the limited narrow scope of this mediation is worth a shot because it has the potential to resolve multiple claims against these debtors, over which the Court clearly has jurisdiction, in a short period.  It's ninety days.  If -- but we have no objection to the committee's request to extend the period to 120 days, because, while that doesn't give us the excuse to push it out, we're going to start the mediation as soon as possible if Your Honor orders us -- orders it to happen.  We want it to go forward as soon as possible and while at the same time limiting these costs.

So that's the first component is the requested mediation.  And I think it is very clear from our papers, and I would also say that no one has cited any case law to the contrary that's applicable, that this Court has jurisdiction to

compel a mediation.

The second component is the stay. And the stay, of course, is necessary because you could have a mediation but, if the parties are able to romp around in -- and I think we're up to nine or ten different courtrooms around the country, using up proceeds -- that's not going to be a very effective way of getting all the parties together.

So the second component, which we also need, is the temporary stay. Now, obviously we already have the automatic stay to the debtors. We also have, in my view, the stay -- and I think the law is pretty clear that under 362(a)(3), the stay also protects any litigation -- any attempt to litigate or wipe out the derivative claims, because many of these claims, while initially asserted by other plaintiffs -- by shareholder plaintiffs, are in fact derivative claims and, upon the filing, they became property of the estate --

THE COURT: Right.

MS. COLEMAN: -- under the Chrysler standard. So -- and just under general Section 541.

So the reason that we need the stay is to rein in other aspects that may or may not -- that may or may not directly fall under the stay. Frankly, I think that it is fairly clear that, because we're dealing with D&O proceeds here as to almost all of these things, with the limited exception of the debtors' purported claims against Cerberus, which have been

asserted as -- in a derivative manner already, not by the debtors but by other plaintiffs, those are not, obviously, covered by D&O.  But -- and they are assets of the estate.

But the stay -- you could argue the stay isn't really necessary because it's all covered by D&O, but the fact that we've been litigating now for a month and had to do all the things that are listed in footnote 7 of our reply indicates that maybe not everybody agrees that it's so clear the stay applies.  And so that's why we're asking Your Honor to make it clear and to issue a stay.

Now, Your Honor, I'm not skimming over the fact that a number of the things that the parties have done probably have violated the automatic stay, and this includes the parties in the shareholder action.  The hedge-fund plaintiffs have pursued litigation in the district court, as I just said.  They currently have a request, which we'll be talking about to Judge Daniels tomorrow, to permit the debtors' counterclaims to be -- summary judgment to be issued.  They already successfully got Judge Daniels to rule -- to dismiss the debtors' counterclaims, which, again, we think is a violation of 362(a)(3).

But we haven't pursued any of those things, Your Honor.  We haven't sought to pursue remedies for those violations of the stay, because we've been waiting on Your Honor's ruling on this motion, because maybe we won't have to; maybe we can bring everybody together and get all of this

resolved and we won't have to go around and ask Your Honor for sanctions and all that sort of thing.  That's not really what we're about in this case.

So, Your Honor, the -- so that's why we're asking for the -- that's why we're asking for the stay.  Now, even if they're not -- we're really talking about extension of the automatic stay, and I think that a number of the parties raised the issue about whether we meet the standard for extending the automatic stay to people who are not the debtor, and the typical are they involved in the reorganization.  Well, no, that's not what we're looking for here.  We're looking for recognition, again, that the D&O proceeds are -- is what's being sought here, and those are property of the debtors' estate.

And the other thing is that the debtors' estates will be harmed absent the requested stay.  They already have been. We've already spent -- we haven't added it up, but we've already spent not insignificant amounts of money chasing around and having to make appearances and file suggest -- well, we would have filed suggestions of bankruptcy anyway, so I guess that's not fair, but making appearances and filing papers and writing letters to judges that we wouldn't have had to do if Your Honor's stay were in place.

So again, Your Honor, not to put too fine a point on it, but we inarguably have an interest in the D&O policies.

You can argue that maybe the Side A proceeds, since they are earmarked for officers and directors, are not -- there's a part of those that the proceeds may not be assets of the estate but the policies certainly are.  And with respect to the debtors' own claims that have been previously asserted derivatively and now will be taken over and asserted by the debtor if they're asserted at all, those are -- we have insurance for our own claims, and there is an insured-versus-insured exception in the policy.  So that -- those are clearly assets of the estates.

So the other point here is that the claims that are asserted far exceed the available proceeds.  So this is a question of it's very important that we not have a race to the courthouse.  This is really a mini example of a microcosm of what bankruptcy in Chapter 11 is all about.  Everybody is supposed to be starting from the same starting line, not staggering in -- not a relay race.

So and the problem is that in addition to fighting over a pot that is too small to satisfy everybody, and so you can't have people going in and getting full satisfaction first, one settlement or one judgment could really fully dissipate all of the proceeds or use up all of the proceeds, and that, in turn, would expose the debtors to substantial claims that we would then have to deal with in this case.

And in the interim obviously, the defense costs are being used up pretty quickly.  And I think you'll probably hear

about that from some of the other parties here.  And if we don't get that requested temporary stay, the estate will continue to be harmed by all of this -- all of this litigation.

And we've, I think, set forth all of this in the reply.  But again, we've spent substantial resources dealing with this.  So Your Honor, we would request -- and again, we don't have an objection to the committee's request that the stay be extended to 120 days to allow the mediation to go forward.  A variation of that might be ninety days for now and kind of an interim report as to how it's going --

THE COURT:  Right.

MS. COLEMAN:  We're really not trying to hold anybody up.  But we are trying to -- to the extent necessary to be compelled -- we are trying to bring everybody together and really just kind of take a shot and see if it works.  We hope it does.  If it doesn't, then there's not much downside, because it's only ninety days.  And then the parties can go back to -- can go back to being a flock of seagulls fighting over the few potato chips that are sitting on the beach.

Thank you, Your Honor.

THE COURT:  All right, thank you, Ms. Coleman.

Mr. Horan, good afternoon.  Or good --

MR. HORAN:  Good afternoon, Your Honor.

THE COURT:  -- yes, it is afternoon.

MR. HORAN:  It is -- this is the afternoon, yes.

THE COURT:  Yes, it is.

MR. HORAN:  Thomas Horan from Shaw Fishman Glantz & Towbin for Hudson Bay Mater Fund, Ltd.  I'm joined by my cocounsel Matthew Warren from the firm of Latham & Watkins.

THE COURT:  Yes.

MR. HORAN:  And I'd ask that Mr. Warren be permitted to do the talking for us this afternoon.

THE COURT:  That would be fine, Mr. Horan.  Thank you.

MR. HORAN:  Thank you.

THE COURT:  Thank you for the introduction.

Mr. Warren, welcome.

MR. WARREN:  Good afternoon, Your Honor.  Matt Warren from Latham & Watkins --

THE COURT:  Yes, sir.

MR. WARREN:  -- on behalf of Hudson Bay.

Your Honor, I'm going to go in a little bit reverse order than what I had contemplated and address the mediation first.  As counsel to the debtor noted, Hudson Bay, I think, was the only party that really objected to participating in mediation.

THE COURT:  Right.

MR. WARREN:  We're not terrible people, Your Honor. We're perfectly good fans of mediation and settlement and everything else, just like any other American, but --

THE COURT:  Most Americans.  Let's put it that way.

MR. WARREN:  Most Americans.

UNIDENTIFIED SPEAKER:  And apple pie.

MR. WARREN:  That's right.  But we did have prior mediation, and I think we're subject to a confidentiality agreement on that mediation, so I don't want to talk about our views too much on the mediation.  I think I'll just say we disagree a bit on the characterization of it as a success.  I think we would have a completely different characterization of the prior mediation.  But we did --

THE COURT:  Well, isn't this a different kind of mediation to some extent, because what you're going to be talking about, largely, I think, is how to divide up the proceeds of the directors' and officers' insurance?

MR. WARREN:  To a degree, Your Honor.  Although the prior mediation that we agreed to -- and this was on Hudson Bay -- so-called Hudson Bay I -- was really justified and argued by Patriot in the court before they were debtors-in-possession, on the exact same grounds that they're arguing today.  They said we're spending a bunch of money on litigation.  There's only so much in the policies.  We should all take a quick break.  This was to Judge Daniels in the Southern District.  And we should all go to mediation for a period of time.

They had originally made that request, I believe, in April, and we had said, well, we're in the middle of fact

discovery; we're spending -- the debtors have spent a lot of money and we've also spent -- our clients have spent millions of dollars on this as well.  Let's finish fact discovery first and then talk.

We finished fact discovery.  It's completely done.  In fact, all discovery on this is done.  And then we were in front of the court on the motions to dismiss, and they again requested the mediation.  We said that's fine, we'll have a mediation period.  We went to the mediation.  Again, I won't go into whether we view it as successful or not, but there was no resolution.

That was actually in November.  And then I believe, Your Honor, it was announced that Patriot National was going to file or had an RSA in place.  We, at that time, informed the court we were willing to just voluntarily stay at that point, even before they filed, the actions against Patriot National, and go forward against Mr. Mariano, and the court wanted to not do that.  The court put it over for thirty days to see if they filed a bankruptcy.  They didn't.  That's when the court took it back up in January.

So I think -- to finish on the mediation point -- our view of the mediation request that we read in the debtors' motion, was that it was largely done to support their request for a stay of the litigation.  Absent the tied stay to the litigation, I don't think Hudson Bay has an issue participating

in the mediation.  We might not think it's the best use of resources, but we're certainly not going to tell people that we don't want to talk to them and we don't want to talk about settlement.  We would never say that.

So moving more to Hudson Bay I, I do think it's important to give just a very high-level overview of that lawsuit.

THE COURT:  Okay.

MR. WARREN:  It was in our -- and I realize it's not before you today, and I don't want to debate anything about the lawsuit, frankly, with anybody else here; because I'm not the lead counsel in that matter, I'm just a bankruptcy lawyer.

That lawyer stems from -- that lawsuit stems from a couple years ago there was an agreement where Hudson Bay paid Mr. Mariano 13.5 million.  And there's a bunch of documents, but -- rescission agreements and the like.  But the end result was Hudson Bay had paid Mr. Mariano 13.5 million and bought shares from Mr. Mariano.

THE COURT:  Right.

MR. WARREN:  Hudson Bay also had, at the same time, bought penny warrants, essentially from Patriot National, where Patriot National would issue additional shares, but to avoid diluting any other public shareholders, because that was the big concern in the transaction, had a back-to-back with Mr. Mariano, where he would effectively surrender his shares to

Patriot National when we exercised the warrant.

THE COURT:  Okay.

MR. WARREN:  We exercised the warrant.  Patriot National didn't want to issue the shares anymore.  There was no explanation.  I don't think they sued Mr. Mariano on his back-to-back.  And so we -- Hudson Bay then brought this lawsuit almost two years ago, at this point, against Patriot National for not issuing the warrants when we believe they were supposed to be issued, but also against Mr. Mariano, because he controlled Patriot National at the time, on the grounds of breach of duty of good faith and tortious interference with contract, really on the grounds that there was never an intent to comply with this.  Those are the allegations.  And we --

THE COURT:  You don't still want the shares?

MR. WARREN:  No, we do not want the shares.  And that's an important --

THE COURT:  Because I --

MR. WARREN:  -- distinction.

THE COURT:  -- bet they'd give them to you.

MR. WARREN:  They were noted -- we're good without the shares now.

THE COURT:  All right.

MR. WARREN:  That was noted in our motion.  We're suing Mr. Mariano for damages.

THE COURT:  Yes.

MR. WARREN:  And the debtors are really focused on the insurance proceeds.  I don't know if this is covered by insurance.  I'm not sure anybody on our side knows if this is covered by insurance.  I don't think the insurers have agreed it's covered by insurance.  Similarly, I don't know if it's covered -- if these kinds of actions are covered by indemnifications by the debtors.  I don't know if the debtors have agreed to indemnify Mr. Mariano.

I know they filed their bylaws, and they are subject to the DGCL.

THE COURT:  Yes.

MR. WARREN:  And these are causes of action against Mr. Mariano for tortious interference with contract and good faith and fair dealing with us and on account of paying him 13.5 million.

What we do know is that Mr. Mariano has or used to have a lot of assets.  He had 13.5 million, because we gave it to him and he took it.  So we are pursuing the cause of action.  I mean, if there's insurance coverage, great.  I don't -- I'm sure that's going to be a separate issue if we ever get to judgment against Mr. Mariano.  But if not, we still have a judgment against a person that we believe currently or should have a lot of assets for us to pursue.

That litigation, as I noted, we've spent millions on it, and we're done with fact discovery.  We're through the

motion to dismiss.  Summary judgments have been completely filed.  And they're set to be heard, I believe, on March 14th by Judge Daniels.  There's a status hearing on it tomorrow.

So I think the arguments that allowing this to continue on, at least particularly to the oral argument on summary judgment, I just don't think that's going to be -- that's going to be a drop in the bucket of any costs, even if the insurers are reimbursing.  And I'm not sure if they're reimbursing these claims just against Mr. Mariano for his costs.  I have no idea.  Even if they are, assuming they are, that's a drop in the bucket compared to the millions of dollars we've spent getting to this point.

And we don't think it's appropriate for there to be a stay of that litigation going through.  Because if we win summary judgment or lose summary judgment, it's going to be very informative on how our claims against him proceed.  And again, Mr. Mariano is not a debtor here today.  He's not part of the debtor's case.  We don't need any more discovery from the debtors.  We really view this as a litigation that shouldn't be impacted by this bankruptcy whatsoever.

I also -- I don't think -- I think that when counsel to the debtor was speaking she referenced derivative causes of action being wrapped up.  I don't think that they were taking the position that our actions are derivative.  They're clearly --

THE COURT:  It doesn't sound like it.  Certainly.

MR. WARREN:  -- they're clearly not.

MS. COLEMAN:  We were not, Your Honor.

MR. WARREN:  Okay, thank you.

The other litigation that's at play here is Hudson Bay II.  That's a litigation that was brought much more recently, that was only filed in August 2017.  Fact discovery is not as far along.  We're only at the motion-to-dismiss stage now.  That's in front of Judge Daniels as well.  So he's teed up the motion to dismiss to be heard at March 14th as well.

THE COURT:  Okay.

MR. WARREN:  Same time.  It's sort of all tied together in his mind and how much he knows about the cases.  But we're -- admittedly, Your Honor, we're not nearly as far along in that case.  We haven't finished fact discovery.  And so unlike Hudson Bay I, I do think here's some burdens that would come on the debtors.  I would hope those will be mitigated by the amount of discovery and everything that's been done prior -- over the prior years, and it wouldn't be nearly as expensive as the discovery that was -- and depositions that were undertaken on Hudson Bay I.  But admittedly, that litigation is not as far along, although I think we and the board of directors who are suing on that -- at least they submitted their objection as well -- would like to see the motions to dismiss go forward as well.

THE COURT:  And the nature of that case is what, Mr. Warren?

MR. WARREN:  The nature -- that's actually a lawsuit against the board of directors -- the people who were on the board that weren't Mariano.

THE COURT:  Okay.  Okay.

MR. WARREN:  They were on the board at the time that Patriot National decided to not issue the warrants when we exercised.  I think that lawsuit asserts claims for Securities Act violations, fraudulent inducement, fiduciary duty, corporate waste, and tortious interference with contract as well, but really on the grounds that there was no real obvious justification for not exercising the warrants and then just demanding Mr. Mariano surrender his shares.  Because it was structured to be sort of a nonevent for Patriot National, that was what we paid the money for.  It wasn't supposed to be dilutive of the Patriot National shareholders, at the time.

So that's a sort of follow-on litigation on what could have been the justification for failing to issue the shares when we had called the warrant.

THE COURT:  So you're opposing the mediation motion on both cases, essentially?

MR. WARREN:  That's right.  We think both should go forward, certainly to the oral arguments on both motions.  And again, we're willing to continue to participate in the

mediation, but we think these have been -- particularly number I has been in front of Judge Daniels for several years now. He's already made rulings on the matter.  And I think this could be informative to both us and the debtors on how to move forward in this bankruptcy case.  I mean, to the extent that Hudson Bay has claims that aren't subordinated against the debtors as unsecured creditors, and for us, for how to go forward against Mariano personally and try to seek collection of assets.

It seems to me that the debtors' real focus is they don't want the insurer to pay out on a judgment if we win a judgment much more than they don't want us to get a judgment.

THE COURT:  Well, how do you think the other parties who are in favor of mediation would feel about Hudson Bay proceeding with its litigation?

MR. WARREN:  I think that -- I think that -- well, I'm sure they would feel it's unfair, would be my guess.

THE COURT:  I would think so.  I would think so.

MR. WARREN:  But I do think it's important to note, none of those lawsuits are remotely as far along a Hudson Bay. I think a lot of those other lawsuits do assert derivative claims and they're very focused on derivative claims.

I think Hudson Bay, particularly in Hudson Bay I, and maybe to a lesser extent in Hudson Bay II, really is focused solely on direct claims against people that aren't currently

debtors, and in Hudson Bay I, aren't even currently directors or officers or in any way related to the company right now. That's just a lawsuit against Mr. Mariano, who I'm sure a bunch of other people may also be suing.  But that's a lawsuit that we brought directly against him personally and seek to recover assets.

I think there's a clear distinguishing factor between that litigation and the litigation that a lot of the other folks here today are pursuing.

THE COURT:  Okay.  And Hudson Bay II, have you named -- you've named former directors as well as present directors?

MR. WARREN:  Yeah, I believe they're mostly current, although I wasn't able to determine who's still on the board.

THE COURT:  Okay.

MR. WARREN:  They were all the directors who were on the board at the time that the warrant wasn't exercised, except -- they did not include Mariano.  I don't know which of them are on the board still or not.

THE COURT:  Okay.  All right.  Well, thank you.

MR. WARREN:  That's all I have.  Thank you, Your Honor.

THE COURT:  Good afternoon.

MR. SUMMERS:  Good afternoon, Your Honor.  Matthew Summers, Ballard Spahr, on behalf of CVI Investments, Inc.

Your Honor, CVI has asserted claims against Patriot National only that are not consolidated with the claims that Hudson Bay's asserted in the Southern District of New York, but are both before Judge Daniels and are both tracking together.  So there is a status conference in CVI's litigation with Judge Daniels scheduled for tomorrow as well, with respect to the counterclaims the debtor has asserted.

I don't want to rehash everything that was just said.  But I think there are a few unique aspects with respect to CVI's claims that distinguish it from the other parties that would be subject to mediation and the proposed stay.

First and foremost, CVI has asserted a claim for breach of contract against only Patriot National.  We haven't sued Steven Mariano.  We haven't sued any other current or former officers or directors of the debtors.

THE COURT:  Is there any doubt that that is stayed by the automatic stay --

MR. SUMMERS:  There --

THE COURT:  -- under three-sixty --

MR. SUMMERS:  -- there is absolutely no doubt that our claims are stayed by the automatic stay --

THE COURT:  Okay.

MR. SUMMERS:  -- our claims against Patriot National.

THE COURT:  Okay.

MR. SUMMERS:  And we have not taken a position

otherwise in front of Judge Daniels with respect to our claims.

And we were involved in the first mediation.  We participated in that.

THE COURT:  Okay; okay.

MR. SUMMERS:  And my client, like Hudson Bay, and my partners who are litigating the claims in New York, are having a case of déjà vu with respect to the arguments that are being made to get us into mediation.  And while I'd also like to tell you my understanding of why the prior mediation didn't result in a settlement, it is a much different understanding that Ms. Coleman put on the record today; but I think confidentiality probably precludes us from getting into that.

But discovery -- we've completed discovery in our case.  Our case was filed in April 2016.  We've completed discovery.  And at the end of discovery, we've never seen an insurance policy or a D&O policy -- even though we haven't sued any Ds&Os -- that would provide coverage for the claims CVI has asserted.

And while we would love to have an insurance policy available to cover our claims against Patriot National only -- and we raised this in our objection -- and I kind of expected the answer in the reply would be well, yes, there's a D&O policy and here it is, we've seen -- almost inviting it, we almost invited that type of response; and that response wasn't provided.

And so we struggle with whether there actually is a D&O policy that would cover breach of contract claims against solely the debtor.

And since we've already been through mediation, our client is very concerned -- CVI is very concerned about being required to incur the cost and expense and time going through that process basically a second time on a promise much like was made before that there might be some insurance policy out there.  And that is largely what was argued on the record in New York in connection with seeking the first mediation.

So Your Honor, CVI is very concerned about having to do this again in the absence of some assurance from the debtors that there actually is an insurance policy that would cover this claim.  And I think that's probably unlikely and maybe unfortunate.

So Your Honor, so either -- if the debtors aren't willing to do that then, Your Honor, I think maybe there could be some adjustment about with respect to paying the mediator fees.  If we're going to go down this path with, I think, substantial doubt about whether there's any policy that covers our claim, I would suggest perhaps it's appropriate that we be excused from paying the mediator fees if the debtors aren't willing to make the simple -- what should be a simple clarification or give us some assurance that there's actually a policy.  If there's a policy, I think we're happy to mediate.

Then Your Honor, I think this ties in, then, to the ninety-day stay issue.  In response to Your Honor's question, there's no doubt our claim against Patriot National is subject to the automatic stay.  Patriot National has asserted direct counterclaims against CVI in the same litigation.  And Judge Daniels recently ruled on a motion to dismiss those counterclaims.  And in connection with making that ruling, he said there would be no further -- no discovery allowed in connection with the counterclaims, because in many respects, defensive of the claims we originally asserted and so the discovery would be the same that was already conducted.

And there're fully briefed -- at least with respect to our breach of contract claims there're fully briefed motions for summary judgment pending.  And so I think the burden to the debtor is minimal, because these issues have already been briefed once.  There's not going to be any discovery.  They're the ones that have asserted the counterclaims and have made that decision.

So if we don't have an insurance policy, why should we be stayed and be left with having to face these counterclaims, potentially, at the end of this bankruptcy case, basically given the track that this case is being put on?

And finally, Your Honor, I want to raise one other thing.  Mr. Mariano has filed recently litigation in state court in Broward County, Florida against CVI and others.

Notably, that's not subject of the mediation motion and it hasn't been served. But I think this gets to the prejudice if we're stayed for a mediation that there may be no policy and aren't able to pursue and resolve the counterclaims.

We think Mr. Mariano's litigation is largely duplicative of what the debtors asserted in the counterclaims, and thus, we are so far along in the Southern District of New York litigation, that if we now are going to be facing a second litigation from Mr. Mariano that's not going to be subject to mediation, not going to be stayed by this Court, it harms us by slowing us down in being able to get these issues resolved. And so now we're going to be fighting potentially -- if he ever serves it -- Mr. Mariano in this state-court action.

And so I think there is some potential prejudice here from trying to slow us down on the counterclaims. And Your Honor, under (a)(3), if there's no D&O policy, I don't -- I don't read (a)(3) and I don't read the cases that we cited in our papers as saying that when the debtor asserts counterclaims that those are stayed. If these are just garden-variety breach-of-contract counterclaims where there's no insurance to cover them, I don't know how (a)(3) would apply to stay claims the debtor has decided to affirmatively assert against CVI.

So while we respect mediation and certainly -- people talking to each other for a settlement is usually a good idea --

THE COURT:  Yes.

MR. SUMMERS:  -- we have serious concerns about being swept up in this given, kind of, the unique circumstances that we face here.

THE COURT:  So just so I understand, you're prepared to go to mediation if you're excused from paying the mediator --

MR. SUMMERS:  Well, we --

THE COURT:  -- but you don't want to be stayed.

MR. SUMMERS:  -- we're fine -- we don't want to be stayed with respect to the debtors' counterclaims.

THE COURT:  Right.

MR. SUMMERS:  Yes.

THE COURT:  Okay.

MR. SUMMERS:  That's correct, Your Honor.

THE COURT:  All right.  All right, thank you, Mr. Summers.

MR. SUMMERS:  Thank you, Your Honor.

THE COURT:  Ms. Humiston, good afternoon.

MS. HUMISTON:  Good afternoon, Your Honor.  Shannon Humiston of McCarter & English.  With me in courtroom is Amy Miller of Levi & Korinsky, and we are here on behalf of Messrs. Wasik and McIntire.

THE COURT:  Yes, yes.

MS. HUMISTON:  Your Honor, the primary concern of our

objection is the length of the proposed stay.  The debtors have come to this Court and have requested an expedited consideration of their case.  We've requested the stay be limited to sixty days.  And given the procedural posture of the proposed pace of these proceedings, the request appears to be reasonable.

An expedited process is required for a meaningful mediation.  And if the mediation is not proportionately expedited, all the parties could be affected at that time.

THE COURT:  All right.

MS. HUMISTON:  Also, Your Honor, the substance of the underlying litigation before the Court is not before the Court at this time --

THE COURT:  Right.

MS. HUMISTON:  -- and we disagree with any inference that Hudson Bay is entitled to any insurance policies or any other inferences that are stated during this hearing regarding the underlying litigation.

THE COURT:  All right.  All right, thank you.

Mr. Monhait, good afternoon.

MR. MONHAIT:  Good afternoon, Your Honor.  Norman Monhait from Rosenthal, Monhait & Goddess, on behalf of Mbago Kaniki --

THE COURT:  Yes.

MR. MONHAIT:  Who is a substantial shareholder pre-

petition of Patriot National.  He has filed a limited objection to this motion.

THE COURT:  Yes.

MR. MONHAIT:  My cocounsel Angela Somers of Reid Collins & Tsai has been joining us through CourtCall and with Your Honor's permission, would like to address his objection.

THE COURT:  All right, thank you, Mr. Monhait.

MS. SOMERS:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MS. SOMERS:  Angela Somers of Reid Collins & Tsai.

Your Honor, we filed a limited objection on behalf of Mr. Kaniki as an equity-holder, and the gist of our objection is we would like the claims against Cerberus mediated as part of this process.  We feel that someone should represent the debtor with respect to mediation of those claims that is impartial.

And the debtor has explained to you the extent to which they rely on Cerberus to get this plan done.  And the importance of that is not beyond us.  We understand that.  At the same time, certain allegations have been made against Cerberus in conjunction with the lending that was at the heart of the debtors' collapse.

We are not saying that Cerberus is responsible for that collapse, because the allegations have not yet been proved.  But we are concerned about them.  Cerberus made a

lending at a very delicate point in time, the purpose of which was to make dividends and buy back stock.  And there are other circumstances surrounding that lending which are also concerning.

And so the Wasik plaintiffs have made allegations against Cerberus for aiding and abetting the breach of fiduciary duty.  And somehow in this mediation process, those claims have disappeared.  They've been ignored.  They've been put to the side.  And they get released very quickly under the construct of the DIP order and the plan.

So we feel that those claims should come to light and should be mediated as part of this process.  We understand that this is a dilemma.  You have Cerberus supporting the plan, at the heart of the plan, and yet you have claims against Cerberus.  But a mediation is the very process in which people can consider all the pros and cons of these kinds of claims. And they also can participate in this kind of mediation in a way that respects the reorganization process and takes that into consideration as well.

So we believe that those claims should be mediated at this mediation.  In fact, there is some possibility that the D&O carriers might request that that be taken care of to account for any kind of counterclaim or cross-claim that may be involved in this process.  And so, Your Honor, we request that the mediation order be modified to account for that possibility

that the claims against Cerberus are mediated, since Cerberus is going to be at this very mediation in any event.  Thank you, Your Honor.

THE COURT:  Thank you.  How about the fact that Cerberus is being released under the plan, which would probably or might go effective before the end of the mediation, before the end of the stay period?

MS. SOMERS:  Well, that is a concern as well.  We have not gotten involved in other aspects of the case.  As an equity-holder, Mr. Kaniki is trying to participate in this case in a way that's economical for him.  But certainly that is a concern as well.

THE COURT:  Okay.  All right.  I certainly understand your position, and I thank you.

MR. MONHAIT:  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Monhait.

Mr. Patton, it's good to see you.

MR. PATTON:  Good to see you, Your Honor.  Your Honor, I represent three individuals in these proceedings:  Quentin Smith, Charles Walsh, and Christopher Pesch.  We filed two responses.  And on behalf of Mr. Smith and Mr. Walsh, we're objecting to the stay and correlatively to the mediation to the extent it stops the proceedings in Hudson Bay II.

So I find myself representing defendants of Mr. Warren's client --

THE COURT:  Yes.

MR. PATTON:  -- in the Hudson Bay matter, but agreeing with him with respect to what should happen with respect to Hudson Bay II.

Just very briefly, Hudson Bay II is a proceeding which, at this moment, is two weeks away from oral argument on motions to dismiss filed by my clients.  It's subject to a statutory stay under the Private Securities Litigation Reform Act.  There's no discovery proceeding underway in that proceeding, while motions to dismiss are pending.  So discovery cannot unfold until the motion to dismiss is resolved.  So there's no risk of runaway litigation there.

And Mr. Smith and Mr. Walsh, if they are successful, and they obviously believe and hope that they will be, will be dismissed from that proceeding and can get that behind them. And getting out from under that piece of litigation is tantalizingly close.

The proceeding known as Hudson Bay II is also one in which the debtor is not a party.  It's Hudson Bay and a number of individuals.  And in that regard, Your Honor, the debtor -- as we pointed out in our papers, the debtor is really procedurally out-of-step.  They haven't followed Rule 7001(7). They cite cases to Your Honor:  American Film, Midway Games, and Your Honor's own decisions in SN Liquidation and World Health.  Interestingly, all of those opinions arose out of

adversary proceedings and preliminary injunction motions seeking to stay litigation and for the obvious reason that Bankruptcy Rule 7001(7) says that if you want a stay you have to initiate an adversary proceeding.

And I hate to be stickler, except in this case my clients are entitled to have me be a stickler and tell you that they -- "they", the debtor, is not entitled to the relief they are requesting with respect to Hudson Bay II.

From our point of view, all we want to see happen is we want to see the hearing go forward, allow this matter that's fully briefed to be argued, and to allow that judge to render his decision.

Interestingly, the opposition to that happening, to me it's a little confusing, because if we are successful, those are two defendants making claims to insurance that will not be making claims in connection with Hudson Bay.  It would arguably improve the likelihood of success of any mediation.  And if the mediation is going to go on as long as it sounds like it might, we could well have a decision before this is resolved.

So in a nutshell, with respect to Hudson Bay II, the debtor is seeking an injunction without initiating an adversary proceeding, without providing the necessary proof that would be necessary to establish that it's entitled to that relief.  And in fact, there is no evidentiary record at all, with respect to an entitlement to stay Hudson Bay II.

Ms. Coleman argues that the issue with respect to the ownership of the insurance policies is uncontroversial.  In the motion they filed the debtor simply asserted or stated that the debtor has a property interest in the policies.  That's an uninteresting and unexciting proposition that's well established.  They did cite in support of that, two opinions -- Your Honor's two opinions -- which went on to say that the question that's of interest in a proceeding like this is who owns the proceeds.

THE COURT:  Right.

MR. PATTON:  And again, as I mentioned, those two proceedings came before Your Honor in the context of an adversary proceeding and a preliminary injunction.  You were presented with evidence.  One of them, I recall Your Honor said that the evidence was a bit thin, but it was, nevertheless, an evidentiary proceeding.

We have no insurance policy introduced by the debtor. We have no discussion other than a high-level discussion from the podium about the structure of the insurance policy and the Side A coverage and what's been exhausted and what hasn't been exhausted and what the limits might be.

In other words, there's no basis for Your Honor to conclude that the question of who owns the proceeds of the insurance is even before you, let alone a basis to decide who actually owns the proceeds.  So for those reasons, Your Honor,

our view is that you could not grant the request that the debtor is seeking with respect to Hudson Bay II, even if -- even if everybody were to agree to it.

We don't agree to it, at least with respect to getting us through the motion on the -- sorry, the hearing on the motion to dismiss.  After that, we're happy to allow the proceeding to be stayed while we finish the -- when we finish the mediation in these proceedings.

We also asked, Your Honor, in a supplemental response, that Your Honor clear something up for us.  The filing of the motion for a stay and the filing of the bankruptcy proceeding has allowed the D&O carrier to throw up his hands and say gee, I don't think we can pay any defense costs.  Not all that surprising.

But the debtor is asking that Your Honor direct us and require the parties to participate in a mediation, the expenses of which are expenses that would be submitted to the carrier and we'd be asking the carrier to pay.  We ask that Your Honor clarify and illuminate the record for the benefit of the carrier.  We have a proposed form of order that simply says that they are authorized to pay defense costs associated with the mediation process.

I think from the point of view of the Court and the process, a successful mediation, to some extent, will depend on vigorous and thorough participation by all of the parties and

their respective counsel.  And there's no reason to allow the cloud of who is going to pay for the costs of mediation to hang over this process.

The Ds&Os are entitled to have their defense costs covered if we're going to insist on mediation, and I'm in support of that if we can get the other relief we want, and insist on a rapid pace.  We would ask that Your Honor also enter the order that we've requested that says that the carriers are authorized to pay the defense costs of the Ds&Os associated with the mediation.

THE COURT:  So in other words, if your clients are not dismissed, then you would go to mediation?

MR. PATTON:  No, Your Honor, we will mediate -- in simple terms, we're happy to begin a mediation provided Your Honor allows the argument to proceed on March 14th, I believe it is -- or 13th -- and allow the judge in that proceeding to render his or her decision following argument.  And we'll commence a mediation immediately.  It's not a sequential exercise.  There are other proceedings that we're involved in that are important to us as well.

But with respect to this one, these two individuals, from their point of view, they're very close to getting out from under this litigation.  They may not be successful, but they believe they will be, and they'd like to get this behind them.

THE COURT:  All right.

MR. PATTON:  Thank you.

THE COURT:  Thank you, Mr. Patton.

Mr. Posner, yes, sir.

MR. POSNER:  Very briefly, Your Honor.

THE COURT:  Yes.

MR. POSNER:  For the record, David Posner, Kilpatrick Townsend, proposed counsel to the committee.

So we support the stay and the effort at mediation. We filed a limited objection, Your Honor, aimed at a couple of things.  First is we had suggested, as Ms. Coleman said, 120 days not 90 days.  That really was driven by -- in part, by the fact that we were thinking about adding on to the schedule in terms of the timelines of the case.  And currently the draft of the disclosure statement and plan says that the committee dissolves upon confirmation of the case.  So if the timelines move, we just wanted to make sure that the stay and the mediation moved.  Obviously if none of the timelines move and the case is out of bankruptcy on April 24th and the committee dissolves, I'm not sure another thirty days, at that point, makes a difference to the committee.

The other point we made is similar to the one that Mr. Kaniki made in his pleading, which was we think Cerberus does need to be a party here.  And because of that and because of the relationship between the debtors and Cerberus, both in

terms of financing and being the plan proponent, we think that the committee should be the one calling the balls and the strikes at the mediation, and not the debtors or Cerberus.

And we said some things in our papers, so I won't elaborate, because I'm sure Your Honor has read them. I think in response Cerberus says first claims against us -- and I don't have a basis to say whether those claims are good, bad, or indifferent.

THE COURT: Right.

MR. POSNER: We just don't know anything about them. We have Mr. Harris' representations which I take at face value with respect to those. No reason to -- one way or the other -- to disagree with his characterization of the claims. But they --

THE COURT: And that's not going to be decided in the mediation in any event, who's right or wrong; is that correct?

MR. POSNER: I think that -- I'm not sure, Your Honor. I mean, Cerberus says it's beyond the scope of the mediation because it's not covered by the D&O policies. I don't know the answer to that as I stand here today, but what I will say is typically you go into mediation with the hope of resolving all of the claims in the underlying action. And it seems, if that's a claim in the underlying action and everybody's going to make the effort at mediation, that they ought to participate and see if it can get resolved, that's number one.

And number two, I think they make the point that part of the business deal that was struck is they get a release from the debtors on those claims.  I'd asked Ms. Coleman at one of the breaks, when do they think they're going to get the mediation going and when do they think it's going to conclude, in part because we were curious because of this issue of the committee dissolving.

THE COURT:  Right.

MR. POSNER:  But I take them at their word that they're going to hopefully get the mediation going expeditiously.  But I guess our concern was, and it goes to Mr. Harris' point in Cerberus' papers, what happens if the mediation doesn't conclude within the time frame that the Chapter 11 concludes, Cerberus gets their release under the Chapter 11 plan, and then it comes out at the mediation that there are facts that suggest that there is a claim against Cerberus?  It just seems to us that from that perspective, it makes sense for Cerberus to participate in the mediation.

I don't have anything else, Your Honor.

THE COURT:  All right, thank you.

MR. PALACIO:  Good afternoon, Your Honor.  May it please the Court, Ricardo Palacio of Ashby & Geddes on behalf --

THE COURT:  Yes, sir.

MR. PALACIO:  -- of Austin Shanfelter, one of the

former D&Os you heard mentioned earlier.

Your Honor, I'm not here to belabor a lot of the points that were made previously.  A couple of things, and I'll do this in bullet-point fashion.

One, we didn't file a formal response because in general, Mr. Shanfelter agreed with the requested relief that a mediation is appropriate under the circumstances in a very general way.  Why I'm rising now is to put more color on it and address specific points in light of responses that we read that hit the docket --

THE COURT:  Okay.

MR. PALACIO:  -- and points that have been made today.

First, we do agree and we join the group that has said Cerberus should be made a party to this.  We've heard the concerns that have been raised.  My client also has similar concerns.  And we believe that if there's going to be a fruitful and truly global resolution, Cerberus should be made party to the mediation process.

Second, I heard Ms. Coleman mention earlier that defense costs are being used up.  Nobody's disputing that.  One of the issues -- and this dovetails with my last point -- is Mr. Patton's motion or supplemental response with respect to a comfort order, as typically coined, to allow those defense costs to be paid, but prospectively.  I imagine that the motion or the supplemental response was drafted in such a way, given

the -- or given the way the motion was framed, that is, the mediation motion, and because it is requesting anticipated prospective relief.

Our concern is -- and I echo what Mr. Patton said -- to have a vigorous and fruitful mediation process, everyone needs to be at the table in an equal position, that is, understanding that they're getting paid, my client is getting paid, as well as everyone around the table is being paid.

THE COURT:  Right.

MR. PALACIO:  So while Mr. Patton's motion requests prospective relief, I can tell you at least from our end, we haven't been paid since November.  We've reached out to at least one of the carriers.  They were looking for a comfort order.  And I won't get into detail, but suffice it to say is we've been trying to push them to get something on file, and we were saying if you don't soon, we are going to get something on file, because you are, in effect -- and again, this is not meant in a pejorative way -- really hindering my client's defense going forward.  And if there's going to be a meaningful mediation, we want to make sure that everyone is brought current and everything prospectively is paid.

So in that last point, if Your Honor's inclined to enter Mr. Patton's order, we ask that that also take into account and provide relief for anything that is outstanding and otherwise due and owing.  That's all I have.

THE COURT:  For other defendants?

MR. PALACIO:  Of course, Your Honor.  Certainly.  I mean, I speak only for Mr. Shanfelter.

THE COURT:  Right.

MR. PALACIO:  But presumably that would apply for everyone else.

THE COURT:  Okay.  All right.

MR. PALACIO:  Thank you, Your Honor.

THE COURT:  Thank you.  Thank you.

Mr. Harris?  Your client is -- oh, we have one more person.  I'm sorry.

MR. SCHERER:  Thank you, Your Honor.  I'm William Scherer, and I represent Mr. Mariano.

THE COURT:  Yes.

MR. SCHERER:  And you heard the hammer and the nail analogy earlier, and I suppose I'm a nail, because Mr. Mariano has been named in at least seven actions that the D&O carriers are paying for the defense, although they haven't paid since November.  When the 8-K was filed, Argo (ph.) took the position that they would need a comfort order once the bankruptcy was filed.

Your Honor, in May I was retained and I appeared for the first time before Judge Daniels in the hedge fund litigation.  And I urged Judge Daniels to enter an order for global mediation and that I had heard that the Wasik case was

being mediated and that we should join in the mediation.  And I urged him at that time that this policy was a wasting policy for 2016.  There was sixty-million dollars in coverage:  forty A-B-C coverage and twenty A side coverage in the event of insolvency --

THE COURT:  Um-hum.

MR. SCHERER:  -- to cover the directors and officers because the company would no longer be able to indemnify them.

And at that time -- I reread the transcript -- I said I think we have burned through over three million dollars in coverage and that there is a lot of coverage available, and we should try to globally mediate and settle the case -- all of these cases.

Since that time, Your Honor, I have participated in every mediation, both the Wasik mediation and then the Hudson Bay mediations.  I've worked with Bob Meyer who is a great mediator, by the way.  And now we have spent over twenty-five million dollars of that -- so another twenty since I made that plea in May.

And of course, everybody wanted to finish the discovery and finish this motion and finish that motion.  But to my knowledge, the insurance companies have paid the defense costs for all of the officers and directors that have been involved in this litigation.  And since I participated in the Hudson Bay mediation, and of course they objected and we had to

finish discovery, which cost millions, and it's a mediation privilege and I won't violate the terms of the privilege, but there was -- the carriers participated in that mediation, and I thought, at some point, we might have succeeded.

With respect to the Wasik mediations that we mediated for two solid days and shuttled diplomacy for hours and days and days, that matter almost got resolved. And it almost got resolved at a time when there were buyers for this company that were making offers or tentative offers that was a hundred million dollars more than the Cerberus debt, so we all had great expectations that this was going to be a successful mediation, settlement, and sale of the company.

And as it's turned out, as we know, once GIC went under, and was taken over by the receiver, and the money stopped flowing, here we are. At the time we started that mediation back in July -  I believe was the first one -- the publicly traded company, I think they were still in the $3.50 a share, at that point, and with lots of buyers.

So I've been riding this matter and I'm looking at all these hammers around. And being the nail I would urge the Court to order a stand-down and let us try to resolve these claims, because at the end of the day, if we don't, we will -- they call them wasting policies. Now, I don't think legal fees are wasted. I think legal fees are well-spent.

THE COURT: Yes. Right.

MR. SCHERER:  But so I don't use that term, but these policies are going to be dissipated to nothing, and we'll be right back where we are right now.  So I've made this argument yesterday to Judge Ramos in the class actions that he stayed, and agreed that if Your Honor enters a stay order, he's bound by it.  And so tomorrow, before Judge Daniels, I intend to remind him of the May transcript that I may read a little bit of and ask that we do a stand-down.  Because every time somebody gets to go forward and finish just a little bit more and a little bit more and a little bit more, it adds up to twenty-five million dollars, just a little bit at a time.

THE COURT:  Yes.

MR. SCHERER:  So and with respect to the comfort order, I'm uncomfortable also, because we are now in the third layer.  They've already spent the first ten, the second ten, and now we're in the third layer.  And they've got about five million dollars' worth of bills that they have not paid, including mine and everybody else's.

And so we would like -- and they want to pay as soon as there's a comfort order, as soon as they're comfortable. And then our discomfort won't be so much.  And I don't know that the carriers have declined to pay anybody that's represented an officer and director, ever, in this matter.  So that tower of insurance -- and there's ten, ten, ten, ten, ten, all the way up in '16.  And then '17, there are towers that are

there and there's issues as to whether '17 is involved or not.

But that'll all be handled in mediation if Your Honor will allow us to do that.  And I'm going to make that argument to Judge Daniels tomorrow, and that hopefully he will allow that.

Of course, rulings have consequences.  And then they have consequences that bind and may preclude issues or maybe collateral estoppel and res judicata and all those sorts of things that we have to spend a lot of money researching and handling that we won't if Your Honor would agree.  And so our filing that was -- I don't know -- late last night and the night before, we were kind of burning midnight oil here -- urges exactly that.

THE COURT:  Yes.

MR. SCHERER:  But it also urged that the language of the DIP 400 pages, be clarified so that it's clear that no -- there is no release or some kind of preclusion of any of the officers and directors in making claims and raising defenses in the after, if we're not able to resolve these cases.

And I've been advised by bankruptcy counsel that they didn't intend for that language to mean what we thought it might mean.  And so there's going to be, I hope, some changes in that language to reflect that there's no issue preclusion, no releases granted, with respect to claims made against my client in the future.

THE COURT:  All right.

MR. SCHERER:  Thank you.

THE COURT:  Thank you.  Thank you very much.

Yes?

MR. LEVITIN:  Sorry; good afternoon, Your Honor.  Joel Levitin from Cahill Gordon & Reindel in New York.

THE COURT:  Welcome, sir.

MR. LEVITIN:  Your Honor, I apologize.  I didn't particularly expect to speak today, so we did not file appropriate papers for pro hac.  I would ask that you indulge me at this point.

THE COURT:  I will, certainly.

MR. LEVITIN:  Thank you, Your Honor.  I just thought it would be helpful.  We represent certain of the directors and others in various of the litigation.  We support the mediation process.  The one thing I wanted to point out for Your Honor and for the other parties that are here today is that we have been in touch with counsel for Argonaut, which I believe is the next layer of the D&O coverage.  And they have provided us with a form of stipulation and motion to seek approval -- a comfort order, if you will -- to continue to cover the defense costs that have accrued since November, when I think they stopped paying those amounts.

And so we expect to work with other counsel to get that finalized in the next few days and to get that on file

with the Court and hopefully approved so that that can go forward and to pay defense costs.

THE COURT:  All right.

MR. LEVITIN:  Both what has accrued so far and what would be incurred going forward in the mediation and otherwise.

THE COURT:  All right.  All right, thank you --

MR. LEVITIN:  Thank you, Your Honor.

THE COURT:  -- Mr. Levitin.  Thank you.

Mr. Harris, I think you're up now.

MR. HARRIS:  Thank you, Your Honor.  I don't want to belabor a lot of the points that have been already raised, so I'm not going to repeat them.  I mean, Cerberus obviously supports the mediation here, anything that can potentially bring a global resolution to something as chaotic as the circumstances what's before Your Honor today would clearly be helpful.  And obviously finding a way to bring money, a pool of money available that people could then negotiate allocations of as between derivative claims, direct claims, dollar amounts of damages, et cetera, would obviously advance the ball dramatically here.

I do want to answer a couple of points that have been raised, and, in particular, I'm going to start with the ones raised by Ms. Somers on behalf of the shareholder Mbago Kaniki.

Her comment at the beginning was interesting to me.  It said that Cerberus' lending arrangement was "at the heart of

the debtors' collapse".  To me, anybody who spent five minutes with the record here would clearly understand that the heart of the debtors' collapse had nothing to do with the fact that they borrowed money from my client, repaid an existing loan facility, and were willing to advance funds to effectively fund a dividend to shareholders.  There's nothing inherently wrong with any of that.

What ultimately drove this underground was Mr. Mariano's conduct, his inability to get properly capitalized, the failure to diversify the carrier risk, and a variety of other elements of mismanagement, all of which will be the sort of things that are raised in the context of both the mediation and ultimately litigation, if that becomes ultimately necessary.

She also made comments about how potential claims against us are being ignored, put to the side.  They're going to go away with, you know, in the dark of night.  And that same comment was reiterated in not such stark terms but also by the creditors' committee's lawyer, Mr. Posner.

And I don't really get it, Your Honor.  We have a proposed release in a plan.  The plan is subject to Your Honor's approval.  The propriety of that release in the context of the settlements embodied in that plan and the consideration that's being provided by Cerberus in order to effectuate that plan, are all going to be part of a consensual or a contested

confirmation hearing before Your Honor if we get that far.

THE COURT:  Right.

MR. HARRIS:  So the idea -- and not to mention that the committee's got a statutory investigation period to do what it needs to do in order to give itself and inform itself as to what, if any, claims are out there.  And obviously they also benefit from the fact that there's a 250-page Wasik complaint that was attached to their objection.  And I apologize if it's [way-SIK] versus [wah-SIK], but I'm going with what I know.

THE COURT:  Right.

MR. HARRIS:  And in there, Your Honor, there are two counts of aiding and abetting breach of fiduciary duty that, frankly, are supported by the following fact:  Cerberus loaned money to the company in addition to allowing proceeds to be used to pay a dividend and repurchase shares.  That's the extent of the aiding and abetting charge, the facts on which it relies.  But people will do what they want to do.

The point of my commentary on this issue, Your Honor, is I think that including mediation of alleged claims against my client, unless there is more out there, is a diversion from what the main goal is here.  We're trying to work with the various plaintiffs in the various lawsuits and the insurance companies to create a pot of money that people can then work around.

I have said to anybody who has asked me that if we get

to a point in the conversation where that pot has been put on the table and now we're talking about allocations, that we're certainly happy to have a conversation about allocable shares. If people think that there are claims against us and think that we shouldn't get eighty percent versus twenty, but we should get seventy-five versus twenty-five, we're happy to have the conversation at that point in time.

But to delve into a series of facts and questions about whether Cerberus has liability to this estate in the context of that mediation, I think, is a big diversion from what the real focus of it was intended to be. We have plenty of people who are looking at that in other ways, and obviously it'll all come back to Your Honor at the end of the day.

With respect to Mr. Patton's comments and those that were just raised by Mr. Levitin from Cahill --

THE COURT: Yes.

MR. HARRIS: On the payment of defense costs, Your Honor has seen these stipulations in comfort order requests a hundred times. I don't think it's anything Your Honor should deal with, frankly, today. When appropriate pleadings are filed, people have an opportunity to review them, and it's procedurally proper before Your Honor, we can all deal with the issues at that point in time.

And one last comment, and I find Mr. Mariano's counsel's commentary to be interesting. I'm glad he supports

the mediation.  I'm sure he would like nothing more than for the litigation against him to stop for as long as possible. The query I would have and would ask the Court to raise with Mr. Mariano's counsel is is Mr. Mariano prepared to agree not to dissipate any of his assets or transfer them outside his normal business expenses and personal expenses while this goes on?  Because to the extent he is supporting a stay of litigation against him, he should not be free, in effect, to dissipate assets that might otherwise be available for payment of creditor claims should judgments be entered, and would also, obviously, give him a better opportunity to participate financially in the results of any mediated result.

So with that, Your Honor, we are supportive of this, and we would ask the Court to move forward with the mediation.

THE COURT:  All right.  Is Cerberus prepared to participate in the mediation?

MR. HARRIS:  Your Honor, we were intending to participate, because we are the largest, by far, creditor of this estate.

THE COURT:  Right.  Right.

MR. HARRIS:  We will be there.  We are happy to have any conversation with anybody that they want to have with us. I was not intending to go into a detailed history of our lending relationship with the client or the circumstances giving rise to our loan.  But, as I said, if we get to a point

where we effectively change the focus of the mediation from one related to creating a pool of funds that need to be allocated to what's the right allocation, which, and to me, is more of a plan negotiation than it is anything else, we're happy to participate in that.

THE COURT:  All right.  So I just want to be sure, because I'm not quite clear.  Are you prepared to be a party to the mediation -- in the mediation?

MR. HARRIS:  A party in the sense of having our claim -- alleged claims against us be --

THE COURT:  As part of the mediation.

MR. HARRIS:  -- be one element of it?

THE COURT:  Yes.

MR. HARRIS:  We don't think that's appropriate, Your Honor.

THE COURT:  Okay.  All right.

Ms. Coleman, yes.

MS. COLEMAN:  I'll try to be kind of brief, Your Honor.  Your Honor, I'll address the, kind of, the overarching issue, and then I have a couple of specific comments.  You've heard a lot.

Your Honor, nobody has articulated a serious issue that the Court has jurisdiction or that they're using up, and I have to apologize to Mr. Scherer.  I said wasting, not wasted. Very, very, very different -- very different concept.

THE COURT: Okay. Right.

MS. COLEMAN: I was not saying that the -- I was saying wasting in the means of diminishing. Or the using up, I'll say, of the D&O policies and the attempts to get at those D&O proceeds and to exert control or otherwise affect the debtors' claims in these cases, which are only in some of the cases, not in all of them, are not stayed under 362(a)(3).

And I know Your Honor knows what 362(a)(3) says, but for the transcript I'm going to read it. And it says that 362 stays, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate".

Nobody is going to argue that these D&O policies and claims -- litigation claims of the debtor -- are not property of the estate. Nobody has raised a serious argument on that point.

I do want, Your Honor, before I go to the specifics, to address the procedural point.

THE COURT: Yes.

MS. COLEMAN: The question of proceeding under 7001, under an adversary complaint. Your Honor, people do it both ways, as Your Honor obviously knows. Quite frankly, Your Honor, our independent director, when we discussed this with him, I don't think anybody saw this as really fundamentally adversary, and I think the fact that almost everybody who has

come up here, with few exceptions, have said sure, we'll mediate. I think that indicates that it really isn't an adversary, but we didn't really see it as trying to club people over the head and drag them in here with a big butterfly net. We thought that they would voluntarily come. And lo and behold, here they all are.

This went out on full notice, full twenty-one days' notice. Everybody's here. Everybody's been able to make all of the arguments that they would make if they were responding to a complaint. And we simply felt, and I think we've been borne out on this, that this was the most efficient way to get to a mediation, and it's really elevating form over substance to say that well, now, you got to go back and file a complaint and do the whole thing. Serve everybody and do it by adversary. And we're not in the business of trying to expend more resources of this estate to achieve the efficiency of a mediation.

So I think that just like in the SunEdison case in the Second Circuit, there's ample precedent for proceeding in this manner. And again, I think the fact that all the parties are here and obviously found their way to bankruptcy court and made their arguments very forcefully and articulately has really borne that out.

All right. Your Honor, I just want to make a couple of comments on the very specific points. With respect to

Hudson Bay --

THE COURT:  Yes.

MS. COLEMAN:  -- and, to some extent, CVI -- CVII, I guess.  I keep wanting to call it CVI II, and I apologize.  I think that's probably wrong.

I have an offer for them.  If they will stipulate that the D&O policy doesn't apply and that the defendants in those actions won't have any indemnification claims coming back against the company, go for it.  Then that litigation really won't be affected.  But I don't think -- in fact, I know they're not willing to make that stipulation, because I asked their counsel if they were, and they said of course not.  So that just tells you, Your Honor, that the results in those cases do affect the debtor and do affect property of the estate, and saying well, gosh, we've been in this litigation for a long time, and it's a darn shame that the debtor had to go and file bankruptcy and implicate property of the estate, and now we're stayed, well, you know, unfortunately, I don't mean to be flip about it, but that is one of the effects of Chapter 11.

And I think Your Honor's question, which is well, what would everybody else think about the fact that you were further down the road, and they're less far down the road, Chapter 11 is meant to take away that advantage, not to allow it to continue.  So I think the offer to participate in mediation,

except we really want to proceed so we can win and get a litigation advantage, including in some other case in Florida that is completely between nondebtors, and I don't know if that case maybe affects -- maybe there's an effect on the debtor in that case too, the one in Florida. But the whole point is that we're trying to wipe away as much of that as possible, again, faced with a pot that isn't enough to feed everybody the full amount of their claims.

And the same, as I said, the same thing with CVI. If you give up your claims against Patriot, which they've sued Patriot. And they're clearly saying that those are stayed.

THE COURT: Right.

MS. COLEMAN: The issue with the counterclaims is a troublesome one, because there is case law in the Second Circuit, which is correct, which says that the litigation stay of 362(a)(1), which contemplates pursuit of actions against the debtor, by its very nature of course it doesn't apply to counterclaims, because it isn't pursuing actions against the debtor.

However, their attempts, and they've been successful so far, to get Judge Daniels to act, notwithstanding the pendency of the bankruptcy case, and we, obviously, think that Judge Daniels' decision was wrong in this respect, because he did not look at (a)(3), which I just read.

THE COURT: Right.

MS. COLEMAN:  The counterclaims are clearly property of the estate, and that's black letter law under the Chrysler case, Northview v. Chrysler, which we cite in our papers.

So again, there's no serious question about that.  But again, it just seems unfair and contrary to the law to allow anything in those cases to proceed to the extent that they affect anything relating to property of the debtor, which it clearly does.

Your Honor, I wanted to talk about the question of the mediation and the confirmation timing.  We are not saying -- this is not a big race to get to confirmation.  We are not -- we would -- and, obviously, we'd have to discuss this with Cerberus, but the contemplation is that if the mediation isn't over by the time we get to the plan date of confirmation, the plan would be amended to allow somehow the participation in mediation.  If it's going well and everybody thinks it should be continued, then the mediation can go forward.

And similarly, to address Mr. Posner's concern, I told him during the break not only that we were trying to get the mediation going as soon as possible if Your Honor orders it to happen, but also that we are not -- this is not a gotcha. We're not trying to get to a point where the committee's going to dissolve and say see you later and continue the mediation. There's obviously some amendments that will have to be made. And we do contemplate the participation by the committee in the

mediation.

Whether or not Your Honor orders that the Cerberus claim should be in there, as we said in our papers, mediating the Cerberus claims is beyond the scope of what we initially contemplated, because, again, we're focusing on the D&O proceeds and trying to get everybody in the same place.  And there's a, as Mr. Harris pointed out, there is a procedure for that, for dealing with the claims against Cerberus.  The committee has a challenge period under the DIP, and we would anticipate that that's where that would get played out and the rigors of the confirmation process, as Mr. Harris also pointed out.

Finally, Your Honor, it is irrelevant to me -- to what the details of the insurance and the staff and the policy and how things are paid are.  One of the objectors -- I'm afraid I was writing too fast to write down the name -- but the counsel for Messrs. Smith, Walsh, and Pesch --

THE COURT:  Mr. Patton, yes.

MS. COLEMAN:  Oh, yes, Mr. Patton.  Sorry.  Apologies. Said that we had not put any evidence in with respect to the stack and how the insurance would be paid.  Well, in part, that's because some of those things are unknowable at this time, because insurers, as I'm sure Your Honor is aware, take the position until very late in the process that they're insuring under a reservation, and they may pay, they may not

pay.

But what is incontrovertible is two things.  Number one, we are subject to the DCGL, and obviously -- DGCL, excuse me -- and therefore there are indemnity claims that are going to be asserted against these debtors.  There are claims against these estates.  Obviously those are things the Court has jurisdiction over.

And number two, we have D&O policies, and we are willing to provide evidence of that.  I believe we've already done so, but to anybody who asks.

So with those two things, I don't think it's really necessary to this Court's consideration of this motion how exactly the pieces are going to work and how the building blocks are all going to move around.

THE COURT:  So you wouldn't have me enter then a comfort order?

MS. COLEMAN:  Well, Your Honor, I think that it's become typical for -- I do find it a little bit ironic that the very same party that's insisting that we should have proceeded by 7001 is now trying to make a motion for a comfort order that isn't before this Court.

But leaving that aside, we have no objection to the entry of -- typically I think insurers ask for relief from the stay in order to be able to make those payments, which exactly proves my point.  I mean, you guys wouldn't need a comfort

order if this were outside this Court's jurisdiction, now would you?  So I think that that's an admission that these policies are assets of the debtors' estate.  But no, the debtor does not object in the slightest to entry of an order for relief from the stay to allow the --

THE COURT:  Okay.

MS. COLEMAN:  -- insurers to announce (ph.) those costs.

THE COURT:  All right.  All right.  Thank you, Ms. Coleman.

MS. COLEMAN:  Thank you, Your Honor.

THE COURT:  Thank you.

MS. COLEMAN:  I should have asked Your Honor if Your Honor had any questions.

THE COURT:  I don't.  I don't.

MS. COLEMAN:  Great.

THE COURT:  I think I understand the situation well.

MS. COLEMAN:  Thank you, Your Honor.

MR. WARREN:  Do you wish to be heard?  I'll hear from you, and then I'll rule.

MR. WARREN:  Yes, yes.  Sorry, Your Honor.  Only a couple of sentences.

I don't recall the offer that Ms. Coleman referred to. I don't think we've ever spoken before on this matter or any other.  But we're not going to stipulate that the D&O policy

doesn't cover any judgment we win.  I don't know if it does or does not.  Maybe we win this judgment against Mr. Mariano.  We collect from his personal assets, and we don't care if the D&O policy covers or not.  If he still has substantial assets and needs to pay what our judgment is, that might not matter at all.

But again, I think this goes back to the point we raised earlier, that the real concern here seems to be to stopping the insurers from paying out on a judgment, which I am sure we'll all have time to talk about if we get a judgment against Mr. Mariano and not the judgment against Mr. Mariano himself.  And as to the indemnification claims, I don't think I get to choose whether or not people have indemnification claims with their company or not, so I don't view that as something I can make a choice about.

THE COURT:  I think that's right.  Yes.

MR. WARREN:  Okay.  That's all I have, Your Honor.

THE COURT:  All right.  Thank you.

MR. WARREN:  Thank you.

THE COURT:  Thank you.  Well, you know, I'm very much struck by the number of litigations facing the debtors and facing their officers and directors.  And that brings, of course, the directors and officers' policies into account, either to pay the judgment or to provide defense costs or indemnification.

And the debtor's goal to mediate the claims is a good one. And I'm a very strong proponent of mediation. I think it helps. I think it works. And I think it's appropriate.

And is mediation perfect? Of course not. Can it work here? I think it can. And I think that the parties ought to be open to mediation, at least in the first instance and at least for ninety days. I think that I'm not going to go with sixty. I'm not going to go with 120. I think that the ninety days that was suggested is appropriate. And if a party wishes to have more, if the mediation is becoming successful and you need a little bit more time, of course I would be willing to extend the stay.

But I am going to stay the actions. I understand Mr. Patton's argument about the procedural propriety and using Rule 7000, but I also understand that parties and courts do proceed by motion, and that's the way we're going here.

And the litigation is really a great distraction. And even assuming that the directors and officers' policies are not property of the estate, the litigation has the debtors involved in some capacity. And it's distracting to them, and it has to be, at least for the time being, stayed.

Addressing Hudson Bay, I am prepared to hold the litigations -- are related to the litigation -- to the bankruptcy -- and related-to jurisdiction, include suits between third parties which have an effect on the bankruptcy

estate.  And that is what we have here.  And the Court, of course, also has the power under Section 105, I think, to stay the actions and to order mediation.

So I am going to order the parties to the litigations to go to mediation.  I'll stay the cases from proceeding for ninety days.

As far as Cerberus is concerned, that's a little more difficult, but Cerberus is really a key player in this bankruptcy, and it's a defendant in at least one of the cases, and it's also threatened suit against Mr. Mariano.  And Cerberus -- I think Cerberus will be a party to the mediation as well under the circumstances.  I think that that's appropriate.

So yes, I will order mediation, and I will stay the litigations for ninety days.  And I think we need -- do we need an amended order to include Cerberus?

MS. COLEMAN:  I think we do, Your Honor.  We will work with counsel and submit that.

THE COURT:  Mr. Posner, yes, sir?

MR. POSNER:  At least as it relates to Cerberus, I think clarification that the committee represents the estate's interests with respect to that.  I'm not sure how, since they're the debtors' lender, the debtors can decide to call balls and strikes on resolving that.

MS. COLEMAN:  Well, Your Honor, we haven't really

given a lot of thought to that, but it --

THE COURT: No. No, we haven't talked about that.

THE COURT: Yes, but I guess I would say that this is a mediation. It's not --

THE COURT: Well, that's right.

MS. COLEMAN: It's not supposed to be an adversary.

THE COURT: It's not going to determine anyone's liability.

MS. COLEMAN: So I think that everybody is going to be there, and so I don't think that we do have an independent director that --

THE COURT: Yes.

MS. COLEMAN: -- who will be there and will participate in the mediation, and I would say that Mr. Landers is probably the appropriate person. He's a member of the board of the debtor. The debtor is the party that has these claims for now, and we haven't addressed the issue of whether the committee should go through the STN process and get the standing here. We haven't talked about that.

THE COURT: Right.

MS. COLEMAN: So I think it would be improper to leapfrog that analysis. And I believe that Mr. Landers' presence here, without any, you know, he's not the borrower. He's an independent board member specifically elected by the board to serve as their representative with respect to

litigations that the rest of them are, for one reason or the other, may have conflicts with respect to.  So I would think that given that it's a mediation, and these are claims of the estate, and the debtor has an independent fiduciary obligation and cannot be assumed that it will ignore that obligation, until there's evidence that the debtor is not discharging that obligation, I would say that -- and given the fact that everybody's participating in the mediation as a party, not as lobbying in adversary positions, I would think that we could proceed on that basis, at least temporarily, unless and until there's a reason to change that.  That would be our position.

MR. POSNER:  Your Honor, I don't disagree with much of what Ms. Coleman said.  I guess I just would point out to the Court that in the DIP order the debtors are stipulating that there are no claims or causes of action against the lenders. That's all.

MS. COLEMAN:  But, Your Honor, in the DIP order that's with respect to previous lending behavior.  Right.  I mean, we're not talking about the kind of things that Ms. Somers was talking about.

THE COURT:  I'm not prepared yet to give the committee the standing that you're really looking for in the case.  So I will say that we will certainly hope.

Mr. Landers is an independent director.  He can represent the debtors in the mediation.  And, of course, the

debtors will be present at the mediation.  And I think that's the appropriate way to proceed at this point.

MS. COLEMAN:  Thank you, Your Honor.

THE COURT:  Did any have a que -- yes?

MR. PALACIO:  Your Honor, I'm not --

THE COURT:  Mr. Palacio?  Yes, Mr. Palacio.

MR. PALACIO:  I heard what Your Honor said, and by implication I understand you're not going to rule on Mr. Patton's motion.  One thing I'm -- I only rise is --

THE COURT:  Oh, no, I'm not.  No, I'm not.

MR. PALACIO:  If Your Honor can urge somebody to get a comfort order on file.

THE COURT:  Absolutely.

MR. PALACIO:  Otherwise this mediation is probably not going to go as everybody wants it to go.

THE COURT:  I agree.  And I don't have it really before me today.

MR. PALACIO:  Agreed, Your Honor.  I'm just saying Your Honor's word carries a lot of weight.

THE COURT:  Yes.

MR. PALACIO:  So to those that are in the know and have the ability to get this on file -- I'd be happy to file one myself, but I think those that are really in a position and should file these should get a comfort motion and order on file sooner, rather than later.

THE COURT:  I think that's right.

MR. PALACIO:  Thank you, Your Honor.

THE COURT:  And maybe we could even do it on shortened notice, and I could take it up on the 8th.

MR. PALACIO:  Thank you, Your Honor.

MR. LEVITIN:  Your Honor, it's Joel Levitin.  It was my intention that -- I thought I mentioned before that we're working on that and hope to get the insurer to file that in the very near future, and we'll try to run it by whoever is interested in seeing it before it goes in.

THE COURT:  All right.  Thank you.  Thank you.

Yes?

MS. SOMERS:  And Your Honor --

THE COURT:  Yes.

MS. SOMERS:  This is Angela Somers; I had one last concern --

THE COURT:  Yes.

MS. SOMERS:  -- which is if Mr. Landers is going to be the representative on behalf of the debtor, that there be some line of communication between the committee equity holders so he can understand the point of view of those who are proponents of the Cerberus claim.

THE COURT:  All right.

Mr. Landers, yes, sir.

MR. LANDERS:  Yes, Your Honor.

THE COURT: Good afternoon.

MR. LANDERS: I wanted to say two things. First of all, I will be attending the mediation; there ought to be no doubt about that. The second thing is, I did specifically talk to the U.S. Trustee in the prior break and told her that she's free to call me at any time with issues that are concerning. And I haven't had a chance to say the same thing to Mr. Posner, but I'll say it publicly here. They can call me directly; they don't have to call me through counsel or anything like that. I am a true individual. I am not -- you know, Your Honor, it's good not to be a lawyer for --

THE COURT: Yes.

MR. LANDERS: -- for a while, but that's my role.

THE COURT: Are you making that offer to all of the parties to the mediation?

MR. LANDERS: Yes.

THE COURT: All right, good.

MR. LANDERS: Absolutely.

THE COURT: Fine.

MR. LANDERS: Absolutely.

THE COURT: Good, thank you, Mr. Landers.

MR. LANDERS: Okay.

THE COURT: Thank you, sir.

MR. LANDERS: Thank you, Your Honor.

THE COURT: Yes.

Ms. Jones, did you wish to bring me up to speed on the remaining two matters?

MS. JONES:  I did, Your Honor.  I was --

THE COURT:  Okay.

MS. JONES:  -- going to say, just as a household matter, Your Honor, we will submit an order under certification of counsel on Your Honor's ruling.

THE COURT:  Good.

MS. JONES:  Your Honor, that brings us --

THE COURT:  And I assume that ought to be -- I ought to get that in pretty quickly because there is litigation pending with -- somebody said something about a status conference tomorrow or something like that?

MS. COLEMAN:  Yes, Your Honor; it would be very nice to be able to inform Judge Daniels that he does not have to go forward with his status conference tomorrow because that would save a lot of people from going to court at 10 o'clock tomorrow morning in New York.  So if we could get that order on today, I think that that would probably be helpful.

THE COURT:  All right.

MS. COLEMAN:  So we will work on that right away and get it to Your Honor, and pass it by counsel, as well.

THE COURT:  That's wonderful, thank you.

MS. COLEMAN:  Thank you.

THE COURT:  Yes.

All right, Ms. Jones, yes.

MS. JONES:  So Your Honor, I think it leaves us with a couple short things left on the calendar.  Your Honor, matter 20 was the application of the debtors to retain Duff & Phelps.

THE COURT:  Yes.  Yes.

MS. JONES:  Your Honor, we filed the application pursuant to Section 363 --

THE COURT:  I saw that.

MS. JONES:  -- to retain Duff & Phelps.

THE COURT:  Yes.

MS. JONES:  And to provide Mr. Feltman as the CRO.

Your Honor, the terms of the engagement were set forth in the motion and in the engagement letter.  The U.S. Trustee did raise an issue with respect to the terms of Mr. Feltman's compensation, which we have resolved and we have clarified with an amended engagement letter.

Specifically, Your Honor, the concern was that that the milestones could appear to be somehow a success fee, which they're not.

THE COURT:  Right.

MS. JONES:  Rather, Your Honor, that was the result of negotiations with Duff & Phelps where Mr. Feltman, in probably a no good deed goes unpunished manner, agreed to take some of his monthly fee later on in the case so that the company wasn't hit with cash hits so early in the case.  So what we've done,

Your Honor, to resolve that is we fixed it so that they're date-specific --

THE COURT:  Okay.

MS. JONES:  -- as compared to clinical objective events happening, and we've made other changes that were requested by the U.S. Trustee to comport with the Alix protocol --

THE COURT:  Yes.

MS. JONES:  -- as the U.S. Trustee sees it with respect to this retention.

THE COURT:  All right.

MS. JONES:  So we've made those changes, Your Honor. Any other concerns that the committee had, we addressed, as well.  So Your Honor, I do have a form of blackline that I would -- if I may, would approach and show Your Honor.  I have given it to committee counsel to show the changes that we've made in light of Ms. Casey's concerns.

THE COURT:  All right, thank you.

Ms. Casey, thank you.  Yes.

Thank you.  All right, good.

MS. JONES:  And Your Honor, the amendment that we made to the engagement letter, obviously, is not attached to the blackline, but it is attached to the clean, and Your Honor, you'll see that those -- rather than the events happening, there's just now date-specific.

THE COURT:  All right.

MS. JONES:  And that resolved that issue, Your Honor.

THE COURT:  Very well.  All right, I will sign the order.

MS. JONES:  Thank you.

Your Honor, could we have the Court's indulgence one moment?  Mr. Posner is asking me a question that I do not know the answer to.

THE COURT:  Okay.

MS. JONES:  Just one moment, please.

THE COURT:  Absolutely, Ms. Jones.

I take it the answer was satisfactory to Mr. Posner?

MS. JONES:  I assume so, Your Honor.

THE COURT:  All right.

MS. JONES:  Your Honor, matter 21, Your Honor has already signed an order on that.  Matter 22, Your Honor, was the motion to file a late omnibus reply in connection with the financing that Ms. Coleman referred to.  Your Honor, I know we're coming back on that.

THE COURT:  Yes.

MS. JONES:  But I don't think there's any dispute about our needing to file the reply.  There were some last-minute objections, that type of thing we responded to.  So we would ask that that be permitted, Your Honor.

THE COURT:  I didn't sign the order, did I?

MS. JONES:  No, Your Honor, I don't think so.

THE COURT:  All right, I will sign that order.

MS. JONES:  Thank you, Your Honor.

THE COURT:  Yes.

MS. JONES:  Your Honor, do you need me to -- I'll hand one up?

THE COURT:  And the only other thing was, of course, the temporary restraining order application.

MS. JONES:  Right, and I have that, Your Honor, next.

THE COURT:  Okay.  All right.

MS. JONES:  To talk to you about that next.

Your Honor, do you need a form of order on that reply?

THE COURT:  If you have one, I'll take it from you; that way I won't have to look for it.

MS. JONES:  Your Honor, if I may approach?

THE COURT:  Yes.  Yes, Ms. Jones.

Thank you.  Save me some time.

Okay, great.  All right.

MS. JONES:  Your Honor, what I handed to the Court was a proposed order both with respect to the motion to shorten, as well as the order permitting the reply.

THE COURT:  Yes.  All right, I'm signing both orders.

MS. JONES:  Thank you, Your Honor.

THE COURT:  Okay.

All right, both have been signed.

MS. JONES:  Thank you, Your Honor.  And the next is matter 23, Your Honor, which was our motion for a temporary restraining order.  Your Honor, we filed this very early this morning against CareWorks Managed Care Services and York Risk Services Group.  This matter, Your Honor, was brought to our attention last evening.  We reached out to discuss the situation with our opposing counsel, but unfortunately, we were forced to have a very busy night and filed this motion to have it on file with the courts and so that we could present the motion today.

THE COURT:  Yes.

MS. JONES:  Your Honor, I've got good news and bad news on this.  The bad news, Your Honor, is that this was a very unfortunate situation.  This defendant is a member of our creditors' committee.

THE COURT:  Yes.

MS. JONES:  Makes it even more disappointing.  And intentionally, they decided to shut off services with the debtors with whom they've had an existing ongoing contract, and our motion and our complaint lay out that situation.

The good news, Your Honor, is that the defendant told us, and I just received an email from them while Ms. Coleman was talking, that they have agreed to turn the services back on and to -- I have talked with counsel, Your Honor, and they've agreed to entry of the order that we submitted to the Court.

Your Honor, we have added a paragraph to that order at the defendant's request that the debtors will continue to pay for the services post-petition pursuant to the contract.

THE COURT:  All right.

MS. JONES:  That's always been our intention, Your Honor, so we didn't have a problem with that.

THE COURT:  Yes.

MS. JONES:  Your Honor, we did leave in the space for a hearing on the preliminary injunction.  Again, hopefully, Your Honor, not needed; hopefully, I'll be able to inform chambers that's one less thing that's on your docket.  But frankly, Your Honor, just given the history here and our concern of what happened on what is a very important contract, we're going to leave it on --

THE COURT:  All right.

MS. JONES:  -- with space for a preliminary injunction.

THE COURT:  Should we make that March 8th, or is that too much to put on?

MS. JONES:  I think, Your Honor, this is one that actually we would benefit from it being a little further out --

THE COURT:  Okay.

MS. JONES:  -- because the temporary restraining order itself, as Your Honor knows, has a shelf life of fourteen days.

THE COURT:  Right.

MS. JONES:  I'm hoping, Your Honor, given now I think everybody's hopeful reread of Bildisco from the U.S. Supreme Court that we're not going to have this issue and I'm not going to have to bring it back before the Court, but I'd like to have a little bit of the expenditure of time to see if everybody remembers what that case teaches us.

THE COURT:  Let's see; we have fourteen days.  I could hear you on the afternoon of the 14th.

MS. JONES:  That's fine, Your Honor.

THE COURT:  That's fourteen days out, so why don't we plan on 2 o'clock on the 14th.

MS. JONES:  Thank you, Your Honor.  And Your Honor, I'm hopeful that we will be able to contact the Court prior to that and say either that we don't need the hearing or that we can continue off that hearing because everybody has been doing what the contract requires everybody to do.

THE COURT:  All right.  Good, I hope that's the case.

MS. JONES:  Your Honor, may I approach with a --

THE COURT:  Yes.

MS. JONES:  -- form of blackline and the clean?

THE COURT:  Please.

Good afternoon.

MR. MANN:  Good afternoon, Your Honor.  Kevin Mann on behalf of --

THE COURT:  Yes.

MR. MANN:  -- CareWorks and York, the defendants now in this adversary proceeding.  I don't want to get into testifying with the Court, but I was not made aware of this issue until about 8 o'clock or so last night.  And I know attorneys work twenty-four hours a day, but it's not always easy to get ahold of your client after hours, so that, I guess, is what led to Ms. Jones having to stay up all night and get this on file.

I will say that with the added paragraph that we discussed, we do not object to the form of order that's been handed up on the TRO.  March 14th, I'm not available, but I'll make sure that somebody else is if we do have to move forward.

And one last thing I just wanted to make sure we get on the record, Your Honor, the motion refers to the Contract as a defined term --

THE COURT:  Yes.

MR. MANN:  -- as the August 6th, 2014 managed-care-services agreement --

THE COURT:  Yes.

MR. MANN:  -- which we believe is the operative contract, but the exhibit includes that contract and an old contract from 2007.  There is a footnote in the complaint that clarifies that, but there's no footnote in the actual motion for TRO that clarifies that.  So I just wanted to make sure on the record that the defined term Contract is the managed-care-

services agreement from August 6th, 2014, Your Honor.

MS. JONES:  Your Honor, I can confirm that.  We did drop that footnote into the complaint because there were the two contracts, and we wanted to make sure that we received confirmation from the defendant that the contract from 2014 actually supersedes and is the contract we're all working under.

THE COURT:  All right.

MS. JONES:  And with that confirmation on the record, I do not have a problem with that.

Your Honor, with respect to scheduling, if the 14th is not good for Mr. Mann, I have no problem finding a different day that he might be more available because, Your Honor, again, I am hopeful that we're not going to have this hearing.

THE COURT:  How about the 13th, Mr. Mann; does that work for you?

MR. MANN:  I think so, Your Honor, if you'll indulge me to look at my calendar real quick?

THE COURT:  Yes, of course.

MR. MANN:  I just know I'm in depositions all day on the 14th.

THE COURT:  That's fine.

MR. MANN:  I apologize.

The 13th works for me, Your Honor.

THE COURT:  3:30, all right?

MR. MANN:  Sure.

THE COURT:  Can we do this at 3:30?  Ms. Jones, 3:30 is all right?

MS. JONES:  That's fine.

THE COURT:  I know that's cutting it a little close for the end of the day, but hopefully, it won't matter.

MS. JONES:  That's fine, Your Honor.

THE COURT:  All right.

MS. JONES:  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Mann.

MR. MANN:  Thank you.

THE COURT:  All right.

MS. JONES:  Your Honor, I guess just one procedural thing before we go with respect to this.  Your Honor, we did -- and I wanted to make sure Your Honor saw it -- we did reserve our rights with respect to seeking attorneys' fees for having to go through this process.  Again, let's see where we go, Your Honor, over the next several months, and we'll see where that takes us.

THE COURT:  All right.  Oh, and for objections to be filed, Mr. Mann, how about the 12th at noon?  Or do you want to -- would you file a reply, Ms. Jones?

MS. JONES:  Your Honor, depending what it would say --

THE COURT:  Yeah.

MS. JONES:  -- we may need a reply.  I think the facts

really a pretty straightforward and the issues have been pretty straightforward.

THE COURT:  I think so, too.

MS. JONES:  And again, Your Honor, I'm hoping we're just not having to bother you with this.  But Your Honor, maybe if the --

THE COURT:  Let's make it the 9th at noon.

MS. JONES:  Thank you, Your Honor, and then if we need to reply, can we reply by the end of the day on Monday?

THE COURT:  That would be fine.

MS. JONES:  That'll give Mr. Keane and Mr. O'Neill something to do over the weekend.

THE COURT:  I don't think they need that, but that's all right.

MR. MANN:  That works for me, Your Honor.

THE COURT:  All right, great.  Thank you.

Oh, objections shall be filed and served no later than three business days, and then the replies may be filed on the end of the day on the 12th.

MS. JONES:  Yes, sir.

THE COURT:  Okay.  Okay, all right.  That takes care of the order.  I'll sign it.

And let's talk about the financing motion.  It's now a little after 1:30.  Is 3 o'clock reasonable?

MR. POSNER:  Your Honor, could we do 2:30?

THE COURT:  Is 2:30 -- well, that's a little tighter. I'll tell you what, we'll split it, we'll make it quarter to 3.

Do you have a plane or something that you're trying to catch?

MR. POSNER:  I have a personal issue, yes, your Honor.

THE COURT:  Oh, okay.

MR. POSNER:  I'm sorry.

THE COURT:  Well, then, 2:30 is what we'll do; we'll do 2:30.  Although I'm sure you wanted to get something to eat, but --

MS. JONES:  It's waiting in our conference room, Your Honor.

THE COURT:  All right, good.

MS. JONES:  We're going to try to facilitate it for Mr. Posner.

THE COURT:  Very fine; all right.  All right, everyone, we'll stand in recess until 2:30.

MR. POSNER:  Thank you, Your Honor.

(Recess at 1:37 p.m. until 2:35 p.m.)

THE CLERK:  Please rise.

THE COURT:  Thank you, everyone; you may be seated.

Mr. Posner, yes, sir.

MR. POSNER:  Your Honor, for the record, David Posner, Kirkpatrick Townsend, proposed counsel for the committee.

Well, we haven't reached a resolution, unfortunately.

THE COURT:  I'm not surprised; there wasn't that much time.

MR. POSNER:  There wasn't, unfortunately.  As I had said before, Mr. Harris, before we started the proceedings today, had grabbed me in the hall and made a proposal which was made in good faith and was productive.  We took some time and we made a counterproposal to him, which I know he, I'm sure, considered and discussed with his client.  We just made the counterproposal in the interest of time without the benefit of getting our client on the phone or our financial advisor.  Obviously, we're not at yes.

If Your Honor is inclined to grant the continuance we asked for before, recognizing there is a March 6th deadline, and obviously, Mr. Harris and his client will be free to do what they feel they need to do in light of that, we'll continue to work in good faith to try and get to yes.  I've been doing this, probably not as long as some people, but long enough to say that in my experiences, I can't think of that many instances where I didn't ultimately reach a consensus with enough time with the DIP lender, and we will try to do that if they think it's productive to continue to do that.  We'd like the opportunity.

And I will cede the podium to Mr. Harris.

THE COURT:  All right, thank you.  Thank you, Mr. Posner.

Mr. Harris, I note that time is tight.

MR. HARRIS:  Your Honor, time is tight and cash is even tighter.

THE COURT:  Yes.

MR. HARRIS:  But under our existing interim DIP order, we don't have a termination date until March 6th.

THE COURT:  Right.

MR. HARRIS:  The debtors do continue to have the authority to borrow things that they needed, and cash wasn't in their budget or different than what's currently forecast.  So we'll work on that.  I mean, I heard Your Honor's comment before about absent a consensual resolution, you had concerns about terms of the order, and --

THE COURT:  I did have some concerns, yes.

MR. HARRIS:  So on that basis, Your Honor, I think that it sounds like the adjournment is the right way to go for purposes of today.  I will say this, Your Honor, though; I mean, and I understand that the committee and its professionals are somewhat new to the case, a couple weeks in.

THE COURT:  Yes.

MR. HARRIS:  I don't want anybody to be harboring any impressions that this is something other than what it really is, and what this really is is a business that's in extremis, and it needs to get fixed really quickly.

THE COURT:  Yes.

MR. HARRIS:  It cannot suffer under the hardships of the kinds of fights that are being thrown out as possibilities here.  We made it very clear early on that this business is something that we are prepared to undertake as a project to rebuild value and keep people employed --

THE COURT:  Yes.

MR. HARRIS:  -- and frankly, as I readily admit, to help us earn back some of what will be a very large loss here. But at a certain point, some things just become unsalvageable. And I think people need to get realistic about where the recoveries are likely to be coming from for unsecured creditors in this case; it's almost exclusively, if not exclusively, on the litigation side and the trust.  I have told Mr. Posner that we are happy to talk about issues related to allocation, waterfalls, all those issues, but spending a lot of time diligencing the company -- I'm going to caveat this.

Beyond this meeting tomorrow where, hopefully, the company and its professionals will give supporting information that will allow Mr. Posner and the folks from Providence to better understand what I'm saying here today, because I don't think they currently grasp the reality of the situation here and how grave it is, absent that, I don't think the committee's time is best spent diligencing the business itself.  We're going to have a discussion about what enterprise value is for this when it comes to plan purposes and figuring out what my

deficiency claim is.  But their time here and whatever fees they want to incur are best spent focusing on that area of the case that is likely to be justifying and supporting recoveries for them.

I would be remiss if I didn't say again that my client is likely to be the largest unsecured creditor in this case. The magnitude of fees for the committee and the budget and the carve-out that are being requested are almost identical to what we've allocated for debtors' counsel which, to me, shows an extraordinary lack of grasp of the situation we're in.

This company cannot afford millions and millions of dollars of legal fees and professional fees because we're barely generating that much in revenue and new contracts and renewals in a monthly basis.  Performance has to get stabilized.  It has to, and we just don't have the time.  And I know what the articles are going to look like tomorrow morning, and that's not going to help.

Reorg Research, Bloomberg, Reuters, whoever's here today, will write articles about the views on mediation and the potential claims that people want to assert and the fact that investigations need to be done and will headline it with that the DIP financing's not been approved and needs to be put off. That's all just kind of layering on what is already an extraordinarily difficult situation for management.

There's a team of people who walked out the door last

week that were integral to the regrowth of the business and support of the business.  And to everybody who's been spending twenty-four/seven trying to hold this thing together, we just can't afford as collectively to make their jobs any more difficult than they already are.

So with that, Your Honor, we will do what we can to work with Mr. Posner to try and come to a consensus by next week.  If not, we will be here, prepared to litigate the propriety of the DIP as --

THE COURT:  That's right.

MR. HARRIS:  -- drafted.

THE COURT:  Yes.

MR. HARRIS:  And the Court will rule however it rules, and my clients will make whatever decisions they make based on that.  So I appreciate Your Honor's time and attention and look forward to seeing you next week.

THE COURT:  All right.

MR. HARRIS:  Thank you.

THE COURT:  How does the 5th look?  I know that we have the 6th as the deadline; are you available on the 5th? That's Monday, at 11 o'clock.  If not, tell me, and I'll schedule it differently.  I don't have a lot of time, but I do have some.

I could hear you Tuesday morning, 10 o'clock.

MR. HARRIS:  Your Honor, if we're going to do

something before the 8th, which I would greatly appreciate --

THE COURT:  Yes.

MR. HARRIS:  -- let me just quickly look at my calendar here, I could be here on the 5th.  I would just have to have a hard stop sometime around -- by 3 or 4 o'clock because I may need to fly to the West Coast that night.

THE COURT:  That would be fine, yes.  Are other people available on the 5th?

IN UNISON:  Yes, Your Honor.

THE COURT:  How about you, Mr. Posner?

MR. POSNER:  Yes, Your Honor.

THE COURT:  All right, let's tee this up on the 5th at 11.

MR. HARRIS:  Terrific, Your Honor; I appreciate it.

THE COURT:  And look, talk it through; I recognize the difficulties, and I just think that perhaps the committee has not been on board long enough to really have a handle on the facts, and I think that will be helpful to them.  And there may be some issues that remain and that I'll have to decide, but if you can narrow them, that would be helpful to me.

MR. HARRIS:  Understood, Your Honor; we will try to do exactly that.

THE COURT:  Okay.

MR. HARRIS:  Thank you for your help.

MR. POSNER:  Thank you.

THE COURT:  All right, anything else, anyone?

All right, everyone; we'll stand in recess.  I'll see you on the 5th at 11.

IN UNISON:  Thank you, Your Honor.

THE COURT:  Thank you.

(Whereupon these proceedings were concluded at 2:44 PM)

**I N D E X**

**E X H I B I T S**

| DEBTORS' | DESCRIPTION | PAGE |
|---|---|---|
| -- | Declaration of James Feltman | 45 |

**RULINGS**

| | Page | Line |
|---|---|---|
| Debtors' utilities motion, granted. | 31 | 9 |
| Debtors' first omnibus motion to reject certain leases, granted. | 35 | 13 |
| Debtors' cash-management motion granted on an interim basis. | 52 | 7 |
| Debtors' pass-through motion granted on an interim basis. | 52 | 17 |
| Debtors' motion to (I) compel mediation of claims against the debtors' directors and officers and (II) temporarily stay related litigation pending the outcome of mediation is granted. | 145 | 4 |
| Debtor's application to retain Duff & Phelps and James Feltman as CRO, granted. | 154 | 3 |

RULINGS (cont'd.)

| | Page | Line |
|---|---|---|
| Debtor's motion to file a late omnibus reply, granted. | 155 | 2 |
| Plaintiff's motion for temporary restraining order, granted. | 157 | 18 |

# C E R T I F I C A T I O N

I, Clara Rubin, certify that the foregoing transcript is a true and accurate record of the proceedings.

March 1, 2018

_____          _____

**CLARA RUBIN**                          **DATE**

eScribers, LLC

352 Seventh Avenue, Suite #604

New York, NY 10001

(973) 406-2250

operations@escribers.net

**$**

**$3.50 (1)**
125:17

**[**

**[wah-SIK] (1)**
131:9
**[way-SIK] (1)**
131:9

**A**

**a1 (1)**
84:7
**a3 (5)**
84:8;107:16,17,
21;138:24
**abandon (1)**
15:6
**abandoned (4)**
31:18,20,23;34:19
**abandoning (1)**
34:25
**A-B-C (2)**
84:15;124:4
**abetting (3)**
111:6;131:12,16
**ability (8)**
17:19;19:11;
25:12;28:17;63:6;
70:9,10;148:22
**able (19)**
27:21;32:17;
34:12;63:5;69:23;
75:18;84:17,17;
87:4;102:14;107:4,
11;124:8;127:19;
136:8;141:24;
151:15;157:10;
158:13
**ably (1)**
70:15
**above (2)**
21:5;23:5
**absence (2)**
48:18;105:12
**absent (4)**
89:16;94:24;
165:12;166:22
**absolutely (11)**
18:2;46:22;47:17;
52:12;76:16;79:22;
103:20;148:13;
150:18,20;154:11
**abuse (1)**
60:19
**accentuate (1)**
81:10
**acceptable (2)**
27:16;60:1

**access (7)**
19:3,7,12;56:19;
70:6;72:3;80:19
**accomplish (1)**
13:6
**account (14)**
40:12;45:13,15,15,
19;46:1,19;47:16;
55:24;97:14;111:23,
25;122:24;143:23
**accountable (1)**
17:20
**accounting (9)**
23:25;40:8;41:13,
18;42:8;47:8;48:1,
14;51:18
**accountings (1)**
47:6
**accounts (19)**
40:13,23;41:7,7,
18;42:6;45:12,22,24;
46:17,25;47:13,14,
18,23;48:1,3;49:4,9
**accounts' (1)**
47:9
**accrued (4)**
26:23,24;128:22;
129:4
**accurate (2)**
65:20;69:18
**achieve (2)**
14:10;136:16
**acquire (1)**
45:16
**acquires (1)**
61:13
**acquisition (1)**
85:23
**Act (4)**
100:10;113:9;
135:10;138:21
**acting (1)**
75:23
**action (15)**
62:5,18;67:15;
76:4,16,19;85:18;
88:14;97:12,18;
98:23;107:13;
119:22,23;147:15
**actions (13)**
82:22;83:4;85:17;
94:16;97:6;98:24;
123:17;126:4;137:8;
138:16,18;144:13;
145:3
**activities (1)**
13:18
**activity (2)**
80:23;81:1
**acts (3)**
16:25;17:18;24:9
**actual (1)**
159:23

**actually (16)**
12:21;18:19;
35:24;37:1;57:11,
15;83:22;85:10;
94:12;100:3;105:1,
13,24;115:25;
157:21;160:6
**ADAM (2)**
9:11;11:3
**add (1)**
31:17
**added (6)**
26:17;30:23;36:6;
89:17;157:1;159:9
**adding (1)**
118:13
**addition (3)**
15:9;90:17;131:14
**additional (2)**
83:20;95:22
**address (19)**
13:1;17:23;19:5;
21:24,25;22:3;57:5;
67:2;78:12,17;79:4;
81:14;85:9;92:17;
110:6;121:9;134:19;
135:18;139:18
**addressed (3)**
75:5;146:17;
153:13
**Addressing (1)**
144:22
**adds (1)**
126:10
**adequate (1)**
32:2
**adequate-assurance (1)**
31:1
**adjourned (1)**
22:10
**adjournment (8)**
53:12;54:3;62:23;
63:9,10,24,25;
165:16
**adjournment's (1)**
77:20
**adjusting (2)**
28:9,9
**adjustment (1)**
105:18
**admin (1)**
61:19
**administration (1)**
77:2
**administratively (1)**
76:24
**administrator (1)**
61:23
**admired (1)**
66:14
**admission (2)**
59:3;142:2
**admit (1)**

**166:7**
**admitted (1)**
45:1
**admittedly (2)**
99:14,21
**admitting (1)**
44:24
**advance (4)**
15:4;63:12;
129:19;130:5
**advanced (1)**
15:3
**advances (1)**
57:25
**advantage (4)**
17:3;84:23;
137:24;138:2
**adversary (11)**
114:1,4,21;
115:13;135:21,25;
136:3,15;146:6;
147:9;159:2
**advised (1)**
127:20
**advisor (9)**
56:16,18;57:10;
62:2;63:6;69:5;78:6,
10;164:10
**advisors (1)**
55:12
**affairs (1)**
18:8
**affect (4)**
135:5;137:14,14;
139:7
**affected (2)**
109:9;137:10
**affects (2)**
63:7;138:4
**affidavit (1)**
46:24
**affiliate (1)**
13:13
**affirmatively (2)**
59:8;107:22
**afford (2)**
167:11;168:4
**afraid (1)**
140:15
**afternoon (22)**
77:14;79:24;
91:22,23,24,25;92:7,
12;102:23,24;
108:19,20;109:20,
21;110:8,9;120:21;
128:5;150:1;158:8,
22,23
**again (53)**
17:17,24;23:8;
24:12,15;26:14;
27:25;28:6,10,15,18,
21;29:20;32:15,21,
23;33:1,13;34:5;

**36:4;49:4,23;53:18;**
**54:25;60:17;73:4;**
**74:2;76:20,25;**
**83:11;88:20;89:12,**
**24;91:5,6;94:7,9;**
**98:17;100:25;**
**105:12;115:11;**
**122:17;136:20;**
**138:6;139:4,5;**
**140:5;143:7;157:9;**
**160:13;161:17;**
**162:4;167:5**
**against (62)**
15:24;16:20;
62:18;84:3;85:4,5,
21,24;86:4,14;87:25;
94:16,17;96:7,9;
97:12,21,22;98:9,16;
100:4;101:6,8,25;
102:3,5;103:1,13,23;
104:20;105:2;106:3,
5,25;107:22;110:13,
20;111:6,14;112:1;
119:6;120:16;
127:24;130:16;
131:19;132:4;133:2,
8;134:10;137:9;
138:10,16,18;140:8;
141:5,5;143:2,11,11;
145:10;147:15;
156:4
**agenda (9)**
12:18;20:7,12;
30:14;31:11;35:18;
43:8;52:18,21
**ago (4)**
23:9;55:14;95:14;
96:7
**agree (11)**
28:23;53:25;68:7;
75:7,8;116:3,4;
121:13;127:10;
133:4;148:16
**agreed (17)**
15:10,20;17:15;
18:14,17;58:17;
69:20;86:5;93:15;
97:4,8;121:6;126:5;
148:18;152:23;
156:23,25
**agreed-upon (2)**
16:7,12
**agreeing (1)**
113:2
**agreement (9)**
14:8,9,12;69:21;
70:13;93:5;95:14;
159:18;160:1
**agreements (1)**
95:16
**agrees (1)**
88:8
**ahead (2)**

32:14;36:19
**ahold (1)**
159:6
**aiding (3)**
111:6;131:12,16
**aimed (1)**
118:10
**ALBERTS (10)**
8:10;43:4,4,7,10,
14;44:1,4,6,7
**ALEXANDER (1)**
7:22
**aligned (1)**
76:17
**alive (1)**
61:8
**Alix (1)**
153:6
**allegation (1)**
24:9
**allegations (5)**
21:12;96:13;
110:20,24;111:5
**alleged (2)**
131:19;134:10
**allocable (1)**
132:3
**allocated (2)**
134:2;167:9
**allocation (3)**
76:5;134:3;166:14
**allocations (2)**
129:17;132:2
**allow (16)**
44:13;81:8;91:8;
114:10,11;116:6;
117:1,16;121:23;
127:3,4;137:24;
139:5,15;142:5;
166:19
**allowed (3)**
48:19;106:8;
116:12
**allowing (2)**
98:4;131:14
**allows (1)**
117:15
**all-time (1)**
80:6
**almost (14)**
41:22;55:19;83:5,
6,19;87:24;96:7;
104:23,24;125:7,7;
135:25;166:12;
167:8
**alone (4)**
13:18;14:20;57:9;
115:24
**along (5)**
99:8,15,22;
101:20;107:7
**alter (1)**
86:8

**alternative (4)**
53:22;58:25;59:1;
61:10
**alternatives (1)**
59:7
**although (7)**
56:18;85:22;
93:14;99:22;102:14;
123:18;163:9
**always (5)**
71:3;73:5;78:2;
157:5;159:5
**amazed (1)**
38:6
**amended (5)**
20:6;25:5;139:15;
145:16;152:16
**amendment (3)**
26:6;30:11;153:21
**amendments (1)**
139:24
**American (2)**
92:24;113:23
**Americans (2)**
92:25;93:1
**amount (9)**
29:4,5;46:19,20,
21;62:9;64:20;
99:18;138:8
**amounts (13)**
23:18;24:13,14;
28:6,7,14,18;36:8;
45:24;61:19;89:18;
128:23;129:18
**ample (1)**
136:19
**AMRON (1)**
6:7
**AMY (2)**
9:22;108:21
**analogy (1)**
123:16
**analysis (3)**
60:9,15;146:22
**and/or (1)**
18:22
**ANGELA (4)**
10:20;110:4,10;
149:15
**announce (1)**
142:7
**announced (1)**
94:13
**answered (1)**
18:16
**anticipate (1)**
140:10
**anticipated (2)**
32:24;122:2
**anymore (1)**
96:4
**apart (1)**
37:18

**Apologies (1)**
140:19
**apologize (5)**
128:8;131:8;
134:24;137:4;
160:23
**appear (1)**
152:18
**appearances (2)**
89:19,21
**appeared (2)**
85:20;123:22
**appears (3)**
61:7;76:11;109:5
**apple (1)**
93:2
**applicable (1)**
86:25
**application (4)**
79:15;152:4,6;
155:8
**applies (1)**
88:9
**apply (9)**
84:2,3,5,6,8;
107:21;123:5;137:7;
138:17
**appointed (6)**
54:13;55:7;69:1,6,
24;73:10
**appointment (2)**
68:23,25
**appoints (1)**
54:19
**appreciate (5)**
67:4,23;168:15;
169:1,14
**approach (4)**
31:6;153:15;
155:15;158:18
**appropriate (20)**
24:15;34:20;
36:11;37:8;51:16;
65:4,10;77:3,20;
98:13;105:21;121:7;
128:10;132:20;
134:14;144:3,9;
145:13;146:15;
148:2
**approval (4)**
58:21;67:7;
128:20;130:22
**approve (2)**
52:7;71:9
**approved (4)**
52:5;57:22;129:1;
167:22
**approximately (2)**
26:22;34:2
**April (3)**
93:25;104:14;
118:19
**area (1)**

167:2
**Argo (1)**
123:19
**Argonaut (1)**
128:18
**arguably (1)**
114:16
**argue (7)**
70:22;74:24,24;
86:7;88:4;90:1;
135:13
**argued (3)**
93:17;105:9;
114:11
**argues (1)**
115:1
**arguing (2)**
85:2;93:18
**argument (9)**
65:8;98:5;113:6;
117:15,17;126:3;
127:3;135:15;
144:14
**arguments (5)**
98:4;100:24;
104:7;136:9,22
**Aric (2)**
9:21;10:8
**arms (1)**
64:11
**arose (1)**
113:25
**around (12)**
46:16,17;79:23;
87:4,5;89:1,18;
122:8;125:20;
131:24;141:14;
169:5
**arrangement (1)**
129:25
**articles (2)**
167:16,19
**articulated (3)**
67:12;75:9;134:22
**articulately (1)**
136:22
**articulating (1)**
81:21
**Ashby (1)**
120:22
**aside (2)**
72:5;141:22
**aspect (1)**
64:16
**aspects (4)**
75:7;87:21;103:9;
112:9
**assert (3)**
101:21;107:22;
167:20
**asserted (17)**
87:14;88:1;90:5,6,
7,11;103:1,3,7,12;

104:18;106:4,10,17;
107:6;115:3;141:5
**assertions (1)**
66:5
**asserts (2)**
100:9;107:18
**asset (1)**
61:7
**assets (25)**
38:23;39:17;
40:11,18,24;41:4;
42:15,18,20;44:10;
67:17;76:24;84:12;
88:3;90:3,9;97:17,
23;101:9;102:6;
133:5,9;142:3;143:3,
4
**assist (1)**
15:8
**assistance (1)**
27:9
**associated (3)**
16:25;116:21;
117:10
**assume (6)**
36:10;38:12;
47:20;50:4;151:10;
154:13
**assumed (1)**
147:5
**assuming (3)**
78:8;98:10;144:18
**assurance (5)**
32:2;39:7;75:18;
105:12,24
**assurances (1)**
57:22
**attached (3)**
131:8;153:22,23
**attempt (3)**
17:17;82:15;87:12
**attempts (2)**
135:4;138:20
**attend (3)**
57:11,14;65:22
**attended (1)**
65:22
**attending (1)**
150:3
**attention (3)**
80:13;156:6;
168:15
**attorney-client (1)**
59:18
**Attorneys (24)**
6:3,8,13,22;7:2,8,
15,20;8:3,9,19;9:3,
10,15,21;10:3,8,19,
24;11:2,8,13,18;
159:5
**attorneys' (1)**
161:16
**attract (1)**

80:13
**audience (1)**
  56:16
**August (3)**
  99:7;159:17;160:1
**Austin (1)**
  120:25
**authority (1)**
  165:9
**authorized (3)**
  31:20;116:21;
  117:9
**automatic (9)**
  83:25;84:2;87:9;
  88:13;89:7,9;103:17,
  21;106:4
**automatically (1)**
  54:15
**available (10)**
  68:16;90:11;
  104:20;124:11;
  129:17;133:9;
  159:11;160:13;
  168:20;169:8
**avoid (2)**
  61:8;95:22
**aware (2)**
  140:23;159:3
**away (9)**
  13:11;17:17;
  18:18;56:18;113:6;
  130:17;137:24;
  138:6;151:21

**B**

**back (30)**
  25:14;34:21;
  42:13;49:9;50:14;
  55:6;58:14;59:25;
  61:17;64:2;70:17;
  71:15,20;77:18,19;
  79:3;91:18,18;
  94:20;111:2;125:16;
  126:3;132:13;
  136:13;137:8;143:7;
  154:19;156:23;
  158:4;166:8
**back- (1)**
  96:5
**background (2)**
  12:22;37:25
**back-to-back (1)**
  95:24
**backup (1)**
  72:22
**bad (6)**
  16:25;24:9;80:17;
  119:7;156:12,13
**baked (1)**
  55:4
**balance (1)**
  76:12

**balancing (1)**
  16:9
**ball (2)**
  77:4;129:19
**BALLARD (2)**
  6:2;102:25
**balls (2)**
  119:2;145:24
**Bank (2)**
  7:15;8:14
**bankruptcy (22)**
  42:3;60:23,24;
  83:25;89:20;90:14;
  94:19;95:12;98:20;
  101:5;106:21;114:3;
  116:11;118:19;
  123:20;127:20;
  136:21;137:17;
  138:22;144:24,25;
  145:9
**banks (2)**
  51:1,5
**barely (1)**
  167:13
**based (4)**
  40:21;76:10;
  83:16;168:14
**basic (2)**
  32:23;64:17
**basically (9)**
  26:23;44:9;47:15;
  62:4;73:19;74:1,2;
  105:7;106:21
**basis (16)**
  22:13,20;27:19;
  29:21;35:22;36:15;
  42:8;46:22;47:17;
  52:5;115:22,24;
  119:7;147:10;
  165:15;167:14
**BAST (1)**
  6:7
**bat (1)**
  15:15
**Bay (46)**
  9:15;11:8;81:22;
  85:9,20,25;86:4;
  92:3,15,18;93:16,16;
  94:25;95:5,14,17,20;
  96:6;99:5,16,21;
  101:6,14,20,23,23,
  24;102:1,10;104:5;
  109:16;112:23;
  113:2,4,5,18,19;
  114:8,16,20,25;
  116:2;124:16,25;
  137:1;144:22
**BAYARD (1)**
  6:12
**Bay's (1)**
  103:3
**beach (1)**
  91:19

**bear (1)**
  61:21
**became (1)**
  87:16
**become (3)**
  15:25;141:18;
  166:9
**becomes (2)**
  74:10;130:13
**becoming (1)**
  144:10
**beforehand (1)**
  78:22
**began (1)**
  46:7
**begin (1)**
  117:14
**beginning (2)**
  23:10;129:24
**begs (1)**
  44:11
**behalf (12)**
  43:5;54:17;92:15;
  102:25;108:22;
  109:22;110:11;
  112:21;120:23;
  129:23;149:19;
  158:24
**behavior (1)**
  147:18
**behind (2)**
  113:15;117:24
**behold (1)**
  136:6
**belabor (2)**
  121:2;129:11
**belaboring (1)**
  76:10
**believes (1)**
  51:21
**beneficial (1)**
  55:2
**benefit (15)**
  17:25;19:9;54:2,3,
  11,12;55:7;64:3,7;
  76:19;77:1;116:19;
  131:7;157:21;164:9
**benefits (2)**
  15:19;77:1
**BERGER (1)**
  6:21
**besides (1)**
  72:10
**best (6)**
  16:15;49:2,5;95:1;
  166:23;167:2
**bet (1)**
  96:19
**better (3)**
  63:10;133:11;
  166:20
**beyond (5)**
  13:3;110:19;

  119:18;140:4;
  166:17
**big (8)**
  34:3;49:4;82:6,6;
  95:24;132:10;136:4;
  139:11
**Bildisco (1)**
  158:2
**bills (1)**
  126:17
**bind (1)**
  127:7
**bit (15)**
  12:21;59:4;72:15;
  73:16;92:16;93:7;
  115:15;126:7,9,10,
  10,11;141:18;
  144:11;158:5
**bite (1)**
  82:25
**bi-weekly (4)**
  49:21,23;50:7,17
**BLACK (6)**
  7:1,3;37:12,12,12;
  139:2
**blackline (3)**
  153:14,23;158:20
**blank (1)**
  84:3
**blocks (1)**
  141:14
**Bloomberg (1)**
  167:18
**Board (15)**
  7:8;17:9;54:20,23;
  99:23;100:4,5,7;
  102:14,17,19;
  146:15,24,25;169:17
**Bob (2)**
  83:13;124:16
**books (2)**
  40:21;41:2
**borne (2)**
  136:11,23
**borrow (1)**
  165:9
**borrowed (1)**
  130:4
**borrower (1)**
  146:23
**both (22)**
  15:3;16:24;17:3;
  20:25;22:11;28:22;
  33:23;73:8;100:22,
  23,24;101:4;103:4,4;
  118:25;124:15;
  129:4;130:12;
  135:21;155:20,22,25
**bother (1)**
  162:5
**bottom (1)**
  51:17
**bought (2)**

  95:17,21
**bound (1)**
  126:5
**breach (6)**
  96:11;103:13;
  105:2;106:13;111:6;
  131:12
**breach-of-contract (1)**
  107:20
**break (8)**
  74:25;77:13;
  78:18,18;79:3;
  93:21;139:19;150:5
**breaks (1)**
  120:4
**brief (1)**
  134:18
**briefed (4)**
  106:12,13,16;
  114:11
**briefly (3)**
  72:2;113:5;118:5
**bring (7)**
  37:1;88:25;91:14;
  129:14,16;151:1;
  158:4
**brings (5)**
  20:16;80:1,1;
  143:22;151:9
**broad (1)**
  58:16
**broken (1)**
  81:15
**brokerage (1)**
  14:15
**brokers (2)**
  74:2;75:17
**brought (6)**
  37:16;96:6;99:6;
  102:5;122:20;156:5
**Broward (1)**
  106:25
**BROWN (1)**
  8:13
**bucket (2)**
  98:7,11
**budget (6)**
  61:21;63:8;72:12,
  22;165:10;167:7
**building (1)**
  141:13
**bullet-point (1)**
  121:4
**bunch (6)**
  60:22;67:15;
  70:15;93:19;95:15;
  102:3
**burden (1)**
  106:14
**burdens (1)**
  99:16
**burdensome (3)**
  41:19;47:11,24

Case 18-10189-CTG    Doc 264    Filed 03/02/18    Page 177 of 202

PATRIOT NATIONAL, INC., et al.
Case No. 18-10189 (KG)

February 28, 2018

**burned (1)**
124:10
**burning (1)**
127:12
**BURT (1)**
7:14
**BUSENKELL (2)**
8:13,15
**Business (43)**
9:10;11:2;13:5,7,
11,20,22,22,25;
14:15,16,18,23,25;
15:2,12,14;16:9,16;
19:15;27:10,22;
32:17;39:18;47:13;
73:20,22;74:1,9,19;
75:15,19;76:1;77:7;
120:2;133:6;136:15;
162:18;165:23;
166:3,23;168:1,2
**busy (1)**
156:8
**buts (1)**
82:5
**butterfly (1)**
136:4
**buy (2)**
76:23;111:2
**buyers (2)**
125:8,18
**bylaws (2)**
59:24;97:9

**C**

**CAHILL (3)**
7:7;128:6;132:15
**calendar (3)**
152:3;160:18;
169:4
**California (1)**
83:16
**call (9)**
38:21;55:11;
56:25;125:23;137:4;
145:23;150:6,8,9
**callback (1)**
25:13
**called (2)**
55:21;100:20
**calling (1)**
119:2
**came (7)**
13:10;41:21;42:5;
57:2;64:24;65:1;
115:12
**can (64)**
14:18,19;18:6;
20:21;24:23;26:17;
28:24;30:6;31:6;
34:11;36:10;41:20;
43:21;48:10,11,18;
49:6;56:13;69:3,21;

70:9,14;71:15;73:11,
13,20;75:1;77:8,18;
78:8,18;81:15,25;
88:25;90:1;91:17,
18;111:16,17;
113:15;116:13;
117:6;119:25;
122:11;129:1,13;
131:23;132:22;
138:1;139:17;
143:15;144:4,5;
145:23;147:24;
148:11;149:21;
150:8;158:15;160:2;
161:2;162:9;168:6;
169:20
**cap (5)**
21:4,5;23:5,15;
26:1
**capacity (1)**
144:20
**capital (3)**
14:7;39:24,25
**capitalized (1)**
130:9
**Captives (1)**
39:11
**Care (5)**
8:3;111:22;143:3;
156:4;162:21
**careful (1)**
15:9
**carefully (1)**
14:22
**CareWorks (3)**
8:3;156:4;159:1
**CARL (1)**
10:15
**CARLTON (1)**
7:14
**carrier (6)**
41:6;116:12,17,18,
20;130:10
**carriers (7)**
75:17;111:22;
117:9;122:13;
123:17;125:3;
126:22
**carries (1)**
148:19
**carve-out (1)**
167:8
**case (60)**
13:2;14:3,11,13;
15:6;16:2,3,8;37:16;
58:4,12;60:18;62:6;
64:21;65:2,5;67:4,
13;68:17;80:15;
83:8;85:6,21;86:24;
89:3;90:23;98:18;
99:15;100:1;101:5;
104:7,14,14;106:21,
22;109:3;112:9,10;

114:5;118:14,16,19;
123:25;124:12;
136:18;138:2,4,5,14,
22;139:3;147:22;
152:24,25;158:6,17;
165:19;166:12;
167:3,6
**case-law (1)**
86:10
**cases (20)**
14:23;16:25;28:3;
47:12;66:10;80:5,
16;83:5;99:13;
100:22;107:17;
113:23;124:13;
127:19;135:6,7;
137:14;139:6;145:5,
9
**Casey (9)**
50:21,23;51:1,4,8;
56:13;66:13;70:15;
153:19
**Casey's (1)**
153:17
**cash (11)**
19:11;22:11,16;
50:9,16,19;52:3;
55:23;152:25;165:2,
9
**cash- (1)**
35:15
**cash-management (1)**
50:21
**Casualty (3)**
6:14;9:4;37:24
**catch (1)**
163:4
**cause (3)**
28:6;71:16;97:18
**causes (9)**
62:5,17;67:15;
76:4,16,18;97:12;
98:22;147:15
**cave (1)**
71:3
**caveat (1)**
166:16
**cede (1)**
164:23
**cents (1)**
63:8
**Cerberus (51)**
9:10;11:2;14:6;
15:7;54:19,23;61:13,
25;62:6;67:19;
73:15;82:23;87:25;
110:13,18,21,23,25;
111:6,13,15;112:1,1,
5;118:23,25;119:3,6,
18;120:14,17,18;
121:14,17;125:10;
129:12;130:24;
131:13;132:9;

133:15;139:13;
140:2,4,8;145:7,8,
11,11,16,20;149:22
**Cerberus' (3)**
69:11;120:12;
129:25
**Certain (9)**
7:8;24:5;31:15;
39:19;46:19;75:6;
110:20;128:14;
166:9
**certainly (19)**
29:4;43:25;52:6;
70:7,9,10;75:21;
76:2;90:4;95:2;99:1;
100:24;107:23;
112:11,13;123:2;
128:12;132:3;
147:23
**certification (1)**
151:6
**cetera (1)**
129:19
**chagrin (1)**
18:12
**challenge (2)**
62:17;140:9
**challenges (1)**
72:10
**chambers (1)**
157:11
**chance (3)**
16:16;57:9;150:7
**Chancellor (1)**
40:7
**change (6)**
22:15,17;35:12;
43:23;134:1;147:11
**changed (3)**
20:9;83:21,24
**changes (9)**
30:18;43:15;50:1;
52:4,6;127:22;153:5,
12,16
**chaos (1)**
28:6
**chaotic (2)**
62:14;129:14
**Chapter (22)**
13:6;14:10,13,18,
20;15:14;19:2;55:5;
58:9,17;59:13;
60:20;62:1,11,12,19;
65:5;90:14;120:14,
15;137:20,23
**characterization (3)**
93:7,8;119:13
**characterizations (3)**
65:19;66:7;73:8
**characterize (1)**
59:16
**charge (1)**
131:16

133:15;139:13;
140:2,4,8;145:7,8,
**Charles (2)**
11:18;112:20
**chart (1)**
25:9
**chasing (2)**
74:7;89:18
**checked (1)**
68:4
**cheese (1)**
85:3
**chin (1)**
73:16
**chips (1)**
91:19
**choice (1)**
143:15
**chomping (1)**
85:7
**choose (1)**
143:13
**choosing (1)**
15:18
**chose (1)**
69:2
**Christopher (4)**
11:19;12:14;20:4;
112:20
**Chrysler (3)**
87:18;139:2,3
**circle (1)**
55:6
**circles (1)**
64:2
**Circuit (4)**
86:3,9;136:19;
138:15
**circumstances (7)**
19:8;108:3;111:3;
121:7;129:15;
133:24;145:12
**cite (3)**
113:23;115:6;
139:3
**cited (2)**
86:24;107:17
**claim (12)**
76:9,12;103:12;
105:14,21;106:3;
119:23;120:16;
134:10;140:3;
149:22;167:1
**claims (92)**
15:24;16:2;31:22,
25;54:7;62:17;
82:11,12,12,16,18;
84:3,13;85:21,22,22,
24;86:2,4,7,13;
87:13,13,15,25;90:5,
8,10,22;98:9,16;
100:9;101:6,22,22,
25;103:1,2,10,21,23;
104:1,6,17,20;105:2;
106:10,13;107:21;

Case 18-10189-CTG    Doc 264    Filed 03/02/18    Page 178 of 202
PATRIOT NATIONAL, INC., et al.
Case No. 18-10189 (KG)

February 28, 2018

110:13,15;111:8,11,
14,16,20;112:1;
114:15,16;119:6,7,
13,22;120:3;125:22;
127:18,24;129:18,
18;130:15;131:6,19;
132:4;133:10;
134:10;135:6,14,14;
137:8;138:8,10;
140:4,8;141:4,5;
143:12,13;144:1;
146:16;147:3,15;
167:20
**claim's (1)**
61:22
**clarification (2)**
105:24;145:21
**clarified (2)**
127:16;152:15
**clarifies (2)**
159:23,24
**clarify (2)**
49:16;116:19
**class (1)**
126:4
**clean (2)**
153:23;158:20
**clear (19)**
21:5;23:14;29:11;
33:18;50:9;57:21;
76:1;77:15,15;
86:23;87:11,23;88:8,
10;102:7;116:10;
127:16;134:7;166:3
**clearly (12)**
34:25;73:15;
84:10;86:14;90:9;
98:25;99:2;129:15;
130:2;138:11;139:1,
8
**CLERK (3)**
12:2;79:8;163:20
**client (23)**
54:17;57:4,9;63:6;
68:7;74:12;76:14;
78:9;104:5;105:5;
112:25;121:15;
122:7;123:10;
127:25;130:4;
131:20;133:24;
159:6;164:8,10,14;
167:5
**clients (6)**
60:25;94:2;113:7;
114:6;117:11;
168:14
**client's (2)**
76:8;122:18
**clinical (1)**
153:4
**clock (1)**
72:16
**close (4)**

26:3;113:17;
117:22;161:5
**closely (2)**
18:23,23
**cloud (1)**
117:2
**club (1)**
136:3
**Coast (1)**
169:6
**COBB (1)**
9:9
**cocounsel (2)**
92:4;110:4
**co-counsel (2)**
12:13;37:11
**Code (1)**
48:20
**coincidence (1)**
46:11
**coined (1)**
121:23
**COLEMAN (86)**
12:9,10,11,12,17,
25;13:16;18:10,12,
21;19:23;20:23;
53:23,23,25;55:25;
64:23;65:17;66:23,
25;67:1;68:13,21;
71:11,18;72:2,3,6;
74:22;77:17;78:20,
24;79:6,10,12,18,23;
80:1,5,9,12;83:11,
13,16;84:10;85:13,
15;87:18;91:12,21;
99:3;104:11;115:1;
118:11;120:3;
121:19;134:17,18;
135:2,20;137:3;
138:13;139:1;
140:19;141:17;
142:7,10,11,13,16,
18,23;145:17,25;
146:6,9,13,21;
147:13,17;148:3;
151:14,21,24;
154:18;156:22
**collapse (4)**
110:22,24;130:1,3
**collateral (12)**
19:12;39:7,9,10,
17;40:11,18;41:4;
57:25;62:11;63:12;
127:8
**colleague (2)**
19:18;21:24
**colleagues (1)**
12:14
**collect (1)**
143:3
**collection (1)**
101:8
**collectively (1)**

168:4
**COLLINS (3)**
10:18;110:5,10
**color (1)**
121:8
**comfort (12)**
121:23;122:13;
123:20;126:13,20;
128:20;132:18;
141:16,20,25;
148:12,24
**comfortable (3)**
19:6;76:5;126:20
**coming (6)**
65:9;72:17;82:17;
137:8;154:19;
166:11
**command (1)**
83:7
**commence (1)**
117:18
**commenced (1)**
72:19
**comment (7)**
35:3;64:22;74:10;
129:24;130:18;
132:24;165:11
**commentary (3)**
24:19;131:18;
132:25
**comments (7)**
22:1;30:20;55:18;
130:15;132:14;
134:20;136:25
**Commissioner (4)**
6:13;9:3;36:23;
49:12
**commissioners (1)**
37:16
**commissions (2)**
27:5,20
**Committee (79)**
8:19;10:13;18:2;
19:24;20:19,20,24;
21:7,23;22:24;23:2,
9;24:22;25:11;
26:16,19;27:13;28:1,
16,25;29:6;30:23;
32:1,17;33:12;36:5;
38:1;49:15,17;50:2,
18;51:15,20;53:20;
54:12,14;55:1,7,9,
11;57:12,16;58:7;
60:21,25;65:7;
66:12;67:14;68:14,
23,25;69:1,1,5,20,
24;73:10;75:22;
76:2;82:23;118:8,15,
19,21;119:2;120:7;
139:25;140:9;
145:21;146:18;
147:21;149:20;
153:13,16;156:15;

163:24;165:18;
167:7;169:16
**committee's (13)**
17:23;23:8;53:21;
55:2;56:12;57:9;
70:5;86:16;91:7;
130:19;131:4;
139:22;166:22
**communication (2)**
28:24;149:20
**community (1)**
75:18
**companies (3)**
39:24;124:22;
131:23
**Company (27)**
6:15;8:9;9:5;
13:13;18:3;37:24;
40:17;48:4;49:22;
61:8;63:14;64:19;
66:9;73:25;85:24;
102:2;124:8;125:8,
12,17;131:14;137:9;
143:14;152:24;
166:16,18;167:11
**company's (1)**
56:5
**compared (2)**
98:11;153:4
**compel (4)**
80:2;81:6;85:13;
87:1
**compelled (1)**
91:14
**compensation (1)**
152:15
**competing (2)**
80:16;84:13
**competitors (1)**
18:22
**compiled (1)**
33:14
**complaint (7)**
131:7;135:21;
136:10,13;156:20;
159:22;160:3
**complete (2)**
68:22;72:9
**completed (2)**
104:13,14
**completely (6)**
13:11;14:15;93:8;
94:5;98:1;138:3
**complicate (1)**
37:2
**complicated (2)**
84:16,18
**compliment (2)**
66:13,19
**comply (2)**
36:4;96:13
**component (3)**
86:22;87:2,8

**components (1)**
81:4
**comport (1)**
153:6
**CONAWAY (1)**
11:17
**concept (4)**
55:3;70:17;71:20;
134:25
**concern (16)**
38:9;40:15;44:2;
68:13;85:14;95:24;
108:25;112:8,12;
120:11;122:4;
139:18;143:8;
149:16;152:17;
157:13
**concerned (10)**
21:10;40:11;41:3;
46:13;71:4;105:5,5,
11;110:25;145:7
**concerning (2)**
111:4;150:6
**concerns (13)**
15:4;47:5;70:16;
71:3,17,19;108:2;
121:15,16;153:13,
17;165:12,14
**conclude (3)**
115:23;120:5,13
**concluded (1)**
170:6
**concludes (2)**
19:16;120:14
**condition (1)**
74:8
**conditions (1)**
14:23
**conduct (1)**
130:9
**conducted (1)**
106:11
**conference (4)**
103:5;151:13,16;
163:11
**confidence (1)**
14:17
**confidential (1)**
29:21
**confidentiality (3)**
59:24;93:4;104:11
**confined (1)**
47:21
**confirm (2)**
21:14;160:2
**confirmation (8)**
118:16;131:1;
139:10,11,14;
140:11;160:5,9
**confirming (1)**
65:6
**confirms (1)**
54:14

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

Case 18-10189-CTG   Doc 264   Filed 03/02/18   Page 179 of 202

PATRIOT NATIONAL, INC., et al.
Case No. 18-10189 (KG)                                                 February 28, 2018

**conflicts (1)**
147:2
**confusing (1)**
114:14
**conjunction (1)**
110:21
**connection (6)**
85:22;105:10;
106:7,9;114:16;
154:17
**CONRAD (1)**
7:19
**cons (1)**
111:16
**consensual (3)**
75:2;130:25;
165:12
**consensus (2)**
164:19;168:7
**consequences (4)**
16:8;68:11;127:6,
7
**consider (4)**
16:6;64:13;79:11;
111:16
**consideration (5)**
14:23;109:3;
111:19;130:23;
141:12
**considered (1)**
164:8
**consistent (2)**
57:20;75:6
**consolidated (1)**
103:2
**constituency (1)**
68:10
**constitute (1)**
67:17
**construct (1)**
111:10
**constructive (1)**
80:15
**contact (2)**
17:9;158:13
**contemplate (1)**
139:25
**contemplated (3)**
16:15;92:17;140:5
**contemplates (1)**
138:16
**contemplation (2)**
54:19;139:13
**contest (1)**
68:15
**contested (2)**
20:16;130:25
**context (9)**
13:1;16:3,6;19:17;
58:10;115:12;
130:12,22;132:10
**continu (1)**
44:12

**continuance (2)**
35:23;164:12
**continuances (1)**
18:15
**continue (25)**
18:2,17;19:1,11;
22:12,20;27:22;
35:22;36:2;51:4;
63:3;69:17;77:8;
83:9;91:3;98:5;
100:25;128:21;
137:25;139:23;
157:2;158:15;
164:15,21;165:8
**continued (7)**
16:17;19:3,7,19;
20:7;33:19;139:17
**continuing (1)**
44:12
**contract (17)**
96:12;97:13;
100:11;103:13;
105:2;106:13;
156:19;157:3,13;
158:16;159:14,21,
21,22,25;160:5,6
**contractor (2)**
21:1;25:25
**contracts (2)**
160:4;167:13
**contrary (6)**
16:20;17:18;59:7;
67:12;86:25;139:5
**control (2)**
135:5,11
**controlled (1)**
96:10
**controversial (1)**
49:20
**convened (2)**
55:9,11
**conversation (14)**
38:20;55:25;56:2,
7,14,23;65:10;69:13,
14;78:6;132:1,3,7;
133:22
**conversations (2)**
42:1;55:19
**Conversely (1)**
77:9
**conversion (1)**
65:6
**converting (2)**
62:4,7
**convinced (1)**
63:13
**cooperation (1)**
57:7
**copy (4)**
26:9;35:8;43:16,
22
**corporate (1)**
100:11

**correlatively (1)**
112:22
**cost (5)**
13:24;61:22;
73:25;105:6;125:1
**costing (1)**
62:6
**costs (18)**
31:23;86:21;
90:24;98:7,10;
116:13,21;117:2,4,9;
121:20,24;124:23;
128:21;129:2;
132:17;142:8;
143:24
**Counsel (42)**
10:13;20:20;
21:23;23:2,3,19;
26:19;28:1,9,15;
37:13;38:1,22;
47:24;49:14;51:15;
53:19;55:10,16;
56:23;69:2,5;92:18;
95:12;98:21;117:1;
118:8;127:20;
128:18,24;133:4;
137:12;140:16;
145:18;150:9;151:7,
22;153:16;156:7,24;
163:24;167:9
**Counsel's (2)**
28:2;132:25
**counterclaim (1)**
111:23
**counterclaims (21)**
84:6,7,8,10;88:17,
19;103:7;106:5,7,9,
17,20;107:4,6,15,18,
20;108:11;138:13,
18;139:1
**counterparties (1)**
75:17
**counterproposal (2)**
164:7,9
**country (1)**
87:5
**counts (1)**
131:12
**County (1)**
106:25
**couple (15)**
26:16;58:5;70:11;
77:13;79:14;80:23;
95:14;118:10;121:3;
129:21;134:20;
136:24;142:22;
152:3;165:19
**course (28)**
19:12;29:21;
38:13;49:11;50:4;
51:11;62:7,12;
82:17;84:4;85:3,7,
14;86:10;87:3;

123:2;124:20,25;
127:6;137:12;
138:17;143:23;
144:4,11;145:2;
147:25;155:7;
160:19
**COURT (467)**
12:3,6,10,16,24;
13:15;16:6;17:3,24;
18:9,11,20;19:22,24;
20:1,5,9,12,15;21:3,
13,21,24;22:2,5,8,14,
21,23;23:6,22;24:7,
21,24;25:5,13,14,16,
19,23;26:2,5,12,20,
25;27:3,6,23;28:4,
23;29:3,9,13,17,23;
30:3,7,10,13,16,21,
25;31:2,4,7,13;32:1,
4,6,8,11,19;33:6,11,
16,22;34:4,7,14,18,
23;35:3,6,10,17,20;
36:1,16,22,25;37:4,
6,10,14,20;38:2,6,8,
11,15;39:21;40:2,9;
41:1,9,11,16,25;
42:11,23;43:3,6,9,
13,25;44:5,7,17,23;
45:1,8;46:3;47:4,19;
48:7,9,16,21,24;
49:7,11;50:3,7,10,
13,15,20,25;51:3,7,9,
11,24;52:1,6,10,12,
14,17,20;53:1,6,9,12,
15,17,25;54:21;58:4,
12;60:5;63:17,21,24;
64:4;65:11,14;66:21,
24;68:13;70:25;
71:1,13,24;72:1;
73:3,18;74:5,17;
75:6,20;77:15,22;
78:1,4,11,16,23;
79:2,9,17,22,25;
80:4,8,11;81:5,7;
82:3;83:11,15;84:9,
24,24;85:12,14,16,
25;86:14,25;87:17;
88:15;91:11,21,24;
92:1,5,8,10,14,21,25;
93:10,17;94:7,15,17,
18,19;95:8,19;96:2,
14,17,19,22,25;
97:11;99:1,11;100:1,
6,21;101:13,18;
102:10,15,20,23;
103:16,19,22,24;
104:4;106:25;
107:10;108:1,5,9,12,
14,16,19,24;109:2,
10,12,12,14,19,24;
110:3,7,9;112:4,13,
16;113:1;115:10;
116:23;117:11;

118:1,3,6;119:9,15;
120:8,20,22,24;
121:11;122:9;123:1,
4,7,9,14;124:6;
125:21,25;126:12;
127:14;128:1,3,7,12;
129:1,3,6,8;131:2,
10;132:16;133:3,14,
15,20;134:6,11,13,
16,23;135:1,19;
136:21;137:2;
138:12,25;140:18;
141:6,15,21;142:6,9,
12,15,17;143:16,18,
20;145:1,19;146:2,3,
5,7,12,20;147:14,21;
148:4,6,10,13,16,20;
149:1,3,11,14,17,23;
150:1,12,14,17,19,
21,23,25;151:4,8,10,
17,20,23,25;152:5,8,
10,20;153:3,8,11,18;
154:1,3,9,11,14,20,
25;155:2,4,7,10,13,
16,19,22,24;156:11,
16,25;157:4,7,15,18,
22,25;158:3,4,7,10,
13,17,19,21,25;
159:3,16,19;160:8,
15,19,22,25;161:2,5,
8,10,12,20,24;162:3,
7,10,13,16,21;163:1,
6,8,13,16,21;164:1,
24;165:4,7,14,20,25;
166:6;168:10,12,13,
17,19;169:2,7,10,12,
15,23;170:1,5
**CourtCall (1)**
110:5
**courthouse (1)**
90:13
**courtroom (2)**
37:3;108:21
**courtrooms (1)**
87:5
**courts (6)**
17:3;77:2;80:19;
81:9;144:15;156:9
**Court's (6)**
63:19;67:24;
85:10;141:12;142:1;
154:6
**cover (9)**
39:9,13;104:20;
105:2,13;107:21;
124:7;128:21;143:1
**coverage (10)**
85:7;97:19;
104:17;115:20;
124:3,4,4,11,11;
128:19
**covered (13)**
26:8;61:14,20;

PATRIOT NATIONAL, INC., et al.
Case No. 18-10189 (KG)

February 28, 2018

82:11;88:3,5;97:2,4,
5,6,6;117:5;119:19
**covers (4)**
21:17;38:16;
105:20;143:4
**COYLE (1)**
11:21
**create (2)**
70:4;131:23
**created (2)**
15:22;70:3
**creating (1)**
134:2
**creditor (3)**
133:10,18;167:6
**Creditors (10)**
8:19;10:14;15:21;
61:15,24;62:20;
76:21;77:5;101:7;
166:11
**creditors' (6)**
26:15;28:16;
30:23;36:5;130:19;
156:15
**critical (8)**
14:12;26:13,14,
18;28:17;29:21;
39:4;55:23
**criticized (1)**
77:5
**CRO (4)**
17:8;38:21;66:8;
152:11
**CROSS (1)**
8:2
**cross-claim (1)**
111:23
**cross-examination (1)**
37:19
**cross-examine (1)**
44:20
**cube (1)**
42:4
**curious (2)**
37:6;120:6
**current (9)**
21:16;49:8;54:14,
19;61:12;64:13;
102:13;103:14;
122:21
**currently (9)**
16:15;46:10;
88:16;97:22;101:25;
102:1;118:14;
165:10;166:21
**customer (2)**
13:13,18
**customers (8)**
15:5;18:22,25;
19:6;39:19;41:5;
74:1;75:16
**customers' (2)**
14:17;15:4

**cut (3)**
61:3,12;75:24
**cutting (1)**
161:5
**CVI (13)**
6:3;102:25;103:1,
12;104:17;105:5,11;
106:5,25;107:22;
137:3,4;138:9
**CVII (1)**
137:3
**CVI's (2)**
103:5,10

# D

**D&O (31)**
24:8,9;80:19;
82:11,21;83:1,1;
84:12;85:7;87:23;
88:3,5;89:12,25;
104:16,22;105:2;
107:16;111:22;
116:12;119:19;
123:17;128:19;
135:4,5,13;137:7;
140:5;141:8;142:25;
143:3
**D&Os (1)**
121:1
**daily (1)**
80:18
**damages (4)**
32:25;33:25;
96:24;129:19
**DANA (1)**
6:9
**Daniels (17)**
85:1;88:17,19;
93:21;98:3;99:9;
101:2;103:4,6;
104:1;106:6;123:23,
24;126:6;127:4;
138:21;151:15
**Daniels' (1)**
138:23
**dark (1)**
130:17
**darn (1)**
137:16
**data (9)**
48:14,19,20;
56:19;69:23;70:6;
72:3,5,6
**date (8)**
34:17,20;43:15;
45:3;58:2;76:11;
139:14;165:6
**dates (1)**
43:23
**date-specific (2)**
153:2,25
**DAVID (5)**

8:20;21:19;53:18;
118:7;163:23
**Davis (2)**
12:13;65:15
**day (12)**
32:24;55:8,9;56:6;
125:22;132:13;
159:5;160:13,20;
161:6;162:9,19
**days (31)**
23:9;24:18;28:11;
29:15;45:14;64:10;
75:8;80:23;81:7;
86:15,17;91:8,9,17;
94:18;109:4;118:12,
12,20;125:6,6,7;
128:25;144:7,9;
145:6,15;157:24;
158:7,10;162:18
**days' (1)**
136:7
**DCGL (1)**
141:3
**de (2)**
24:2;28:6
**dead (1)**
59:15
**deadline (3)**
60:16;164:13;
168:20
**deadlines (1)**
64:9
**deal (12)**
44:14;54:6;69:12,
16;71:1;74:1;75:16;
78:21;90:23;120:2;
132:20,22
**dealing (7)**
17:4;19:6;60:22;
87:23;91:5;97:14;
140:8
**deals (1)**
34:2
**dealt (2)**
52:9;70:24
**debate (1)**
95:10
**debt (5)**
14:5,6;62:4,7;
125:10
**debtor (51)**
28:25;42:24;44:1;
45:17;46:4,12;56:9;
58:20;62:16;67:6,13,
18;68:10,19;69:15;
85:21;89:9;90:6;
92:18;98:17,22;
103:7;105:3;106:15;
107:18,22;110:15,
17;113:19,20,21;
114:7,21;115:3,4,17;
116:2,15;135:14;
137:14,16;138:4,17,

19;139:7;142:3;
146:16,16;147:4,6;
149:19
**debtor-in-possession (1)**
68:15
**Debtors (68)**
11:25;12:12;13:5;
15:14,24;17:7,16;
18:1;20:4;28:21;
31:21;38:22,24;
42:24;51:5;55:16;
56:17,21;57:14,21;
58:6,24,25;59:3,23;
61:8;68:19;70:18;
81:5,6;84:1,5;85:16;
86:4,5,14;87:10;
88:2;90:22;94:1;
97:1,7,7;98:19;
99:17;101:4,7;
102:1;103:15;
105:12,16,22;107:6;
109:1;118:25;119:3;
120:3;141:5;143:21;
144:19;145:23;
147:14,25;148:1;
152:4;156:19;157:2;
165:8
**debtors' (34)**
16:20;18:22;19:1,
11;23:3,19;24:15;
28:15;32:17;45:3;
55:19;56:15;69:12;
72:24;80:2,19;84:5,
7;87:25;88:17,19;
89:13,15;90:4;
94:22;101:10;
108:11;110:22;
130:1,3;135:6;
142:3;145:23;167:9
**debtor's (4)**
80:13;86:8;98:18;
144:1
**debtors-in- (1)**
93:17
**decide (6)**
49:24;77:19;
82:13;115:24;
145:23;169:19
**decided (7)**
12:8;55:12;75:24;
100:8;107:22;
119:15;156:18
**decides (1)**
61:23
**decision (6)**
75:2;106:18;
114:12,19;117:17;
138:23
**decisions (2)**
113:24;168:14
**declaration (10)**
37:17;39:6;40:20,
21;44:19,24;45:2;

46:6;59:5;66:9
**declaration's (1)**
37:21
**declined (2)**
13:19;126:22
**decretal (1)**
42:14
**deductible (1)**
39:9
**deed (1)**
152:23
**default (4)**
19:14;68:5,11,12
**defendant (4)**
145:9;156:14,21;
160:5
**defendants (5)**
112:24;114:15;
123:1;137:7;159:1
**defendant's (1)**
157:2
**defense (14)**
90:24;116:13,21;
117:4,9;121:20,23;
122:19;123:18;
124:22;128:21;
129:2;132:17;
143:24
**defenses (1)**
127:18
**defensive (1)**
106:10
**deficiency (3)**
76:9,12;167:1
**defined (2)**
159:15,25
**degree (1)**
93:14
**déjà (1)**
104:7
**Delaware (3)**
6:14;9:4;69:22
**delay (7)**
16:9,10,11;17:23,
25;19:5,9
**delicate (1)**
111:1
**delivered (1)**
34:24
**delve (1)**
132:8
**demanding (1)**
100:14
**demise (1)**
73:17
**demonstrate (1)**
64:7
**demonstrated (8)**
17:25;19:9;54:2,3,
10,11;55:7;64:3
**DENTONS (2)**
8:8;43:5
**depend (1)**

116:24
**depended (1)**
13:9
**dependent (1)**
19:2
**depending (2)**
84:14;161:23
**deposition (1)**
40:20
**depositions (2)**
99:20;160:20
**derivative (9)**
82:12;87:13,15;
88:1;98:22,24;
101:21,22;129:18
**derivatively (1)**
90:5
**describes (1)**
45:23
**designed (1)**
82:10
**desire (2)**
44:20;63:1
**despite (2)**
56:17;66:12
**detail (1)**
122:14
**detailed (3)**
81:2;83:17;133:23
**details (3)**
12:22;13:1;140:14
**determination (1)**
82:14
**determine (4)**
18:24;51:5;
102:14;146:7
**detrimental (1)**
19:15
**DEUTSCH (1)**
6:23
**DGCL (2)**
97:10;141:3
**dialogue (2)**
58:6;63:3
**Diers (1)**
12:15
**difference (1)**
118:21
**differences (1)**
63:4
**different (11)**
73:15;82:2;84:15;
87:5;93:8,10;
104:10;134:25,25;
160:12;165:10
**differently (1)**
168:22
**difficult (5)**
33:9;49:24;145:8;
167:24;168:5
**difficulties (1)**
169:16
**dilemma (1)**

111:13
**diligence (2)**
24:14;33:5
**diligencing (2)**
166:16,23
**diluting (1)**
95:23
**dilutive (1)**
100:17
**diminishing (1)**
135:3
**DIP (43)**
19:5,12,14;22:1;
52:19;53:7;56:15,
24;57:22;58:2,21,25;
59:4,6,9;61:11,18;
62:16,23;63:4,16;
67:6,21;68:1,2,5;
70:13,21,23;71:5,9;
72:11;78:19;79:5;
111:10;127:16;
140:9;147:14,17;
164:20;165:5;
167:22;168:9
**DIP- (2)**
69:10;70:10
**DIP-issues (3)**
55:17;56:15;69:10
**diplomacy (1)**
125:6
**direct (6)**
82:12;85:24;
101:25;106:4;
116:15;129:18
**directed (1)**
47:6
**directly (3)**
87:22;102:5;150:8
**Director (5)**
11:24;126:23;
135:23;146:11;
147:24
**Directors (22)**
7:9;17:9;25:1;
82:23;84:4;86:5,6;
90:2;99:23;100:4;
102:1,11,12,16;
103:15;124:7,23;
127:18;128:14;
143:22,23;144:18
**directors' (1)**
93:13
**disagree (5)**
54:1;93:7;109:15;
119:13;147:12
**disappeared (1)**
111:8
**disappointing (1)**
156:17
**discharge (5)**
54:13;58:7;60:18;
62:21;64:10
**discharging (3)**

54:16;55:1;147:6
**disclosure (4)**
58:21;60:10;
75:13;118:15
**disclosure's (1)**
37:8
**disclosure-statement (2)**
60:2,3
**discomfort (1)**
126:21
**discovery (23)**
41:22;42:10;94:1,
3,5,6;97:25;98:18;
99:7,15,18,20;
104:13,13,15,15;
106:8,11,16;113:9,
10;124:21;125:1
**discuss (5)**
15:4;29:24;51:21;
139:12;156:6
**discussed (7)**
27:15;28:20;
51:14;56:9;135:23;
159:10;164:8
**discussing (1)**
28:18
**discussion (5)**
71:10;77:24;
115:18,18;166:24
**discussions (4)**
45:7;48:11;69:17;
73:10
**disgorge (1)**
43:20
**disgorgement (6)**
36:9;42:16;43:17;
49:16;50:1,17
**disingenuous (2)**
59:4;69:9
**disk (2)**
72:5,7
**dismiss (10)**
88:19;94:7;98:1;
99:10,25;106:6;
113:7,10,11;116:6
**dismissed (2)**
113:15;117:12
**disposal (1)**
31:23
**dispose (2)**
31:20;65:5
**dispositive (1)**
48:19
**dispute (3)**
39:15;67:23;
154:21
**disputes (1)**
77:6
**disputing (1)**
121:20
**disrespect (1)**
74:9
**dissipate (3)**

90:20;133:5,9
**dissipated (1)**
126:2
**dissolve (1)**
139:23
**dissolves (3)**
54:15;118:16,20
**dissolving (1)**
120:7
**distinction (1)**
96:18
**distinguish (1)**
103:10
**distinguishing (1)**
102:7
**distracting (1)**
144:20
**distraction (1)**
144:17
**District (6)**
84:25;85:1;88:15;
93:22;103:3;107:7
**district-court (1)**
85:17
**diversify (1)**
130:10
**diversion (2)**
131:20;132:10
**divide (1)**
93:12
**dividend (2)**
130:6;131:15
**dividends (1)**
111:2
**docket (9)**
30:14;31:12;
35:18,19;52:22;
80:22;81:13;121:10;
157:11
**documents (3)**
69:4;70:6;95:15
**Dodge (1)**
65:2
**dog (1)**
56:11
**dollar (5)**
39:9;46:19;72:12;
74:11;129:18
**dollars (25)**
14:2;23:18;26:22,
24;27:1,7,18;28:8;
29:12;34:3;41:15;
46:16,18;57:25;
63:8;74:13;82:16;
94:3;98:11;124:3,10,
18;125:10;126:11;
167:12
**dollars' (1)**
126:17
**DONALD (1)**
7:16
**done (18)**
26:11;39:5;42:8;

55:5;62:20;68:19,
20;81:21;88:12;
94:5,6,23;97:25;
99:19;110:18;
141:10;152:25;
167:21
**door (1)**
167:25
**doubt (6)**
15:21;103:16,20;
105:20;106:3;150:4
**DOUGHERTY (1)**
10:9
**dovetail (1)**
76:22
**dovetails (1)**
121:21
**down (11)**
16:13;63:14;
81:15,15;84:16;
105:19;107:11,15;
137:23,23;140:16
**downside (2)**
16:11;91:16
**downsize (1)**
13:24
**draft (1)**
118:14
**drafted (2)**
121:25;168:11
**drag (1)**
136:4
**dramatic (1)**
19:10
**dramatically (1)**
129:20
**draw (3)**
57:24;63:11,11
**drawn (1)**
13:3
**draws (2)**
58:2;63:13
**driven (1)**
118:12
**drop (3)**
98:7,11;160:3
**drop- (1)**
84:15
**drove (1)**
130:8
**Ds (3)**
23:20,25;24:3
**Ds&Os (3)**
104:17;117:4,9
**dual (1)**
14:10
**due (5)**
23:20;24:14;
45:22;60:2;122:25
**Duff (5)**
56:21;79:15;
152:4,9,22
**duplicative (1)**

PATRIOT NATIONAL, INC., et al.
Case No. 18-10189 (KG)

February 28, 2018

107:6
**during (2)**
109:17;139:19
**duty (11)**
54:13,17;55:1;
58:8;60:19;62:21;
64:11;96:11;100:10;
111:7;131:12

**E**

**earlier (5)**
66:5;121:1,19;
123:16;143:8
**early (5)**
33:8;45:16;
152:25;156:3;166:3
**earmarked (1)**
90:2
**earn (1)**
166:8
**easy (1)**
159:6
**eat (1)**
163:9
**echo (2)**
66:4;122:4
**economic (2)**
17:12;74:7
**economical (1)**
112:11
**economically (1)**
74:10
**economy (1)**
77:9
**EDELSTEIN (1)**
10:2
**effect (5)**
14:23;122:17;
133:8;138:4;144:25
**effective (2)**
87:6;112:6
**effectively (6)**
52:9;54:23;58:24;
95:25;130:5;134:1
**effects (1)**
137:19
**effectuate (1)**
130:24
**efficiency (1)**
136:16
**efficient (1)**
136:11
**effort (5)**
61:8;84:19,20;
118:9;119:24
**efforts (2)**
58:20;80:18
**eight (1)**
18:13
**eighty (1)**
132:5
**either (9)**

25:10,12;67:11,
18;70:20;86:8;
105:16;143:24;
158:14
**elaborate (1)**
119:5
**elected (1)**
146:24
**element (1)**
134:12
**elements (2)**
75:4;130:11
**elevating (1)**
136:12
**else (13)**
42:21,24;44:24;
64:13;81:23;92:24;
95:11;120:19;123:6;
134:4;137:22;
159:12;170:1
**else's (1)**
126:18
**email (1)**
156:22
**embellishments (1)**
82:2
**embodied (1)**
130:23
**emphasize (3)**
16:23;17:25;28:10
**employ (1)**
77:8
**employed (1)**
166:5
**employee (5)**
21:1;23:4,11;
25:25;70:24
**employees (3)**
21:16;24:5;74:16
**Employees' (1)**
15:22
**employee-wage (1)**
20:18
**encapsulated (1)**
17:5
**end (16)**
30:4;59:12;62:6;
66:13;83:2;95:16;
104:15;106:21;
112:6,7;122:11;
125:22;132:13;
161:6;162:9,19
**engaged (1)**
69:19
**engagement (6)**
24:17;30:2;
152:12,13,16;153:22
**ENGLISH (2)**
10:7;108:21
**enough (5)**
78:13;138:7;
164:17,20;169:17
**enter (5)**

43:22;117:8;
122:23;123:24;
141:15
**entered (6)**
14:7;20:13;36:15;
43:11,16;133:10
**enterprise (4)**
13:9;17:13;19:10;
166:24
**enters (1)**
126:5
**entire (3)**
47:12,16;69:23
**entities (8)**
39:1,8;40:16;46:8,
10,12,12;47:6
**entitled (7)**
43:25;76:2;
109:16;114:6,7,23;
117:4
**entitlement (1)**
114:25
**entity (5)**
45:11,17,18,20;
51:19
**entry (4)**
28:19;141:23;
142:4;156:25
**equal (1)**
122:6
**equitable (1)**
80:15
**equity (4)**
61:14;62:5,8;
149:20
**equity-holder (2)**
110:12;112:10
**Erin (1)**
12:15
**error (1)**
36:8
**ESQ (34)**
6:4,9,16,17,18,23;
7:3,4,10,11,16,21,22;
8:5,10,15,20;9:6,11,
16,17,22;10:4,9,15,
20,25;11:3,4,9,14,20,
21,24
**essentially (4)**
45:25;58:1;95:21;
100:22
**establish (1)**
114:23
**established (2)**
59:6;115:6
**establishing (1)**
28:16
**establishment (1)**
40:23
**estate (30)**
37:25;38:3,3;
42:17;43:19;67:17;
68:9;76:25;77:1;

84:11,13;87:16;
88:3;89:14;90:3;
91:2;132:9;133:19;
135:10,11,12,15;
136:16;137:15,17;
139:2;142:3;144:19;
145:1;147:4
**estates (3)**
89:15;90:9;141:6
**estate's (2)**
39:17;145:21
**estimate (1)**
33:2
**estimated (1)**
33:25
**estoppel (1)**
127:8
**et (1)**
129:19
**EVAN (1)**
6:18
**even (25)**
45:16;46:6,13;
47:17;49:4;65:1,2,
25;69:1;72:18;73:9;
84:12;89:5;94:16;
98:7,10;102:1;
104:16;115:24;
116:2,3;144:18;
149:3;156:17;165:3
**evening (2)**
55:8;156:6
**event (4)**
36:13;112:2;
119:16;124:4
**events (2)**
153:5,24
**Eventually (1)**
40:6
**everybody (29)**
15:14;40:8;54:7;
64:24;76:19;82:4;
83:8,8;85:8;88:8,25;
90:14,18;91:14;
116:3;124:20;
126:18;135:25;
136:14;137:22;
138:7;139:16;140:6;
146:9;148:15;158:5,
15,16;168:2
**everybody's (8)**
63:1,19;64:11;
119:23;136:8,8;
147:8;158:2
**everyone (8)**
12:3;122:5,8,20;
123:6;163:17,21;
170:2
**evidence (13)**
44:22,24;45:3,9;
59:5,7;67:9,12;
115:14,15;140:20;
141:9;147:6

**evidentiary (2)**
114:24;115:16
**EVP (1)**
17:10
**exact (1)**
93:18
**exactly (12)**
18:4;25:15;44:4;
52:14;60:16;75:23;
77:9,10;127:13;
141:13,24;169:22
**examiner (2)**
56:8,13
**example (6)**
14:1;40:20;48:3;
68:22;84:24;90:13
**exceed (2)**
25:25;90:11
**exceeded (1)**
21:2
**exceeding (1)**
28:7
**exceeds (1)**
27:17
**Excel (1)**
84:17
**except (6)**
39:23;81:17,22;
102:18;114:5;138:1
**exception (4)**
58:22;82:6;87:24;
90:8
**exceptions (1)**
136:1
**excess (1)**
23:15
**exclusively (2)**
166:12,12
**excuse (2)**
86:18;141:3
**excused (2)**
105:22;108:6
**executed (1)**
51:2
**exercise (3)**
85:18;117:19;
135:11
**exercised (4)**
96:1,3;100:9;
102:17
**exercising (1)**
100:13
**exert (1)**
135:5
**exhausted (2)**
115:20,21
**exhibit (2)**
45:3;159:21
**exist (2)**
70:3,21
**existence (1)**
83:21
**existing (3)**

130:4;156:19;
165:5
**exit (1)**
61:18
**exiting (1)**
19:2
**expect (4)**
15:15;32:16;
128:9,24
**expectations (1)**
125:11
**expected (2)**
73:23;104:21
**expedited (4)**
14:13;109:2,7,9
**expeditiously (1)**
120:11
**expend (1)**
136:15
**expenditure (1)**
158:5
**expense (6)**
21:7,8;24:6;61:22;
82:17;105:6
**expenses (14)**
21:11,15;23:17,
25;24:2,10,25;25:9;
61:17;70:23;116:16,
17;133:6,6
**expensive (2)**
47:10;99:20
**experienced (2)**
57:1;61:1
**experiences (1)**
164:18
**explained (2)**
59:9;110:17
**explanation (1)**
96:5
**expose (1)**
90:22
**expressly (1)**
18:25
**extend (4)**
16:7;75:8;86:16;
144:12
**extended (1)**
91:8
**extending (1)**
89:8
**extension (2)**
19:13;89:6
**extensions (1)**
52:24
**extent (19)**
20:20,24;25:8;
34:12,21;39:19;
44:19;83:6;91:13;
93:11;101:5,24;
110:17;112:23;
116:24;131:16;
133:7;137:3;139:6
**extraordinarily (1)**

167:24
**extraordinary (2)**
15:3;167:10
**extremis (1)**
165:23
**eye (2)**
15:15;77:4
**eyes (1)**
61:2

**F**

**f/k/a (1)**
8:3
**face (5)**
23:24;24:15;
106:20;108:4;
119:11
**faced (1)**
138:7
**facilitate (1)**
163:14
**facility (3)**
61:18,18;130:5
**facing (4)**
47:14;107:8;
143:21,22
**fact (36)**
40:22;45:23,24;
46:8;55:20;62:25;
64:6;66:17;68:25;
69:14,19;83:6;85:6;
87:15;88:5,11;
93:25;94:3,5,6;
97:25;99:7,15;
111:21;112:4;
114:24;118:13;
130:3;131:7,13;
135:25;136:20;
137:10,22;147:7;
167:20
**factor (1)**
102:7
**facts (5)**
120:16;131:16;
132:8;161:25;
169:18
**failing (1)**
100:19
**failure (1)**
130:10
**fair (2)**
89:21;97:14
**fairly (3)**
16:24;28:3;87:23
**faith (5)**
80:17;96:11;
97:14;164:6,16
**fall (2)**
58:12;87:22
**fans (2)**
12:7;92:23
**far (15)**

46:13;58:6;72:21;
90:11;99:8,14,22;
101:20;107:7;129:4;
131:1;133:18;
137:23;138:21;
145:7
**FAs (1)**
72:22
**fashion (1)**
121:4
**fast (4)**
54:14;58:5;61:14;
140:16
**fast-paced (2)**
68:17,18
**fast-track (1)**
42:3
**fault (1)**
77:10
**favor (2)**
56:12;101:14
**feature (1)**
29:10
**features (1)**
14:12
**February (1)**
18:19
**federal (1)**
84:24
**fee (4)**
56:8,13;152:18,24
**feed (1)**
138:7
**feel (7)**
54:8;73:15;
101:14,17;110:14;
111:11;164:15
**fees (9)**
105:19,22;125:23,
24;161:16;167:1,7,
12,12
**Feldman's (1)**
40:20
**fell (2)**
13:11,16
**felt (1)**
136:10
**Feltman (20)**
17:8;38:20;39:2;
42:1;44:19,24;45:2;
48:25;57:15,23;
58:2;59:13,15,16;
60:13;65:23;66:8,
18;152:11,22
**Feltman's (6)**
37:17;62:24;
65:20,23;70:4;
152:14
**few (5)**
19:20;91:19;
103:9;128:25;136:1
**fiduciary (12)**
54:12,13,17;55:1;

58:8;60:19;62:21;
64:11;100:10;111:7;
131:12;147:4
**FIELDS (1)**
7:14
**Fifth (2)**
7:15;8:14
**fifty-five (1)**
13:17
**fight (3)**
12:6;32:21,21
**fighting (3)**
90:17;91:18;
107:12
**fights (1)**
166:2
**figure (2)**
13:21,24
**figuring (1)**
166:25
**file (33)**
24:2;31:22;52:22,
23,25;53:5;59:12,20;
60:8,9,10,12;61:12;
89:19;94:14;121:5;
122:15,17;128:9,25;
136:13;137:17;
148:12,22,22,24,24;
149:8;154:17,22;
156:9;159:8;161:22
**filed (43)**
12:21;15:6;18:7;
20:7,19;30:18;
32:24;44:18;58:13,
15;59:6;60:7,14,15;
79:18;80:7;81:13;
83:5;85:21;86:4;
89:20;94:16,19;
97:9;98:2;99:7;
104:14;106:24;
110:1,11;112:20;
113:7;115:3;118:10;
123:19,21;132:21;
152:6;156:3,8;
161:21;162:17,18
**filing (7)**
14:24;15:4;87:15;
89:21;116:10,11;
127:11
**fill (1)**
84:3
**Film (1)**
113:23
**fin (1)**
66:2
**final (11)**
30:19;42:9;43:12;
47:3;48:11;50:4,5,8;
62:25;63:2;68:5
**finalized (1)**
128:25
**finally (3)**
38:20;106:23;

140:13
**Finance (3)**
9:10;11:2;17:10
**financial (14)**
18:7;55:12;56:16,
18,20;57:10;62:1;
63:6;69:5;74:8;
75:18;78:6,9;164:10
**financially (1)**
133:12
**financing (13)**
19:3,7;67:7,13;
68:16;69:4;70:6;
71:6,9;73:21;119:1;
154:18;162:23
**financing's (1)**
167:22
**find (8)**
12:21;15:5;49:11;
55:21;57:18;112:24;
132:24;141:18
**finding (2)**
129:16;160:12
**fine (24)**
12:24;22:23;
25:18;26:2;33:2;
35:12;43:14,23;
44:7;51:24,25;
52:17;89:24;92:8;
94:8;108:10;150:19;
158:9;160:22;161:4,
7;162:10;163:16;
169:7
**finish (10)**
79:20;94:3,21;
116:7,7;124:20,21,
21;125:1;126:9
**finished (3)**
66:2;94:5;99:15
**finite (1)**
82:25
**FINIZIO (51)**
6:17;9:6;21:25;
22:25;23:1,1,7,23;
24:8;25:2,4,7,14;
26:4,6,9;27:23,25;
28:1,5,23;29:2,8,11,
14,18;30:8,9;32:9,
12,15,20;33:7,17,21,
23;34:5,8;37:2;
49:13,14,14;50:5,6,
8,11,14,16;51:25;
52:1;65:21
**firm (4)**
12:14;65:22;
66:12;92:4
**first (31)**
13:23;16:18;
20:17;28:12;30:19;
31:14;32:24;34:1;
36:18;54:1;56:20;
59:22;60:23;82:18,
25;85:16;86:22;

90:19;92:18;94:3;
103:12;104:2;
105:10;118:11;
119:6;121:13;
123:23;125:16;
126:15;144:6;150:2
**first-day (7)**
12:23;55:18;
57:21;59:3,8;62:24;
70:14
**FISHMAN (2)**
11:7;92:2
**five (8)**
45:11,21;47:9,21;
49:9;57:25;126:16;
130:1
**five-million-dollar (1)**
63:12
**fixed (2)**
153:1;165:24
**flexibility (1)**
27:21
**flip (1)**
137:19
**flock (1)**
91:18
**Florida (4)**
13:14;106:25;
138:2,5
**flow (2)**
51:17,19
**flowing (1)**
125:15
**fly (2)**
63:5;169:6
**flyspeck (1)**
64:16
**focus (4)**
76:3;101:10;
132:11;134:1
**focused (4)**
77:10;97:1;
101:22,24
**focusing (3)**
77:6;140:5;167:2
**folks (2)**
102:9;166:19
**follow (1)**
86:3
**followed (2)**
34:20;113:22
**following (5)**
21:7;49:25;61:15;
117:17;131:13
**follow-on (1)**
100:18
**footnote (8)**
80:21,24;81:2,17;
88:7;159:22,23;
160:3
**forced (1)**
156:8
**forcefully (1)**

136:22
**forecast (1)**
165:10
**foreclosed (1)**
62:11
**foremost (1)**
103:12
**forensic (2)**
17:5;48:14
**forgetting (1)**
77:6
**form (14)**
31:5;36:11;61:20;
69:20;70:3,5;71:9;
116:20;128:20;
136:12;153:14;
155:12;158:20;
159:10
**forma (1)**
60:9
**formal (2)**
42:10;121:5
**formed (2)**
23:9;46:7
**former (6)**
23:20;24:1;25:1;
102:11;103:15;
121:1
**forth (5)**
16:19;50:14;
86:10;91:4;152:12
**forthcoming (2)**
24:6,25
**forty (1)**
124:3
**forty-second (1)**
59:15
**forward (29)**
13:22,23;19:21;
20:17;54:24;67:25;
71:8,8,17;74:25;
75:3;77:19;86:20;
91:9;94:17;99:25;
100:24;101:5,8;
114:10;122:19;
126:9;129:2,5;
133:14;139:17;
151:16;159:12;
168:16
**found (2)**
15:2;136:21
**fourteen (3)**
157:24;158:7,10
**frame (5)**
16:7,12;65:3,4;
120:13
**framed (1)**
122:1
**frankly (15)**
40:14;45:22;
47:11;58:8;65:21;
66:18;68:9;74:3;
87:22;95:11;131:13;

132:20;135:22;
157:12;166:7
**fraudulent (1)**
100:10
**free (3)**
133:8;150:6;
164:14
**freefall (1)**
58:13
**freight (1)**
62:22
**Friday (3)**
55:8;56:24;69:13
**friend (1)**
74:19
**front (6)**
73:14;85:1;94:6;
99:9;101:2;104:1
**fruitful (2)**
121:17;122:5
**fudge (1)**
81:24
**full (7)**
12:18;66:1;70:6;
90:19;136:7,7;138:7
**fully (5)**
31:23;90:20;
106:12,13;114:11
**fun (1)**
12:20
**Fund (5)**
9:15;11:8;92:3;
123:23;130:5
**Fundamentally (2)**
75:12;135:24
**funded (2)**
38:14;45:19
**funds (8)**
38:4;46:4;47:23;
49:3,8;50:18;130:5;
134:2
**further (8)**
39:2;45:7;50:24;
54:18;61:5;106:8;
137:22;157:21
**future (3)**
75:25;127:25;
149:9
**fuzzy (1)**
54:8

**G**

**gaining (1)**
17:2
**games (2)**
12:20;113:23
**gaping (1)**
60:10
**garden-variety (1)**
107:19
**Gartman (88)**
12:14,15;19:18;

20:3,4,6,11,13,16;
21:4,14;22:2,4,6,11,
15,22;24:21,23;
25:16,18,20,24;26:3,
13,14,21;27:2,4,7;
29:24,25;30:4,11,12,
14,17,22;31:1,3,5,8,
11,14;32:5,7,14;
33:12,13,20;34:9,15,
19,24;35:5,7,8,14,15,
18,21;36:2;44:8,11,
18;45:4,9;46:4;47:8;
48:23,24,25;49:8;
51:10,13;52:2,8,11,
13,15,18,21;53:2,7,
11,14,16;55:21
**gave (4)**
59:15;66:17;
81:12;97:17
**Geddes (1)**
120:22
**gee (2)**
65:9;116:12
**GELLERT (1)**
8:13
**general (5)**
38:22;44:15;
87:19;121:6,8
**generally (1)**
17:23
**generate (1)**
75:1
**generating (1)**
167:13
**GERNGROSS (2)**
7:1;37:12
**gets (9)**
55:4;61:25;62:3;
65:2,25;78:7;107:2;
120:14;126:9
**GF (34)**
23:1,7,23;24:8;
25:4,7,14;26:4,9;
27:25;28:5;29:2,8,
11,14,18;30:9;32:9,
12,15,20;33:7,17,21,
23;34:5,8;49:14;
50:6,8,11,14,16;
51:25
**GIANCLAUDIO (1)**
6:17
**GIANFRANCO (4)**
9:6;23:1;28:1;
49:14
**GIC (2)**
73:17;125:13
**Gingello (2)**
6:22;10:3
**gist (1)**
110:12
**given (18)**
57:13;66:16;
70:19,20;71:4;

72:16;82:7;106:22;
108:3;109:4;121:25;
122:1;146:1;147:3,
7;153:16;157:12;
158:1
**gives (1)**
16:15
**giving (1)**
133:25
**glad (2)**
74:13;132:25
**GLANTZ (2)**
11:7;92:2
**GLASSMAN (39)**
6:16;36:17,18,20,
22,24;37:1,5,8,11,15,
21;38:3,7,9,13,16;
39:22;40:3,10;41:2,
10,12,17;42:1,12;
43:1,2;44:23,25;
47:4,5,20,22;48:8,
10,13,17,22
**Glassman's (1)**
44:8
**global (3)**
121:17;123:25;
129:14
**globally (2)**
39:13;124:12
**goal (3)**
17:2;131:21;144:1
**goals (2)**
14:3,10
**GODDESS (2)**
10:23;109:22
**goes (8)**
42:9;54:18,24;
120:11;133:6;143:7;
149:10;152:23
**Good (63)**
12:3,5,6,10,11;
20:2,3;22:25;23:1;
30:13;31:4;34:6;
36:21,22;38:19;43:3,
4;65:13,14;68:9;
70:7;73:4,5;82:5;
91:22,22,23;92:12,
23;96:11,20;97:13;
102:23,24;107:24;
108:19,20;109:20,
21;110:8,9;112:17,
18;119:7;120:21;
128:5;144:1;150:1,
11,17,21;151:8;
152:23;153:20;
156:12,21;158:17,
22,23;160:12;
163:13;164:6,16
**GORDON (2)**
7:7;128:6
**gosh (1)**
137:15
**go-shop (1)**

58:23
**gotcha (1)**
139:21
**grabbed (1)**
164:5
**grant (5)**
19:8;27:14;63:24;
116:1;164:12
**granted (1)**
127:24
**grasp (2)**
166:21;167:10
**grave (1)**
166:22
**great (15)**
26:2,4;31:8;33:16;
51:7;52:1;77:18;
83:9;97:19;124:16;
125:11;142:16;
144:17;155:18;
162:16
**greatly (1)**
169:1
**ground (1)**
56:6
**grounds (4)**
93:18;96:10,12;
100:12
**group (3)**
17:7;121:13;156:5
**Guarantee (11)**
13:13;38:4,12,25;
39:1,1,25;40:17;
45:17;46:9;48:4
**guess (14)**
20:7;21:11;24:9,
12,19;45:5;89:20;
101:17;120:11;
137:4;146:3;147:13;
159:6;161:13
**guys (1)**
141:25

## H

**hac (1)**
128:10
**hair (1)**
56:11
**half (1)**
13:10
**hall (1)**
164:5
**halt (1)**
47:15
**hammer (2)**
67:5;123:15
**hammers (1)**
125:20
**HAMMOND (1)**
11:21
**hand (2)**
16:14;155:5

**handed (3)**
34:21;155:19;
159:11
**handle (2)**
22:7;169:17
**handled (2)**
67:16;127:2
**handling (1)**
127:10
**hands (1)**
116:12
**hang (1)**
117:2
**happen (7)**
46:9,17;57:19;
86:20;113:3;114:9;
139:21
**happened (2)**
41:6;157:13
**happening (6)**
15:8;72:25;84:22;
114:13;153:5,24
**happens (1)**
120:12
**happy (17)**
28:8,21;34:10;
51:21;76:7;78:2,7;
81:13;105:25;116:6;
117:14;132:3,6;
133:21;134:4;
148:22;166:14
**harboring (1)**
165:21
**hard (6)**
34:11;42:5,6;
64:14,20;169:5
**hardships (1)**
166:1
**harm (2)**
16:10,18
**harmed (2)**
89:16;91:3
**harms (1)**
107:10
**HARRIS (55)**
11:3;56:25;57:6;
63:4;68:7,25;69:2,7,
13;71:15;72:5;73:1,
4,5,19;74:6,18;
75:21;77:16;78:15,
16,17,21;123:10;
129:9,10;131:3,11;
132:17;133:17,21;
134:9,12,14;140:7,
11;164:4,14,23;
165:1,2,5,8,15,21;
166:1,7;168:11,13,
18,25;169:3,14,21,
24
**Harris' (2)**
119:11;120:12
**hate (1)**
114:5

**head (1)**
136:4
**headline (1)**
167:21
**headquarters (1)**
18:3
**Health (1)**
113:25
**hear (16)**
19:24;22:24;
27:23;36:16,17;
42:23,23;47:4;53:10,
13;57:4;72:17;
90:25;142:19;158:8;
168:24
**heard (17)**
42:25;53:23;54:1;
56:20;60:1;72:17;
98:2;99:10;121:1,14,
19;123:15,25;
134:21;142:19;
148:7;165:11
**hearing (37)**
12:19;18:17;
22:22;26:19;30:22;
33:24;35:23;38:21;
41:23;43:12;44:14,
21;47:3;48:11;49:2,
25;51:16,22;55:24;
57:21;59:3,8,21;
60:3;62:24;70:14;
84:23,25;98:3;
109:17;114:10;
116:5;131:1;157:9;
158:14,15;160:14
**heart (4)**
110:21;111:14;
129:25;130:2
**hedge (1)**
123:23
**hedge-fund (1)**
88:14
**held (3)**
43:12;44:21;46:5
**help (9)**
39:2;73:20,21;
74:1,3;75:16;166:8;
167:17;169:24
**helpful (9)**
12:19;42:2;71:6,7;
128:14;129:16;
151:19;169:18,20
**helps (1)**
144:3
**Henry (2)**
9:21;10:8
**hereby (1)**
45:2
**here's (2)**
61:3;99:16
**high-level (2)**
95:6;115:18
**highlight (4)**

24:16;31:16;
34:16;49:19
**high-reward (1)**
82:10
**himself (2)**
69:3;143:12
**hindering (1)**
122:18
**hired (2)**
56:1,2
**hiring (1)**
55:15
**history (4)**
38:18;73:9;
133:23;157:12
**hit (3)**
56:6;121:10;
152:25
**hits (1)**
152:25
**hold (8)**
14:6;17:19;45:13;
47:25;73:7;91:12;
144:22;168:3
**holders (1)**
149:20
**holding (2)**
17:12;46:23
**holes (1)**
85:2
**honestly (1)**
78:5
**Honor (334)**
12:9,11,17,23,25;
13:2,7;14:1,5,8,14;
15:13,17;18:14;19:8,
18,23,25;20:3,6;
21:19,25;21:21;27:25;
30:9;31:11;32:9;
33:17;34:8;36:21,
24;42:13;43:2,4;
44:6,25;45:4;47:8;
48:6,22,23;50:23;
51:10,13,25;52:2,15;
53:16,22;54:10,18;
55:14;56:10,22;
57:12;58:8,11,19;
59:11;60:3,11,16,17,
21;61:13;62:10;
64:1,14,22;65:2,10,
13,16,19,21;66:6,9,
10,10,15,17,22;67:1,
1,6,8;68:3,8,21;
69:19;71:12,18,25;
72:8,21;73:5,7,13,
14;74:6,20,21;75:8,
10;76:8;77:4,12,20,
20,25;78:15,25;79:6,
12;80:2,5,12,12,25;
81:4,10;83:3,13;
85:16;86:19;88:9,11,
22;89:1,4,24;91:6,
20,23;92:12,16,22;

93:14;94:13;99:3,
14;102:22,24;103:1;
105:11,16,17;106:1,
23;107:16;108:15,
18,20,25;109:11,21;
110:8,11;111:24;
112:3,15,18,18;
113:20,23;115:12,
14,22,25;116:9,10,
15,18;117:7,13,15;
118:5,10;119:5,17;
120:19,21;121:2;
123:2,8,12,22;
124:14;126:5;127:2,
10;128:5,8,13,16;
129:7,10,15;130:20;
131:1,11,18;132:13,
18,19,22;133:13,17;
134:15,19,19,22;
135:8,17,21,22,23;
136:24;137:13;
139:9,20;140:2,13,
23;141:17;142:11,
13,14,18,21;143:17;
145:17,25;147:12,
17;148:3,5,7,11,18;
149:2,5,6,13,25;
150:10,24;151:3,6,9,
14,22;152:2,3,6,12,
17,21;153:1,12,14,
15,21,23;154:2,6,13,
15,15,16,18,24;
155:1,3,5,9,12,15,19,
23;156:1,2,3,5,12,13,
21,24;157:1,6,8,10,
12,20,24;158:1,9,12,
12,18,23;159:14;
160:1,2,11,13,17,24;
161:7,9,13,14,15,18,
23;162:4,5,8,15,25;
163:5,12,18,23;
164:12;165:2,15,17;
168:6,25;169:9,11,
14,21;170:4
**Honor's (15)**
74:10;77:13;
88:24;89:23;106:2;
110:6;113:24;115:7;
122:22;130:22;
137:21;148:19;
151:7;165:11;
168:15
**hope (8)**
91:15;99:17;
113:14;119:21;
127:22;147:23;
149:8;158:17
**hopeful (3)**
158:2,13;160:14
**hopefully (8)**
30:7;120:10;
127:4;129:1;157:9,
10;161:6;166:17

hoping (2)
158:1;162:4
HORAN (9)
11:9;91:22,23,25;
92:2,2,6,8,9
hot (1)
81:24
hours (5)
77:13;78:14;
125:6;159:5,6
household (1)
151:5
Hubbard (3)
12:12;20:4;72:4
Hudson (48)
9:15;11:8;81:22;
82:6;85:9,20,25;
86:4;92:3,15,18;
93:15,16;94:25;95:5,
14,17,20;96:6;99:5,
16,21;101:6,14,20,
23,23,24;102:1,10;
103:2;104:5;109:16;
112:23;113:2,4,5,18,
19;114:8,16,20,25;
116:2;124:15,25;
137:1;144:22
huge (1)
74:11
HUGGETT (1)
10:4
Hughes (3)
12:12;20:4;72:4
HUMISTON (7)
10:9;108:19,20,21,
25;109:11,15
hundred (2)
125:9;132:19
hundred-million-dollar (1)
62:3
hundreds (1)
82:16
hurts (1)
42:19

I

ice (1)
42:4
idea (4)
82:5;98:10;
107:25;131:3
identical (1)
167:8
identify (1)
49:3
identity (2)
23:13,16
ignore (1)
147:5
ignored (2)
111:8;130:16
II (14)

6:22;10:3;99:6;
101:24;102:10;
112:23;113:4,5,18;
114:8,20,25;116:2;
137:4
III (2)
7:3;10:15
illuminate (1)
116:19
imagination (1)
74:20
imagine (1)
121:24
immediately (3)
68:23,24;117:18
impacted (1)
98:20
impartial (1)
110:16
implementing (1)
28:5
implicate (1)
137:17
implication (1)
148:8
importance (2)
56:12;110:19
important (13)
15:5,25;19:4;
65:17;71:22;77:9;
79:10;90:12;95:6;
96:16;101:19;
117:20;157:13
importantly (2)
17:5;84:1
impossible (2)
58:7;63:15
impressions (1)
165:22
improper (1)
146:21
improperly (1)
40:14
improve (1)
114:17
inability (2)
60:18;130:9
inappropriate (1)
25:10
inarguably (1)
89:25
Inc (3)
6:3;46:6;102:25
incentives (1)
76:16
inches (1)
18:13
inclined (2)
122:22;164:12
include (4)
53:4;102:18;
144:24;145:16
included (2)

15:1;35:1
includes (2)
88:13;159:21
including (7)
40:12;76:8;82:21;
84:19;126:18;
131:19;138:2
incontrovertible (1)
141:2
incorporates (1)
30:19
incredibly (5)
45:13;47:10,10;
49:4;58:5
incur (2)
105:6;167:2
incurred (1)
129:5
Indeed (3)
18:2;57:3;67:16
indemnification (4)
137:8;143:12,13,
25
indemnifications (1)
97:7
indemnify (3)
86:6;97:8;124:8
Indemnity (2)
8:9;141:4
Independent (13)
11:24;17:8,8,10;
21:1;23:5,12;25:25;
135:23;146:10,24;
147:4,24
indicates (2)
88:7;136:2
indifferent (1)
119:8
individual (1)
150:10
individuals (3)
112:19;113:20;
117:21
inducement (1)
100:10
indulge (3)
12:23;128:10;
160:17
indulgence (1)
154:6
inexplicably (1)
59:12
inference (1)
109:15
inferences (1)
109:17
infirmities (1)
60:11
inform (3)
131:5;151:15;
157:10
informal (1)
31:15

information (44)
18:1,4;20:24;21:2;
22:18;23:7,11;24:17,
18,21;26:7,18;30:5;
32:11;33:4,9,14;
34:9,11,12;36:4;
49:3;56:20;60:8;
61:5;64:20;68:14,16,
18,22;69:19;70:1,2,
2,5,9,12,18;71:21;
72:14,21;76:3,11;
166:18
informational (2)
32:16;59:21
information-related (1)
26:15
informative (2)
98:16;101:4
informed (2)
21:14;94:14
infrastructure (1)
73:22
inherently (1)
130:6
initially (2)
87:14;140:4
initiate (1)
114:4
initiating (1)
114:21
injunction (5)
114:1,21;115:13;
157:9,17
in-person (1)
18:3
inquired (1)
56:8
insignificant (2)
62:9;89:18
insist (3)
71:7;117:5,7
insisting (1)
141:19
insolvency (3)
38:3;40:7;124:5
insolvent (1)
76:24
insomuch (1)
24:10
instance (1)
144:6
instances (1)
164:19
instead (1)
15:11
Insurance (39)
6:13;9:3;13:13;
14:15;36:23;37:16;
38:17;39:23,24;
40:17;41:5;45:18;
48:4;49:12;74:2;
90:7;93:13;97:2,3,4,
5,19;104:16,19;

105:8,13;106:19;
107:20;109:16;
114:15;115:2,17,19,
24;124:22;126:24;
131:22;140:14,21
insureds (3)
39:12,20;41:4
insureds' (2)
41:4;43:18
insured's (1)
39:18
insured-versus-insured (1)
90:8
insurer (3)
39:10;101:11;
149:8
insurers (8)
41:20;82:21;97:4;
98:8;140:23;141:23;
142:7;143:9
insuring (1)
140:25
intact (1)
75:19
integral (1)
168:1
intend (2)
126:6;127:21
intended (1)
132:11
intending (3)
80:13;133:17,23
intent (1)
96:12
intention (2)
149:7;157:5
intentionally (1)
156:18
intercompanies (1)
51:14
intercompany (2)
49:22;50:18
intercreditor (1)
77:6
interest (10)
17:12;74:4;75:25;
76:20,21;80:25;
89:25;115:4,8;164:9
interested (1)
149:10
interesting (2)
129:24;132:25
Interestingly (2)
113:25;114:13
interests (1)
145:22
interference (3)
96:11;97:13;
100:11
interim (18)
22:13,20;30:20;
35:22;36:12,12,15;
41:19;42:8;43:11;

Case 18-10189-CTG   Doc 264   Filed 03/02/18   Page 187 of 202

PATRIOT NATIONAL, INC., et al.
Case No. 18-10189 (KG)                                                February 28, 2018

49:17;50:22,24;52:5,
7;90:24;91:10;165:5
**interpose (1)**
42:10
**interrupt (1)**
32:13
**interruption (1)**
81:9
**interview (1)**
55:12
**interviews (1)**
55:10
**into (42)**
12:21,25;14:7;
19:13;40:3,6;44:22,
24;45:2,12,20;47:23;
54:6,18;55:4;61:5;
62:4;63:18;68:4,10,
12;71:1;72:11,23;
73:11,23;74:11;
75:15;81:16;84:20;
94:10;104:8,12;
111:19;119:21;
122:14,23;132:8;
133:23;143:23;
159:2;160:3
**introduced (1)**
115:17
**introduction (1)**
92:10
**introductory (1)**
19:16
**investigate (1)**
67:15
**investigated (1)**
67:16
**investigating (2)**
15:23;16:2
**investigation (1)**
131:4
**investigations (1)**
167:21
**Investments (2)**
6:3;102:25
**invited (1)**
104:24
**inviting (1)**
104:23
**involved (9)**
83:19;89:10;
104:2;111:24;112:9;
117:19;124:24;
127:1;144:19
**involves (1)**
24:10
**ironic (1)**
141:18
**irrelevant (2)**
70:21;140:13
**issue (27)**
41:6;43:21;47:2;
51:20;52:2;88:10;
89:8;94:25;95:22;

96:4;97:20;100:8,
19;106:2;115:1;
120:6;127:23;
131:18;134:20,22;
138:13;146:17;
152:14;154:2;158:3;
159:4;163:5
**issued (2)**
88:18;96:9
**issues (42)**
12:7;22:18;28:13;
36:4;44:14;46:14,
15;48:4,10;50:22;
52:3;56:24;57:2,6;
65:18;66:11;68:1;
69:11,11,12,15;
70:11;71:3,5;72:10;
74:2;76:7,8;78:12,
19;79:4;106:15;
107:11;121:21;
127:1,7;132:23;
150:6;162:1;166:14,
15;169:19
**issuing (1)**
96:8
**item (6)**
31:11;35:19;43:7;
52:11,18,21
**items (5)**
27:14;60:14;
61:15;63:16;70:2

**J**

**Jacob (1)**
12:15
**JAMES (6)**
7:3;10:4,12;11:20;
37:12;45:2
**January (2)**
59:12;94:20
**Jeff (1)**
37:12
**JEFFREY (2)**
7:4;9:17
**JENKINS (1)**
11:12
**Jim (1)**
37:11
**jobs (3)**
15:22;61:9;168:4
**JOEL (3)**
7:10;128:5;149:6
**join (2)**
121:13;124:1
**joined (1)**
92:3
**joining (1)**
110:5
**JONATHAN (1)**
11:24
**Jones (69)**
12:13;37:25;

65:12,13,15,15,16;
66:22;79:13;151:1,3,
5,9;152:1,2,6,9,11,
21;153:4,9,12,21;
154:2,5,10,11,13,15,
21;155:1,3,5,9,11,15,
16,19,23;156:1,12,
17;157:5,8,16,20,23;
158:1,9,12,18,20;
159:7;160:2,9;161:2,
4,7,9,13,22,23,25;
162:4,8,11,20;
163:11,14
**JORDEN (1)**
7:14
**JR (1)**
7:11
**judge (26)**
41:24;62:19;71:2;
72:18;84:24;85:1;
88:16,19;93:21;
98:3;99:9;101:2;
103:4,5;104:1;
106:5;114:11;
117:16;123:23,24;
126:4,6;127:4;
138:21,23;151:15
**judges (1)**
89:22
**judgment (19)**
32:18;88:18;
90:20;97:21,22;98:6,
15,15;101:11,12,12;
106:14;143:1,2,5,9,
10,11,24
**judgments (2)**
98:1;133:10
**judicata (1)**
127:8
**July (1)**
125:16
**jurisdiction (10)**
85:10,18,19,25;
86:15,25;134:23;
141:7;142:1;144:24
**justification (2)**
100:13,19
**justified (1)**
93:16
**justifying (1)**
167:3

**K**

**Kaniki (7)**
10:19,24;109:23;
110:12;112:10;
118:23;129:23
**KARA (1)**
11:21
**KATHLEEN (1)**
11:14
**Kathryn (1)**

12:11
**KATZENSTEIN (1)**
11:12
**Keane (1)**
162:11
**keep (8)**
29:25;38:19;61:7;
75:19;77:4;84:1;
137:4;166:5
**keeping (1)**
14:17
**KEVIN (2)**
8:5;158:23
**key (1)**
145:8
**keys (2)**
34:21,22
**KILPATRICK (11)**
8:18;9:2;21:22;
23:2,8;28:11;53:19;
55:10;65:22;66:12;
118:7
**KIM (1)**
11:4
**kind (23)**
13:21;14:17;
28:20;80:25;81:1,2,
10,19;82:8,10;91:10,
15;93:10;104:21;
108:3;111:17,23;
127:12,17;134:18,
19;147:19;167:23
**kinds (3)**
97:6;111:16;166:2
**KIRK (1)**
7:16
**Kirkpatrick (1)**
163:24
**knowledge (3)**
40:21;41:2;124:22
**known (3)**
59:11;66:15;
113:18
**knows (10)**
13:2;14:5,8;58:4;
64:14;97:3;99:13;
135:8,22;157:24
**Korinsky (1)**
108:22
**KORSINSKY (1)**
9:20
**KUNZ (1)**
10:15

**L**

**lack (3)**
58:6;68:14;167:10
**land (1)**
55:22
**LANDERS (15)**
11:24;17:10;
146:14;147:24;

149:18,24,25;150:2,
13,16,18,20,21,22,24
**Landers' (1)**
146:22
**LANDIS (2)**
9:9,11
**landlord (1)**
31:17
**landlords (2)**
31:19;35:4
**landlords' (1)**
31:22
**landscape (2)**
83:20,24
**language (10)**
31:17;35:12;36:6,
11;49:17;50:17;
51:16;127:15,21,23
**large (2)**
29:4;166:8
**largely (10)**
13:9;56:1;57:5,13;
61:9;64:7;93:12;
94:23;105:9;107:5
**largest (4)**
13:18;76:13;
133:18;167:6
**last (35)**
13:12;18:10;
23:10;30:5;32:22,
22;37:17;38:22;
44:19;47:11;52:22;
55:15;56:11;57:5,
16;59:6,22,22,25;
60:7;64:22;68:4;
69:14,24;73:24;
81:13;121:21;
122:22;127:11;
132:24;149:15;
156:6;159:4,13;
167:25
**last- (1)**
154:22
**Laster (1)**
40:7
**late (9)**
32:22;37:17;
45:16;52:23;53:3;
60:7;127:11;140:24;
154:17
**later (5)**
73:11;139:23;
148:25;152:24;
162:17
**LATHAM (3)**
9:14;92:4,13
**launch (2)**
63:18;72:11
**laundry (1)**
63:16
**Laura (2)**
12:13;65:15
**law (6)**

86:4,24;87:11;
138:14;139:2,5
**LAWRENCE (1)**
6:23
**lawsuit (8)**
95:7,11,13;96:6;
100:3,9;102:3,4
**lawsuits (3)**
101:20,21;131:22
**lawyer (4)**
95:12,13;130:19;
150:11
**lay (2)**
55:22;156:20
**layer (3)**
126:15,16;128:19
**layering (1)**
167:23
**lead (1)**
95:12
**leading (1)**
73:16
**leapfrog (1)**
146:22
**learn (4)**
57:20,20;58:3,3
**leases (5)**
31:15,20;34:2,15,
19
**least (19)**
25:8;39:19;48:20;
58:15;75:24;86:2;
98:5;99:23;106:12;
116:4;122:11,13;
123:17;144:6,7,21;
145:9,20;147:10
**leave (5)**
26:25;72:5;76:24;
157:8,14
**leaves (1)**
152:2
**leaving (1)**
141:22
**led (1)**
159:7
**left (2)**
106:20;152:3
**legal (3)**
125:23,24;167:12
**legitimate (1)**
18:16
**legs (2)**
75:1;77:17
**lender (2)**
145:23;164:20
**lenders (13)**
14:6,8,21;15:2,9,
20,22;17:11;58:1;
62:18;71:1;77:5;
147:15
**lenders' (3)**
16:16;55:16;56:23
**lending (6)**

110:21;111:1,3;
129:25;133:24;
147:18
**length (1)**
109:1
**less (3)**
71:4;137:23;
157:11
**lesser (1)**
101:24
**letter (4)**
139:2;152:13,16;
153:22
**letters (1)**
89:22
**level (2)**
80:25;81:1
**LEVI (2)**
9:20;108:22
**LEVITIN (11)**
7:10;128:5,6,8,13;
129:4,7,8;132:15;
149:6,6
**liabilities (1)**
86:9
**liability (4)**
17:18;31:21;
132:9;146:8
**lien (7)**
68:24;69:8;70:7;
72:4,7,19,20
**liens (1)**
72:9
**lien-search (2)**
69:7,8
**life (1)**
157:24
**light (4)**
111:11;121:9;
153:17;164:15
**likelihood (1)**
114:17
**likely (4)**
16:12;166:11;
167:3,6
**limited (8)**
40:12;46:1;86:12;
87:24;109:4;110:1,
11;118:10
**limiting (1)**
86:21
**limits (1)**
115:21
**line (3)**
51:17;90:15;
149:20
**liquidating (1)**
65:6
**Liquidation (10)**
6:15;9:5;40:4,6,
22;47:14;60:9,14;
61:9;113:24
**list (12)**

29:20;47:22;
55:17,17;56:15;
63:16;69:10,11;
70:11,13,22;80:23
**listed (1)**
88:7
**listened (1)**
53:23
**listens (1)**
66:1
**literally (1)**
45:18
**litigants (1)**
80:16
**litigate (2)**
87:12;168:8
**litigating (2)**
88:6;104:6
**litigation (57)**
15:23;17:2;23:21;
37:13;61:21;62:14;
64:17;66:16;80:3;
81:8;84:5,6;87:12;
88:15;91:3;93:20;
94:24,25;97:24;
98:14,19;99:5,6,22;
100:18;101:15;
102:8,8;103:5;106:5,
24;107:5,8,9;109:12,
18;113:8,12,16;
114:2;117:23;
123:24;124:24;
128:15;130:13;
133:2,8;135:14;
137:9,15;138:2,15;
144:17,19,23;
151:11;166:13
**litigations (7)**
54:7;80:18;
143:21;144:23;
145:4,15;147:1
**litigation-trust (4)**
16:1,21;61:17,17
**little (22)**
12:21;56:19;
58:10;59:4;72:15;
73:16;82:5;92:16;
114:14;126:7,9,10,
10,11;141:18;
144:11;145:7;
157:21;158:5;161:5;
162:24;163:1
**live (1)**
74:14
**LLC (6)**
8:2,4,13;9:10;
11:2,7
**LLP (16)**
6:2,7;7:7,19;8:8,
18;9:2,9,14,20;10:7,
12,18;11:1,12,17
**lo (1)**
136:5

**loan (2)**
130:4;133:25
**loaned (1)**
131:13
**lobbying (1)**
147:9
**Local (2)**
69:22;72:13
**locked (1)**
58:24
**Loeb (2)**
83:14,14
**long (16)**
14:18;18:18;
37:24;38:18;69:12;
70:11;79:4;80:25;
81:17,18;114:18;
133:2;137:16;
164:17,17;169:17
**longer (3)**
47:12;74:7;124:8
**longtime (1)**
37:13
**look (15)**
16:11;48:13;
58:17;59:1;61:10;
73:13;80:21;138:24;
155:14;160:18;
167:16;168:15,19;
169:3,15
**looked (1)**
13:22
**looking (10)**
28:6;47:7;63:14;
74:3;89:11,11;
122:13;125:19;
132:12;147:22
**looks (2)**
67:5;77:14
**loop (1)**
26:3
**lose (1)**
98:15
**loss (3)**
13:20;74:14;166:8
**lost (1)**
13:16
**lot (28)**
59:21;64:14,15;
67:4,23;71:3;72:6;
73:15;77:5;80:11,
13;84:19,20;94:1;
97:17,23;101:21;
102:8;121:2;124:11;
127:9;129:11;
134:21;146:1;
148:19;151:17;
166:15;168:22
**lots (1)**
125:18
**loud (1)**
31:19
**love (2)**

56:5;104:19
**low-risk (1)**
82:9
**Ltd (3)**
9:15;11:8;92:3
**luckily (1)**
14:21
**lunchtime (1)**
82:1

**M**

**MacKenzie (1)**
17:11
**magnitude (1)**
167:7
**main (2)**
51:19;131:21
**major (2)**
15:2;57:6
**majority (2)**
54:22;82:22
**makes (9)**
18:15;51:22;58:7;
63:10;64:14;74:7;
118:21;120:18;
156:17
**making (13)**
18:24;28:21;
64:25,25;65:8;76:4;
89:21;106:7;114:15,
16;125:9;127:18;
150:14
**Managed (2)**
8:3;156:4
**managed-care- (2)**
159:17,25
**management (11)**
22:12,16;35:16;
50:9,17,19;52:4;
55:23;73:25;75:16;
167:24
**MANN (16)**
8:5;158:23,23;
159:1,17,20;160:12,
15,17,20,23;161:1,
10,11,21;162:15
**manner (4)**
75:5;88:1;136:20;
152:23
**many (5)**
32:25;78:25;
87:13;106:9;164:18
**March (21)**
18:17;22:22;
33:21;35:22,24;
43:11;44:14,21;
49:2;60:4;68:3,4,12;
71:15;98:2;99:10;
117:15;157:18;
159:11;164:13;
165:6
**Margolin (1)**

55:21
**MARGOLIS (1)**
10:2
**Mariano (33)**
7:20;11:13;53:3;
94:17;95:15,17,18,
25;96:5,9,24;97:8,
13,16,21;98:9,17;
100:5,14;101:8;
102:3,18;103:14;
106:24;107:9,13;
123:13,16;133:4;
143:2,11,11;145:10
**Mariano's (4)**
107:5;130:9;
132:24;133:4
**mark (1)**
24:10
**marked (1)**
57:5
**market (1)**
57:23
**MASOTTI (1)**
7:22
**massive (1)**
64:20
**Master (2)**
9:15;11:8
**Mater (1)**
92:3
**Matt (1)**
92:12
**matter (18)**
16:8;67:19;95:12;
101:3;113:2;114:10;
125:7,19;126:23;
142:24;143:5;151:6;
152:3;154:15,16;
156:2,5;161:6
**matters (11)**
17:24;18:15;
19:19,19,20;20:8,8,
14,17;79:13;151:2
**MATTHEW (4)**
6:4;9:16;92:4;
102:24
**maximize (3)**
14:24;74:3;76:18
**maximized (1)**
15:10
**may (40)**
12:3;15:24;28:12;
31:7;40:19;41:3;
51:20;63:21,21;
67:16;78:19,21;
79:9;84:13;87:21,21,
21,21;90:3;102:4;
107:3;111:23;
117:23;120:21;
123:22;124:19;
126:7,7;127:7;
140:25,25;147:2;
153:15;155:15;

158:18;161:25;
162:18;163:21;
169:6,18
**maybe (27)**
14:19;46:9;53:22;
58:22;61:24,24;
64:16;73:22;77:10,
13,18;78:15,17;
79:20;88:8,24,25;
90:1;101:24;105:14,
17;127:7;138:4,4;
143:2;149:3;162:5
**Mbago (4)**
10:19,24;109:22;
129:23
**MCCARTER (2)**
10:7;108:21
**McIntire (3)**
9:21;10:8;108:23
**MCMC (2)**
6:8;8:3
**mean (25)**
37:2;46:11,21;
47:10;48:4;52:3;
60:17;64:1;71:15,
19;77:5;79:19;83:1;
97:19;101:5;119:18;
123:3;127:21,22;
129:12;137:19;
141:25;147:18;
165:11,18
**meaningful (3)**
58:6;109:7;122:19
**means (5)**
19:13;58:14;
60:16;71:10;135:3
**meant (3)**
13:21;122:18;
137:24
**meantime (1)**
48:12
**mechanism (4)**
15:23;54:9,24;
77:3
**mediate (6)**
81:6;105:25;
117:13;124:12;
136:2;144:1
**mediated (7)**
110:13;111:12,20;
112:1;124:1;125:5;
133:12
**mediating (1)**
140:3
**mediation (142)**
22:1;78:17,22;
79:4,20;80:2;81:8,
23,24,25;82:21,24;
83:4,21;85:13;86:12,
18,23;87:1,3;91:8;
92:17,20,23;93:4,5,
6,9,11,15,22;94:8,9,
9,21,22;95:1;100:21;

101:1,14;103:11;
104:2,8,9;105:4,10;
107:1,3,10,23;108:6;
109:8,8;110:15;
111:7,15,17,21,25;
112:2,6,22;114:17,
18;116:8,16,22,24;
117:2,5,10,12,14,18;
118:9,18;119:3,16,
18,21,24;120:5,10,
13,15,18;121:7,18;
122:2,5,20;123:25;
124:1,15,15,25;
125:1,3,12,16;127:2;
128:15;129:5,13;
130:12;131:19;
132:10;133:1,14,16;
134:1,8,8,11;136:12,
17;137:25;139:10,
13,16,17,20,23;
140:1;144:2,4,6,10;
145:3,5,11,14;146:4,
14;147:3,8,25;148:1,
14;150:3,15;167:19
**mediations (3)**
83:18;124:16;
125:5
**mediation's (1)**
82:5
**mediator (9)**
82:15;83:7,9,22;
84:20;105:18,22;
108:7;124:17
**meet (2)**
60:15;89:8
**meeting (10)**
15:2;18:3;24:22;
26:7;56:21;57:11;
59:14;65:22;72:24;
166:17
**meets (1)**
12:20
**melting (1)**
42:4
**member (4)**
17:8;146:15,24;
156:14
**Members (4)**
7:8;54:20,23;
75:21
**mention (3)**
19:11;121:19;
131:3
**mentioned (3)**
115:11;121:1;
149:7
**mere (1)**
23:9
**merits (1)**
67:10
**Messrs (2)**
108:22;140:17
**met (1)**

55:9
**Meyer (4)**
83:8,13;84:19;
124:16
**MICELI (2)**
7:4;37:12
**MICHAEL (1)**
8:15
**microcosm (1)**
90:13
**mid (1)**
23:10
**middle (2)**
32:22;93:25
**midnight (1)**
127:12
**Midway (1)**
113:23
**might (22)**
19:4;37:18;40:13,
13,14;47:17;53:13;
79:14,19;80:6;91:9;
95:1;105:8;111:22;
112:6;114:18;
115:21;125:4;
127:22;133:9;143:5;
160:13
**milestones (5)**
54:3;64:9;68:6;
75:8;152:18
**MILLER (4)**
6:18;9:22;11:14;
108:22
**million (20)**
14:2;26:22,25;
27:2;38:5;41:14,16;
46:16,17;57:25;
74:12;95:15,17;
97:15,17;124:10,18;
125:10;126:11,17
**million- (1)**
26:22
**millions (7)**
82:16;94:2;97:24;
98:11;125:1;167:11,
11
**mind (3)**
25:1;72:15;99:13
**mine (1)**
126:18
**mini (1)**
90:13
**minimal (2)**
30:18;106:15
**minimis (2)**
24:2;28:6
**minimize (1)**
71:19
**minimum (3)**
23:24;24:13;63:9
**minute (2)**
72:6;154:23
**minutes (3)**

56:4,18;130:1
**misappropriated (1)**
48:5
**misconduct (1)**
21:12
**mismanagement (1)**
130:11
**misnomer (1)**
59:4
**MISPAGEL (1)**
9:17
**missing (2)**
41:15;71:22
**mistake (1)**
74:12
**mitigated (1)**
99:18
**model (1)**
39:19
**modified (1)**
111:25
**moment (4)**
85:9;113:6;154:7,
10
**Monday (4)**
52:25;56:7;162:9;
168:21
**money (20)**
39:7;41:7,21;42:5;
48:5;62:9;74:7,7;
75:15;89:18;93:19;
94:2;100:16;125:14;
127:9;129:16,17;
130:4;131:14,23
**MONHAIT (11)**
10:23,25;109:20,
21,22,22,25;110:4,7;
112:15,16
**monies (1)**
23:19
**monitor (1)**
18:23
**MONTAGUE (1)**
6:21
**month (2)**
45:14;88:6
**monthly (2)**
152:24;167:14
**months (1)**
161:18
**more (32)**
17:1;32:15;38:5;
39:13;47:1,20;
58:10;73:11;78:5;
80:23;84:1,12;95:5;
98:18;99:6;101:12;
121:8;123:10;
125:10;126:9,10,10;
131:20;133:1;134:3;
136:16;144:10,11;
145:7;156:17;
160:13;168:4
**morning (26)**

PATRIOT NATIONAL, INC., et al.
Case No. 18-10189 (KG)

February 28, 2018

12:3,5,6,10,11;
20:2,3,7;22:25;23:1;
28:12;36:21,22;43:3,
4;45:7;57:7;60:8;
63:5;65:13,14;
75:22;151:18;156:4;
167:16;168:24
**MORRIS (1)**
10:12
**most (9)**
17:5,24;39:23;
75:23;82:2,20;
92:25;93:1;136:11
**mostly (1)**
102:13
**motion (68)**
20:18;22:3;24:4,
20;25:2;30:17;
31:14;32:23;33:3,
18;34:16;35:1,15,16;
36:13;45:23;52:19,
23;53:7,13;67:6,21;
68:1,2;70:24;78:18,
21;79:10;80:2;81:1;
86:10;88:24;94:23;
96:23;98:1;99:10;
100:21;106:6;107:1;
110:2;113:11;115:3;
116:5,6,11;121:22,
24;122:1,2,10;
124:21,21;128:20;
141:12,20;144:16;
148:9,24;152:13;
154:17;155:20;
156:2,8,10,20;
159:14,23;162:23
**motions (12)**
21:25;22:9;55:18,
20;57:18;94:7;
99:25;100:24;
106:13;113:7,10;
114:1
**motion-to-dismiss (1)**
99:8
**move (7)**
44:21;101:4;
118:17,18;133:14;
141:14;159:12
**moved (3)**
40:16,19;118:18
**movement (1)**
50:18
**movie (1)**
61:1
**moving (3)**
58:4;60:18;95:5
**much (22)**
13:25;18:12;
38:24;57:3,18;62:2;
91:16;93:6,20;99:6,
13;101:12;104:10;
105:7;126:21;128:3;
138:6;143:20;

147:12;157:19;
164:1;167:13
**multiple (4)**
17:3;39:13;80:18;
86:13
**multiples (1)**
76:12
**must (1)**
46:18
**myself (3)**
71:5;112:24;
148:23

**N**

**nail (4)**
67:5;123:15,16;
125:20
**name (7)**
37:7;38:25;39:1;
41:8;46:10;83:13;
140:16
**named (3)**
102:11,11;123:17
**names (1)**
47:23
**narrow (3)**
65:16;86:12;
169:20
**National (20)**
12:13;46:6;94:13,
16;95:21,22;96:1,4,
7,10;100:8,15,17;
103:1,13,23;104:20;
106:3,4;110:1
**nature (6)**
13:5;71:4;82:7;
100:1,3;138:17
**Navarro (3)**
6:13;9:3;37:23
**NDA (3)**
59:22,23,25
**near (1)**
149:9
**nearly (3)**
80:18;99:14,19
**necessarily (3)**
47:24;48:5;62:12
**necessary (11)**
29:16;54:4;63:14;
74:18;87:3;88:5;
91:13;114:22,23;
130:14;141:12
**need (47)**
16:1;18:16;19:4;
27:9,21;28:17;
37:18;42:21;47:12;
48:17;51:2;52:23;
57:3,22,24;62:10,25;
69:21;70:12,17,22;
72:18,21,23;73:12;
77:4;81:2;87:8,20;
98:18;118:24;

123:20;134:2;
141:25;144:11;
145:15,15;155:5,12;
158:14;161:25;
162:8,13;164:15;
166:10;167:21;
169:6
**needed (3)**
39:22;157:10;
165:9
**needing (1)**
154:22
**needs (10)**
55:5;67:7,7,13;
76:3;122:6;131:5;
143:5;165:24;
167:22
**negotiate (1)**
129:17
**negotiation (1)**
134:4
**negotiations (1)**
152:22
**NEIL (1)**
6:16
**neither (3)**
48:18;65:21;68:6
**net (1)**
136:4
**neutral (1)**
82:15
**nevertheless (1)**
115:15
**new (13)**
14:4;41:5;74:7;
84:25;85:2;103:3;
104:6;105:10;107:7;
128:6;151:18;
165:19;167:13
**news (5)**
38:19;156:12,13,
13,21
**next (16)**
18:17,19;35:15;
52:9,18;56:6;57:24;
80:10;128:19,25;
155:9,11;156:1;
161:18;168:7,16
**nice (2)**
55:3;151:14
**night (17)**
18:10;37:17;
38:22;44:19;52:22;
57:5;59:6,22;60:1;
81:13;127:11,12;
130:17;156:8;159:4,
7;169:6
**night/early (1)**
60:7
**nine (2)**
24:18;87:5
**ninety (10)**
64:10;75:8;81:7;

86:15;91:9,17;144:7,
8;145:6,15
**ninety-day (3)**
15:15;65:3;106:2
**no- (1)**
58:22
**Nobody (7)**
15:15;75:14,15,
16;134:22;135:13,15
**Nobody's (2)**
75:17;121:20
**noise (2)**
64:25;65:1
**NOL (2)**
62:3,13
**noncontroversial (1)**
49:18
**nondebtor (2)**
40:16;46:14
**nondebtors (1)**
138:3
**nondisclosure (1)**
69:20
**none (8)**
14:19;16:17;17:4;
22:9;23:20;46:25;
101:20;118:18
**nonevent (1)**
100:15
**noon (2)**
161:21;162:7
**normal (1)**
133:6
**NORMAN (2)**
10:25;109:21
**Northview (1)**
139:3
**no-shop (2)**
58:19;61:10
**Notably (2)**
82:23;107:1
**note (5)**
24:4;25:20;29:25;
101:19;165:1
**noted (6)**
22:16;23:3;92:18;
96:20,23;97:24
**notice (12)**
15:3;20:6;27:13,
15,17;28:10,13;
30:24;31:21;136:7,
8;149:4
**notices (1)**
34:24
**notified (1)**
32:2
**notwithstanding (3)**
64:6;69:22;138:21
**November (13)**
13:7,12;14:7;
58:14,16,25;59:11;
73:17,24;94:12;
122:12;123:19;

128:22
**number (32)**
12:7;19:19,19;
20:17;26:13;28:8,9;
30:14,15;31:12,12;
33:2;35:18,19,19;
38:8;43:7;52:21,22;
80:22;81:5,11,13;
88:12;89:7;101:1;
113:19;119:25;
120:1;141:2,8;
143:21
**numerous (1)**
80:18
**nunc (1)**
34:17
**nutshell (1)**
114:20

**O**

**obfuscated (1)**
59:17
**obfuscation (1)**
66:4
**object (8)**
28:17,19;29:16;
31:24;33:3;82:24;
142:4;159:10
**objected (2)**
92:19;124:25
**objecting (1)**
112:22
**objection (19)**
21:9;25:2;35:4;
44:23;60:2,12;75:5;
86:16;91:7;99:24;
104:21;109:1;110:1,
6,11,12;118:10;
131:8;141:22
**objections (6)**
21:17;52:25;
61:22;154:23;
161:20;162:17
**objective (1)**
153:4
**objectors (1)**
140:15
**obligation (3)**
147:4,5,7
**obligations (1)**
39:11
**obtain (3)**
47:6;58:20;135:10
**obviates (1)**
16:1
**obvious (2)**
100:12;114:2
**obviously (36)**
15:6;20:20,21,23;
27:10;44:18;57:1;
62:14;63:11;64:12;
67:3;69:3,17,21;

PATRIOT NATIONAL, INC., et al.
Case No. 18-10189 (KG)

February 28, 2018

81:11;87:9;88:2;
90:24;113:14;
118:18;129:12,16,
19;131:6;132:12;
133:11;135:22;
136:21;138:22;
139:12,24;141:3,6;
153:22;164:11,14
**occurred (1)**
56:24
**o'clock (7)**
151:17;158:11;
159:4;162:24;
168:21,24;169:5
**Octagon (1)**
12:9
**off (5)**
16:24;75:24;
156:18;158:15;
167:22
**offense (1)**
59:16
**offer (4)**
137:6,25;142:23;
150:14
**offered (2)**
46:22;67:12
**offers (2)**
125:9,9
**office (2)**
36:3;56:8
**officer (1)**
126:23
**officers (13)**
21:16;25:1;82:23;
84:4;86:5,6;90:2;
102:2;103:15;124:7,
23;127:18;143:22
**officers' (3)**
93:13;143:23;
144:18
**offices (2)**
56:4,5
**Official (2)**
8:19;10:13
**often (1)**
70:25
**oil (1)**
127:12
**old (3)**
38:25;74:7;159:21
**omnibus (5)**
31:14;34:1;52:22;
53:5;154:17
**Once (5)**
13:23;15:6;
106:16;123:20;
125:13
**one (77)**
13:16,17;14:12,
19;20:17;21:18;
22:6,6,11,15,17;
26:11;27:14,18;

31:6;32:12,15;34:2;
35:3,3,21,23;39:9;
46:9;48:3;49:18;
50:24;52:16;53:2;
54:2;55:25;72:10;
75:10,24;81:5,17;
86:24;90:20,20;
106:23;113:18;
115:14;117:21;
118:22;119:2,12,25;
120:3,25;121:5,20;
122:13;123:10;
125:16;128:16;
132:24;134:1,12;
137:19;138:5,14;
140:15;141:3;144:2;
145:9;147:1;148:9,
23;149:15;154:6,10;
155:6,13;157:11,20;
159:13;161:13
**O'Neill (1)**
162:11
**ones (2)**
106:17;129:22
**one's (2)**
61:2;63:14
**one-week (1)**
63:9
**ongoing (1)**
156:19
**only (27)**
17:19;18:18;
20:18;22:11;31:15;
34:1;61:6,7;64:1;
74:12;75:24;82:24;
85:10;91:17;92:19;
93:20;99:7,8;103:2,
13;104:20;123:3;
135:6;139:19;
142:21;148:9;155:7
**open (5)**
28:18,24,24;
69:23;144:6
**opened (1)**
16:4
**opening (1)**
64:3
**operate (6)**
27:10;45:24;
47:12,14;63:15;
75:15
**operating (1)**
64:7
**operations (2)**
14:4;73:24
**operative (1)**
159:20
**opinions (3)**
113:25;115:6,7
**opportunity (5)**
57:16;62:21;
132:21;133:11;
164:22

**oppose (1)**
43:10
**opposed (3)**
55:3;81:20;83:23
**opposing (2)**
100:21;156:7
**opposition (1)**
114:13
**oral (3)**
98:5;100:24;113:6
**order (87)**
23:14;25:5,21;
26:6,10,17;28:19;
30:11,18,19;31:6,9;
33:4;35:7,13;36:6,7,
12,13;41:20;42:14,
16,19;43:11,15,22;
47:13;49:17;50:2,4,
5,8,22,24;52:7;57:5;
68:5;82:15;92:17;
111:10,25;116:20;
117:8;121:23;
122:14,23;123:20,
24;125:21;126:5,14,
20;128:21;130:24;
131:5;132:18;
141:16,20,24;142:1,
4;145:3,4,14,16;
147:14,17;148:12,
24;151:6,18;154:4,
16,25;155:2,8,12,20,
21;156:3,25;157:1,
23;159:10;162:22;
165:5,13
**ordered (1)**
40:8
**orders (6)**
20:13;86:19,19;
139:20;140:2;
155:22
**org (1)**
40:17
**original (1)**
20:10
**originally (2)**
93:24;106:10
**Os (2)**
23:20;24:1
**others (3)**
32:25;106:25;
128:15
**otherwise (9)**
15:21;70:24;
85:18;104:1;122:25;
129:5;133:9;135:5;
148:14
**ought (8)**
29:5,9,9;119:24;
144:5;150:3;151:10,
10
**ours (1)**
63:2
**out (52)**

12:21;13:21,24;
15:5;16:1,12;18:14;
31:18;38:5;49:6,11;
54:16;55:16,17,21;
57:18;59:9;65:2;
73:8;74:16;80:17;
83:3;86:18;87:13;
101:11;105:8;
113:16,21,25;
117:22;118:19;
120:15;122:12;
125:13;128:16;
131:6,20;136:7,11,
23;140:7,10,12;
143:9;147:13;156:6,
20;157:21;158:10;
166:2,25;167:25
**outcome (1)**
74:19
**outlined (1)**
75:14
**out-of-step (1)**
113:22
**outset (5)**
23:8;24:17;29:20;
30:1;33:8
**outside (3)**
62:12;133:5;142:1
**outstanding (6)**
21:9;23:13;29:22;
32:16;33:1;122:24
**over (32)**
13:4,10;19:17;
29:12;40:7;61:2,9;
64:11;71:14;73:1;
85:18,18,19,25;
86:14;88:11;90:6,
18;91:19;94:18;
99:19;117:3;124:10,
17;125:14;135:11;
136:4,12;139:14;
141:7;161:18;
162:12
**overall (5)**
13:2;22:1;54:5;
55:2;64:1
**overarching (1)**
134:19
**overnight (1)**
79:18
**overview (1)**
95:6
**overwhelming (1)**
17:12
**owe (2)**
46:20,20
**owed (1)**
46:16
**owes (1)**
46:20
**owing (1)**
122:25
**own (8)**

24:13,14;39:24;
59:2;75:14;90:5,7;
113:24
**ownership (2)**
15:11;115:2
**owns (3)**
115:9,23,25

**P**

**P&Ls (1)**
60:9
**PA (3)**
6:12;7:14;10:23
**pace (3)**
60:17;109:5;117:7
**Pachulski (2)**
12:14;65:15
**package (1)**
69:4
**pages (2)**
70:11;127:16
**paid (30)**
21:11,15;23:14;
24:9,13;25:1,11,11;
26:22,23;27:8,11;
36:8;38:4;39:10;
61:21;95:14,17;
100:16;121:24;
122:7,8,8,12,21;
123:18;124:22;
126:17;140:15,21
**PALACIO (18)**
120:21,22,25;
121:12;122:10;
123:2,5,8;148:5,6,6,
7,11,14,18,21;149:2,
5
**papers (13)**
58:11;62:22;64:2,
15;86:23;89:21;
107:18;113:21;
119:4;120:12;
128:10;139:3;140:3
**paragraph (5)**
25:21;42:14;44:9;
157:1;159:9
**parameters (1)**
58:16
**parochial (2)**
74:4;76:20
**parse (1)**
61:13
**part (19)**
15:1;38:14,16;
46:8;61:15;63:7;
70:23,23;77:9;90:2;
98:17;110:13;
111:12;118:12;
120:1,6;130:25;
134:11;140:21
**partial (1)**
80:22

**participate (12)**
100:25;111:17;
112:10;116:16;
119:24;120:18;
133:11,16,18;134:5;
137:25;146:14
**participated (4)**
104:3;124:14,24;
125:3
**participating (4)**
60:22;92:19;
94:25;147:8
**participation (3)**
116:25;139:15,25
**particular (2)**
27:14;129:22
**particularly (6)**
14:19;15:19;98:5;
101:1,23;128:9
**parties (37)**
13:11;15:25;16:7,
20;17:20;31:22;
45:19;52:25;81:6,
20;82:11,20;83:4;
84:19,22;85:2,5,19;
87:4,7;88:12,13;
89:7;91:1,17;
101:13;103:10;
109:9;116:16,25;
128:17;136:20;
144:5,15,25;145:4;
150:15
**parties' (1)**
83:22
**parties-in-interest (1)**
31:24
**partner (1)**
83:14
**partners (2)**
15:2;104:6
**party (21)**
13:19;17:18;
30:24;45:16;46:2,2;
80:10;83:2;85:10;
92:19;113:19;
118:24;121:14,18;
134:7,9;141:19;
144:9;145:11;
146:16;147:8
**pass (1)**
151:22
**passed (1)**
45:25
**pass-through (10)**
22:12,17;43:8,9;
45:13,15,25;50:16;
52:10;55:24
**pass-through-account (2)**
36:7,13
**path (3)**
59:11;60:17;
105:19
**patience (1)**

66:14
**patient (1)**
66:16
**patiently (1)**
73:2
**Patriot (48)**
12:12;13:16,21,
24;14:3,7,9,21;15:1,
10,17;16:15;17:10;
38:10,25;39:8,23;
40:5,12,17,18;41:8;
46:6,8,10;47:7;85:4;
93:17;94:13,16;
95:21,22;96:1,3,7,
10;100:8,15,17;
103:1,13,23;104:20;
106:3,4;110:1;
138:10,11
**Patriot's (3)**
13:12;14:6;39:19
**PATTON (11)**
11:20;112:17,18;
113:2;115:11;
117:13;118:2,3;
122:4;140:18,19
**Patton's (6)**
121:22;122:10,23;
132:14;144:14;
148:9
**Pause (1)**
51:12
**pay (20)**
21:5;23:4;27:20;
62:22;63:12;101:11;
116:13,18,21;117:2,
9;126:19,22;129:2;
131:15;140:25;
141:1;143:5,24;
157:2
**paying (7)**
97:14;105:18,22;
108:6;123:18;
128:23;143:9
**payment (5)**
25:24;27:17;
51:18;132:17;133:9
**payments (5)**
27:19,22;29:12,
14;141:24
**PC (2)**
6:21;7:1
**pejorative (1)**
122:18
**pen (1)**
39:8
**penalized (1)**
15:18
**pendency (1)**
138:22
**pending (6)**
21:25;55:20;81:7;
106:14;113:10;
151:12

**penny (1)**
95:21
**people (42)**
12:20;21:11,16;
36:8;62:6;64:12;
73:24;75:11,23,25;
77:8;78:14,25;
79:14;80:9;82:24;
85:5;89:9;90:19;
92:22;95:2;100:4;
101:25;102:4;
107:23;111:15;
129:17;131:17,23;
132:4,12,21;135:21;
136:3;143:13;
151:17;164:17;
166:5,10;167:20,25;
169:7
**per (1)**
33:3
**percent (3)**
13:17;61:16;132:5
**perfect (1)**
144:4
**perfectly (1)**
92:23
**performance (2)**
74:8;167:14
**Perhaps (8)**
25:5;53:25,25;
61:8;62:2,5;105:21;
169:16
**period (17)**
27:15,21;28:10,13,
18;45:14;46:1;
47:21;49:5;72:9;
86:15,17;93:23;
94:9;112:7;131:4;
140:9
**permission (1)**
110:6
**permit (1)**
88:17
**permitted (2)**
92:6;154:24
**permitting (1)**
155:21
**person (5)**
65:25;71:22;
97:22;123:11;
146:15
**personal (4)**
41:2;133:6;143:3;
163:5
**personally (2)**
101:8;102:5
**perspective (5)**
53:21;54:16,25;
59:10;120:17
**perverting (1)**
58:9
**Pesch (3)**
11:19;112:20;

140:17
**petition (4)**
34:17,20;57:25;
110:1
**ph (4)**
27:8;55:13;
123:19;142:7
**Phelps (5)**
56:21;79:15;
152:4,9,22
**phone (3)**
78:9,10;164:10
**picture (1)**
68:22
**pie (1)**
93:2
**piece (1)**
113:16
**pieces (1)**
141:13
**pipeline (1)**
26:24
**place (7)**
16:18;54:6,18;
82:19;89:23;94:14;
140:6
**placed (2)**
13:13;40:3
**plaintiffs (9)**
81:22;82:22;86:1;
87:14,15;88:2,14;
111:5;131:22
**plan (33)**
15:12,18,20;17:15,
19;54:14,19;55:4;
58:21;61:12,22;
62:16;65:6;75:13;
76:7,23;110:18;
111:10,13,14;112:5;
118:15;119:1;
120:15;130:21,21,
23,25;134:4;139:14,
15;158:11;166:25
**plane (1)**
163:3
**planned (2)**
14:22;18:24
**planning (2)**
15:1,9
**play (1)**
99:5
**played (1)**
140:10
**player (1)**
145:8
**plea (1)**
124:19
**pleading (1)**
118:23
**pleadings (1)**
132:20
**Please (8)**
12:2;47:25;68:20;

79:8;120:22;154:10;
158:21;163:20
**pleased (1)**
35:6
**pleasure (1)**
73:6
**plenty (2)**
67:14;132:11
**plus (1)**
13:9
**pm (3)**
163:19,19;170:6
**podium (4)**
71:23;73:1;
115:19;164:23
**point (51)**
18:21;19:6;25:3,
21;27:16;36:11;
44:22;47:7;58:16;
65:17;72:24;74:6;
76:10;78:19;83:2;
85:7;89:24;90:10;
94:15,21;96:7;
98:12;111:1;114:9;
116:23;117:22;
118:20,22;120:1,12;
121:21;122:22;
125:4,18;128:11,16;
131:18;132:1,7,23;
133:25;135:16,18;
138:5;139:22;
141:25;143:7;
147:13;148:2;
149:21;166:9
**pointed (4)**
83:3;113:21;
140:7,11
**points (9)**
20:22;44:16;
77:24;121:3,9,12;
129:11,21;136:25
**policies (21)**
41:6;80:20;82:12;
84:12,14,16;89:25;
90:4;93:20;109:16;
115:2,4;119:19;
125:23;126:2;135:4,
13;141:8;142:2;
143:23;144:18
**policy (22)**
90:9;104:16,16,19,
23;105:2,8,13,20,25;
25;106:19;107:3,16;
115:17,19;124:2,2;
137:7;140:14;
142:25;143:4
**policyholders' (1)**
38:14
**polite (1)**
66:1
**pooh-pooh (2)**
62:8;74:14
**pool (4)**

76:13;83:1;
129:16;134:2
**portion (2)**
23:15;61:16
**position (14)**
33:9;38:23;43:17;
51:5;64:2;82:4;
98:24;103:25;
112:14;122:6;
123:19;140:24;
147:11;148:23
**positions (1)**
147:9
**positive (1)**
81:11
**POSNER (61)**
8:20;19:25;21:19,
20,21,22;53:10,18,
18;54:22;60:6;
63:18,23,25;64:5;
65:11,21;67:3,11,22;
69:9;71:25;72:1,2;
74:13;75:1;77:16,23,
25;78:2,5;118:4,5,7,
7;119:10,17;120:9;
130:19;145:19,20;
147:12;150:7;154:7,
12;162:25;163:5,7,
15,18,22,23,23;
164:3,25;166:13,19;
168:7;169:10,11,25
**Posner's (4)**
68:10;74:22;76:6;
139:18
**possession (2)**
93:18;135:10
**possibilities (1)**
166:2
**possibility (3)**
45:18;111:21,25
**possible (8)**
16:17;62:13;78:8;
86:19,20;133:2;
138:6;139:20
**possibly (3)**
60:19;64:5;73:20
**post-petition (2)**
49:21;157:3
**posture (1)**
109:4
**pot (5)**
82:18;90:18;
131:23;132:1;138:7
**potato (1)**
91:19
**potential (6)**
16:10;34:3;86:13;
107:14;130:15;
167:20
**potentially (6)**
28:9;76:24;82:9;
106:21;107:12;
129:13

**power (1)**
145:2
**pre- (2)**
57:24;109:25
**preceded (1)**
40:22
**precedent (2)**
75:6;136:19
**precise (1)**
33:2
**preclude (1)**
127:7
**precludes (1)**
104:12
**preclusion (2)**
127:17,23
**preference (2)**
27:14;29:15
**prejudice (2)**
107:2,14
**preliminary (4)**
114:1;115:13;
157:9,16
**premiums (1)**
38:14
**pre-negotiated (1)**
14:10
**prepared (9)**
68:18;108:5;
133:4,15;134:7;
144:22;147:21;
166:4;168:8
**pre-petition (2)**
17:6,18
**presence (1)**
146:23
**PRESENT (6)**
11:23;24:1;71:9;
102:11;148:1;156:9
**presentation (1)**
53:24
**presented (2)**
59:7;115:14
**presently (1)**
49:9
**preserve (3)**
61:9;62:13;85:8
**preserved (3)**
15:22;16:21;62:3
**preserves (1)**
17:19
**preserving (1)**
16:16
**President's (2)**
55:8,9
**presides (1)**
40:7
**presumably (1)**
123:5
**pretty (8)**
12:18;57:12;
81:16;87:11;90:25;
151:11;162:1,1

**previewed (1)**
49:19
**previous (4)**
17:9;83:18,21;
147:18
**previously (2)**
90:5;121:3
**primarily (1)**
38:9
**primary (1)**
108:25
**principal (1)**
13:12
**print (1)**
18:14
**prior (14)**
26:19;27:20;
34:20;58:15;83:4,5;
93:3,9,15;99:19,19;
104:9;150:5;158:13
**priority (4)**
21:4,5;25:25;
61:19
**Private (1)**
113:8
**privilege (3)**
59:18;125:2,2
**pro (3)**
34:17;60:9;128:10
**probably (18)**
42:9;56:10;58:14;
59:18;66:10;69:7;
72:17;88:12;90:25;
104:12;105:14;
112:5;137:5;146:15;
148:14;151:19;
152:22;164:17
**problem (6)**
74:12;80:15;
90:17;157:6;160:10,
12
**procedural (4)**
109:4;135:18;
144:14;161:13
**procedurally (3)**
82:3;113:22;
132:22
**procedure (1)**
140:7
**proceed (12)**
14:13;47:13;
67:25;81:8;85:5;
98:16;117:15;138:1;
139:6;144:15;
147:10;148:2
**proceeded (1)**
141:19
**proceeding (21)**
16:13,19;40:7;
101:15;113:5,9,10,
15,18;114:4,22;
115:8,13,16;116:7,
11;117:16;135:20;

136:19;145:5;159:2
**proceedings (11)**
46:7;47:16;109:5;
112:19,23;114:1;
115:12;116:8;
117:19;164:4;170:6
**proceeds (19)**
80:19;83:1;84:14;
87:6,23;89:12;90:1,
3,11,21,21;93:13;
97:2;115:9,23,25;
131:14;135:5;140:6
**process (29)**
13:6;15:16;18:23,
24;47:11;58:9;
60:20;62:19;70:4;
77:6;84:18;105:7;
109:7;110:14;111:7,
12,15,18,24;116:22,
24;117:3;121:18;
122:5;128:16;
140:11,24;146:18;
161:17
**productive (6)**
56:25;71:11;78:6;
81:14;164:6,21
**productiveness (1)**
57:8
**profess (1)**
60:23
**professional (5)**
56:15;57:1;65:24;
66:7;167:12
**professionals (9)**
23:10;48:15;
55:15,20;56:17;
60:24;72:24;165:18;
166:18
**proffered (1)**
37:22
**progress (2)**
19:2;59:21
**project (1)**
166:4
**projected (1)**
14:1
**promise (1)**
105:7
**prompted (1)**
46:15
**promptly (5)**
26:10;33:15;
55:11;59:25;72:14
**proof (1)**
114:22
**proper (1)**
132:22
**properly (2)**
82:3;130:9
**property (27)**
31:18,20,23;
34:25;42:17;43:19;
45:10,13,20;46:21,

23,25;47:1,16;84:11;
87:16;89:13;115:4;
135:10,11,12,14;
137:14,17;139:1,7;
144:19
**proponent (2)**
119:1;144:2
**proponents (1)**
149:21
**proportionately (1)**
109:8
**proposal (7)**
57:6;63:7;73:14;
74:25;75:7;77:17;
164:5
**propose (4)**
17:16;29:15;
52:16;80:14
**Proposed (27)**
10:13;21:23;22:3;
23:2;25:11;26:10;
28:1,11,13,13;30:18,
18;31:5;33:10;38:1;
43:22;49:14;53:19;
55:4;103:11;109:1,
5;116:20;118:8;
130:21;155:20;
163:24
**proposing (1)**
17:14
**proposition (2)**
82:10;115:5
**propriety (3)**
130:22;144:14;
168:9
**pros (1)**
111:16
**prospective (2)**
122:3,11
**prospectively (2)**
121:24;122:21
**prosper (1)**
14:20
**protects (2)**
83:25;87:12
**protocol (11)**
28:5,10,16,20;
29:7,8,11,19;34:21;
52:16;153:7
**proved (2)**
61:4;110:25
**proven (1)**
17:14
**proves (3)**
81:1,2;141:25
**provide (26)**
15:3;25:24;26:17;
27:8,18;30:5;34:12,
12;36:7;49:2;51:22;
53:22;57:22;62:13,
15,20;69:5,16,21;
70:8;75:18;104:17;
122:24;141:9;

PATRIOT NATIONAL, INC., et al.
Case No. 18-10189 (KG)

February 28, 2018

143:24;152:11
**provided (25)**
  18:1;21:6;24:22;
  26:19;30:8;33:8,12,
  15,25;34:5;52:24;
  68:14,23;69:7,8,18;
  70:1,18;71:20;
  72:12;73:21;104:25;
  117:14;128:19;
  130:24
**Providence (1)**
  166:19
**provider (2)**
  23:5,12
**provides (1)**
  35:24
**providing (3)**
  20:24;68:18;
  114:22
**Province (3)**
  55:13;56:3,20
**Province's (1)**
  56:4
**provision (3)**
  42:16;58:19;67:16
**provisions (3)**
  26:16;58:22;59:24
**public (1)**
  95:23
**publicly (2)**
  125:17;150:8
**pull (1)**
  37:18
**pulling (1)**
  61:2
**purported (2)**
  38:1;87:25
**purpose (4)**
  18:4;46:1;53:4;
  111:1
**purposes (3)**
  31:1;165:17;
  166:25
**pursuant (3)**
  76:22;152:7;157:3
**pursue (4)**
  61:23;88:22;
  97:23;107:4
**pursued (2)**
  88:14,21
**pursuing (6)**
  15:24;76:4,16;
  97:18;102:9;138:18
**pursuit (1)**
  138:16
**push (3)**
  70:17;86:18;
  122:15
**pushing (1)**
  71:20
**put (20)**
  42:19;45:12;
  46:24;66:20;74:11;

75:15;84:19,20;
  89:24;92:25;94:18;
  104:11;106:22;
  111:9;121:8;130:16;
  132:1;140:20;
  157:19;167:22
**putting (4)**
  39:24;69:2,4;
  74:16

## Q

**quarter (2)**
  73:22;163:2
**que (1)**
  148:4
**Quentin (2)**
  11:18;112:19
**query (1)**
  133:3
**question's (1)**
  66:2
**QUICK (3)**
  6:9;93:21;160:18
**quickly (8)**
  30:6;48:17;66:18;
  90:25;111:9;151:11;
  165:24;169:3
**quite (7)**
  13:3,8;15:3;29:12;
  58:8;134:7;135:22
**quote (1)**
  86:8
**quote-unquote (1)**
  62:14

## R

**race (3)**
  90:12,16;139:11
**radio (1)**
  57:14
**raise (5)**
  44:3;46:14;
  106:23;133:3;
  152:14
**raised (14)**
  20:23;67:3;68:1;
  70:15;89:7;104:21;
  121:15;129:11,22,
  23;130:12;132:15;
  135:15;143:8
**raising (1)**
  127:18
**Ramos (1)**
  126:4
**Ramos' (1)**
  84:24
**rank-and- (1)**
  24:1
**rapid (1)**
  117:7
**RATH (1)**

9:9
**rather (4)**
  74:23;148:25;
  152:21;153:24
**reach (1)**
  164:19
**reached (3)**
  122:12;156:6;
  163:25
**read (14)**
  31:18;64:15;
  70:13,14;75:12;
  80:11;94:22;107:17,
  17;119:5;121:9;
  126:7;135:9;138:24
**readily (1)**
  166:7
**real (8)**
  71:16;75:25;
  80:15;100:12;
  101:10;132:11;
  143:8;160:18
**realistic (1)**
  166:10
**reality (3)**
  14:4,22;166:21
**realize (1)**
  95:9
**really (63)**
  12:20,22;13:4,8,
  21,22;14:3;15:3;
  19:1,5,9,14;39:17;
  42:4;47:24;66:6;
  67:2;72:23;76:1,3;
  77:7;80:17;81:4;
  82:3;83:24;84:18;
  88:4;89:2,6;90:13,
  20;91:12,15;92:19;
  93:16;96:12;97:1;
  98:19;100:12;
  101:24;113:21;
  118:12;122:18;
  130:20;135:24;
  136:2,3,12,22;137:9;
  138:1;141:11;
  144:17;145:8,25;
  147:22;148:16,23;
  162:1;165:22,23,24;
  169:17
**reason (16)**
  13:3,4;14:14;
  41:12;53:4;67:18;
  75:9;76:17;83:23,
  23;87:20;114:2;
  117:1;119:12;147:1,
  11
**reasonable (7)**
  20:25;28:8;29:3;
  58:20;64:12;109:6;
  162:24
**reasons (4)**
  61:6;77:1;81:20;
  115:25

**rebuild (1)**
  166:5
**recall (3)**
  32:4;115:14;
  142:23
**recapitalize (1)**
  14:5
**received (7)**
  20:18;31:16;45:2;
  66:13;81:11;156:22;
  160:4
**Receiver (5)**
  6:14;9:4;37:24;
  49:12;125:14
**Receivers (2)**
  7:2;37:13
**receiver's (1)**
  48:15
**receivership (4)**
  13:14;45:12,20;
  46:7
**recently (4)**
  13:8;99:6;106:6,
  24
**Recess (4)**
  79:7;163:17,19;
  170:2
**reckless (4)**
  16:24;17:1;66:5,6
**recognition (1)**
  89:12
**recognize (3)**
  14:22;39:2;169:15
**recognizing (2)**
  59:18;164:13
**record (23)**
  16:24;21:19;28:1,
  21;33:24;53:18;
  56:12;57:20;62:23;
  66:5,20;67:9;80:6;
  104:11;105:9;
  114:24;116:19;
  118:7;130:2;159:14,
  25;160:9;163:23
**records (2)**
  40:22;41:3
**recover (1)**
  102:5
**recoveries (4)**
  76:4,5;166:11;
  167:3
**recovery (1)**
  15:20
**Reed (2)**
  12:12;72:4
**referenced (1)**
  98:22
**referred (2)**
  142:23;154:18
**refers (1)**
  159:14
**reflect (2)**
  13:25;127:23

**Reform (1)**
  113:8
**regard (2)**
  65:7;113:20
**regarding (4)**
  16:25;31:17;
  56:24;109:17
**regrowth (1)**
  168:1
**regulators (1)**
  74:2
**rehabilitation (1)**
  40:4
**rehash (1)**
  103:8
**REID (3)**
  10:18;110:4,10
**reimbursable (1)**
  25:9
**reimbursed (1)**
  23:18
**reimbursement (2)**
  23:17;70:22
**reimbursements (3)**
  21:8,8;24:6
**reimbursing (2)**
  98:8,9
**rein (1)**
  87:20
**REINDEL (2)**
  7:7;128:6
**reinsurance (1)**
  39:11
**reiterated (2)**
  49:1;130:18
**reject (1)**
  31:15
**rejected (1)**
  31:19
**rejecting (1)**
  32:20
**rejection (5)**
  32:23,25;33:18,
  25;34:1
**rejections (2)**
  33:7,10
**related (8)**
  13:10,19;17:22;
  80:3;102:2;134:2;
  144:23;166:14
**related-party (3)**
  13:9,11,20
**related-to (3)**
  86:2,3;144:24
**relates (4)**
  17:4;24:19;64:18;
  145:20
**relating (1)**
  139:7
**relationship (3)**
  13:17;118:25;
  133:24
**relationship-based (1)**

14:16
**relay (1)**
90:16
**release (5)**
120:2,14;127:17;
130:21,22
**released (2)**
111:9;112:5
**releases (2)**
62:15;127:24
**relevant (1)**
82:20
**relief (14)**
34:17;35:2;52:23;
81:2,5;114:7,23;
117:6;121:6;122:3,
11,24;141:23;142:4
**relies (1)**
131:17
**rely (1)**
110:18
**remain (1)**
169:19
**remaining (1)**
151:2
**remark (1)**
64:3
**remarks (1)**
19:16
**remedies (1)**
88:22
**Remember (1)**
45:11
**remembers (1)**
158:6
**remind (1)**
126:7
**reminded (1)**
79:13
**remiss (1)**
167:5
**remotely (2)**
47:17;101:20
**renamed (2)**
38:24,24
**render (2)**
114:11;117:17
**renewals (1)**
167:14
**Reorg (1)**
167:18
**reorganization (4)**
15:12;39:3;89:10;
111:18
**reorganize (1)**
15:18
**reorganizes (1)**
77:8
**repaid (4)**
61:14,18,19;130:4
**repay (1)**
57:24
**repeat (1)**

129:12
**replies (1)**
162:18
**reply (21)**
52:22,23;53:3,5;
80:21;81:12,12,16;
85:20;86:11;88:7;
91:5;104:22;154:17,
22;155:12,21;
161:22,25;162:9,9
**report (1)**
91:10
**reporting (7)**
27:18;49:21;50:1,
7,18;51:14,22
**represent (5)**
110:14;112:19;
123:13;128:14;
147:25
**representation (5)**
23:19,23;24:8,15;
31:9
**representations (1)**
119:11
**representative (2)**
146:25;149:19
**representatives (1)**
78:9
**represented (1)**
126:23
**representing (3)**
37:25;60:24;
112:24
**represents (1)**
145:21
**repurchase (1)**
131:15
**request (24)**
17:23;25:7;28:2;
29:3;31:16;32:16,
25;33:23,24;36:14;
44:8;52:4;86:16;
88:16;91:6,7;93:24;
94:22,23;109:5;
111:22,24;116:1;
157:2
**requested (20)**
21:1;26:6,16;
27:13;29:1;30:1,4,
23;35:2;81:5;86:22;
89:16;91:2;94:8;
109:2,3;117:8;
121:6;153:6;167:8
**requesting (4)**
22:19;34:17;
114:8;122:2
**requests (8)**
22:19;23:12;32:2;
34:9,10;36:5;
122:10;132:18
**require (1)**
116:16
**required (3)**

60:15;105:6;109:7
**requires (3)**
14:16;58:20;
158:16
**reread (2)**
124:9;158:2
**res (1)**
127:8
**rescission (1)**
95:16
**Research (1)**
167:18
**researching (1)**
127:9
**reservation (5)**
20:19;21:10;25:8;
44:22;140:25
**reserve (3)**
37:22;44:13;
161:15
**reserved (2)**
31:23;47:2
**resolution (8)**
17:23;77:18;86:7;
94:11;121:17;
129:14;163:25;
165:12
**resolve (10)**
63:4;78:7,19;
82:15;85:17;86:13;
107:4;125:21;
127:19;153:1
**resolved (13)**
19:20;63:22;
79:14,19;89:1;
107:11;113:11;
114:19;119:25;
125:7,8;152:15;
154:2
**resolving (2)**
119:21;145:24
**resources (3)**
91:5;95:2;136:16
**respect (47)**
36:3;39:15,16;
53:7;65:18;68:2,8;
83:7,22;90:4;103:6,
9;104:1,7;105:18;
106:12;107:23;
108:11;110:15;
113:3,3;114:8,20,24;
115:1;116:2,4;
117:21;119:12;
121:22;125:5;
126:13;127:24;
132:14;136:25;
138:23;140:20;
145:22;146:25;
147:2,18;152:14;
153:10;155:20;
160:11;161:14,16
**respective (1)**
117:1

**respects (3)**
76:20;106:9;
111:18
**respond (1)**
44:15
**responded (1)**
154:23
**responding (1)**
136:9
**responds (1)**
66:2
**response (14)**
20:18;26:15;
31:15,16;46:15;
59:17;104:24,24;
106:2;116:9;119:6;
121:5,22,25
**responses (7)**
65:20;80:7;81:12,
12;82:7;112:21;
121:9
**responsible (1)**
110:23
**rest (1)**
147:1
**restraining (3)**
155:8;156:3;
157:23
**restricted (6)**
40:13,23;41:18;
45:12,22;46:17
**restructure (1)**
14:4
**restructuring (1)**
40:5
**restructuring-support (1)**
14:9
**result (9)**
16:12;29:14;
68:11;74:15;75:1;
95:16;104:9;133:12;
152:21
**resulting (1)**
14:8
**results (6)**
68:24;69:7,8,16;
133:12;137:13
**retain (2)**
152:4,9
**retained (3)**
23:10;28:11;
123:22
**retaining (1)**
16:16
**retention (4)**
23:8;29:20;79:15;
153:10
**returning (1)**
17:22
**Reuters (1)**
167:18
**revenue (3)**
13:10;14:1;167:13

**revenues (2)**
13:17;41:14
**reverse (1)**
92:16
**review (7)**
25:9;26:10;29:16;
72:9,19,20;132:21
**revised (4)**
26:10;31:5;36:11,
12
**Ricardo (1)**
120:22
**RICHARD (1)**
7:11
**Richardson (1)**
83:17
**riding (1)**
125:19
**right (180)**
12:10;18:20;
19:22;22:2,10,14,23,
23;23:6,22;24:24;
25:15,16;26:5,12,13;
27:6,23;28:2;29:23;
30:7,21,25;31:8,10;
32:1,3,8,19;33:20,
22;34:7,14,18;35:1,
6,10,14,20;36:16;
39:21;40:2,9;41:25,
25;42:11,23;43:13;
44:5;45:1;47:19;
48:2,7,9,9,16,21;
49:7;50:3,9,11,15,
20,21;51:3;52:10;
53:1;54:21;55:25;
60:5;62:20;66:21,
24;69:24;73:3;74:5,
15;75:20;76:3;
77:22;78:23;79:2;
87:17;91:11,21;
92:21;93:3;95:19;
96:22;100:23;102:2,
20;108:12,16,16;
109:10,14,19,19;
110:7;112:13;
115:10;118:1;119:9,
16;120:8,20;122:9;
123:4,7;125:25;
126:3,3;128:1;129:3,
6,6;131:2,10;133:15,
20,20;134:3,6,16;
135:1;136:24;
138:12,25;142:9,9;
143:16,18;146:5,20;
147:18;149:1,11,23;
150:17;151:20,21;
152:1,20;153:11,18,
20;154:1,3,14;155:2,
9,10,18,22,25;157:4,
15,25;158:17;160:8,
25;161:3,8,12,20;
162:14,16,21;
163:13,16,16;

164:24;165:7,16;
168:10,17;169:12;
170:1,2
**rights (11)**
16:20;20:19;
21:10;25:8;31:22,
24;37:22;44:13;
62:17;86:8;161:16
**right-size (1)**
73:21
**rigors (1)**
140:11
**rise (7)**
12:2;65:16,19;
79:8;133:25;148:9;
163:20
**risen (1)**
36:17
**rising (1)**
121:8
**Risk (10)**
6:8;19:9,13;39:24;
40:1;58:9;60:19;
113:12;130:10;
156:4
**risks (1)**
39:13
**road (3)**
12:20;137:23,23
**rodeo (1)**
60:23
**role (1)**
150:13
**roll (1)**
58:1
**rolled (2)**
61:9;64:10
**romp (1)**
87:4
**room (7)**
56:19;69:23;70:6;
72:3,5,6;163:11
**ROSENTHAL (2)**
10:23;109:22
**ROTH (1)**
11:1
**RSA (5)**
58:13,14,19,22;
94:14
**rubber (1)**
12:19
**rudely (1)**
66:20
**rug (1)**
17:21
**Rule (9)**
69:23;72:13;
88:19;113:22;114:3;
142:20;144:14;
148:8;168:13
**ruled (1)**
106:6
**rules (1)**

168:13
**ruling (3)**
88:24;106:7;151:7
**rulings (2)**
101:3;127:6
**run (3)**
20:22;27:22;149:9
**runaway (1)**
113:12
**running (2)**
56:6;72:16
**runs (2)**
58:8;60:19

**S**

**sale (4)**
15:11,16;65:3;
125:12
**SAM (2)**
8:10;43:4
**same (26)**
33:24;40:5;45:22;
46:10,11,21;52:16;
70:15,15;82:14,18;
83:7;86:21;90:15;
93:18;95:20;99:12;
106:5,11;110:20;
130:17;138:9,9;
140:6;141:19;150:7
**sanctions (1)**
89:2
**satisfaction (1)**
90:19
**satisfactory (1)**
154:12
**satisfied (1)**
59:24
**satisfy (2)**
82:18;90:18
**sauce (1)**
81:25
**save (2)**
151:17;155:17
**saw (6)**
18:9;34:23;37:6;
135:24;152:8;
161:15
**saying (15)**
19:4;30:1;47:25;
48:2;72:18;107:18;
110:23;122:16;
135:2,3;137:15;
138:11;139:10;
148:18;166:20
**SCALI (1)**
8:13
**schedule (4)**
14:14;77:14;
118:13;168:22
**scheduled (2)**
84:25;103:6
**schedules (2)**

18:8;60:7
**scheduling (1)**
160:11
**SCHERER (11)**
7:19,21;123:12,13,
15;124:7;126:1,13;
127:15;128:2;
134:24
**SCHULTE (1)**
11:1
**scope (3)**
86:12;119:18;
140:4
**SCOTT (1)**
8:5
**SDNY (2)**
6:22;10:3
**se (1)**
33:3
**seagulls (1)**
91:18
**search (1)**
68:24
**searches (4)**
69:8;70:7;72:4,7
**seated (3)**
12:4;79:9;163:21
**second (22)**
13:18;16:4;27:16;
30:22;33:18;34:1,2;
41:23;49:17;51:10;
54:4;81:6;86:2;87:2,
8;105:7;107:8;
121:19;126:15;
136:19;138:14;
150:4
**second-day (2)**
12:19;59:20
**Section (3)**
87:19;145:2;152:7
**secure (1)**
39:11
**securities (3)**
85:23;100:9;113:8
**seeing (2)**
149:10;168:16
**Seek (4)**
25:13;101:8;
102:5;128:20
**seeking (9)**
21:4;22:12;23:4;
67:7;105:10;114:2,
21;116:2;161:16
**seem (1)**
32:4
**seems (8)**
22:17;25:18;83:7;
101:10;119:22;
120:17;139:5;143:8
**sees (1)**
153:9
**selected (4)**
54:22;55:10,13;

56:4
**self- (1)**
72:7
**self-serving (1)**
72:15
**sell (1)**
61:25
**semi-weekly (1)**
27:19
**sense (12)**
18:15;33:7;38:20;
51:23;59:10;63:10;
64:23;72:8;74:8;
78:21;120:18;134:9
**sensitive (1)**
14:20
**sent (3)**
55:16,17;59:25
**sentences (1)**
142:22
**separate (1)**
97:20
**sequential (1)**
117:18
**serial (1)**
37:15
**series (1)**
132:8
**serious (4)**
108:2;134:22;
135:15;139:4
**Serve (2)**
136:14;146:25
**served (3)**
41:22;107:2;
162:17
**serves (1)**
107:13
**service (4)**
14:15;23:5,12;
61:5
**Services (13)**
6:8;8:3;19:1;27:9;
40:18;75:24;156:4,5,
18,23;157:3;159:18;
160:1
**serving (1)**
72:8
**session (1)**
79:24
**set (12)**
16:19;18:3;19:17;
30:19,22;53:21;
60:3;77:2;86:10;
91:4;98:2;152:12
**settle (1)**
124:12
**settlement (6)**
90:20;92:23;95:4;
104:10;107:24;
125:12
**settlements (1)**
130:23

**seven (2)**
80:7;123:17
**seventy- (1)**
62:2
**seventy-five (1)**
132:6
**several (4)**
81:16;83:3;101:2;
161:18
**severe (1)**
16:8
**shall (1)**
162:17
**shame (2)**
84:21;137:16
**Shanfelter (3)**
120:25;121:6;
123:3
**SHANNON (2)**
10:9;108:20
**shape (1)**
61:20
**share (3)**
17:12,14;125:18
**shared (2)**
18:5;29:5
**shareholder (4)**
87:14;88:14;
109:25;129:23
**shareholders (4)**
82:22;95:23;
100:17;130:6
**shares (11)**
95:18,22,25;96:4,
14,15,21;100:14,19;
131:15;132:3
**SHAW (2)**
11:7;92:2
**shelf (1)**
157:24
**ship (1)**
15:6
**shop (4)**
58:23,25;59:3,9
**short (6)**
38:19;45:14;46:1;
80:24;86:15;152:3
**shorten (1)**
155:20
**shortened (1)**
149:3
**shortly (1)**
60:15
**shot (2)**
86:13;91:15
**show (4)**
41:3;44:1;153:15,
16
**shown (2)**
47:17;54:2
**shows (1)**
167:9
**shut (2)**

Case 18-10189-CTG    Doc 264    Filed 03/02/18    Page 197 of 202

PATRIOT NATIONAL, INC., et al.
Case No. 18-10189 (KG)

February 28, 2018

63:14;156:18
**shuttled (1)**
125:6
**sic (7)**
20:25;30:14;
39:11;40:20,25;61:6,
25
**Side (9)**
84:14,15;90:1;
97:3;111:9;115:20;
124:4;130:16;
166:13
**sides (2)**
28:22;73:8
**sign (7)**
31:9;35:6,12;
154:3,25;155:2;
162:22
**Signed (3)**
31:10;154:16;
155:25
**significant (4)**
15:19;16:11;29:5;
67:17
**signing (1)**
155:22
**silence (2)**
57:14;59:15
**silo (2)**
40:17,18
**similar (4)**
28:20;45:25;
118:22;121:15
**similarly (4)**
21:6;27:17;97:5;
139:18
**SIMON (1)**
8:2
**simple (6)**
14:14;29:12;
81:16;105:23,23;
117:14
**simply (13)**
13:4;15:5;17:1,25;
19:4;31:18,19;
70:18;71:19;85:23;
115:3;116:20;
136:10
**singular (1)**
39:12
**sitting (1)**
91:19
**situation (8)**
17:4;142:17;
156:7,14,20;166:21;
167:10,24
**sixty (4)**
14:2;34:3;109:4;
144:8
**sixty-day (1)**
72:8
**sixty-million (1)**
124:3

**size (5)**
13:21,25;28:3;
73:23;76:8
**skimming (1)**
88:11
**sky (1)**
58:13
**slightest (1)**
142:4
**slow (2)**
49:23;107:15
**slowing (1)**
107:11
**small (2)**
38:16;90:18
**smaller (1)**
13:25
**SMITH (6)**
11:12,18;112:20,
21;113:13;140:17
**SN (1)**
113:24
**sneeze (1)**
74:13
**so-called (1)**
93:16
**SOFAs (1)**
60:7
**software-related (1)**
27:9
**solely (2)**
101:25;105:3
**solid (1)**
125:6
**somebody (6)**
39:22;46:20;
126:9;148:11;
151:12;159:12
**somehow (4)**
65:2;111:7;
139:15;152:18
**Someone (2)**
42:24;110:14
**SOMERS (12)**
10:20;110:4,8,10,
10;112:8;129:23;
147:19;149:13,15,
15,18
**sometime (1)**
169:5
**somewhat (2)**
72:7;165:19
**soon (8)**
40:4;69:6;86:19,
20;122:16;126:19,
20;139:20
**sooner (1)**
148:25
**sophisticated (2)**
60:21,24
**sorry (11)**
32:6,6,13;35:18;
71:2;116:5;123:11;

128:5;140:19;
142:21;163:7
**sort (9)**
13:1;54:4;61:12;
82:5;89:2;99:12;
100:15,18;130:11
**sorts (1)**
127:8
**sought (3)**
21:15;88:22;89:13
**sound (1)**
99:1
**sounds (5)**
18:18;28:25;
30:12;114:18;
165:16
**source (2)**
41:13;49:8
**sources (3)**
47:23;48:3;49:3
**Southern (5)**
84:25;85:1;93:22;
103:3;107:7
**space (2)**
157:8,16
**SPAHR (2)**
6:2;102:25
**speak (7)**
21:18;57:4;66:18;
69:3;77:16;123:3;
128:9
**SPEAKER (3)**
12:5;36:19;93:2
**speaking (1)**
98:22
**specific (3)**
121:9;134:20;
136:25
**specifically (3)**
146:24;150:4;
152:17
**specifics (1)**
135:17
**speech (1)**
67:22
**speed (1)**
151:1
**spend (1)**
127:9
**spending (4)**
93:19;94:1;
166:15;168:2
**spent (13)**
89:17,18;91:5;
94:1,2,2;97:24;
98:12;124:17;
126:15;130:1;
166:23;167:2
**spirit (1)**
57:7
**split (2)**
76:5;163:2
**spoke (1)**

48:25
**spoken (2)**
20:19;142:24
**spreadsheet (1)**
84:17
**sprinkles (1)**
81:24
**stabilized (2)**
74:9;167:15
**stack (1)**
140:21
**stacks (1)**
84:15
**staff (1)**
140:14
**stage (1)**
99:8
**staggering (1)**
90:16
**stakeholder (1)**
16:18
**stakeholders (1)**
14:25
**stand (5)**
60:6;68:8;119:20;
163:17;170:2
**standard (11)**
28:3;54:10,11;
55:6;64:6,23,23;
86:3,9;87:18;89:8
**stand-down (2)**
125:21;126:8
**standing (4)**
46:14;74:23;
146:19;147:22
**stands (1)**
61:6
**Stang (1)**
65:15
**STARGATT (1)**
11:17
**stark (1)**
130:18
**start (4)**
65:25;70:7;86:18;
129:22
**started (3)**
38:21;125:15;
164:4
**starting (4)**
13:12;74:24;
90:15,15
**starts (1)**
16:3
**State (3)**
6:14;9:4;106:24
**state-court (2)**
85:17;107:13
**stated (4)**
21:10;81:16;
109:17;115:3
**statement (8)**
18:7;43:16;58:21;

60:10;67:22;75:13;
83:17;118:15
**statements (3)**
16:24;17:2;20:21
**States (2)**
36:3;38:12
**status (4)**
98:3;103:5;
151:12,16
**statutory (2)**
113:8;131:4
**stay (58)**
80:3;81:7;83:25;
84:2;85:3;87:2,2,9,
10,10,11,20,22;88:4,
4,8,10,13,23;89:5,7,
9,16,23;91:2,8;
94:15,24,24;98:14;
103:11,17,21;106:2,
4;107:21;109:1,3;
112:7,22;113:8;
114:2,3,25;116:11;
118:9,17;126:5;
133:7;138:15;
141:24;142:5;
144:12,13;145:2,5,
14;159:7
**stayed (15)**
85:4;103:16,21;
106:20;107:3,10,19;
108:9,11;116:7;
126:4;135:7;137:18;
138:11;144:21
**stays (1)**
135:10
**stems (2)**
95:13,13
**step (1)**
13:23
**Steve (1)**
11:13
**Steven (2)**
7:20;103:14
**stick (2)**
16:14;79:23
**stickler (2)**
114:5,6
**STIEGLITZ (1)**
7:11
**still (19)**
18:18;19:21;
23:13,16,24;24:9,18;
29:22;32:25;39:5;
64:7;65:4;69:20;
96:14;97:21;102:14,
19;125:17;143:4
**stipulate (3)**
34:10;137:6;
142:25
**stipulated (1)**
62:16
**stipulating (1)**
147:14

**stipulation (2)**
128:20;137:11
**stipulations (1)**
132:18
**STN (1)**
146:18
**stock (1)**
111:2
**STOCKTON (4)**
8:18;9:2;21:22;
53:19
**stonewalling (1)**
69:25
**stop (4)**
41:12;42:7;133:2;
169:5
**stopped (2)**
125:15;128:22
**stopping (1)**
143:9
**stops (1)**
112:23
**straightforward (2)**
162:1,2
**stressed (1)**
54:2
**stretch (2)**
16:1;74:20
**stretching (1)**
16:12
**strikes (2)**
119:3;145:24
**strong (1)**
144:2
**struck (2)**
120:2;143:21
**structure (6)**
13:25;16:1,22;
40:17;46:11;115:19
**structured (1)**
100:15
**structuring (1)**
67:14
**struggle (1)**
105:1
**stuff (5)**
39:23;64:15;
70:20,20;72:18
**subject (16)**
21:11;34:15;36:8;
44:22;52:4,6;62:16;
93:4;97:9;103:11;
106:3;107:1,9;
113:7;130:21;141:3
**submit (4)**
36:11,12;145:18;
151:6
**submitted (6)**
24:2,5,11;99:24;
116:17;156:25
**subordinated (2)**
85:23;101:6
**subproducers (1)**

27:5
**substance (3)**
29:18;109:11;
136:12
**substantial (9)**
18:1;38:4;55:19;
83:1;90:22;91:5;
105:20;109:25;
143:4
**substantiate (1)**
62:25
**substantive (4)**
56:1;69:13,16;
82:14
**succeeded (1)**
125:4
**success (4)**
14:16;93:7;
114:17;152:18
**successful (8)**
94:10;113:13;
114:14;116:24;
117:23;125:11;
138:20;144:10
**successfully (1)**
88:18
**sued (5)**
96:5;103:14,14;
104:16;138:10
**suffer (1)**
166:1
**suffice (1)**
122:14
**sufficient (3)**
47:1;49:12;64:10
**suggest (9)**
44:20;45:10;
46:22;74:21;78:24;
79:19;89:19;105:21;
120:16
**suggested (2)**
118:11;144:9
**suggestion (2)**
75:11;77:12
**suggestions (1)**
89:20
**suggests (2)**
40:18;47:24
**suing (3)**
96:24;99:23;102:4
**suit (1)**
145:10
**suits (1)**
144:24
**summary (6)**
88:18;98:1,6,15,
15;106:14
**SUMMERS (15)**
6:4;102:24,25;
103:18,20,23,25;
104:5;108:2,8,10,13,
15,17,18
**SunEdison (1)**

136:18
**supersedes (1)**
160:6
**supervision (1)**
45:21
**supplant (1)**
32:17
**supplemental (5)**
44:18;59:5;116:9;
121:22,25
**support (13)**
14:21;15:20;
16:17;17:11,15;
82:21;86:10;94:23;
115:6;117:6;118:9;
128:15;168:2
**supported (1)**
131:13
**supporting (5)**
67:9;111:13;
133:7;166:18;167:3
**supportive (2)**
75:23;133:13
**supports (3)**
17:19;129:13;
132:25
**suppose (1)**
123:16
**supposed (4)**
90:15;96:8;
100:16;146:6
**Supreme (1)**
158:2
**sure (35)**
37:8;44:1;53:11,
14;55:22;57:16;
60:16;66:9;68:3;
76:4;77:7;97:3,20;
98:8;101:17;102:3;
118:17,20;119:5,17;
122:20;133:1;134:6;
136:1;140:23;
143:10;145:22;
159:12,13,24;160:4;
161:1,15;163:9;
164:7
**surprise (3)**
57:2;60:11;61:1
**surprised (2)**
43:18;164:1
**surprising (1)**
116:14
**surrender (2)**
95:25;100:14
**surrounding (1)**
111:3
**survive (2)**
73:20;74:3
**sweeping (1)**
17:20
**swept (1)**
108:3
**Swiss (1)**

85:3
**swoop (1)**
13:16
**sworn (1)**
46:24
**system (2)**
51:18,18

**T**

**table (5)**
53:21;82:14;
122:6,8;132:2
**tables (1)**
59:2
**TAE (1)**
11:4
**tail (1)**
56:11
**tailor (1)**
14:4
**talk (25)**
16:3,4;19:20;45:6;
56:13;57:9;63:6;
69:10,10;75:11;
76:7;78:2;81:19;
82:7;93:5;94:4;95:3,
3;139:9;143:10;
150:4;155:11;
162:23;166:14;
169:15
**talked (4)**
55:23;146:2,19;
156:24
**talking (18)**
34:3;38:11;45:14;
47:10,20;50:9;67:20,
20,21;88:16;89:6;
92:7;93:12;107:24;
132:2;147:19,20;
156:23
**tall (1)**
18:13
**tame (1)**
62:14
**tantalizingly (1)**
113:17
**targets (1)**
23:20
**TAYLOR (1)**
11:17
**TCW (1)**
14:6
**teaches (1)**
158:6
**team (3)**
70:4;73:24;167:25
**technically (1)**
76:13
**tee (1)**
169:12
**teed (2)**
65:3;99:9

**TELEPHONICALLY (5)**
6:9;7:10,11,16;
10:20
**telling (1)**
47:5
**tells (2)**
62:2;137:13
**temporarily (3)**
80:3;81:7;147:10
**temporary (5)**
87:9;91:2;155:8;
156:2;157:23
**ten (13)**
24:18;27:4;34:2;
56:4,17;87:5;126:15,
15,24,24,24,24,24
**ten-minute (1)**
79:3
**tentative (1)**
125:9
**term (3)**
126:1;159:15,25
**termination (1)**
165:6
**terms (17)**
22:18;23:12;
26:17,18;27:11;
35:24;55:5;56:11;
63:7;117:14;118:14;
119:1;125:2;130:18;
152:12,14;165:13
**terrible (1)**
92:22
**Terrific (1)**
169:14
**testified (1)**
57:23
**testifying (1)**
159:3
**testimony (1)**
62:24
**Thanks (3)**
27:25;30:9;34:8
**that'll (2)**
127:2;162:11
**theme (1)**
54:5
**themes (3)**
53:24;54:1;81:16
**therefore (3)**
14:25;46:18;141:4
**there're (5)**
18:16;75:6;85:4;
106:12,13
**there've (2)**
16:23;70:1
**thin (1)**
115:15
**thinking (1)**
118:13
**Third (13)**
7:15;8:14;15:24;
16:20;17:20;31:21;

PATRIOT NATIONAL, INC., et al.
Case No. 18-10189 (KG)

February 28, 2018

45:16,19;86:3,9;
126:14,16;144:25
**third- (1)**
17:17
**third-party (1)**
82:15
**thirty (2)**
94:18;118:20
**thirty- (1)**
59:15
**thirty-second (1)**
66:3
**THOMAS (2)**
11:9;92:2
**thorough (1)**
116:25
**though (5)**
25:20;60:6;82:7;
104:16;165:17
**thought (16)**
12:18;13:1;22:8;
28:7;33:1;37:18;
44:12;56:24;57:14;
77:3;125:4;127:21;
128:13;136:5;146:1;
149:7
**thoughtful (1)**
65:23
**thousands (2)**
49:10,10
**threads (1)**
37:18
**threatened (1)**
145:10
**three (6)**
26:23;29:15;
54:20;112:19;
124:10;162:18
**three-day (1)**
27:15
**three-sixty (1)**
103:19
**threshold (1)**
24:12
**throw (1)**
116:12
**thrown (2)**
73:8;166:2
**Thursday (1)**
55:16
**thus (1)**
107:7
**ticktock (1)**
72:16
**tied (2)**
94:24;99:12
**ties (1)**
106:1
**tight (2)**
165:1,2
**tighter (2)**
163:1;165:3
**tightly (1)**

13:3
**till (2)**
41:23;72:25
**time-consuming (1)**
47:11
**timed (1)**
14:24
**timelines (3)**
118:14,16,18
**times (3)**
27:20;77:5;132:19
**timetable (2)**
16:19;64:21
**timing (6)**
13:2;15:13;16:15;
17:22;54:4;139:10
**timingwise (1)**
57:13
**titled (1)**
41:8
**to-back (1)**
96:6
**today (38)**
12:7;17:7,24;
26:21;28:12;55:22;
57:19,22;58:3;60:6;
63:1,2;71:14,17;
75:3;77:10,11,19;
78:8,12;93:19;
95:10;98:17;102:9;
104:11;119:20;
121:12;128:9,17;
129:15;132:20;
148:17;151:18;
156:10;164:5;
165:17;166:20;
167:19
**today's (1)**
17:4
**together (8)**
69:2,4;87:7;88:25;
91:14;99:13;103:4;
168:3
**told (11)**
18:25;23:3;28:12;
41:19;59:14;83:18,
19;139:18;150:5;
156:21;166:13
**tomorrow (20)**
18:4;24:22;26:7;
29:24;56:21;60:2,
12;72:25;78:7;85:1;
88:17;98:3;103:6;
126:6;127:4;151:13,
16,17;166:17;167:16
**tongue (1)**
73:8
**took (5)**
39:1;94:19;97:18;
123:19;164:6
**topic (1)**
56:7
**tortious (3)**

96:11;97:13;
100:11
**totally (1)**
62:8
**touch (1)**
128:18
**toward (1)**
19:2
**TOWBIN (2)**
11:7;92:3
**tower (1)**
126:24
**towers (1)**
126:25
**TOWNSEND (8)**
8:18;9:2;21:22;
23:2;53:19;55:10;
118:8;163:24
**trace (1)**
41:20
**track (4)**
54:14;58:5;61:14;
106:22
**tracking (1)**
103:4
**trade (1)**
60:22
**traded (1)**
125:17
**traditional (1)**
27:8
**train (1)**
42:7
**training (1)**
66:16
**trajectory (1)**
64:13
**transaction (6)**
59:1,2;71:5;73:14;
75:13;95:24
**transactions (3)**
13:10;49:10;51:17
**transcript (4)**
70:14;124:9;
126:7;135:9
**transfer (1)**
133:5
**transferred (2)**
40:12,14
**transferring (1)**
15:11
**transfers (2)**
47:9;49:22
**Travelers (3)**
8:9;43:5,10
**Travelers' (1)**
43:17
**trees (1)**
18:13
**tried (3)**
45:6;66:11;76:1
**Trinidad (3)**
6:13;9:3;37:23

**TRO (3)**
79:16;159:11,24
**troublesome (1)**
138:14
**true (6)**
69:25;70:8,19;
72:14;78:23;150:10
**truly (1)**
121:17
**trust (11)**
15:23;54:5,6,16,
18;55:1,3;61:16,21;
64:19;166:13
**Trustee (9)**
50:22,23;51:6;
54:22;56:9;150:5;
152:13;153:6,9
**Trustee's (3)**
30:20;36:3;56:8
**try (15)**
38:18;47:25;78:3,
7,19;101:8;124:12;
125:21;134:18;
149:9;163:14;
164:16,20;168:7;
169:21
**trying (34)**
13:4,5;39:4;41:10;
42:7;47:15;48:2;
49:23;70:4;76:23;
77:11;80:14;81:20;
82:8,25;84:23;85:5,
8;91:12,13,14;
107:15;112:10;
122:15;131:21;
136:3,15;138:6;
139:19,22;140:6;
141:20;163:3;168:3
**TSAI (3)**
10:18;110:5,10
**Tuesday (2)**
55:11;168:24
**tunc (1)**
34:17
**turn (4)**
19:17;73:1;90:22;
156:23
**turned (2)**
74:9;125:13
**twelve (1)**
23:9
**twenty (4)**
61:16;124:4,18;
132:5
**twenty-five (3)**
124:17;126:11;
132:6
**twenty-four (1)**
159:5
**twenty-four/seven (1)**
168:3
**twenty-one (1)**
136:7

**twenty-six (2)**
41:14,16
**twenty-two (4)**
41:14,16;46:16,17
**two (34)**
14:3;23:14,16;
26:25;27:2,8,13;
28:11;35:21;46:10;
50:1;53:24;54:20;
78:14;79:13,20;
81:4;96:7;112:20;
113:6;114:15;115:6,
7,11;117:21;120:1;
125:6;131:11;141:2,
8,11;150:2;151:2;
160:4
**two-week (2)**
62:23;63:10
**type (5)**
22:19;36:10;
51:22;104:24;
154:23
**types (2)**
24:2,3
**typical (2)**
89:10;141:18
**typically (3)**
119:21;121:23;
141:23

**U**

**UDA (1)**
36:3
**UDAs (1)**
51:2
**Ullico (16)**
6:14;9:4;37:24;
38:4,23;39:8,17,25;
40:3,6;41:3;42:19;
44:9;45:5;46:25;
49:1
**Ullico's (4)**
40:11;42:15,18;
44:9
**ultimately (6)**
37:21;58:17;
130:8,13,13;164:19
**Um-hum (1)**
124:6
**unburdensome (1)**
20:25
**uncomfortable (1)**
126:14
**uncommon (1)**
58:22
**uncontroversial (1)**
115:2
**under (40)**
17:21;19:8,14;
45:21;48:20;51:18;
54:19;61:12;62:15,
16;84:7,8;85:23;

86:3;87:11,18,19,22;
103:19;107:16;
111:9;112:5;113:8,
16;117:23;120:14;
121:7;125:14;135:7,
20,21;139:2;140:9,
25;145:2,12;151:6;
160:7;165:5;166:1
**underground (1)**
130:8
**underlying (4)**
109:12,18;119:22,
23
**underscore (3)**
29:19;32:21;33:4
**understands (2)**
61:6,7
**Understood (3)**
33:11;53:6;169:21
**undertake (2)**
80:24;166:4
**undertaken (1)**
99:21
**undertaking (1)**
82:17
**underway (1)**
113:9
**underwent (1)**
40:5
**unequivocally (1)**
34:25
**unexciting (1)**
115:5
**unfair (2)**
101:17;139:5
**unfold (1)**
113:11
**unfortunate (3)**
66:6;105:15;
156:14
**unfortunately (5)**
23:13;137:18;
156:7;163:25;164:3
**UNIDENTIFIED (3)**
12:5;36:19;93:2
**uninteresting (1)**
115:5
**unique (2)**
103:9;108:3
**UNISON (2)**
169:9;170:4
**United (1)**
36:3
**universal (2)**
83:22;85:6
**universally (1)**
84:12
**unjustifiable (1)**
74:10
**unknowable (1)**
140:22
**unless (6)**
21:17;36:14;

43:23;52:15;131:20;
147:10
**unlike (3)**
34:1;65:24;99:16
**unlikely (2)**
71:9;105:14
**unnecessary (1)**
82:17
**unpunished (1)**
152:23
**unrelated (2)**
38:16,17
**unsalvageable (1)**
166:9
**Unsecured (8)**
8:19;10:13;15:21;
61:15;76:21;101:7;
166:11;167:6
**unsecured-creditor (1)**
76:13
**unusual (2)**
57:12;66:15
**up (46)**
16:3;18:4;43:21;
47:25;51:16,17,19;
58:1,24;62:6;64:11;
65:3;67:19;69:23;
70:10,12;74:23;
77:2;85:7;87:4,6;
89:17;90:21,25;
91:13;93:12;94:20;
98:23;99:9;108:3;
116:10,12;121:20;
126:10,25;129:9;
134:23;135:3;136:1;
138:10;149:4;151:1;
155:6;159:7,11;
169:12
**update (1)**
26:18
**upon (7)**
40:21;58:18;
68:23,24;76:10;
87:15;118:16
**upside (2)**
16:10;61:25
**upwards (1)**
34:2
**urge (2)**
125:20;148:11
**urged (3)**
123:24;124:2;
127:15
**urges (1)**
127:13
**use (9)**
19:1,11;41:17;
42:19;47:25;84:17;
90:21;95:1;126:1
**used (8)**
39:7,13;42:15;
44:10;90:25;97:16;
121:20;131:15

**using (5)**
83:7;87:5;134:23;
135:3;144:14
**Usually (2)**
57:12;107:24
**utilities (2)**
30:17;32:5

**V**

**vacuum (1)**
64:8
**valuable (1)**
62:5
**valuation (2)**
60:8,14
**value (14)**
14:24,25;15:10;
19:10;23:24;24:16;
64:18,18,19;74:4;
76:18;119:11;166:5,
24
**variation (1)**
91:9
**variety (1)**
130:10
**various (8)**
38:11;47:6;52:24;
57:18;85:2;128:15;
131:22,22
**vehicle (1)**
62:13
**vendors (8)**
26:13,14,18;27:8;
28:17;29:21;55:23;
60:22
**version (1)**
53:22
**versus (4)**
58:23;131:9;
132:5,6
**viability (1)**
75:25
**Vice (1)**
40:6
**view (13)**
15:17;60:10;82:9;
87:10;94:10,22;
98:19;114:9;116:1,
23;117:22;143:14;
149:21
**views (2)**
93:6;167:19
**vigorous (2)**
116:25;122:5
**violate (1)**
125:2
**violated (1)**
88:13
**violation (1)**
88:20
**violations (2)**
88:23;100:10

**virtually (1)**
58:7
**voluminous (1)**
18:7
**voluntarily (2)**
94:15;136:5
**vote (1)**
54:23
**vu (1)**
104:7

**W**

**wage (1)**
24:20
**wages (1)**
55:23
**wagging (1)**
56:11
**wait (4)**
41:22,23;48:10;
50:4
**waited (2)**
53:5;59:12
**waiting (3)**
73:2;88:23;163:11
**waive (2)**
68:7;71:16
**waiver (3)**
29:15;35:1,25
**waivers (1)**
27:15
**walk (4)**
18:5;19:18;71:2;
76:23
**walked (1)**
167:25
**Walsh (5)**
11:18;112:20,21;
113:13;140:17
**wants (3)**
53:12;61:7;148:15
**warm (1)**
54:8
**warm-and-fuzzies (1)**
54:15
**warrant (4)**
96:1,3;100:20;
102:17
**warranted (2)**
58:10;63:13
**warrants (4)**
95:21;96:8;100:8,
13
**WARREN (36)**
9:16;92:4,6,11,12,
12,15,22;93:1,3,14;
95:9,20;96:3,15,18,
20,23;97:1,12;99:2,
4,12;100:2,3,7,23;
101:16,19;102:13,
16,21;142:19,21;
143:17,19

**Warren's (1)**
112:25
**Wasik (8)**
9:21;10:8;108:23;
111:5;123:25;
124:15;125:5;131:7
**waste (2)**
84:22;100:11
**wasted (2)**
125:24;134:24
**wasting (5)**
80:19;124:2;
125:23;134:24;
135:3
**waterfall (1)**
76:6
**waterfalls (1)**
166:15
**WATKINS (3)**
9:14;92:4,13
**wax-off (1)**
59:17
**wax-on (1)**
59:17
**way (27)**
37:15,19;42:4;
45:23;61:20,21;
62:1;71:19;87:6;
92:25;102:2;111:18;
112:11;119:12;
121:8,25;122:1,18;
124:17;126:25;
129:16;136:11,21;
144:16;148:2;
155:14;165:16
**ways (3)**
73:15;132:12;
135:22
**Wednesday (2)**
55:12;56:3
**week (14)**
18:19;23:10;30:5;
32:22,22;55:13;
57:24;59:22;69:14,
24;71:14;168:1,8,16
**Weekend (2)**
55:8;162:12
**weekly (6)**
27:19;49:21,23;
50:1,7,17
**weeks (2)**
113:6;165:19
**weight (1)**
148:19
**welcome (3)**
57:8;92:11;128:7
**well-spent (1)**
125:24
**weren't (3)**
33:1;58:2;100:5
**West (1)**
169:6
**what's (9)**

Case 18-10189-CTG   Doc 264   Filed 03/02/18   Page 201 of 202
PATRIOT NATIONAL, INC., et al.
Case No. 18-10189 (KG)

February 28, 2018

16:11;42:17;
64:19;84:22;89:12;
115:20;129:15;
134:3;165:10
**whatsoever (2)**
46:22;98:20
**whereas (1)**
38:25
**Whereupon (1)**
170:6
**whoever's (1)**
167:18
**whole (6)**
63:16;67:4,4;77:2;
136:14;138:5
**who's (8)**
19:18;36:17;73:1;
79:21;83:12;102:14;
119:16;168:2
**WILLIAM (2)**
7:21;123:12
**willing (18)**
17:14;27:18;
28:15;49:1,5,22;
64:13;71:16;78:3;
83:9;94:15;100:25;
105:17,23;130:5;
137:11;141:9;
144:11
**willingness (1)**
19:1
**win (5)**
98:14;101:11;
138:1;143:1,2
**wipe (3)**
17:17;87:12;138:6
**wish (2)**
142:19;151:1
**wishes (2)**
42:25;144:9
**withdraw (1)**
35:1
**within (3)**
15:14;72:9;120:13
**without (14)**
16:17;24:18;
31:21;33:10;63:5;
68:16;76:10;81:8;
82:16;96:20;114:21,
22;146:23;164:9
**withstand (1)**
14:18
**wonderful (1)**
151:23
**wool (1)**
61:2
**word (4)**
66:5;67:8;120:9;
148:19
**words (6)**
54:8;66:4;77:23;
79:14;115:22;
117:11

**work (35)**
22:18;25:16;28:8,
15,21;36:2,10;42:2,
9,10;48:2,17;49:1,6,
22;51:4,15;65:7;
66:11;74:16;76:15;
77:23;83:9;128:24;
131:21,23;141:13;
144:4;145:17;
151:21;159:5;
160:16;164:16;
165:11;168:7
**worked (3)**
33:14;58:15;
124:16
**working (5)**
30:5;34:11;73:25;
149:8;160:6
**works (5)**
28:22;91:15;
144:3;160:24;
162:15
**world (4)**
18:13;66:17;
75:23;113:24
**worth (5)**
47:9,9;49:9;86:12;
126:17
**wrapped (1)**
98:23
**write (2)**
140:16;167:19
**writing (2)**
89:22;140:16
**wrong (8)**
48:14;61:4,5;
68:20;119:16;130:6;
137:5;138:23

**Y**

**year (3)**
13:12;40:5;73:24
**years (7)**
45:11,21;47:21;
95:14;96:7;99:19;
101:2
**years' (2)**
47:9;49:9
**yesterday (14)**
16:5;23:4;41:22;
45:6;53:2;55:21;
57:11,19;59:14;
60:13;66:12;75:22;
84:23;126:4
**yield (2)**
65:17;66:22
**York (11)**
6:8;84:25;85:2;
103:3;104:6;105:10;
107:8;128:6;151:18;
156:4;159:1
**YOUNG (1)**

11:17

**Z**

**ZABEL (1)**
11:1
**Ziehl (1)**
65:15

**1**

**1 (1)**
20:8
**1:30 (2)**
78:13;162:24
**1:37 (1)**
163:19
**10 (2)**
151:17;168:24
**10,000 (1)**
27:7
**100,000 (3)**
27:18;28:8;29:12
**100,000-dollar (1)**
29:4
**101 (1)**
28:16
**105 (1)**
145:2
**11 (27)**
13:6;14:10,13,18,
20;15:14;19:2;
20:14;30:15;55:5;
58:9,17;59:13;
60:20;62:1,11,12,19;
65:5;90:14;120:14,
15;137:20,23;
168:21;169:13;
170:3
**11:30 (1)**
78:12
**11:36 (1)**
79:7
**11:50 (1)**
79:7
**12 (1)**
20:17
**120 (4)**
86:17;91:8;
118:11;144:8
**12th (2)**
161:21;162:19
**13 (1)**
26:13
**13.5 (4)**
95:15,17;97:15,17
**13th (3)**
117:16;160:15,24
**14 (2)**
30:14;31:12
**14th (8)**
98:2;99:10;
117:15;158:8,11;

159:11;160:11,21
**15 (1)**
31:12
**16 (2)**
35:19;126:25
**16th (2)**
55:7;73:10
**17 (3)**
43:7;126:25;127:1
**179 (2)**
80:22;81:13
**18 (2)**
52:21,22

**2**

**2 (1)**
158:11
**2:30 (5)**
162:25;163:1,8,9,
17
**2:35 (1)**
163:19
**2:44 (1)**
170:6
**20 (1)**
152:4
**2007 (1)**
159:22
**200-million-dollar- (1)**
13:8
**2013 (1)**
40:3
**2014 (4)**
46:7;159:17;
160:1,5
**2015 (1)**
45:16
**2016 (3)**
45:16;104:14;
124:3
**2017 (3)**
13:8;14:7;99:7
**2018 (1)**
14:2
**21 (1)**
154:15
**21st (1)**
55:13
**22 (1)**
154:16
**23 (1)**
156:2
**230 (1)**
74:12
**24th (1)**
118:19
**25,000- (1)**
72:11
**250-page (1)**
131:7

**3**

**3 (4)**
20:8;162:24;
163:2;169:5
**3:30 (3)**
160:25;161:2,2
**300 (2)**
38:5;47:9
**300,000 (1)**
26:23
**341 (10)**
16:4;57:11,13,23;
59:14;60:13;62:24;
65:20,22;66:16
**345 (1)**
35:24
**362 (1)**
135:9
**362a1 (1)**
138:16
**362a3 (4)**
87:11;88:20;
135:7,8
**363 (10)**
15:11,13;64:23,
24;65:1,1,3,9;76:23;
152:7

**4**

**4 (3)**
20:14;25:21;169:5
**400 (2)**
74:16;127:16

**5**

**510b (1)**
85:24
**541 (1)**
87:19
**5th (6)**
168:19,20;169:4,8,
12;170:3

**6**

**6 (2)**
68:3,12
**6th (5)**
159:17;160:1;
164:13;165:6;
168:20

**7**

**7 (4)**
35:19;80:21;81:2;
88:7
**7000 (1)**
144:15

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

PATRIOT NATIONAL, INC., et al.
Case No. 18-10189 (KG)

February 28, 2018

**7001 (2)**
  135:20;141:20
**70017 (2)**
  113:22;114:3
**75,000 (1)**
  23:18

## 8

**8 (1)**
  159:4
**8-K (3)**
  58:14,15;123:19
**8th (15)**
  18:18;22:22;
  33:21;35:22;43:11;
  44:14,21;49:2;60:4;
  63:10;68:4;71:15;
  149:4;157:18;169:1

## 9

**90 (1)**
  118:12
**9th (2)**
  35:24;162:7