## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| PATRIOT NATIONAL, INC., *et al.*,[1] | Case No. 18-10189 (KG) |
| Debtors. | <u>Related D.I.:</u> **16, 17, 64, 84** |

## RECEIVER OF ULLICO CASUALTY COMPANY IN LIQUIDATION'S OBJECTION TO DEBTORS' THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION

The Honorable Trinidad Navarro, Insurance Commissioner of the State of Delaware, in his capacity as the Receiver (the "**Receiver**") of Ullico Casualty Company in Liquidation ("**Ullico Casualty**"), by and through undersigned counsel, files this objection (the "**Objection**") to the *Debtors' Third Amended Joint Chapter 11 Plan of Reorganization* [D.I. 382] (the "**Plan**").[2] In support of this Objection, the Receiver respectfully states as follows:

## PRELIMINARY STATEMENT

The Receiver files this objection in his ongoing efforts to ensure that his rights pursuant to 18 Del. C. Ch. 59, also known as the Delaware Uniform Insurers Liquidation Act (the "**DUILA**"), and the authority granted by the Court of Chancery of

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors' federal tax identification number, are: Patriot National, Inc. (1376), Patriot Services, LLC (7695); TriGen Insurance Solutions, Inc. (2501); Patriot Captive Management, LLC (2341); Patriot Underwriters, Inc. (0045); TriGen Hospitality Group, Inc. (6557); Patriot Risk Consultants, LLC (0844); Patriot Audit Services, LLC (5793); Patriot Claim Services, Inc. (9147); Patriot Risk Services, Inc. (7189); Corporate. Claims Management, Inc. (6760); CWIBenefits, Inc. (0204); Forza Lien, LLC (7153); Contego Investigative Services, Inc. (0330); Contego Services Group, LLC (0012); Patriot Care Management, LLC (2808); Radar Post-Closing Holding Company, Inc. (2049); Patriot Technology Solutions, LLC (6855); and Decision UR, LLC (1826). The Debtors' headquarters are located at 401 East Las Olas Boulevard, Suite 1650, Fort Lauderdale, Florida 33301.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan. The defined term Plan is intended herein to include to the extent appropriate the proposed order confirming the Plan and proposed statement of facts and conclusions of law.

the State of Delaware (the "**Court of Chancery**") pursuant to the Liquidation Order (defined below) are preserved as required pursuant to the McCarran-Ferguson Act, and consistent with the *Younger* and *Burford* abstention doctrines.

On February 21, 2018, the Receiver filed its *Limited Objection to the Debtors' Motion for Interim and Final Orders (I) Authorizing the Continued Use of Cash Management System, Bank Accounts and Business Forms, (II) Extending the Debtors' Time to Comply with Section 345(b) of the Bankruptcy Code, (III) Approving Continuation of Ordinary Course Intercompany Transactions and (IV) Granting Related Relief* [D.I. 138] (the "**Cash Management Objection**") which is incorporated here as if set forth in full. Through the Cash Management Objection, the Receiver sought to preserve its rights and authority pursuant to the Liquidation Order to recover any assets belonging to Ullico Casualty ("**Assets of Ullico Casualty**") which may be in the possession or control of one of more of the Debtors and to prosecute claims related thereto.

On March 5, 2018, the Receiver issued its *First Set of (I) Requests for Production and (II) Interrogatories Directed to the Debtors*, seeking, *inter alia*, information and data (which information and data was to have been provided in 2013 pursuant to the Liquidation Order) to assist the Receiver in completing a forensic accounting to identify any Assets of Ullico Casualty that may be in the possession or control of any of the Debtors. Such discovery requests remain pending as of the date hereof, with responses due to the Receiver on or before April 4, 2018.[3]

Also on March 5, 2018, the Receiver filed its Objection to the Debtor's disclosure

---

[3] The discovery requests were served by email on Saturday, March 3, 2018, and by hand and mail delivery on March 5, 2018. *See* D.I. 284.

statement [D.I. 286] (the "**DS Objection**"). Consistent with the Cash Management Objection, the DS Objection sought to confirm that the Receiver's rights were preserved and not affected by the Plan or the Confirmation Order. In that regard, the Receiver requested the addition of language to the Disclosure Statement to make clear that nothing in the Plan or the Confirmation Order affected the Receiver's rights and authority pursuant to the Liquidation Order. Specifically, in connection with its DS Objection and subsequent communications with counsel for the Debtors and counsel for Cerberus, the Receiver sought the inclusion of the following language in the Disclosure Statement (the "**Receiver's Carve-Out Language**"):

> Nothing in the Plan or the Confirmation Order shall restrict, modify, or in any way affect the Receiver's rights in connection with that certain Liquidation and Injunction Order with Bar Date entered on May 30, 2013, In The Court of Chancery of the State of Delaware, In The Matter of the Liquidation of Ullico Casualty Company, C.A. No. 8392-VCS, including the Receiver's authority to prosecute suits by or for Ullico Casualty or to recover assets belonging to Ullico Casualty.

The Receiver's Carve-Out Language was rejected from inclusion in the Disclosure Statement by the Debtors and by Cerberus on the basis that it would impermissibly carve out the Receiver from applicability of the Plan's discharge provision.

The Receiver continues to maintain that preserving his rights under the Liquidation Order and under the DUILA (the "**Receiver's Rights**"), is not only supported but is mandated in both law and equity, and is necessary for the Receiver to carry out his obligations which include the protection of persons who purchased insurance policies of Ullico Casualty through one or more Patriot entities. The Plan,

however, through the discharge, injunction, release and exculpation provisions impedes the Receiver's authority to carry out his DUILA obligations by preventing the Receiver from pursuing possible claims and causes of actions to recover and administer Assets of Ullico Casualty. Court approval of these provisions, and any other Plan provision which impedes on the Receiver's authority impermissibly exceeds this Court's subject matter jurisdiction pursuant to the McCarran-Ferguson Act, and runs afoul of the abstention doctrines established by *Younger v. Harris*, 401 U.S. 37 (1971) and *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

In addition, from an equitable perspective the prejudice against the Receiver is significant should the Plan restrict the Receiver's rights pursuant to the DUILA and the Liquidation Order from pursuing his efforts to locate between $22 and $26 million of collateral for the benefit of Ullico Casualty and injured employees seeking to be paid on workers' compensation claims. This is in stark contrast to the absence of any prejudice to the Debtors. If a Debtor is later found to be in possession or control of Assets of Ullico Casualty, it can only be because of the Debtor's violation of the Liquidation Order's express prohibition on the continued use of any Assets or possible Assets of Ullico Casualty, and the Debtor's violation of the Liquidation Order's requirement that all Assets of Ullico Casualty be returned to the Receiver. It matters not whether that violation is intentional or unintentional, or is known now or unkown. In other words, the Debtors have no property interest in Assets of Ullico Casualty and, therefore, preserving the Receiver's Rights has no prejudicial effect against the Debtors. Rather, the inclusion of the Receiver's Carve-Out Language will prevent the Plan from being used to support conversion of Assets of Ullico Casualty (essentially a forfeiture by the Receiver and a

windfall to Cerberus and TCW) should it be determined that Assets of Ullico Casualty are in the possession or control of a Debtor.

## GENERAL BACKGROUND

1. On January 30, 2018 (the "**Petition Date**"), the Debtors commenced their bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

2. No trustee or examiner has been appointed in these cases. The Debtors are operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. On February 1, 2018, the Court entered an interim order granting the Motion [D.I. 50].

4. On February 16, 2018, the Office of the United States Trustee appointed a committee of unsecured creditors.

## RELEVANT BACKGROUND

5. Ullico Casualty is in insurance delinquency proceedings under the DUILA.

6. The Delaware Supreme Court recently explained the genesis and purpose of the DUILA as follows:

> Insurer insolvency is regulated by state law rather than the federal Bankruptcy Code. Many states, including Delaware, have adopted a form of the Uniform Insurers Liquidation Act "to avoid the confusion inherent in the forced liquidation of a multistate insurance corporation, especially with regard to assets in foreign jurisdictions." The General Assembly enacted the Delaware Uniform Insurers Liquidation Act [the DUILA] in 1953.

*Cohen v. Stewart*, 89 A.2d 65, 72 (Del. 2014) (footnotes and citations omitted). The

overall purpose of the DUILA, and liquidation proceedings in general, "is not only to preserve available assets for the benefit of creditors, but to protect the interests of persons who purchased insurance policies from a company which has become insolvent." *Cohen*, 89 A.2d at 80 n. 65 (quoting *Matter of Transit Cas. Co.*, 588 N.E.2d 38, 42 (1992)).

7.     The goals of the DUILA when an insolvent insurer is in liquidation "center on the orderly, expeditious, and equitable resolution of all claims against the insolvent insurer." *Cohen*, 89 A.2d at 94.

8.     The Receiver, by statutory mandate, represents not only the interests of the insurance company, but also, *inter alia,* the policyholders and creditors of the insurance company. 18 *Del. C.* § 5903.  The Receiver is charged with "...preventing further damage to an insurer and marshalling and protecting the remaining assets to pay the potential claims of policyholders and creditors." *See also Cohen*, 89 A.2d at 93.

9.     A Receiver's ability to marshal assets effectively and efficiently is a basic tenet of insurance insolvency law that is recognized by Section 5904(b) of the DUILA. Section 5904(b) gives the Court flexibility to enter orders or injunctions to assist the Receiver in marshalling assets and maximizing the value of estate assets. Section 5904(b) provides that:

> The court may at any time during a proceeding under this chapter issue such other injunctions or orders as may be deemed necessary to prevent interference with the Commissioner or the proceeding or waste of the assets of the insurer or the commencement or prosecution of any actions or the obtaining of preferences, judgments, attachments or other liens or the making of any levy against the insurer or against its assets or any part thereof.

18 Del. C. § 5904(b).

10. Each state has formed guaranty associations or funds (the "**Guaranty Associations**") which are responsible for making payments on the claims of policyholders who reside in that state,[4] with the Guaranty Association then becoming a creditor of the insolvent estate and, under some circumstances, succeeding to payment and reimbursement rights of the insolvent insurer. *See generally* Phillip A. O'Connell, et al., Feature Article, INSURANCE INSOLVENCY: A GUIDE FOR THE PERPLEXED, 27 No. 14 Ins. Litig. Rep. 669 (2005).

11. The role of Guaranty Associations is to provide a safety net for the policyholders of insurers that are in liquidation, subject to the limitations and conditions of the Guaranty Associations' enabling statutes. Toward this end, the regulation of delinquent insurance carriers is designed to ensure that policyholders are paid timely notwithstanding a liquidation proceeding.

12. Guaranty Association coverage is usually triggered by a liquidation order, with a finding of insolvency of the insured. *See, e.g. Koken v. Legion Ins. Co.,* 831 A.2d 1196, 1244 (Pa. Commw. 2003). Unlike claims under other lines of insurance, which often have "caps" on the amount paid by Guaranty Associations, "[m]ost guaranty funds pay 100 percent of their state's statutorily defined workers' compensation benefits." National Conference of Insurance Guaranty Funds, *Frequently Asked Questions about Guaranty Funds*, available at http://www.ncigf.org/media-faqs.[5]

---

[4] While this is generally true, there are exceptions to Guaranty Association coverage for certain lines of business, certain types of insureds, and certain entities that provide insurance coverage such as captive insurers and risk retention groups.

[5] Some jurisdictions do not cover all workers' compensation claims in full, either because they have a per-claim limitation, a limitation on claim payments where the employer has a high net worth ($25 million or $50 million), or based on a deductible. See NAIC/IAIABC Joint Working Group, Workers' Compensation

**The Rehabilitation Order**

13.     On March 11, 2013, the Court of Chancery entered a Rehabilitation and Injunction Order ("**Rehabilitation Order**") concerning Ullico Casualty.     The Rehabilitation Order is attached as Exhibit 1.   In the order, the Court of Chancery found that Ullico Casualty was impaired, insolvent, in unsound condition, and in such condition as to render its further transaction of insurance presently or prospectively hazardous to its policyholders. The Court of Chancery placed Ullico Casualty into rehabilitation and appointed the Honorable Karen Weldin Stewart, CIR-ML, then Insurance Commissioner of the State of Delaware, as the Receiver. The Rehabilitation Order further vested the Receiver with "all right, title and interest in, of or to, all of the property of [Ullico Casualty]." Rehabilitation Order, ¶¶ 1-4, 6-7.

**The Liquidation Order**

14.     On May 30, 2013, the Court entered a Liquidation and Injunction  Order with Bar Date ("**Liquidation Order**") in which this Court, *inter alia*, placed Ullico Casualty into liquidation pursuant to §§ 5905 and 5906 of the DUILA.  The Liquidation Order is attached as Exhibit 2.

15.     The Court found that Ullico Casualty remained in a hazardous condition and that further efforts to rehabilitate the company would be futile.  The Liquidation Order continued the appointment of Commissioner Stewart and her successors as the Receiver of Ullico Casualty.  It also continued to vest the Receiver with "all right, title and interest in, of or to, all of the property of [Ullico Casualty]." Liquidation Order, ¶¶ 1-3 and 7.

---

Large Deductible Study, pp. 9-10 (NAIC 2006) accessible at  www.naic.org/store/free/wcd-op.pdf (hereinafter "**Large Deductible Study**") (discussing individual provisions).

16.     The Liquidation Order defines "Assets" as:

> all right, title, and interest in, of, and to the property of
> ULLICO CASUALTY including, without limitation, all of
> ULLICO CASUALTY's assets, contracts, rights of action,
> books, records, bank accounts, certificates of deposits,
> collateral and rights to collateral of ULLICO CASUALTY,
> securities or other funds, and all real or personal property
> of any nature of ULLICO CASUALTY, including, without
> limitation, all proceeds or accessions to any of the
> foregoing, wherever located, in the possession, custody, or
> control of ULLICO CASUALTY or any trustee, bailee, or
> any agent acting for or on behalf of ULLICO CASUALTY

Liquidation Order at ¶ 3.

17.     The Liquidation Order includes a number of provisions authorized by 18 *Del. C.* § 5904(b) to assist the Receiver in one of his core functions: to marshal the assets and possible assets of the estate. The Liquidation Order prevents the dissipation of Ullico Casualty's assets or assets that it may have an interest in; requires the person or entity in possession of the assets to file an accounting of those assets with the Receiver; and mandates that all assets be turned over to the Receiver. *See, e.g.* Liquidation Order at ¶¶ 8, 9,[6] and 10.[7] As of this date, despite having controlled virtually every aspect of the Large Deductible Workers' Compensation Program with Ullico Casualty, including holding the collateral for Ullico Casualty, no Patriot related entity has either provided an accounting or

---

[6] Paragraph 9 provides: "9. Except as otherwise indicated elsewhere in this Order or except as excluded by express written notice provided by the Receiver, all persons or entities holding Assets of, or on behalf of, ULLICO CASUALTY shall file with the Receiver within ten (10) calendar days of the entry of this Order an accounting of those Assets, regardless of whether such persons or entities dispute the Receiver's entitlement to such Assets."
[7] Paragraph 10 provides: "10. Except as otherwise indicated elsewhere in this Order or except as excluded by express written notice provided by the Receiver, all persons or entities holding Assets of, or on behalf of, ULLICO CASUALTY shall within ten (10) calendar days of the entry of this Order, turn those Assets over to the Receiver."

turned over assets to Ullico Casualty as required by the Court of Chancery's Liquidation Order.[8]

18.     Pursuant to paragraph 11 of the Liquidation Order, all persons or entities are prohibited from, *inter alia*, "exercising any right adverse to the right of ULLICO CASUALTY to or in the Assets, or in any way interfering with the Receiver, the Deputy Receiver(s), or the Designees either in their possession and control of the Assets or in the discharge of their duties hereunder." Liquidation Order at ¶ 11.

19.     In this way, all estate assets are brought into the estate for the purpose of administering them which includes determinations by the Receiver, when and where appropriate, to distribute assets in a manner that is consistent with the DUILA and Liquidation Order.

**The Carve-Out Language**

20.     In 2009, Ullico Casualty entered into relationships with Patriot Underwriters, Inc., now known as Guarantee Underwriters, Inc. ("**PUI/GUI**"), to provide workers' compensation insurance through a workers' compensation program operated by it.   Upon information and belief, PUI/GUI and Guarantee Insurance Company had intercompany relationships with other affiliates such as Patriot Claim Services, Inc. and CTS Underwriters, Inc. regarding Ullico Casualty business.   In 2014: (1) Patriot Underwriters, Inc. changed its name to Guarantee Underwriters, Inc.; (2) CTS Underwriters, Inc. changed its name to Patriot Underwriters, Inc. and was placed under the ownership of Patriot Services, Inc.; and (3) Patriot Claim Services, Inc. and Carrier &

---

[8] The Receiver issued discovery requests on the Debtors seeking information regarding the Debtors' accounting of and related to the Restricted Accounts.  Such requests remain pending as of the date hereof, with responses due from the Debtor on or before April 4, 2018.

Technology Solutions, Inc. were placed under the ownership of Patriot Services, Inc.  In 2015, Patriot Underwriters Inc. (formerly CTS Underwriters, Inc.), Patriot Claim Services, Inc., and Patriot Technology Solutions, Inc. (formerly Carrier & Technology Solutions, Inc.") (among others) were part of the Patriot National IPO, and each are debtors in these Chapter 11 cases.   These moves made by the Debtors between 2013 and 2015 to restructure away from their pre-existing liabilities and indebtedness to Ullico Casualty are reflected in the organization charts contained in the statutory regulatory filings of GIC with the Florida Office of Insurance Regulation which are attached hereto as Exhibits [3, 4 and 5].  Through the Program Administration Agreements ("**PAA**") between PUI/GUI and Ullico Casualty, PUI/GUI was afforded tremendous flexibility to authorize PUI/GUI to delegate responsibilities of the PAA to affiliated entities without having to obtain written consent of Ullico Casualty.  Therefore, through intercompany delegation it is conceivable that any one of the Debtor entities in existence during or prior to the year 2013 (the year in which Ullico Casualty was put into liquidation) came into the possession or control of Assets of Ullico Casualty.

21.     On March 5, 2018, the Receiver issued its *First Set of (I) Requests for Production and (II) Interrogatories Directed to the Debtors*, seeking, *inter alia*, information and data (which information and data was to have been provided in 2013 pursuant to the Liquidation Order) to assist the Receiver in completing a forensic accounting to identify any Assets of Ullico Casualty that may be in the possession or control of any of the Debtors.  Such discovery requests remain pending as of the date hereof, with responses due to the Receiver on or before April 4, 2018.  *See* n.3.

22.     Also on March 5, 2018, the Receiver filed its DS Objection.  Consistent

with the Cash Management Objection, the DS Objection sought to confirm that the Receiver's Rights were preserved and not affected by the Plan or Confirmation Order. In that regard, the Receiver requested the addition of language to the Disclosure Statement to make clear that nothing in the Plan or the Confirmation Order affected the Receiver's rights and authority pursuant to the Liquidation Order. Specifically, in connection with its DS Objection and subsequent communications with counsel for the Debtors and counsel for Cerberus, the Receiver sought the inclusion of the Receiver's Carve-Out Language, set forth below:

> Nothing in the Plan or the Confirmation Order shall restrict, modify, or in any way affect the Receiver's rights in connection with that certain Liquidation and Injunction Order with Bar Date entered on May 30, 2013, In The Court of Chancery of the State of Delaware, In The Matter of the Liquidation of Ullico Casualty Company, C.A. No. 8392-VCS, including the Receiver's authority to prosecute suits by or for Ullico Casualty or to recover assets belonging to Ullico Casualty.

23. The Receiver's Carve-Out Language was rejected from inclusion in the Disclosure Statement by the Debtors and by Cerberus on the basis that it would impermissibly carve out the Receiver from applicability of the Plan's discharge provision.

## OBJECTION

24. The Receiver objects to confirmation of the Plan pursuant to 11. U.S.C. § 1129(a)(3) which provides:

> (a) The court shall confirm a plan only if all of the following requirements are met:
> . . .
> (3) The plan has been proposed in good faith and not by any means forbidden by law.

25. As proposed, the Plan violates § 1129(a)(3) because it has not been

proposed in good faith and not by any means forbidden by law in that it violates the

McCarran-Ferguson Act and the *Younger* and *Burford* abstention doctrines.

## A. The Bankruptcy Court's Jurisdiction to Impede the Receiver's Rights is Reverse Preempted by the DUILA and the Liquidation Order Pursuant to the McCarran-Ferguson Act

26.     The McCarran-Ferguson Act provides that "No Act of Congress shall be

construed to invalidate, impair, or supersede any law enacted by any State for the purpose

of regulating the business of insurance, or which imposes a fee or tax upon such business,

unless such Act specifically relates to the business of insurance."  15 U.S.C. § 1101.

27.     Bankruptcy courts apply a three-part test to determine whether a federal

statute is reverse preempted by state insurance law pursuant to the McCarran-Ferguson

Act.  *See e.g.*, *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491 (1993); *In re MF Global*

*Holdings Ltd.*, 469 B.R. 177, 195 n.17 (Bankr. S.D.N.Y. 2017); *In re PRS Ins. Grp., Inc.*,

294 B.R. 609, 612 (Bankr. D. Del. 2003) ("**PRS I**").

> [P]ursuant to the McCarran–Ferguson Act, federal law, including the Bankruptcy Code, will be reverse preempted by state insurance law if
>
> i)   the federal statute does not specifically relate to insurance;
> ii)  the state law at issue was enacted to regulate the business of insurance; and
> iii) the federal statute at issue would invalidate, impair, or supersede the state law.

*MF Global*, 469 B.R. at 195, n.17 (citing *Fabe*, 508 U.S. 491).

28.     The first factor of the McCarran-Ferguson Act test is met where the

"federal statute [at issue] does not specifically relate to insurance."  *Id.*  Here, the first

factor is met because "the Bankruptcy Code does not specifically relate to the business of

insurance."  *PRS I* at 612; *see, e.g.*, *Barnett Bank of Marion County, N.A. v. Nelson*, 517

U.S. 25, 42 (1996) (The "bankruptcy statutes use general language that does not appear to 'specifically relate' to insurance; and where those statutes conflict with state law that was enacted 'for the purpose of regulating the business of insurance,' the McCarran-Ferguson Act's anti-pre-emption rule will apply."); *PRS I* at 612 (citing 11 U.S.C. § 109(b)(2)) (noting that the "Bankruptcy Code expressly states that a domestic insurance company is *not* eligible for relief as a debtor" and "conclud[ing] that the Bankruptcy Code does not specifically relate to the business of insurance.").

29.     The second factor of the McCarran-Ferguson Act is met where "the state law at issue," i.e., the state law with potentially preemptive effect under the McCarran-Ferguson Act, "was enacted to regulate the business of insurance." *MF Global*, 469 B.R. at 195, n.17. "The broad category of laws enacted 'for the purpose of regulating the business of insurance' consists of laws that possess the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance. This category necessarily encompasses more than just the 'business of insurance.'" *U.S. Dept. of Treasury v. Fabe*, 508 U.S. 491, 505 (1993); *see id.* (finding that the Ohio insolvency regime for insurance companies was "enacted for the purpose of regulating insurance" based on its finding that "the Ohio statute is 'aimed at protecting or regulating' the performance of an insurance conract" and because the phrase "was enacted for the purpose of regulating insurance" refers to "statutes aimed at protecting or regulating, directly or indirectly, the relationship between the insurance company and its policyholders.").

30.     Here, the second factor of the McCarran-Ferguson Act is met because the chapter 59 of title 18 of the Delaware Code, §§ 101–8511, as amended (the "**Insurance**

**Code**") which provides for the rehabilitations or liquidation of insurance companies was "enacted for the purpose of regulating the business of insurance." *See PRS I* at 612.

31.     The third factor of the McCarran-Ferguson Act is satisfied where the "federal statute at issue would invalidate, impair, or supersede" the pertinent state law. *See Humana, Inc. v. Forsyth,* 525 U.S. 299, 307–310 (1999) (The term "invalidate" ordinarily means "to render ineffective, generally without providing a replacement rule or law." . . . [a]nd the term "supersede" ordinarily means "to displace (and thus render ineffective) while providing a substitute rule."); s*ee PRS I* at 613 (where the determination sought by the Debtor-plaintiffs would "violate the [state insurance] statute" by allowing the Debtors to "receive payment ahead of creditors entitled to a higher priority under the state's liquidation scheme," the Court "conclude[d] that application of the Bankruptcy Code in the instant adversary would frustrate state policy and interfere with a State's administrative regime regulating insurance.").

32.     Like the Liquidator in *PRS I*, applicability of the Plan provisions will prevent the Receiver from administering Assets of Ullico Casualty for the benefit of stakeholders according to the terms and intention of the applicable state insurance regime.  *See* DUILA § 5918.  Because the "application of the Bankruptcy Code . . . would frustrate state policy and interfere with a State's administrative regime regulating insurance," the third McCarran-Ferguson factor is satisfied here.

33.     Indeed the teaching of *PRS I* is that the court must defer unless the state insurance law interests are not disturbed.  Here, confirmation of the Plan, as proposed, would invalidate the Receiver's authority under the DUILA and the Liquidation Order to recover Assets of Ullico Casualty for the benefit of workers' compensation policy holders

and other Ullico Casualty stakeholders and to prosecute related claims. Specifically, the discharge, injunction, and exculpation provisions of the Plan will, if confirmed, prevent the Receiver from pursuing causes of action to recover Assets belonging to Ullico Casualty which may have been improperly transferred or retained by the Debtors in violation of the Liquidation Order. *See* Plan, §§ XI.E (Discharge); XI.H (Exculpation and Limitation of Liability); and XI.I (Injunction); *see also* Plan, § V.B (proposing transfer of the "Debtors' assets" free and clear of all claims and interests). The Receiver objects to each of these Plan provisions.

34. Here, each of the three McCarran-Ferguson factors is satisfied with respect to the Receiver's authority pursuant to the DUILA and the Liquidation Order to pursue causes of action to recover Assets of Ullico Casualty. Thus, the Plan provisions which in any way restrict, modify or affect the Receiver's authority to recover Assets of Ullico Casualty would cause this Court to exceed its jurisdictional authority pursuant to eh McCarran-Ferguson Act.

35. Accordingly, the Receiver objects to entry of an Order confirming the Plan as proposed as it will interfere with the DUILA and the Liquidation Order by preventing the Receiver from fulfilling his obligations which include the recovery of Assets belonging to Ullico Casualty.

36. Additionally, the Receiver objects to confirmation of the Plan, as proposed, to the extent the Plan purports to vest post-confirmation jurisdiction exclusively in the Bankruptcy Court. *See* Plan at § X.A. As to the Receiver's authority pursuant to the DUILA and the Liquidation Order, and any Assets of Ullico Casualty that are or may be in the possession of one or more Debtor entities, the Bankruptcy Court

lacks subject matter jurisdiction in the first instance pursuant to the McCarran-Ferguson Act. It follows, then, that the Bankruptcy Court may not divest the Court of Chancery of post-confirmation jurisdiction by entering an Order purporting to limit post-confirmation jurisdiction exclusively to the Bankruptcy Court.

### B. The Bankruptcy Court Should Abstain From Enjoining the Potential Causes of Action Pursuant to the *Younger* and *Burford* Abstention Doctrines

37. Federal courts, including bankruptcy courts, "must abstain from hearing a federal case which interferes with certain state proceedings." *Cohen v. Birrane*, 2017 WL 2709566 at *4 (D. Del. June 23, 2017); *see also Lazaridis v. Wehmer*, 591 F.3d 666, 670 (3d Cir. 2010) ("In certain circumstances, district courts must abstain from exercising jurisdiction over a particular claim where resolution of that claim in federal court would offend principles of comity by interfering with an ongoing state proceeding."). Of course here the Bankruptcy Court's jurisdiction is as referee of the District Court's and is so constrained.

38. To determine whether abstention is required under *Younger*, courts apply a three-part test. *See, e.g.*, *Lazaridis*, 591 F.3d at 670; *Cohen*, 2017 WL 2709566 at *4; *see generally Younger v. Harris*, 401 U.S. 37 (1971). Younger abstention is appropriate where:

> (1) [T]here are ongoing state proceedings that are judicial in nature;
> (2) the state proceedings implicate important state interests; and
> (3) the state proceedings afford an adequate opportunity to raise the federal claims.

*Lazaridis, 591 F.3d at 670.*

39.     The first *Younger* doctrine factor is met where there are "ongoing proceedings" parallel to the proceedings before the federal court and such proceedings are "judicial in nature." *Id.* The *Younger* doctrine is not limited to criminal, quasi-criminal, or civil proceedings but applies to all state proceedings that are "judicial in nature." *See Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 43–35 (1982)* (holding that disciplinary action initiated by state bar association constituted "ongoing proceedings" that were "judicial in nature" for purposes of the *Younger* abstention test); *Cohen*, 2017 WL 2709566 at *5 (taking "judicial notice" that state insurance receivership proceedings "remain pending in the Court of Chancery" and ultimately finding that abstention in favor of such "ongoing state proceedings" was required under the *Younger* doctrine).

40.     Here, the Debtors seek confirmation of a Plan that would implicate the Ullico Casualty liquidation proceedings pending in the Chancery Court. Such proceedings are "ongoing" in state court, pursuant to state law, and are plainly "judicial in nature." Thus, the first factor of the *Younger* abstention test is met here.

41.     Under the second prong of the *Younger* doctrine test, the ongoing state proceedings must "implicate important state interests." A state's interest in "preserving [its] judicial system" and avoiding application of a "federal injunction directing future litigation" is a sufficiently important state interest to satisfy the second prong of the *Younger* doctrine test. *See Lazaridis*, 591 F.3d at 670-71. In *Lazaridis*, Plaintiff sought "vacation of existing orders and a federal injunction directing future litigation." *Id.* at 670. The Court in *Lazaridis* found that abstention was appropriate in light of "the

important state interest of preserving the state's judicial system" and noted that "[t]his is precisely the type of case suited to *Younger* abstention." *Id.* at 670-71. *See Id.* (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975) ("Were the District Court to grant this relief, it could be 'readily interpreted as reflecting negatively upon the state court's ability to enforce constitutional principles.'").

42. Here, Delaware's "important state interest" of "preserving [its] judicial system" and avoiding the application of the bankruptcy discharge, i.e. a "federal injunction directing future litigation" is implicated where the Debtors seek to enjoin the Receiver's potential causes of action authorized pursuant to the DUILA and the Liquidation Order through confirmation of the Plan and application of the bankruptcy discharge.

43. Further, enjoining the Receiver's ability to administer the assets of insurance companies in liquidation under the DUILA interfere with Delaware's significant interest, evidenced by the Delaware Insurance Code, in regulating the business of insurance companies organized according to the laws of the State of Delaware and protecting the rights of policy holders of such insurance companies. *See Cohen*, 2017 WL 2709566 at *5 ("Delaware has an important state interest in regulating the insurance industry and protecting the interests of policyholders and creditors from delinquent insurers."); *id.* at *5 (finding that "the Court should abstain under the *Younger* abstention doctrine").

44. Finally, the third prong of the *Younger* doctrine test is met where the state court forum provides an "adequate opportunity to raise the federal claims" before the federal court. *See Juidice v. Vail*, 430 U.S. 327, 337 (1977) (*Younger* requires only an

"opportunity to present federal claims in a state proceeding."). Further, the burden as to the third prong of the *Younger* doctrine is borne by "the federal plaintiff to show that the state procedural law barred presentation of its claims." *Lazaridis*, 591 F.3d at 670–71; *see id.* at 670 ("It is also clear that the Delaware state courts presented an adequate forum in which [the plaintiff] could pursue his claims regarding the constitutionality of Delaware statutes.").

45.     Notably, the Receiver does not seek to divert a specific claim asserted by the Debtors from federal court to state court. Instead, the Receiver seeks only to prevent the Debtors from enjoining the Receiver from administering the Assets of Ullico Casualty in accordance with the authority provided pursuant to the DUILA and the Liquidation Order. To the extent any "federal claims" related to the potential causes of action may later be asserted by the Debtors (or, as the case may be, the Debtors' successors in interest), the Debtors will not be prevented from pursuing such claims in state *or* federal court at such later date. If, in contrast, the Plan is confirmed as proposed, the Receiver will be entirely deprived of a forum to pursue its mandate of administering the Assets of Ullico Casualty for the benefit of creditors and policy holders. Here, therefore, the third prong of the *Younger* doctrine test is easily satisfied.

46.     Alternatively, federal courts must abstain pursuant to *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943) where "questions of state law in which the state has expressed a desire to establish a coherent policy on a matter of substantial public concern are raised." *NYLife Distribs. v. Adherence Grp., Inc.*, 72 F.3d 371, 376 n.8 (3d Cir. 1995); *see Burford*, 319 U.S. 315, 317–18 ("[I]t is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful

independence of state governments in carrying out their domestic policy."); *Logan v. Credit Gen. Indemnity Co. (In re PRS Ins. Grp., Inc.)*, 331 B.R. 580, 589 (Bankr. D. Del. 2005) ("**PRS II**") (quoting *NYLife*, 72 F.3d at 376 n.8).

47.     *Burford* abstention "will be appropriate if federal jurisdiction deals primarily with state law issues and will disrupt a state's efforts 'to establish a coherent policy with respect to a matter of substantial public concern,'" particularly where "a state creates a complex regulatory scheme, supervised by the state courts and central to state interests." *Lac D'Amiante du Quebec, Ltee v. Am. Assurance Co.*, 864 F.2d 1033, 1043 (3d Cir. 1988) (quoting *Colo. River Water Cons. Dist. v. United States*, 424 U.S. 800, 814 (1976)).

48.     Moreover,  "in cases involving challenges to actions taken by state liquidators seeking to dispose of the assets of insolvent insurance companies, all claims brought against a single fund or pool of assets of an insolvent insurance company should be heard in a single forum." *In re Phillips Offset Co., Inc.*, 152 B.R. 836, 839 (Bankr. S.D.N.Y. 1992) (citing *Levy v. Lewis*, 635 F.2d 960 (2d Cir. 1980)).

49.     Here, an exercise of federal jurisdiction to curtail the Receiver's rights to administer assets belonging to Ullico Casualty and otherwise fulfill its duties under the Liquidation Order would "be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern" (i.e., the administration of assets of insolvent, domestic insurance companies for the benefit of policy holders).  *Id.* Abstention under *Burford* is particularly appropriate here, where confirmation of the Plan, as proposed, would counteract the legitimate state interest in having "all claims

brought against a single fund or pool of assets of an insolvent insurance company . . . in a single forum." *Id.*

50.     In light of the foregoing, abstention under both the *Younger* and *Burford* abstention doctrines is warranted as to the narrow issue raised in this Objection.

## <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, the Receiver respectfully requests that the Court enter its Order: (i) sustaining this Objection unless the Debtors  modify the Plan and the Confirmation Order as provided in the Objection; and (ii) granting the Receiver such other and further relief as is just and appropriate.

Dated: April 2, 2018
     Wilmington, Delaware

BAYARD, P.A.

*/s/ GianClaudio Finizio*
Neil B. Glassman (No. 2087)
GianClaudio Finizio (No. 4253)
Evan T. Miller (No. 5364)
600 N. King Street, Suite 400
Wilmington, DE 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
Email: nglassman@bayardlaw.com
     gfinizio@bayardlaw.com
     emiller@bayardlaw.com

*Attorneys for The Honorable Trinidad Navarro, Insurance Commissioner of the State of Delaware, as Receiver of Ullico Casualty Company in Liquidation*