## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| *In re* | ) | Chapter 11 |
|  | ) |  |
| **PATRIOT NATIONAL, INC.**, *et al.*[1] | ) | Case No. 18-10189 (KG) |
|  | ) |  |
|  | ) | (Jointly Administered) |
| **Debtors.** | ) |  |

## MEMORANDUM OF LAW AND OMNIBUS REPLY IN SUPPORT OF CONFIRMATION OF THE DEBTORS' FOURTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION

Kathryn A. Coleman
Christopher Gartman
Dustin P. Smith
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004-1482

*Attorneys for Debtors and Debtors in Possession*

Laura Davis Jones
James E. O'Neill
Peter J. Keane
PACHULSKI STANG
ZIEHL & JONES LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)

*Attorneys for Debtors and Debtors in Possession*

Dated:  April 20, 2018
         Wilmington, Delaware

---

1.   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors' federal tax identification number, are: Patriot National, Inc. (1376); Patriot Services, LLC (1695); TriGen Insurance Solutions, Inc. (2501); Patriot Captive Management, LLC (2341); Patriot Underwriters, Inc. (0045); TriGen Hospitality Group, Inc. (6557); Patriot Risk Consultants, LLC (0844); Patriot Audit Services, LLC  (5793); Patriot Claim Services, Inc. (9147); Patriot Risk Services, Inc. (7189); Corporate Claims Management, Inc. (6760); CWIBenefits, Inc. (0204); Forza Lien, LLC (7153); Contego Investigative Services, Inc. (0330); Contego Services Group, LLC (0012); Patriot Care Management, LLC (2808); Radar Post-Closing Holding Company, Inc. (2049); Patriot Technology Solutions, LLC (6855); and Decision UR, LLC (1826).  The Debtors' headquarters are located at 401 East Las Olas Boulevard, Suite 1650, Fort Lauderdale, Florida 33301.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ......................................................................................................5

SUMMARY OF THE PLAN.....................................................................................8

ARGUMENT ..........................................................................................................10

I.     THE OBJECTIONS TO THE PLAN SHOULD BE OVERRULED...............................10

    A.    The Plan Has Been Proposed in Good Faith.............................................12

    B.    The Debtor Releases Are Proper and Should Be Approved ................................16

    C.    The Exculpations Are Proper and Should Be Approved ......................................23

    D.    The Plan Does Not Conflict with the McCarran-Ferguson Act............................26

        1.    McCarran-Ferguson Reverse Preemption....................................................26

        2.    The GIC Objection as to § 502(d) Is Not a Barrier to Confirmation and Should Be Overruled. ....................................................31

    E.    The Court Should Not Abstain from Confirming All Aspects of the Plan ........................................................................................................32

        1.    Ullico Has Failed To Show that Mandatory or Voluntary Abstention Is Appropriate...........................................................32

        2.    The Receivers Have Failed To Show that *Younger* and *Burford* Abstention Are Appropriate. ..............................................35

        3.    The Ullico Receiver's Request for Relief from the Automatic Stay Should Be Denied. ..........................................37

    F.    The UST Objection Should Be Overruled ..........................................................38

    G.    The Debtors Have Attempted to Resolve the IRS Objection ...............................39

    H.    The Board Objection Is Baseless ......................................................................42

    I.    The Missouri Department of Revenue Objection Is Baseless ..............................43

    J.    The Lackawanna Casualty Objection Is Baseless..................................................43

K.      The Remaining Objections Have Been Addressed by the Debtors ......................44

II.     THE PLAN SATISFIES THE BANKRUPTCY CODE'S
        REQUIREMENTS FOR CONFIRMATION AND SHOULD BE
        APPROVED ...........................................................................................................44

        A.      Section 1129(a)(1):  The Plan Complies with the Applicable
                Provisions of the Bankruptcy Code ........................................................45

        B.      Section 1122:  The Plan's Classification Structure Is Proper ...............45

        C.      Section 1123(a):  The Plan's Content Is Appropriate ...........................47

        D.      Section 1123(b):  The Plan's Content Is Permitted ...............................48

                1.      Plan Permissive Provisions. .........................................................48

        E.      Section 1129(a)(2):  The Debtors Have Complied with the
                Bankruptcy Code .....................................................................................50

                1.      Section 1125:  Postpetition Disclosure Statement and
                        Solicitation. ...................................................................................50

                2.      Section 1126:  Acceptance of the Plan. ......................................51

        F.      Section 1129(a)(3):  The Plan Has Been Proposed in Good Faith
                and Not by Any Means Forbidden by Law.............................................53

        G.      Section 1129(a)(4):  The Plan Provides That Professional Fees and
                Expenses Are Subject to Court Approval .............................................53

        H.      Section 1129(a)(5):  The Debtors Have Disclosed All Necessary
                Information Regarding Directors, Officers, and Insiders .....................54

        I.      Section 1129(a)(6):  The Plan Does Not Contain Any Rate
                Changes....................................................................................................55

        J.      Section 1129(a)(7):  The Plan Is in the Best Interests of All
                Creditors and Equity Interest Holders...................................................55

        K.      The Plan Has Been Accepted by an Impaired Class Entitled to
                Vote on the Plan, and as to Such Class, Requirements of
                Bankruptcy Code Section 1129(a)(8) Have Been Satisfied..................58

        L.      Section 1129(a)(9):  The Plan Provides for Payment in Full of All
                Allowed Priority Claims .........................................................................59

M. Section 1129(a)(10):  At Least One Class of Impaired Claims Has Accepted the Plan ...................................................................................60

N. Section 1129(a)(11):  The Plan Is Feasible ............................................................61

O. Section 1129(a)(12):  All Statutory Fees Have or Will Be Paid ...........................64

P. Section 1129(a)(13):  Continuation of Retiree Benefits ........................................65

Q. Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16):  Inapplicable Provisions ...............................................................................................................65

R. Section 1129(b):  The Plan Satisfies the "Cram Down" Requirements for Non-Accepting Classes ...........................................................66

  The Plan Does Not Discriminate Unfairly ............................................................67

  The Plan Is Fair and Equitable ..............................................................................69

S. Section 1129(c):  The Plan Is the Only Plan Currently on File ...........................69

T. Section 1129(d):  The Principal Purpose of the Plan Is Not the Avoidance of Taxes ...................................................................................................70

U. Section 1129(e):  Inapplicable Provision ...............................................................70

V. Section 1127:  Modification of the Plan ................................................................70

III. GOOD CAUSE EXISTS TO WAIVE ANY STAY OF THE CONFIRMATION ORDER ...................................................................................71

IV. CONCLUSION ...............................................................................................................72

DOCS_DE:219128.1 69353/002

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Abeinsa Holding, Inc.*,
562 B.R. 265 (Bankr. D. Del. 2016) ....................................................................................18

*Addiction Specialists, Inc. v. Twp. of Hampton*,
411 F.3d 399 (3d Cir. 2005) .............................................................................................35

*In re Adelphia Commc'ns Corp.*,
368 B.R. 140, *appeal dismissed*, 371 B.R. 660 (S.D.N.Y. 2007), *aff'd*, 544
F.3d 420 (2d Cir. 2008) .....................................................................................................55

*Aetna Cas. & Sur. Co. v. Jasmine, Ltd. (In re Jasmine, Ltd.)*,
258 B.R. 119 (D. N.J. 2000) .............................................................................................19

*In re Affiliated Foods, Inc.*,
249 B.R. 770 (Bankr. W.D. Mo. 2000) ............................................................................55

*In re Agway*,
357 B.R. 195 (Bankr. N.D.N.Y. 2006) .............................................................................36

*In re Aleris Int'l, Inc.*,
No. 09-10478 (BLS), 2010 WL 3492664 (Bankr. D. Del. May 13, 2010) ........................21

*In re Am. Capital Equip., LLC*,
688 F.3d 145 (3d Cir. 2012) .............................................................................13, 15, 60

*In re Am. Solar King Corp.*,
90 B.R. 808 (Bankr. W.D. Tex.) ......................................................................................54

*In re AmeriServe Food Distribution, Inc.*,
315 B.R. 24 (Bankr. D. Del. 2004) ..................................................................................31

*In re Ames Dep't Stores, Inc.*,
542 B.R. 121 (Bankr. S.D.N.Y. 2015) ........................................................................27, 28

*In re Ampace Corp.*,
279 B.R. 145 (Bankr. D. Del. 2002) ................................................................................31

*In re Applied Safety, Inc.*,
200 B.R. 576 (Bankr. E.D. Pa. 1996) ..............................................................................60

*In re Armstrong World Indus., Inc.*,
348 B.R. 111 (D. Del. 2006) ........................................................................................44, 66

iv

*In re Arctic Sentinel, Inc.*,
No. 15-12465 (CSS) (Bankr. D. Del. Nov. 30, 2016)............................................71

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999)............................................................................................55

*Burford v. Sun Oil Co.*,
319 U.S. 315 (1943)..............................................................................26, 35, 36

*In re Bush Indus., Inc.*,
315 B.R. 292 (Bankr. W.D.N.Y. 2004) ...............................................................12

*In re Buttonwood Partners, Ltd.*,
111 B.R. 57 (Bankr. S.D.N.Y. 1990)..................................................................66

*In re Capmark Fin. Grp. Inc.*,
438 B.R. 471 (Bankr. D. Del. 2010) ...................................................................19

*In re Charter Commc'ns*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009).................................................................54

*In re Chateaugay Corp.*,
89 F.3d 942 (2d Cir. 1996).............................................................................45-46

*In re Chemtura Corp.*,
439 B.R. 561 (Bankr. S.D.N.Y. 2010).................................................................12

*Chiropractic Am. v. Lavecchia*,
180 F.3d 99 (3d Cir. 1999)..................................................................................36

*In re CHL, Ltd.*,
No. 12-12437 (KJC) (Bankr. D. Del. Oct. 4, 2012)............................................71

*In re Clarkson*,
767 F.2d 417 (8th Cir. 1985) ..............................................................................62

*In re Coram Healthcare Corp.*,
315 B.R. 321 (Bankr. D. Del. 2004) ...................................................................19

*In re Dana Corp.*,
412 B.R. 53 (S.D.N.Y. 2008)..............................................................................47

*In re DBSD N. Am., Inc.*,
419 B.R. 179 (Bankr. S.D.N.Y. 2009).................................................................21

*In re Dex Media, Inc.*,
No. 16-11200 (KG) (Bankr. D. Del. July 15, 2016) ...............................................21

*In re Dex One Corp.*,
No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013)...........................................25, 71

*In re DHP Holdings II Corp.*,
435 B.R. 220 (Bankr. D. Del. 2010) ......................................................................34

*In re Drexel Burnham Lambert Grp., Inc.*,
138 B.R. 723 (Bankr. S.D.N.Y. 1992)................................................49, 56, 60, 67

*In re Enron Corp.*,
No. 01-16034 (AJG), 2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15,
2004) ....................................................................................................................46

*In re Exide Techs.*,
303 B.R. 48 (Bankr. D. Del. 2003) ...................................................................17, 61

*In re Extended Stay Inc.*,
Case No. 09-13764 (JMP), 2010 WL 6561113 (Bankr. S.D.N.Y. July 20,
2010) ................................................................................................................. 67-68

*In re FBI Wind Down, Inc.*,
No. 13-12329 (CSS), 2018 WL 922243 (Bankr. D. Del. Feb. 16, 2018) ...............31

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans
Ltd. P'ship)*,
116 F.3d 790 (5th Cir. 1997) ........................................................................... 60-61

*In re First Assured Warranty Corp.*,
383 B.R. 502 (Bankr. D. Colo. 2008) ....................................................................27

*In re Frontier Ins. Grp., LLC*,
517 B.R. 496 (Bankr. S.D.N.Y. 2014)....................................................................27

*Fruit of the Loom, Inc. v. Magnetek, Inc. (In re Fruit of the Loom, Inc.)*,
407 B.R. 593 (Bankr. D. Del. 2009) .......................................................................34

*In re Gatehouse Media, Inc.*,
No. 13-12503 (MFW) (Bankr. D. Del. Nov. 6, 2013) .............................................71

*In re Genesis Health Ventures, Inc.*,
266 B.R. 591 (Bankr. D. Del. 2001) .................................................................44, 61

*In re Geokinetics Inc.*,
No. 13-10472 (KJC) (Bankr. D. Del. Apr. 25, 2013) ............................................................71

*In re Greate Bay Hotel & Casino, Inc.*,
251 B.R. 213 (Bankr. D.N.J. 2000) ....................................................................................44

*In re Halcón Res. Corp.*,
No. 16-11724 (BLS) (Bankr. D. Del. Sept. 8, 2016) ...........................................................21

*In re Hercules Offshore, Inc.*,
565 B.R. 732 (Bankr. D. Del. 2016) ....................................................................................17

*In re Hibbard Brown & Co.*,
217 B.R. 41 (Bankr. S.D.N.Y. 1998) ..................................................................................19

*Humana Inc. v. Forsyth*,
525 U.S. 299 (1999)........................................................................................................ 26-27

*In re Indianapolis Downs, LLC*,
462 B.R. 104 (Bankr. D. Del. 2011) ....................................................................................33

*In re Indianapolis Downs, LLC*,
486 B.R. 286 (Bankr. D. Del. 2013) ..............................................................................23, 62

*In re Jersey City Med. Ctr.*,
817 F.2d 1055 (3d Cir. 1987)..........................................................................................65, 67

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
987 F.2d 154 (3d Cir. 1993)................................................................................................45

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other
grounds, In re Johns-Manville Corp.*, 78 B.R. 407 (S.D.N.Y. 1986), *aff'd sub
nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) .......................................66

*In re Kaiser Aluminum Corp.*,
No. 02-10429 (JKF), 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006), *aff'd*,
343 B.R. 88 (D. Del. 2006) ................................................................................................45

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
843 F.2d 636 (2d Cir. 1988).........................................................................................60, 65

*In re Key3Media Grp., Inc.*,
336 B.R. 87 (Bankr. D. Del. 2005), *aff'd*, No. 03-10323 (MFW), 2006 WL
2842462 (D. Del. Oct. 2, 2006) ...........................................................................................19

*Lazaridis v. Wehmer,*
591 F.3d 666 (3d Cir. 2010)........................................................................35

*In re Lernout & Hauspie Speech Prod., N.V.,*
301 B.R. 651 (Bankr. D. Del. 2003), *aff'd*, 308 B.R. 672 (D. Del. 2004)..............................66

*In re Lisanti Foods Inc.,*
329 B.R. 491 (D. N.J. 2005), *aff'd sub nom. In re Lisanti Foods Inc.*, 241 F.
App'x 1 (3d Cir. 2007).......................................................................53

*In re Louise's Inc.,*
211 B.R. 798 (Bankr. D. Del. 1997) .........................................................19

*Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.),*
304 F.3d 223 (2d Cir. 2002)...........................................................33

*In re Madison Hotel Assocs.,*
749 F.2d 410 (7th Cir. 1984) ...............................................................12

*In re Magnum Hunter Res. Corp.,*
No. 15-12533 (KG) (Bankr. D. Del. Apr. 18, 2016)........................................21

*In re Marvel Entm't Grp., Inc.,*
273 B.R. 58 (Bankr. D. Del. 2002) .........................................................21

*In re Maxcom Telecomunicaciones, S.A.B. de C.V.,*
No. 13-11839 (PJW) (Bankr. D. Del. Sept. 10, 2013)........................................25

*In re Multiut Corp.,*
449 B.R. 323 (Bankr. N.D. Ill. 2011) ......................................................47

*Myers v. Martin (In re Martin),*
91 F.3d 389 (3d Cir. 1996)..........................................................18, 20

*Nat'l Labor Relations Bd. v. Bildisco & Bildisco,*
465 U.S. 513 (1984)...................................................................15

*In re Nat'l Sugar Ref. Co.,*
26 B.R. 765 (Bankr. S.D.N.Y. 1983) .......................................................43

*In re New Gulf Res., LLC,*
No. 15-12566 (BLS) (Bankr. D. Del. Apr. 20, 2016)........................................21

*NYLife Distribs. v. Adherence Grp., Inc.,*
72 F.3d 371 (3d Cir. 1995).............................................................36

*In re Orchard Acquisition Co., LLC*,
   No. 17-12914 (KG) (Bankr. D. Del. Jan. 17, 2018) ................................................21

*In re Penn Cent. Transp. Co.*,
   596 F.2d 1102 (3d Cir. 1979).................................................................................19

*In re Physiotherapy Holdings, Inc.*,
   No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013) ........................................25, 71

*Pizza of Hawaii, Inc. v. Shakey's, Inc.* (*In re Pizza of Hawaii, Inc.*),
   761 F.2d 1374 (9th Cir. 1985) ................................................................................61

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
   390 U.S. 414 (1968)................................................................................................19

*In re PRS Ins. Grp., Inc.*,
   294 B.R. 609 (Bankr. D. Del. 2003), *aff'd and remanded sub nom. In re PRS
   Ins. Grp.*, No. 00-4070-MFW, 2005 WL 4121639 (D. Del. Mar. 31, 2005)....................28, 29

*In re PRS Ins. Grp., Inc.*,
   331 B.R. 580 (Bankr. D. Del. 2005) ............................................................. *passim*

*In re PWS Holding Corp.*,
   228 F.3d 224 (3d Cir. 2000)........................................................................23, 25, 49

*In re Quigley Co., Inc.*,
   377 B.R. 110 (Bankr. S.D.N.Y. 2007) ....................................................................47

*In re RCC Liquidating Corp.*,
   No. 09-10617, 2009 WL 8519778 (Bankr. D. Del. Feb. 22, 2009) .........................12

*In re Reliance Grp. Holdings, Inc.*,
   273 B.R. 374 (Bankr. E.D. Pa. 2002) ......................................................................36

*Republic Underwriters Ins. Co. v. DBSI Republic, LLC (In re DBSI, Inc.)*,
   409 B.R. 720 (Bankr. D. Del. 2009) ........................................................................34

*In re Residential Capital, LLC*,
   No. 12-12020 (Bankr. S.D.N.Y. Dec. 11, 2013)......................................................38

*In re RNI Wind Down Corp.*,
   348 B.R. 286 (Bankr. D. Del. 2006), *subsequently aff'd*, 359 F. App'x 352 (3d
   Cir. 2010) ................................................................................................................33

ix

*In re Roadhouse Holding Inc.*,
No. 16-11819 (BLS) (Bankr. D. Del. Nov. 9, 2016) .............................................21

*In re Rubicon U.S. REIT, Inc.*,
434 B.R. 168 (Bankr. D. Del. 2010) ....................................................67

*In re Sorenson Commc'ns, Inc.*,
No. 14-10454 (BLS) (Bankr. D. Del. Apr. 10, 2014) ............................................25

*In re Sound Radio, Inc.*,
93 B.R. 849 (Bankr. D.N.J. 1988), *aff'd in part, remanded in part*, 103 B.R.
521 (D.N.J. 1989), *aff'd sub nom. In re Sound Radio Inc.*, 908 F.2d 964 (3d
Cir. 1990) ..........................................................................................62

*In re Stone & Webster, Inc.*,
547 B.R. 588 (Bankr. D. Del. 2016) ....................................................31

*In re TCI 2 Holdings, LLC*,
428 B.R. 117 (Bankr. D.N.J. 2010) ....................................................53

*In re Texaco, Inc.*,
 84 B.R. 893 (Bankr. S.D.N.Y. 1988) ....................................................60

*In re The Dolan Co.*,
No. 14-10614 (BLS) (Bankr. D. Del. June 9, 2014) ............................................25

*In re The Leslie Fay Cos., Inc.*,
207 B.R. 764 (Bankr. S.D.N.Y. 1997) ............................................... 12-13

*In re The Prudential Energy Co.*,
58 B.R. 857 (Bankr. S.D.N.Y. 1986) ....................................................62

*In re Tribune Co.*,
464 B.R. 126 (Bankr. D. Del. 2011) ....................................................23, 60

*U.S. Bank Nat'l Assoc. v. Wilmington Tr. Co. (In re Spansion, Inc.)*,
426 B.R. 114 (Bankr. D. Del. 2010) ....................................................21

*In re United Marine, Inc.*,
197 B.R. 942 (Bankr. S.D. Fla. 1996) ............................................... 65-66

*United States v. Energy Res. Co.*,
495 U.S. 545 (1990) ..........................................................................60

**Page(s)**

*In re Variant Holding Co., LLC,*
No. 14-12021 (BLS) (Bankr. D. Del. May 10, 2016) .............................................................71

*In re Verso Corp.,*
No. 16-10163 (KG) (Bankr. D. Del. June 23, 2016) ...........................................................21

*In re W.R. Grace & Co.,*
729 F.3d 311 (3d Cir. 2013)...................................................................................................47

*In re W.R. Grace & Co.,*
729 F.3d 332 (3d Cir. 2013)...................................................................................................13

*In re W.R. Grace & Co.,*
475 B.R. 34 (D. Del. 2012), *aff'd,* 729 F.3d 332 (3d Cir. 2013), *aff'd,* 532 F.
App'x 264 (3d Cir. 2013), *aff'd,* 729 F.3d 311 (3d Cir. 2013) ..............................19, 55-56, 61

*Wagner v. Amwest Ins. Group, Inc. (In re Amwest Ins. Group, Inc.),*
285 B.R. 447 (Bankr. C.D. Cal. 2002)...................................................................................26

*In re Wash. Mut., Inc.,*
442 B.R. 314 (Bankr. D. Del. 2011) ................................................................................17, 23

*In re Watson,*
384 B.R. 697 (Bankr. D. Del. 2008) ................................................................................33, 35

*Will v. Northwestern Univ. (In re Nutraquest, Inc.),*
434 F.3d 639 (3d Cir. 2006)..............................................................................................18-19

*In re World Health Alternatives, Inc.,*
344 B.R. 291 (Bankr. D. Del. 2006) ......................................................................................19

*In re WorldCom, Inc.,*
Case No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31,
2003) ......................................................................................................................................66

*Younger v. Harris,*
401 U.S. 37 (1971)..........................................................................................................26, 35

*In re Zenith Elecs. Corp.,*
241 B.R. 92 (Bankr. D. Del. 1999) ........................................................................................17

**Statutes and Rules**

11 U.S.C. § 301 ..................................................................................................................39, 41

11 U.S.C. § 330 ................................................................................................................53

11 U.S.C. § 331 ................................................................................................................53

11 U.S.C. § 365 ..........................................................................................................43, 48

11 U.S.C. § 365(b)(1) ......................................................................................................43

11 U.S.C. § 365(b)(2) ......................................................................................................43

11 U.S.C. § 502 ................................................................................................................50

11 U.S.C. § 502(d) ..............................................................................................30, 31, 32

11 U.S.C. § 503 ..........................................................................................................39, 41

11 U.S.C. § 503(b) ...........................................................................................................53

11 U.S.C. § 503(b)(1)(B) and (C) ..............................................................................39, 40

11 U.S.C. § 507 ..........................................................................................................63, 64

11 U.S.C. § 507(a)(2) .......................................................................................................64

11 U.S.C. § 510 ................................................................................................................67

11 U.S.C. § 510(b) ...........................................................................................................67

11 U.S.C. § 1122 ........................................................................................................ *passim*

11 U.S.C. § 1122(a) .........................................................................................................45

11 U.S.C. § 1123 ..........................................................................................44, 45, 69, 70

11 U.S.C. § 1123(a) ...................................................................................................46, 48

11 U.S.C. § 1123(a)(1) .....................................................................................................46

11 U.S.C. § 1123(a)(2) .....................................................................................................46

11 U.S.C. § 1123(a)(3) .....................................................................................................46

11 U.S.C. § 1123(a)(4) ...............................................................................................46, 47

11 U.S.C. § 1123(a)(5) .....................................................................................................47

DOCS_DE:219128.1 69353/002

11 U.S.C. § 1123(a)(6)................................................................47

11 U.S.C. § 1123(b)................................................................48, 49

11 U.S.C. § 1123(b)(1)................................................................48

11 U.S.C. § 1123(b)(2)................................................................48

11 U.S.C. § 1123(b)(3)(A)................................................................*passim*

11 U.S.C. § 1123(b)(3)(B)................................................................48

11 U.S.C. § 1123(b)(4)................................................................48

11 U.S.C. § 1123(b)(5)................................................................48

11 U.S.C. § 1123(b)(6)................................................................49

11 U.S.C. § 1123(d)................................................................49

11 U.S.C. § 1125................................................................*passim*

11 U.S.C. § 1125(b)................................................................49-50

11 U.S.C. § 1126................................................................*passim*

11 U.S.C. § 1126(a)................................................................50-51

11 U.S.C. § 1126(c)................................................................52, 58

11 U.S.C. § 1126(f)................................................................50-51, 58

11 U.S.C. § 1126(g)................................................................51, 58

11 U.S.C. § 1127................................................................69, 70

11 U.S.C. § 1129................................................................*passim*

11 U.S.C. § 1129(a)................................................................44, 61

11 U.S.C. § 1129(a)(1)................................................................44, 67

11 U.S.C. § 1129(a)(2)................................................................49, 52

11 U.S.C. § 1129(a)(3)................................................................*passim*

11 U.S.C. § 1129(a)(4) ........................................................................52, 53

11 U.S.C. § 1129(a)(5) ........................................................................53, 54

11 U.S.C. § 1129(a)(6) ..............................................................................54

11 U.S.C. § 1129(a)(7) ........................................................55, 56, 57, 58

11 U.S.C. § 1129(a)(8) ........................................................................58, 65

11 U.S.C. § 1129(a)(9) ..............................................................................59

11 U.S.C. § 1129(a)(9)(A) ..........................................................40, 41, 59

11 U.S.C. § 1129(a)(9)(B) ........................................................................59

11 U.S.C. § 1129(a)(9)(C) ................................................................*passim*

11 U.S.C. § 1129(a)(10) ......................................................................59, 60

11 U.S.C. § 1129(a)(11) ..............................................................60, 61, 63

11 U.S.C. § 1129(a)(12) ......................................................................63, 64

11 U.S.C. § 1129(a)(13) ............................................................................64

11 U.S.C. § 1129(a)(14) ............................................................................64

11 U.S.C. § 1129(a)(15) ............................................................................64

11 U.S.C. § 1129(a)(16) ............................................................................65

11 U.S.C. § 1129(b) ..........................................................................*passim*

11 U.S.C. § 1129(b)(1) ..............................................................................65

11 U.S.C. § 1129(b)(2)(B)(ii) ..................................................................68

11 U.S.C. § 1129(b)(2)(C)(ii) ..................................................................68

11 U.S.C. § 1129(c) ....................................................................................68

11 U.S.C. § 1129(d) ....................................................................................69

11 U.S.C. § 1129(e) ....................................................................................69

DOCS_DE:219128.1 69353/002

# TABLE OF AUTHORITIES

## (Continued)

Page(s)

11 U.S.C. § 1141(d) ...................................................................................................41

11 U.S.C § 1141(d)(6) ...............................................................................................39

15 U.S.C. § 1012(b) ..................................................................................................26

26 U.S.C. §§ 6621 and 6622 ..............................................................................39, 41

28 U.S.C. § 157(a) ....................................................................................................35

28 U.S.C. § 157(b)(2)(B) ..........................................................................................29

28 U.S.C. § 157(b)(2)(E) ..........................................................................................29

28 U.S.C. § 157(b)(2)(F) ...........................................................................................29

28 U.S.C. § 157(b)(2)(H) ..........................................................................................29

28 U.S.C. § 157(b)(2)(L) .....................................................................................33, 34

28 U.S.C. § 1334(a) ..................................................................................................29

28 U.S.C. § 1334(c)(1) .........................................................................................32, 33

28 U.S.C. § 1334(c)(2) .........................................................................................32, 33

28 U.S.C. § 1334(e)(1) ...........................................................................29, 34, 35, 36

Delaware Uniform Insurers Liquidation Act ...........................................................28

Fed R. Bankr. P. 3016(c) ..........................................................................................16

Fed. R. Bankr. P. 3019 .........................................................................................69, 70

Fed. R. Bankr. P. 3019(a) ..........................................................................................69

Fed. R. Bankr. P. 3020(e) .....................................................................................10, 70

Fed. R. Bankr. P. 9019 ...............................................................................................20

Florida Statutes Chapter 631 .....................................................................................28

Internal Revenue Code..........................................................................................40, 41

McCarran-Ferguson Act ...................................................................................... *passim*

DOCS_DE:219128.1 69353/002

# TABLE OF AUTHORITIES

## (Continued)

Page(s)

Securities Act of 1933 § 5...........................................................................................................69

**Legislative and Administrative Proceedings**

H.R. Rep. No. 95-595, First Session (1977) ...........................................................................44, 49

S. Rep. No. 95-989 (1978) ...........................................................................................................44

DOCS_DE:219128.1 69353/002

Patriot National, Inc. ("PNI") and its affiliated debtors, as debtors and debtors in possession (collectively, the "Debtors," "Patriot," or the "Company"), submit this memorandum of law and omnibus reply (the "Memorandum") in support of confirmation of the *Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization* (as amended, supplemented, restated or modified from time to time, the "Plan"),[2] filed contemporaneously herewith, pursuant to section 1129 of title 11 of the United States Code (the "Bankruptcy Code"), and respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      When the Debtors filed their chapter 11 bankruptcy petitions on January 30, 2018, they also filed a plan of reorganization that was supported by the Debtors' First Lien Lenders, who hold security interests on substantially all of the Debtors' assets.  The plan was the product of extensive, arm's-length negotiations between the Debtors and the First Lien Lenders—conducted against the backdrop of the almost-overnight loss of the Debtors' largest customer representing in excess of 60% of their revenues—to develop a comprehensive restructuring and recapitalization of the Debtors' businesses.  Following the commencement of the Chapter 11 Cases, the Debtors continued to engage in good faith negotiations with the Official Committee of Unsecured Creditors (the "Committee") and to respond to concerns regarding the Plan raised by various parties in interest and echoed by the Court.  As a result, the Debtors continued to update and modify the plan throughout these chapter 11 proceedings.  For example, the Debtors and the First Lien Agent voluntarily agreed to remove the third party releases from the Plan.  This process has culminated in the filing of the *Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization* and related form of Proposed Confirmation

---

2.   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan, the Plan Supplement, or the Disclosure Statement (each as defined herein).

Order (as defined herein), which the Debtors' believe resolves the vast majority of the formal and informal objections received by the Debtors.

2.     The Plan is supported by the Debtors' First Lien Lenders, the Committee, and by a majority of the Debtors' General Unsecured Creditors who voted on the Plan.[3]   The Plan is designed to effectuate the objectives and purposes of the Bankruptcy Code by maximizing recoveries to parties in interest, while also avoiding the significant losses that would result from an extended reorganization process or liquidation of the Debtors.  The Plan has been proposed by the Debtors in good faith and with the belief that it will maximize the value of the ultimate recoveries to creditors on a fair and equitable basis.  The Plan will provide the Debtors with liquidity to achieve the financial restructuring contemplated by the Plan, will implement the Debtors' long-term business plan, preserve jobs, and will lead to an overall healthier, restructured company, which will benefit all creditors doing business with the Reorganized Debtors.  The fact that the First Lien Lenders and the Committee support confirmation of the Plan is indicative of the Plan's fairness and evidence of the good faith negotiations that culminated in this restructuring.  As demonstrated herein, the Plan satisfies the confirmation standards stated in section of 1129 of the Bankruptcy Code and the objectives of chapter 11.

3.     The Debtors received fourteen formal objections to the Plan, many of which have been fully resolved by modifications included in the Plan and the Proposed Confirmation Order.  The remaining objections include (a) the objections and related pleadings filed by the Ullico Receiver and the GIC Receiver (each as defined below), (b) the objection of certain former directors and officers, (c) the objection of certain current directors, and (d) the objections of the Office of the United States Trustee and the Internal Revenue Service.

---

3.   Although the Holders of Allowed Class 5 General Unsecured Claims, as a Class, did not accept the Plan, 65.08% of those Holders who did vote voted to accept the Plan.

4.      Specifically, the *Preliminary Objection to the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization* (Docket No. 429) (the "GIC Objection") filed by the Florida Department of Financial Services, Division of Rehabilitation and Liquidation (Department) as Receiver of Guarantee Insurance Company (the "GIC Receiver") contends that the Plan should not be confirmed primarily because (i) the Plan is allegedly inconsistent with the McCarran-Ferguson Act and (ii) the Plan improperly vests post-confirmation jurisdiction exclusively with this Court.  The *Receiver of Ullico Casualty Company in Liquidation's* (the "Ullico Receiver") *Objection to the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization* (Docket No. 482) (the "Ullico Objection") raises similar objections.[4]  The Ullico Receiver also filed a *Motion for Abstention and Relief from Automatic Stay* (Docket No. 559) (the "Ullico Motion"), which requests that the Court abstain from confirming the Plan and grant relief from the automatic stay.[5]

5.      The *Preliminary Objection of Certain Former Directors and Officer to the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization* (Docket No. 416) (the "Former Ds&O Objection") contends that the Plan fails to satisfy the good faith requirements of section 1129(a)(3) of the Bankruptcy Code because the Plan provides for the issuance of new equity interests to the First Lien Lenders and the Debtor Releases and Exculpations contained in the Plan are impermissibly broad.  Similarly, the *Objection of Austin Shanfelter, James O'Brien, Michael Purcell, and Jeffrey Rohr to the Debtors' Third Amended Joint Plan of Reorganization*

---

4.   The GIC Receiver joined the Ullico Objection by filing the *Receiver of Guarantee Insurance Company's: (I) Joinder to the Objection by Receiver of Ullico Casualty Company in Liquidation to the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization; and (II) Supplemental Objection to Confirmation of the Debtors' Plan* (Docket No. 574) (the "GIC Joinder").

5.   Although the Ullico Motion is styled as an independent motion, the Ullico Receiver requests relief that directly impacts the confirmation of the Plan.  Accordingly, the Debtors believe that the Ullico Motion is properly viewed as an objection to the Plan and have responded to it herein.

3

(Docket No. 585) (the "<u>Shanfelter Objection</u>") contends that the Exculpations are overly broad because they cover certain prepetition actions taken by the Exculpated Parties despite the fact that such actions were in furtherance of the Debtors' restructuring efforts. Certain members of the Board of Directors of PNI filed a *Joinder and Objection to Confirmation of Plan* (Docket No. 597) (the "<u>Board Objection</u>"), which joins the Shanfelter Objection and raises concerns regarding the payment of their directors' fees and the purchase of "tail" director and officer liability insurance.

6.    These objections are baseless. As demonstrated more fully below, the Plan is not inconsistent with, and does not impair, the McCarran-Ferguson Act, and the retention of post-confirmation jurisdiction by this Court is proper. Similarly, the Ullico Reciever has failed to identify a basis that would justify abstention by this Court. Further, the Plan was proposed in good faith and with the legitimate and honest purpose of maximizing the value of the Debtors' estates and effectuating a successful reorganization of the Debtors. Finally, the Debtor Releases are appropriate, supported by adequate consideration, and are substantially similar to release provisions contained in plans confirmed by this Court; and the Exculpations protect the estate fiduciaries from having to defend costly and time-consuming litigation related to the development, negotiation, administration, and consummation of the Chapter 11 Cases and the Plan. Accordingly, these objections should be overruled. Furthermore, the remaining objections raise issues that the Debtors believe have either (i) been addressed by the Plan, as amended, or the Proposed Confirmation Order, or (ii) should be overruled for the reasons stated below.

7.    As has been their practice throughout these Chapter 11 Cases, the Debtors have worked with the parties that have filed formal and informal objections to resolve the issues that they have raised. For the Court's reference, attached as <u>Exhibit A</u> is a chart showing (i) the

4

revisions to the Plan and Proposed Confirmation Order that the Debtors have made to address certain of the objections and (ii) the remaining unresolved objections with a reference to the section of the Memorandum that address the objection.

8.    For the reasons set forth herein and in the Supporting Declarations (as defined herein), the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.  The Debtors therefore respectfully request that the Court confirm the Plan.  A proposed order confirming the Plan has been filed contemporaneously herewith (the "Proposed Confirmation Order").

## BACKGROUND

9.    Except as set forth herein, the pertinent and salient facts relating to these Chapter 11 Cases and the Plan are set forth in the Plan, the *Third Amended Disclosure Statement of Patriot National, Inc., and Its Affiliated Debtors* (Docket No. 383) (as amended, supplemented, restated or modified from time to time, the "Disclosure Statement"), and the Plan Supplement (defined below).  In addition, prior to, or contemporaneously with, the filing of this Memorandum, the following documents were filed in support of confirmation of the Plan:

- *Declaration of James S. Feltman in Support of Confirmation of the Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization*, filed contemporaneously herewith (the "Confirmation Declaration");

- *Certification of Christina Pullo with Respect to the Tabulation of Votes on the Amended Chapter 11 Plan of Reorganization of Patriot National, Inc.*, filed contemporaneously herewith (the "Voting Certification");

- *Affidavit of Service of Solicitation Materials*, dated March 21, 2018 (Docket No. 419) (the "First Solicitation Affidavit");

- *Affidavit of Service of Solicitation Materials*, dated April 11, 2018 (Docket No. 555) (the "Second Solicitation Affidavit"); and

- *Affidavit of Service*, including *Notice of Plan Supplement*, by Daniel Kounin on behalf of Prime Clerk LLC, dated April 4, 2018 (Docket No. 508) (the "Plan Supplement Affidavit").

5

10.     In addition, in support of confirmation of the Plan, the Debtors rely on the following previously filed document:  *Declaration of James S. Feltman, Chief Restructuring Officer of Patriot National, Inc., in Support of First Day Relief* (Docket No. 4) (the "First Day Declaration," and together with the above declarations, certifications, and affidavits, the "Supporting Declarations").

11.     On March 14, 2018, the Court issued an *Order (I) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling Confirmation Hearing, and (IV) Establishing Notice and Objection Procedures for Confirmation of the Proposed Plan Pursuant to Sections 105, 502, 1125, 1126, and 1128 of the Bankruptcy Code and Bankruptcy Rules 2002, 3003, 3017, 3018, 3020, and 9006 and Local Rules 2002-1, 3017-1, and 9006-1* (Docket No. 381) (the "Disclosure Statement Order").  On the same day, the Debtors filed and caused their noticing agent, Prime Clerk LLC ("Prime Clerk"), to serve on all parties in interest a *Notice of (I) Approval of Disclosure Statement; (II) Hearing on Confirmation of the Plan and Procedures for Objecting to Confirmation of the Plan; and (III) Voting Procedures* (Docket No. 384) (the "Confirmation Hearing Notice").  (*See* First Solicitation Aff. ¶ 1(b); *see also* Second Solicitation Aff. ¶ 1(b).)  On March 22, 2018, the Debtors filed and caused Prime Clerk to serve on all parties in interest a *Supplement to Notice of (I) Approval of Disclosure Statement; (II) Hearing on Confirmation of the Plan and Procedures for Objecting to Confirmation of the Plan; and (III) Voting Procedures* (Docket No. 421) (the "Supplemental Notice").  (*See* Docket No. 442.)

12.     Pursuant to the Disclosure Statement Order, the Court set the Voting Record Date for all holders of Claims against the Debtor entitled to vote on the Plan as of March

12, 2018.  On March 16, 2018, the Debtors, through Prime Clerk, caused the relevant solicitation packages including the Plan, the Disclosure Statement, the Confirmation Hearing Notice, and the Ballots (the "Solicitation Packages") to be served on holders of Claims in Classes 1A (Secured First Lien Lender Claims), 1B (First Lien Lender Deficiency Claims), and 5 (General Unsecured Claims).  (*See* First Solicitation Aff. ¶ 3(d), (e); Second Solicitation Aff. ¶ 2.)  The forms of Ballots sent to the holders of Class 1A (Secured First Lien Lender Claims), 1B (First Lien Lender Deficiency Claims), and 5 (General Unsecured Claims) (and their respective nominees) are attached as Exhibit 2 and Exhibit 4 to the Disclosure Statement Order.

13.     Pursuant to the Disclosure Statement Order, the Debtors were not required to solicit votes from the holders of Claims in Class 2 (Other Secured Claims) and Class 3 (Priority Claims), because such Claims are Unimpaired; from the holders of Claims in Class 6 (510(b) Claims), Class 7 (Intercompany Claims), and Class 8 (Old Equity Interests), because those parties will not receive any recovery or retain any property under the Plan and are thus deemed to reject the Plan.  (*See* Disclosure Statement Order ¶¶ G-H.)  Except for the holders of Claims in Class 7 (Intercompany Claims), the Debtors sent the applicable *Notice of Non-Voting Status*, attached as Exhibit 5 and Exhibit 6 to the Disclosure Statement Order, to all holders of Claims and Equity Interests in the Non-Voting Classes informing them of their Non-Voting Status.  (*See* First Solicitation Aff. ¶ 3(c), (f); Second Solicitation Aff. ¶ 3; Disclosure Statement Order ¶¶ 8-10.)

14.     The Debtors filed a supplement to the Plan (Docket No. 473) on March 30, 2018 and a second supplement to the Plan, filed contemporaneously herewith, on April 20, 2018 (as amended, supplemented, restated or modified from time to time, the "Plan Supplement"), which includes the following documents:  (i) the form of the Equity Purchase

7

Agreement; (ii) the form of the Litigation Trust Agreement; (iii) the form of the Investment Funding Agreement; (iv) the form of the Exit Facility Financing Agreement; (v) the Assumption Schedule, as amended; (vi) the form of the Reorganized Patriot Services, LLC Agreement, as amended; and (vii) a disclosure concerning the identities of individuals associated with the Litigation Trust Oversight Committee, the Litigation Trust, the Plan Administrator, and Reorganized Patriot. The Debtors caused notice of the Plan Supplement to be served on the Master Mailing List and posted the Plan Supplement on the website of the Debtors' notice, claims, and solicitation agent at https://cases.primeclerk.com/patnat/. (*See* Plan Supplement Aff.)

15. As set forth in the Voting Certification, the holders of Class 1A and Class 1B Claims have overwhelmingly voted to accept the Plan. Upon the conclusion of the solicitation period, the Debtors have received acceptances of the Plan from 100% in number and 100% in value of voting holders of Class 1A and Class 1B Claims. (*See* Voting Certification Ex. A.)

## **SUMMARY OF THE PLAN**

16. The following is a brief overview of certain material provisions of the Plan. Pursuant to the Plan, all of the issued and outstanding equity interests in PNI and each of its direct and indirect subsidiaries will be extinguished, and the First Lien Lenders will receive 100% of newly issued equity interests in Reorganized PNI and each of the Reorganized Subsidiary Debtors on account of their pro rata portion of the First Lien Lender Secured Claims. Allowed Priority Claims and Allowed Other Secured Claims will be paid in full, reinstated, or otherwise rendered unimpaired. Allowed Continuing Vendor Claims and Allowed Continuing Retail Agent Claims will be paid in full in the ordinary course of business, or if such amounts are overdue on the Effective Date of the Plan, in two equal installments with the first such

installment occurring on the Effective Date and the second occurring six months after the Effective Date.

17.     The Plan provides for the creation of a Litigation Trust and for the transfer free and clear into the Litigation Trust of all of the Debtors' Litigation Claims, which include avoidance actions, commercial tort claims, including claims against certain of the Debtors' current and former officers and directors, claims against certain of the Debtors' former professionals, and other claims against third parties held by the Debtors. The proceeds from the settlement or successful prosecution of the causes of action transferred to the Litigation Trust, if any, will be distributed pursuant to the Litigation Proceeds Waterfall as follows:

- *First*, to the extent not previously paid from proceeds of the Litigation Trust Facility, all accrued and unpaid Litigation Trust Expenses included in the Litigation Trust Budget.

- *Second*, to the repayment of the aggregate amount of the outstanding obligations under the Litigation Trust Facility.

- *Third*, from the first $5 million available for distribution to the Holders of Allowed First Lien Lender Deficiency Claims and Allowed Class 5 General Unsecured Claims, ratably (a) 60% to the Holders of Allowed First Lien Lender Deficiency Claims and (b) 40% to the Holders of Allowed Class 5 General Unsecured Claims.

- *Fourth*, from the next $5 million available for distribution to the Holders of Allowed First Lien Lender Deficiency Claims and Allowed Class 5 General Unsecured Claims, ratably (a) 70% to the Holders of Allowed First Lien Lender Deficiency Claims and (b) 30% to the Holders of Allowed Class 5 General Unsecured Claims.

- *Thereafter*, from all funds available for distribution to the Holders of Allowed First Lien Lender Deficiency Claims and Allowed Class 5 General Unsecured Claims, ratably (a) 80% to the Holders of Allowed First Lien Lender Deficiency Claims and (b) 20% to the Holders of Allowed Class 5 General Unsecured Claims.

- To the extent that the Allowed First Lien Lender Deficiency Claims are fully satisfied, any additional recoveries will be distributed to the Holders of Allowed Class 5 General Unsecured Claims. To the extent that Holders of Allowed Class 5 General Unsecured Claims are fully satisfied, any additional recoveries will be distributed to the Holders of Allowed First Lien Lender Deficiency Claims. For the avoidance of doubt, no holder of an Allowed Claim will receive payment in excess of the Allowed amount of its Claim. Upon the satisfaction in full of Allowed Class 5 General Unsecured Claims and Allowed First Lien Lender Deficiency Claims (the "Trigger Event"), the Plan Administrator shall

make any further distributions on account of Claims and Equity Interests in Class 6 and Class 8 in accordance with the Bankruptcy Code, including section 1129(b) thereof. Notwithstanding the foregoing, and for the avoidance of doubt, until the occurrence of the Trigger Event, none of the Litigation Trust, the Litigation Trustee, or the Plan Administrator shall have any obligations or liabilities to the holders of Allowed Claims or Equity Interests in Class 6 or Class 8, holders of such Claims and Equity Interests shall have no rights against the Litigation Trust, the Litigation Trustee, or the Plan Administrator for any amount due on or right created by such Claims or Equity Interests, and holders of Claims and Equity Interests in Class 6 and Class 8 shall not be Litigation Trust Beneficiaries.

18. The Plan includes three funding sources: Available Cash, the proceeds of the Litigation Trust and the Exit Financing.

19. The Debtors respectfully refer the Court to the Plan, the Disclosure Statement, the Disclosure Statement Order, the Plan Supplement, the Supporting Declarations, and the record of these Chapter 11 Cases for an overview of the Debtors' business and any other relevant facts that may bear on confirmation of the Plan. The Supporting Declarations and any testimony and other declarations that may be adduced or submitted at or in connection with the confirmation hearing of the Plan, beginning on April 24, 2018 (the "<u>Confirmation Hearing</u>"), are herein incorporated in full.

## <u>ARGUMENT</u>

20. This Memorandum is divided into three main parts. Section I contains the Debtors' responses to the Objections (as defined herein). Section II addresses the requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code and demonstrates the satisfaction of each such requirement. Section III addresses the Debtors' request for a waiver of the 14-day stay imposed by operation of Bankruptcy Rule 3020(e).

## I. THE OBJECTIONS TO THE PLAN SHOULD BE OVERRULED

21. As referenced above, there are fourteen objections to the Plan (the "<u>Objections</u>").

- The Former Ds&O Objection (Docket No. 416);

- The GIC Objection (Docket No. 429);

- The Ullico Objection (Docket No. 482), which was joined by the GIC Receiver in the GIC Joinder (Docket No 574);

- The *Missouri Department of Revenue Objection to the Third Amended Confirmation of Debtors' Plan of Reorganization* (Docket No. 548) (the "Missouri Department of Revenue Objection");

- *Objection to Assumption of Executory Contract With Lackawanna Casualty Corporation* (Docket No. 557) (the "Lackawanna Casualty Objection")

- The Ullico Motion (Docket No. 559);

- *Fifth Third Bank's Limited Objection to Confirmation of the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization* (Docket No. 565) (the "Fifth Third Objection");

- Steven M. Mariano's *Limited Objection to Confirmation of Debtors' Third Amended Joint Chapter 11 Plan of Reorganization* (Docket No. 575) and *Cautionary, Limited Objection to the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization* (Docket No. 576) (collectively, the "Mariano Objections"); and

- The Shanfelter Objection (Docket No. 585);

- The *Objection by the United States to the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization* (Docket No. 586) (the "IRS Objection");

- The *Limited Objection of CVI Investments, Inc., to Confirmation of Debtors' Third Amended Joint Chapter 11 Plan of Reorganization* (Docket No. 588) (the "CVI Objection");

- The *United States Trustee's Objection to Confirmation of the Debtors Third Amended Plan of Reorganization* (Docket No. 593) (the "UST Objection"); and

- The Board Objection[6] (Docket No. 597).

22. The Objections raise five central contentions:

- Certain of the Objections allege the Plan does not satisfy the "good faith" standard under section 1129(a)(3) of the Bankruptcy Code;

---

6. To the extent that the Board Objection joins the Shanfelter Objection, responses contained in this Memorandum as to the Shanfelter Objection should likewise be construed as responses to the Board Objection.

- Certain of the Objections allege that the Release Provisions of the Plan are improper;

- Certain of the Objections allege that the Exculpations are overbroad;

- Certain of the Objections allege that portions of the Plan should not be approved because the Bankruptcy Code has been reverse preempted by various state insurance statutes pursuant to the McCarran-Ferguson Act; and

- Certain of the Objections allege that this Court should abstain from entering the Confirmation Order.

The Objections raise other issues that are also addressed below. For the reasons stated herein, these Objections should be overruled.

A.     **The Plan Has Been Proposed in Good Faith**

23.     Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "Good faith is 'generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984)). "Whether a reorganization plan has been proposed in good faith must be viewed in the totality of the circumstances, and the requirement of Section 1129(a)(3) 'speaks more to the process of plan development than to the content of the plan.'" *Id.* (quoting *In re Bush Indus., Inc.*, 315 B.R. 292, 304 (Bankr. W.D.N.Y. 2004)). In addition to achieving a result consistent with the objectives of the Bankruptcy Code, the Plan also allows the Debtors' stakeholders to realize the highest possible recoveries under the circumstances. The Plan is the result of consensual resolutions and agreements among the Debtors, the Committee, and various other stakeholders, including the First Lien Lenders. The Committee's support of the Plan, following arm's-length negotiations with the Debtors, demonstrates that the Plan provides fundamental fairness to general unsecured creditors. *In re RCC Liquidating Corp.*, No.

09-10617, 2009 WL 8519778 (Bankr. D. Del. Feb. 22, 2009); *see also In re The Leslie Fay Cos., Inc.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) (finding that committee support for plan constitutes indicia of good faith).

24.     Despite the support for the Plan from the various constituencies in these Chapter 11 Cases, the Former Ds&O Objection broadly asserts that the Plan does not satisfy the good faith requirement of section 1129(a)(3) because the Plan (i) issues new equity interests in the Reorganized Debtors to the First Lien Lenders, including Cerberus, and (ii) fails to initiate avoidance actions against Cerberus based on the allegations contained in the Wasik Complaint. (Former Ds&O Obj. ¶¶ 31-32.)

25.     The Third Circuit has found that a chapter 11 plan is proposed in good faith when it "will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re W.R. Grace & Co.*, 729 F.3d 332, 346 (3d Cir. 2013) (quoting *In re Am. Capital Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012)).   The relevant objectives and purposes of the Bankruptcy Code with respect to "good faith" include, among other things, preserving going concerns, maximizing property available to satisfy creditors, the expeditious distribution of the bankruptcy estate to its creditors, and achieving fundamental fairness and justice. *Am. Capital Equip.*, 688 F.3d at 156-57 (internal citations and quotation marks omitted).

26.     The Former Ds&O do not state any reason why the issuance of new equity interests arising from the Plan would contradict or undermine any of the objectives and purposes of the Bankruptcy Code.   Indeed, the Plan represents the best and only avenue to maximize value for Patriot's creditors and was only made possible by the First Lien Lenders' willingness to engage in arm's-length negotiations with the Debtors that resulted in the debt-for-equity exchange that is the central component of the Plan.   As detailed in previous submissions to the

13

Court, for over a year prior to the commencement of these Chapter 11 Cases, the Debtors engaged in active efforts to sell the Company and succeeded in attracting interest from substantial purchasers, but were ultimately unable to consummate a sale due to the precipitous decline of their largest customer. (*See* Disclosure Statement § II.F.3, 5; *see also* First Day Decl. ¶¶ 37, 40.) The potential for loss to creditors if the Plan is not confirmed is further demonstrated by the Liquidation Analysis contained in <u>Exhibit D</u> to the Disclosure Statement, which shows that unsecured creditors would receive no recovery in a chapter 7 liquidation. Accordingly, far from showing a lack of good faith, the debt for equity exchange contained in the Plan evidences that the Plan was proposed in good faith, as it maximizes the Debtors' going concern value and avoids the total loss of value for creditors that would result from a liquidation.

27.     The structure of the Litigation Proceeds Waterfall further demonstrates the good faith nature of the Plan. Although the First Lien Lender Deficiency Claim is more than seven times greater than the Debtors' estimate of the aggregate amount of Allowed General Unsecured Claims, the First Lien Lenders have agreed to provide General Unsecured Creditors with a disproportionate share of the recoveries obtained on account of the Litigation Claims through the Litigation Proceeds Waterfall. These concessions will enhance recoveries to unsecured creditors and demonstrate that the Plan has been formulated to maximize the property available to satisfy the claims of all creditors of the estate and to achieve the goal of fairness as set forth in the Bankruptcy Code.

28.     The contention contained in the Former Ds&O Objection that the Plan fails under the "good faith" standard because it does not provide for pursuit of avoidance actions against Cerberus is similarly meritless. As detailed in the Confirmation Declaration, prior to the Petition Date, the Debtors and their then-outside counsel analyzed potential claims alleged in the

complaint filed in the Court of Chancery of the State of Delaware captioned *Henry Wasik, et al.*

*v. Steven M. Mariano, et al.*, No. 12953-VCL (Del. Ch.) (the "<u>Wasik Complaint</u>") and

concluded, among other things, that the claims against Cerberus were baseless. (Confirmation

Decl. ¶ 26.) As a result of that analysis, among other things, the Debtors subsequently agreed to

provide Cerberus with a release as part of the prepetition Forbearance Agreement, and further

agreed to provide Cerberus with releases under the Plan in exchange for the additional

consideration provided to the Debtors by Cerberus. (*Id.*) Section 1129(a)(3) does not require

that the Debtors pursue every potential claim, regardless of merit, in order to meet the good faith

standard. In sum, the Former Ds&O Objectors are unable to point to any concrete evidence that

Cerberus or the Debtors have in any way tried to subvert the purposes or goals of the Bankruptcy

Code, or that Cerberus or the Debtors have in any way acted without full candor, in proposing

the Plan.

29.     Finally, the Former Ds&O Objection's oblique reference to the Plan being

collusive (*see* Former Ds&O Obj. ¶ 30) should be disregarded. The Former Ds&O Objection

contains no allegations that any party's rights are being hindered, or that the Plan is attempting to

obtain any objective forbidden by law. *See Am. Capital Equip.*, 688 F.3d at 158 (finding that

collusion requires evidence of an agreement to defraud or obtain something forbidden by law).

30.     Thus, the Plan achieves the primary objectives underlying a chapter 11

bankruptcy: the reorganization and continuation of the Debtors as a viable business and the

distribution of value to creditors on account of their claims. *See Nat'l Labor Relations Bd. v.*

*Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) ("The fundamental purpose of reorganization is to

prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse

of economic resources."). The Former Ds&O Objection as it pertains to the good faith requirement of section 1129(a)(3) should therefore be overruled.

## B. The Debtor Releases Are Proper and Should Be Approved

31. The Debtors' Plan provides for (i) releases of claims held by the Debtors and their estates (the "Debtor Releases") against certain non-Debtor third parties (collectively, the "Released Parties"),[7] (ii) exculpations (the "Exculpations") of (a) the Debtors, (b) the Committee and its members (solely in their capacity as such), and (c) all current officers, directors, employees, professionals, financial advisors, accountants, attorneys, investment bankers, consultants, and other representatives of the Debtors in their capacity as such (the "Exculpated Parties"), and (iii) a permanent injunction with respect to the assertion of certain claims (the "Injunction," and together with the Debtor Releases and the Exculpations, the "Release Provisions") against the Released Parties and the Exculpated Parties (together, the "Protected Parties").[8] In accordance with Bankruptcy Rule 3016(c), the Debtors have provided in full and "in specific and conspicuous language (bold, italic, or underlined text)" each of the

---

7. Pursuant to the Plan, the term "Released Parties" is defined as:

(a) the Debtors' and the Reorganized Debtors' professionals that were retained in the Chapter 11 Cases, including the Debtors' chief restructuring officer, attorneys, financial advisors, investment bankers, consultants, representatives and other professionals, (b) the First Lien Agents, (c) the First Lien Lenders, (d) the DIP Agent, (e) the DIP Lenders, (f) any professionals of the DIP Agent or DIP Lenders, (g) the members of the Committee and the Committee professionals that were retained in the Chapter 11 Cases, but only in their capacity as such, (h) Conway MacKenzie Management Services, LLC, (i) the Debtors' independent director, and (j) with respect to the Persons identified in clauses (b) through (e), their respective directors, officers, principals, shareholders, partners, employees, members, participants, agents, representatives, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, management companies, fund advisors, other professionals, advisory board members, subsidiaries, affiliates, managed accounts or funds, other advisors, predecessors, successors or assigns, in each case in their capacity as such.

(Plan art. I.A.122.)

8. The Debtors do not believe at this time that they have any claims against the subsidiaries or affiliates of the Released Parties.

Release Provisions in the Plan and identified "the entities that would be subject to the injunction." Fed R. Bankr. P. 3016(c).

32.     When considering releases by a debtor of non-debtor third parties pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, courts will generally consider the following five factors:

(a)     an identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources;

(b)     a substantial contribution to the plan by the non-debtor;

(c)     the necessity of the release to the reorganization;

(d)     the overwhelming acceptance of the plan and release by creditors and interest holders;

(e)     the payment of all or substantially all of the claims of the creditors and interest holders under the plan.

*In re Hercules Offshore, Inc.*, 565 B.R. 732, 755–56 (Bankr. D. Del. 2016) (citing *In re Wash. Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999); *In re Exide Techs.*, 303 B.R. 48, 71–72 (Bankr. D. Del. 2003)).  The foregoing factors "are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness."  *Hercules Offshore*, 565 B.R. at 756 (quoting *Wash. Mut.*, 442 B.R. at 346).

33.     The Debtor Releases are narrowly tailored to satisfy these criteria.  The Released Parties are substantially limited to the Debtors' professionals, Cerberus Business Finance, LLC (in its capacity as both First Lien Agent and DIP Agent), the First Lien Lenders, the DIP Lenders and their professionals, the members of the Committee and their professionals, but only in their capacity as such, Conway MacKenzie Management Services, LLC, and the Debtors' independent director.  All Released Parties have made substantial contributions to the Plan.  (*See* Confirmation Decl. ¶¶ 24-25.)  In particular, Cerberus and the First Lien Lenders have, among other things, (i) forborne from exercising their remedies in the wake of the Debtors'

prepetition defaults under the prepetition Financing Agreement; (ii) provided much-needed cash to fund the Debtors' operations until the filing of these Chapter 11 Cases through the Collateral Agent Advances and authorization to use the proceeds of certain tax refunds which were collateral of the First Lien Lenders; (iii) provided a commitment for a further $15.5 million in funding through the duration of the Chapter 11 Cases; and (iv) agreed to convert a portion of the First Lien Lender Secured Claims into equity of the Reorganized Debtors.  (*Id.* ¶ 25.)  Cerberus also provided invaluable assistance to the Debtors in communicating the Plan to the Debtors' customers and clients (thereby helping to stabilize and preserve a viable business), and in transitioning the business to its current sustainable form.  (*Id.*)  Without the backing of Cerberus and the First Lien Lenders, the Debtors' reorganization would not have been possible.  (*Id.*)  The Debtors would not have been able to reorganize or to obtain the DIP financing and likely would have confronted a free-fall bankruptcy and, in all likelihood, a liquidation.  *See In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004) (approving releases where given in exchange for substantial contributions from noteholders, and without which the noteholders would not have provided new funding).  Finally, the Plan is supported by the Committee, further demonstrating the appropriateness of the Debtor Releases.  *See In re Abeinsa Holding, Inc.*, 562 B.R. 265, 284-285 (Bankr. D. Del. 2016) (approving debtor releases that were, in the court's opinion, "quite broad" where, among other things, there was ample evidence of extensive arm's-length negotiations, the support of the creditors' committee, and support of the plan among classes entitled to vote).

34.     Further, section 1123(b)(3)(A) specifically provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  Settlements are generally favored and encouraged in bankruptcy proceedings.  *See*

*Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *see also Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) ("Settlements are favored, but the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them."); *In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1113 (3d Cir. 1979) ("[i]n administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts.") (alteration in original) (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).

35. The decision of whether to approve a particular settlement lies within the sound discretion of the bankruptcy court. *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 515 (Bankr. D. Del. 2010); *see also In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) ("Settlements are generally favored in bankruptcy."). In evaluating the settlement, the Court should consider whether "the compromise is fair, reasonable, and in the best interest of the estate." *In re Louise's Inc.*, 211 B.R. 798, 801 (Bankr. D. Del. 1997). Importantly, the bankruptcy court's discretion should be exercised "in light of the general public policy favoring settlements." *Capmark*, 438 B.R. at 515 (quoting *In re Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998)). In considering the merits of the settlement, a bankruptcy court does not need to be convinced that the settlement is the best possible outcome for the parties; rather, the court need only "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *In re W.R. Grace & Co.*, 475 B.R. 34, 78 (D. Del. 2012) (citing *Aetna Cas. & Sur. Co. v. Jasmine, Ltd. (In re Jasmine, Ltd.)*, 258 B.R. 119, 123 (D. N.J. 2000)), *aff'd*, 729 F.3d 332 (3d Cir. 2013), *aff'd*, 532 F. App'x 264 (3d Cir. 2013), *aff'd*, 729 F.3d 311 (3d Cir. 2013); *In re Key3Media Grp., Inc.*, 336 B.R. 87, 93 (Bankr. D. Del. 2005),

*aff'd*, No. 03-10323 (MFW), 2006 WL 2842462 (D. Del. Oct. 2, 2006); *see also Coram Healthcare*, 315 B.R. at 330.

36.     Settlements pursuant to a plan are generally subject to the same standard applied to settlements under Bankruptcy Rule 9019.  *See Coram Healthcare*, 315 B.R. at 334. The Third Circuit applies a four factor balancing test for considering motions to approve settlements under Bankruptcy Rule 9019, weighing:

<table>
<tr><td>(a)</td><td>the probability of success in litigation;</td></tr>
<tr><td>(b)</td><td>the likely difficulties in collection;</td></tr>
<tr><td>(c)</td><td>the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and</td></tr>
<tr><td>(d)</td><td>the paramount interest of the creditors.</td></tr>
</table>

*Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).  Under the Plan, the Debtors propose to release certain parties—the Released Parties—from Claims or Causes of Action that the Debtors' estates may have.  A plan that proposes to release a claim or a cause of action belonging to a debtor is considered a "settlement" for purposes of satisfying section 1123(b)(3)(A).

37.     Article XI.G.1 of the Plan represents a valid settlement of any Claims the Debtors may have against the Released Parties pursuant to section 1123(b)(3)(A) and Bankruptcy Rule 9019.  The Debtors believe that pursuing Claims, if any, against the Released Parties would not be in the best interest of their various stakeholders because the costs involved would likely outweigh any potential benefit from pursuing such Claims.  (*See* Confirmation Decl. ¶ 26.)  As discussed above, prior to the Petition Date, the Debtors and their then outside counsel analyzed the claims against Cerberus and determined that they were baseless.  (*Id.*) Moreover, the Released Parties were integral to the development of the Restructuring Support Agreement and the Plan and expected a release in exchange for their contributions to the

20

Debtors' estates.  (*Id.* ¶ 25.)  Thus, the Debtors' release of Claims and Causes of Action is a component of the consensual Plan process, and represents a valid exercise of the Debtors' business judgment and should be approved.

38.     "Moreover, a debtor may release claims in a plan pursuant to Bankruptcy Code § 1123(b)(3)(A), if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."  *U.S. Bank Nat'l Assoc. v. Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) (citing *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009)); *see also In re Aleris Int'l, Inc.*, No. 09-10478 (BLS), 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) (stating that where a debtor release is "an active part of the plan negotiation and formulation process, it is a valid exercise of the debtor's business judgment to include a settlement of any claims a debtor might own against third parties as a discretionary provision of the plan").  Because the Debtor Releases were an active part of the plan negotiation and formulation process, the Releases represent a valid exercise of Debtors' business judgment, and so is afforded deference.  *See, e.g.*, *In re Spansion, Inc.*, 426 B.R. at 140 ("It is not appropriate to substitute the judgment of [] objecting creditors over the business judgment of the Debtors.");  *In re Marvel Entm't Grp., Inc.*, 273 B.R. 58, 78 (Bankr. D. Del. 2002).

39.     Additionally, the Debtor Releases are substantially similar to release provisions in plans confirmed by this Court and other courts in this District.  *See*, *e.g.*, *In re Orchard Acquisition Co., LLC*, No. 17-12914 (KG) (Bankr. D. Del. Jan. 17, 2018) (order approving the debtors' joint plan of reorganization, which included debtor releases of various parties in interest); *In re Roadhouse Holding Inc.*, No. 16-11819 (BLS) (Bankr. D. Del. Nov. 9, 2016) (same); *In re Halcón Res. Corp.*, No. 16-11724 (BLS) (Bankr. D. Del. Sept. 8, 2016)

DOCS_DE:219128.1 69353/002

(same); *In re Dex Media, Inc.*, No. 16-11200 (KG) (Bankr. D. Del. July 15, 2016) (same); *In re Verso Corp.*, No. 16-10163 (KG) (Bankr. D. Del. June 23, 2016) (same); *In re New Gulf Res., LLC*, No. 15-12566 (BLS) (Bankr. D. Del. Apr. 20, 2016) (same); *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Apr. 18, 2016) (same). Based on the foregoing, the Debtor Releases comply with the Bankruptcy Code and applicable non-bankruptcy law, and are necessary and integral components of the Debtors' restructuring.

40. Despite the ample evidence supporting the propriety of the Debtor Releases, the Former Ds&O Objection contends that the Debtor Releases are inappropriate because they contain a release of Cerberus. The Former Ds&O Objection fails to address the criteria normally examined by courts in this District when deciding to approve debtor releases, fails to assert facts supporting their objection to the settlement and release, and does not address the deference given to a debtor's business judgment in deciding to grant a release. Rather, the Former Ds&O Objection argues that the Debtor Releases should not be approved because (i) a release of Cerberus is unnecessary, (ii) the Committee does not support the Plan, and (iii) there is no guarantee of a recovery for the general unsecured creditors under the Plan. (*See* Former Ds&O Obj. ¶ 35.) These contentions are factually incorrect and without legal merit.

41. First, as discussed above, the Debtor Releases were a central component of the Plan negotiations and the overall settlement and structure embodied in the Plan. (*See* Confirmation Decl. ¶ 25.) Second, the Committee now supports the approval of the Plan despite the Former Ds&O Objectors' contention to the contrary. Third, the potential that the Litigation Trustee may not be successful in recovering on the Litigation Claims is not a sufficient basis to find the Debtor Releases improper. For these reasons, the Former Ds&O Objection as it pertains to the Debtor Releases should be overruled.

### C. The Exculpations Are Proper and Should Be Approved

42.     As set forth in more detail therein, Article XI.H of the Plan provides that the Exculpated Parties[9] shall not have or incur liability to any person for acts or omissions in connection with the Bankruptcy Case or the Plan other than as a result of gross negligence or willful misconduct.  The Third Circuit Court of Appeals has recognized that a chapter 11 plan may provide for broad exculpation of liability in favor of estate fiduciaries in connection with their implementation of a debtor's restructuring and such provisions are "commonplace" in chapter 11 plans.  *See generally In re PWS Holding Corp.*, 228 F.3d 224, 245-47 (3d Cir. 2000); *see also, e.g.*, *In re Indianapolis Downs, LLC*, 486 B.R. 286, 306 (Bankr. D. Del. 2013) (concluding that exculpation provisions are appropriate for estate fiduciaries and debtor directors and officers); *In re Tribune*, 464 B.R. 126, 189 (Bankr. D. Del. 2011) (same), *on reconsideration*, 464 B.R. 208 (Bankr. D. Del. 2011).

43.     The Exculpations contained in the Plan are proper because they only cover fiduciaries who served during these Chapter 11 Cases and because they are narrowly tailored to only cover actions taken in connection with the restructuring contemplated by the Plan.  The Exculpations also serve the important function of protecting estate fiduciaries from having to defend costly and time-consuming litigation related to the administration and consummation of the Plan.  *See Wash. Mut., Inc.*, 442 B.R. at 350-51 (stating that exculpations "must be limited to

---

9.   The Plan defines "Exculpated Parties" as follows:

(a) the Committee and its members (solely in their capacities as such), (b) the Debtors and their current officers, directors, and employees (c) Conway MacKenzie Management Services, LLC, and its current officers and employees (d) the Debtors' chief restructuring officer, (e) the Debtors' independent director, and (f) with respect to the Persons identified in clauses (a) and (b), to the extent retained in the Chapter 11 Cases, their respective financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and all other retained professionals.

(Plan art. I.A.61.)

the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers"). The Exculpations do not extend to claims resulting from fraud, gross negligence, or willful misconduct and are wholly appropriate given the facts and circumstances of the Chapter 11 Cases. *See id.* at 350 (citing *PWS Holding Corp.*, 228 F.3d at 246).

44. Immediately prior to and throughout these Chapter 11 Cases, the Exculpated Parties have contributed substantial value to the Debtors, the restructuring, and the formulation of the Plan. The Exculpated Parties' efforts in negotiating the prepetition Restructuring Support Agreement and ultimate formulation of the Plan enabled the Debtors to stabilize their businesses and file the Chapter 11 Cases in an orderly and efficient manner, which has preserved the Debtors' businesses as a viable enterprise. (*See* Confirmation Decl. ¶ 27; *see also id.* ¶ 9.) The recoveries negotiated by the key constituencies in the Chapter 11 Cases are far better than those that would have been received from a "free fall" chapter 11 or a liquidation. The Exculpated Parties have participated in good faith in formulating and negotiating the Plan and should be protected from exposure to lawsuits from disgruntled creditors. (*See* Confirmation Decl. ¶ 27.) Indeed, the expectation of exculpation was a significant point in facilitating the Plan. (*Id.*) These facts apply to the Debtors, and by extension to its officers, directors, employees and professionals, and support the requested Exculpations. Further, the Plan's exculpation provision is appropriately tailored to protect the Exculpated Parties from inappropriate litigation and does not relieve any party of liability for gross negligence or willful misconduct. (*Id.*) Accordingly, the Plan's Exculpations should be approved.

45. The Former Ds&O Objection and the Shanfelter Objection assert the Exculpations are improper to the extent that they provide exculpations for pre-petition actions of

the Exculpated Parties.  (*See* Former Ds&O Obj. ¶ 37; Shanfelter Obj. ¶ 13.)  Although the Exculpations cover the immediate period prior to the commencement of these Chapter 11 Cases when the Exculpated Parties were negotiating the Restructuring Support Agreement and preparing the Debtors for filing, the Exculpations are still proper in that they only cover the Debtors' prepetition fiduciaries in respect of the restructuring and contain the appropriate carve outs for gross negligence and willful misconduct.  *See, e.g.*, *PWS Holding Corp.*, 228 F.3d at 236-37 (holding that exculpation clause in plan which frees parties and professionals from third party claims is permissible so long as it is restricted to applicable standard of the duty owed to the estate by that party and professional).  Further, the cases cited in the Shanfelter Objection do not dictate a different conclusion as these cases did not directly address the permissibility of Exculpations related to pre-petition restructuring efforts by the Debtors' professionals.

    46.  Finally, the Exculpations contained in the Plan are similar to the exculpations that have been approved in other chapter 11 cases in this District when a debtor and its professionals undertook substantive efforts prior to the petition date to advance the Debtors' restructuring efforts and prepare the Debtors for a reorganization proceeding.  *See, e.g.*, *In re The Dolan Co.*, No. 14-10614 (BLS) (Bankr. D. Del. June 9, 2014) (confirming chapter 11 plan with exculpation that covered prepetition conduct where substantial efforts to prepare the restructuring were taken pre-petition); *In re Sorenson Commc'ns, Inc.*, No. 14-10454 (BLS) (Bankr. D. Del. Apr. 10, 2014) (same); *In re Maxcom Telecomunicaciones, S.A.B. de C.V.*, No. 13-11839 (PJW) (Bankr. D. Del. Sept. 10, 2013) (same); *In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013) (same); *In re Physiotherapy Holdings, Inc.*, No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013) (same).  Accordingly, the Exculpations are proper and the Objections pertaining to the Exculpations should be overruled**.**

D.     **The Plan Does Not Conflict with the McCarran-Ferguson Act**

47.     The Ullico Objection and the GIC Objection both allege that the Plan was not submitted in good faith because the Plan allegedly violates the McCarran-Ferguson Act[10] and the abstention doctrines outlined in *Younger v. Harris*, 401 U.S. 37 (1971) and *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).   However, because both the Ullico Objection and the GIC Objection are essentially attempting to preemptively confer jurisdiction of any future property disputes on their respective state court proceedings—actions over which this Court has exclusive jurisdiction—both objections should be overruled.

1.     **McCarran-Ferguson Reverse Preemption.**

48.     Reverse preemption under the McCarran-Ferguson Act is not applicable to these Chapter 11 Cases as neither the discharge and injunction provisions of the Bankruptcy Code nor the Plan "invalidate, impair, or supersede" the applicable state insurance laws.   The McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, states in relevant part that, "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, . . . unless such Act specifically relates to the business of insurance."   15 U.S.C. § 1012(b).   As such, federal law may be reverse preempted by state insurance laws if:   (1) the federal statute does not specifically relate to the business of insurance; (2) the state statute was enacted to regulate the business of insurance; and (3) the federal statute would invalidate, impair, or supersede the state statute.   *In re PRS Ins. Grp., Inc.*, 331 B.R. 580, 585 (Bankr. D. Del. 2005) ("*PRS II*") (citing *Wagner v. Amwest Ins. Group, Inc. (In re Amwest Ins. Group, Inc.)*, 285 B.R. 447, 451 (Bankr. C.D. Cal. 2002)).   In *Humana Inc. v.*

---

10.   Although unconnected to the "good faith" requirement under the Bankruptcy Code, the GIC Receiver likewise claims that the Plan cannot be used to impair or infringe upon the GIC Receiver's rights pursuant to the McCarran-Ferguson Act.   (*See* GIC Obj. ¶¶ 9-10.)   Although the GIC Receiver Objection utilizes this argument only towards the end of requesting so-called "clarifications" in the Plan, the Debtors' response to such requests applies equally to the GIC Receiver Objection as to the Ullico Receiver Objection.

*Forsyth*, 525 U.S. 299 (1999), the Supreme Court defines the terms "invalidate," "impair," and "supersede" as follows:  the term "invalidate" means "to render ineffective, generally without providing a replacement rule or law," *id.* at 307; the term "supersede" means "to displace (and thus render ineffective) while providing a substitute rule," *id.*; and the term "impair" means that the "federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime," *id.* at 310.

49.     At its core, the issues raised by the Ullico Receiver and the GIC Receiver are property disputes, namely whether the Ullico Receiver or the GIC Receiver have a claim to any property currently held by the Debtors.  Bankruptcy courts that have examined this issue have consistently held that reverse preemption under the McCarran-Ferguson Act is not applicable when a bankruptcy court is exercising its jurisdiction to determine a property dispute involving a debtor.  For example, in *In re Frontier Insurance Group, LLC,* the Bankruptcy Court for the Southern District of New York rejected a state insurance liquidators argument that the McCarran-Ferguson Act reverse preempted the bankruptcy court from exercising jurisdiction to determine ownership over certain property because the state proceeding would be impaired if the bankruptcy court found the assets belonged to the debtor.  The bankruptcy court rejected this argument and found that "[A] federal court's ordinary determination of property rights, interpretation of contracts, or interpretation of state statutes does not 'impair' state law, even when a federal court's decision has a financial impact on the insolvent insurer's estate."  *In re Frontier Ins. Grp., LLC*, 517 B.R. 496, 506 (Bankr. S.D.N.Y. 2014) (quoting *In re First Assured Warranty Corp.*, 383 B.R. 502, 541 (Bankr. D. Colo. 2008)).  Other bankruptcy courts to examine the issue have reached similar conclusions.  *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 542

B.R. 121, 150 (Bankr. S.D.N.Y. 2015) (in a property dispute between chapter 11 debtor and insolvent Illinois insurance company over trust account containing $8 million, court held that the "property is *neither* side's property until there is a ruling determining it to be such," and concluding that bankruptcy court's exercise of jurisdiction was "fully appropriate") (emphasis original). As the Bankruptcy Court for the Southern District of New York stated in *In re Ames Dep't Stores, Inc.*:

> Many courts, including the Second Circuit, have taken a narrow reading of McCarran-Ferguson. The Second Circuit has held that the Act did not alter the normal rules of federal preemption 'so drastically as to force a federal law that clearly intends to preempt all other states laws to give way simply because the insurance industry is involved.' Courts have expressed skepticism 'that Congress intended, through the McCarran-Ferguson Act, to remove federal jurisdiction over every claim that might be asserted against an insurer in state insolvency proceedings.

542 B.R. at 146 (footnotes and citations omitted).

50. The cases cited by the Ullico and GIC Receivers are inapplicable to the facts of this proceeding and do not support the conclusion that the confirmation of the Plan, let alone the Bankruptcy Code, impair the relevant state insurance statutes. The Receivers primarily rely on *In re PRS Ins. Grp., Inc.*, 294 B.R. 609 (Bankr. D. Del. 2003), *aff'd and remanded sub nom. In re PRS Ins. Grp.*, No. 00-4070-MFW, 2005 WL 4121639 (D. Del. Mar. 31, 2005) ("<u>PRS I</u>"), to support the assertion that the Bankruptcy Code has been reverse preempted by the Delaware Uniform Insurers Liquidation Act ("<u>DUILA</u>") and Chapter 631 of the Florida Statutes (governing Insurer Insolvency; Guaranty of Payment) (the "<u>FL Statute</u>"), respectively. (*See* Ullico Obj. at 13-17; GIC Obj. at 3-7.) However, *PRS I* is inapposite to the facts presented in these Chapter 11 Cases as it addresses the ability of a bankruptcy court to exercise jurisdiction over the <u>affirmative</u> claim of a debtor against an estate being administered by a state insurance receiver. In *PRS I*, a liquidator, appointed pursuant to an Ohio insurance liquidation statute, filed

a proof of claim. *PRS I*, 294 B.R. at 611. The debtor subsequently filed an objection to the state liquidator's proof of claim and initiated an adversary proceeding seeking, among other things, avoidance and recovery of preferential and/or fraudulent transfers. *Id.* at 611-12. The court held that "application of the Bankruptcy Code in the instant adversary *would* frustrate state policy and interfere with a State's administrative regime regulating insurance," because the Ohio statute at issue provided a priority of distribution of claims against an insurance company distinct from the Bankruptcy Code's. *Id.* at 613 (emphasis original). As a result, a determination by the bankruptcy court that there was a voidable transfer that must be returned to the debtor ahead of the insurance company's senior creditors would "impair" the Ohio statute. *Id.*

51. The limited applicability of the court's ruling in *PRS I* is demonstrated by its holding *PRS II*. In *PRS II*, the chapter 11 debtor subsequently filed a second adversary proceeding, asserting the same causes of action, but solely as a defense to the liquidator's claim, and not for the purpose of seeking "affirmative recovery." *PRS II*, 331 B.R. at 584. In this case, the bankruptcy court determined that the exercise of its own jurisdiction did not interfere with the jurisdiction of the Ohio state court because (1) the bankruptcy court was "merely exercising its exclusive jurisdiction" pursuant to 28 U.S.C. § 1334(a) and 28 U.S.C. § 157(b)(2)(F) and (H), *id.* at 588; and (2) the debtor did not seek to exercise control over any property within the Ohio state court's jurisdiction, *id.* at 587. The Debtors here are only seeking to preserve this Court's exclusive jurisdiction to determine property of the Debtors' estates. *See* 28 U.S.C. § 1334(e)(1); *see also* 28 U.S.C § 1334(a); 28 U.S.C. § 157(b)(2)(B) ("allowance or disallowance of claims against the estate or exemptions from property of the estate…"), (E) ("orders to turn over property of the estate"), (F) ("proceedings to determine, avoid, or recover preferences"), (H) ("proceedings to determine, avoid, or recover fraudulent conveyances").

52.     The Ullico Receiver's argument is further undermined by the lack of prejudice that will occur by this Court's exercise of jurisdiction.  The Ullico Receiver was appointed in 2013 and has had nearly five years to assert claims against the Debtors prior to the commencement of these Chapter 11 Cases.  Despite this extensive period to investigate and bring claims, the Ullico Receiver's arguments remain speculative in nature as the Ullico Receiver is unable to identify any actual Ullico property being held by the Debtors, even after the Debtors responded to the Ullico Receiver's discovery requests, and has yet to identify a specific cause of action against the Debtors.  In contrast, if the Court were to grant the request of the Receivers, the Debtors (including the Reorganized Debtors), and their creditors would suffer real and concrete harm, as the entire restructuring process would be held hostage over Ullico's hypothetical claims.  "Absent a legitimate policy concern and substantive conflict with a federal court's exercise of jurisdiction, McCarran-Ferguson cannot *de facto* deprive such federal court of its otherwise valid jurisdiction."  *Ames*, 542 B.R. at 151 (concluding that the claims process and priority scheme of the Illinois Insurance Code was "in no way disturbed by this Court's exercise of its statutory and constitutional jurisdiction to determine the scope of [the debtor's] rights and liabilities against [the insolvent insurance company]").

53.     Finally, despite their contentions to the contrary, nothing in these proceedings has invalidated the Receivers' authority under the relevant state statutory schemes or the orders appointing the Receivers.  The Receivers are free to file a claim or seek to pursue other relief in these Chapter 11 Cases to the extent that they believe that the Debtors are in possession of their property.  In sum, the Receiver Objections are merely an attempt to evade the jurisdiction of the Bankruptcy Court by avoiding the submission of a claim, getting an exception to the discharge, and then pursuing the claim at a later time in a forum of their choosing.  These

actions run counter to the purposes of the Bankruptcy Code in providing a centralized forum for the determination of the property of, and claims against, a debtor. Accordingly, the Receivers' Objections based on the McCarran-Ferguson Act should be overruled.

**2. The GIC Objection as to § 502(d) Is Not a Barrier to Confirmation and Should Be Overruled.**

54. The GIC Receiver objects to the Plan by arguing that section 502(d) and case law require that the defendant in an avoidance action be adjudicated liable before the Plaintiff may invoke section 502(d) and, moreover, that using potential avoidance actions to withhold Receivership Property is in direct violation of the Receivership Order and violates McCarran-Ferguson.

55. The GIC Receiver's argument is baseless. While it is true that avoidance actions require a finding by the court that the defendant in the action is liable before the plaintiff may invoke section 502(d), the Plan merely provides that the Debtors are entitled to utilize section 502(d) to setoff any claim amounts after such a defendant has been adjudicated liable. (*See* Plan art. VIII.E.4.) The Debtors are entitled to preserve their rights pursuant to section 502(d) in the Plan, and to seek adjudication of such claims post-confirmation. *See In re FBI Wind Down, Inc.*, No. 13-12329 (CSS), 2018 WL 922243 (Bankr. D. Del. Feb. 16, 2018) (court deciding whether claims avoided under section 502(d) *after* the debtor's restructuring plan, including avoidance provisions, was confirmed); *In re Stone & Webster, Inc.*, 547 B.R. 588 (Bankr. D. Del. 2016) (same); *In re AmeriServe Food Distribution, Inc.*, 315 B.R. 24 (Bankr. D. Del. 2004) (same); *In re Ampace Corp.*, 279 B.R. 145 (Bankr. D. Del. 2002) (same). It would be illogical to allow an objection to the Plan to stand simply because the Plan explicitly incorporates a statute that can be raised post-confirmation.

56.     Furthermore, the GIC Receiver's insistence that the incorporation of section 502(d) into the Plan violates McCarran-Ferguson is premature.  As discussed in *PRS II*, this Court is entitled to adjudicate any defenses to assertions of claims, regardless of McCarran-Ferguson.  *PRS II*, 331 B.R. at 587.  Furthermore, the GIC Receiver fails to explain how the incorporation of section 502(d) into the Debtors' Plan impairs Florida insurance laws at all because the Debtors have not indicated that they will pursue avoidance actions against the GIC Receiver or any other insurance party.  The Debtors accept and acknowledge that they must apply section 502(d) in a manner that does not impair state insurance laws.  However, the mere inclusion of an insurance creditor in a chapter 11 proceeding does not preclude the incorporation of section 502(d) wholesale.  The GIC Receiver cannot object to and halt confirmation of the entire Plan because some minute portion of it may potentially implicate the McCarran-Ferguson Act in the distant future if, and only if, the Debtors attempted to assert that provision against the GIC Receiver.  Therefore, the GIC Objection to section 502(d) is irrelevant to confirmation, and should be overruled.

### E.     The Court Should Not Abstain from Confirming All Aspects of the Plan

#### 1.     Ullico Has Failed To Show that Mandatory or Voluntary Abstention Is Appropriate.

57.     In the Ullico Motion, the Ullico Receiver asks this Court to abstain from, among other things, confirming the Plan for fear that it might "restrict or otherwise impede the Receiver's exercise of his rights or fulfillment of his duties and obligations pursuant to the Liquidation Order, the DUILA, or otherwise in connection with the DUILA Insolvency Proceedings to administer and pursue the Ullico Casualty Assets."  (Ullico Mot. ¶ 29.)  The Ullico Receiver argues both that mandatory abstention pursuant to 28 U.S.C. § 1334(c)(2) is

required and that this Court should voluntarily abstain from confirming the Plan pursuant to 28 U.S.C. § 1334(c)(1).  For the reasons stated below, the Ullico Motion should be denied.

### (a) The Current Balance of the Ullico Casualty Account.

58.     As an initial matter, the Ullico Motion fails to represent properly the current balance of the Ullico Casualty Account that serves as the basis of the relief requested. Although the Ullico Motion states that the balance of the Ullico Casualty Account was $4.1 million on or around the date that the Ullico Receiver was appointed in 2013 (Ullico Mot. ¶ 15), the balance of the Ullico Casualty Account has been less than $8,000 for several years (primarily as a result of a series of transfers that occurred in late 2013 and 2014).  Accordingly, the current amount at issue is *de minimis*.  As stated above, to the extent that the Ullico Receiver believes it may have any claims against the Debtors arising from the transfers that reduced the account balance, the proper procedural course of action is for the Ullico Receiver to file a claim in this proceeding— not to endanger the Debtors' reorganization efforts by requesting the Court to abstain from confirming the Plan.

### (b) Ullico Has Failed To Demonstrate a Basis for Mandatory Abstention.

59.     There is no basis for this Court to abstain from confirming the Plan pursuant to 28 U.S.C. § 1334(c)(2).  "Under 28 U.S.C. 1334(c)(2), mandatory abstention does not apply to 'core' proceedings." *In re Indianapolis Downs, LLC*, 462 B.R. 104, 114 (Bankr. D. Del. 2011).  Confirmation of a plan is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(L). 28 U.S.C. § 157(b)(2)(L); s*ee also In re Watson*, 384 B.R. 697, 702 (Bankr. D. Del. 2008).  As the Ullico Motion requests that the Court refrain from confirming the Plan, mandatory abstention is inapplicable.

DOCS_DE:219128.1 69353/002

**(c)  Ullico Has Failed To Demonstrate a Basis for Permissive Abstention.**

60.     Permissive abstention with respect to the confirmation of the Plan is likewise inappropriate.  "Permissive abstention from core proceedings under 28 U.S.C. § 1334(c)(1) is left to the bankruptcy court's discretion."  *In re RNI Wind Down Corp.*, 348 B.R. 286, 295 (Bankr. D. Del. 2006), *subsequently aff'd*, 359 F. App'x 352 (3d Cir. 2010) (quoting *Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.*), 304 F.3d 223, 232 (2d Cir. 2002)).

61.     Although courts in this District considers twelve factors when determining whether abstention pursuant to 28 U.S.C. § 1334(c)(1) is appropriate, "[c]ourts place more weight on some of the factors than others; particularly important are factors (1) the effect on the administration of the estate, (2) whether the claim involves only state law issues, and (7) whether the proceeding is core or non-core."  *In re DHP Holdings II Corp.*, 435 B.R. 220, 224 (Bankr. D. Del. 2010) (citing *Fruit of the Loom, Inc. v. Magnetek, Inc. (In re Fruit of the Loom, Inc.)*, 407 B.R. 593, 600 (Bankr. D. Del. 2009); *Republic Underwriters Ins. Co. v. DBSI Republic, LLC (In re DBSI, Inc.)*, 409 B.R. 720, 729 (Bankr. D. Del. 2009)).

62.     Here, these three factors weigh heavily against abstention.  First, administration of the Debtors' estates would grind to a halt—and the Debtors would likely be forced into liquidation—if this Court were to determine that it was unable to confirm the Plan currently before the Court.  Second, the claims upon which the Ullico Receiver relies are not so much "claims" as they are the mere existence of the insolvency proceedings in the Delaware Court of Chancery.  The only claims that the Ullico Receiver articulates in its motion is that it seeks "a detailed accounting" and "turnover" of property belonging to Ullico Casualty.  (*See, e.g.*, Ullico Mot. ¶¶ 32, 35.)  The Debtors have already provided responsive information through

34

discovery, and the Ullico Receiver's request is simply a further attempt to delay the confirmation process. And, as discussed herein, any claims for turnover of property fall within the purview of the Bankruptcy Court, since it would involve a determination of property of the estate, which is committed to the exclusive jurisdiction of the district courts pursuant to 28 U.S.C. § 1334(e)(1). Finally, as described above, the confirmation of a plan is a core proceeding. 28 U.S.C. § 157(b)(2)(L). Therefore, permissive abstention is likewise inappropriate.

63.     Additionally, to the extent that the Ullico Receiver seeks this Court's abstention in order to preserve its rights to adjudicate a turnover action in the Delaware Court of Chancery, abstention is still inappropriate. The proper venue to assert such rights is this Bankruptcy Court. "The district court in which a case under title 11 is commenced or is pending shall have *exclusive jurisdiction* … of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." 28 U.S.C. § 1334(e)(1) (emphasis added); *see also Watson*, 384 B.R. at 701 n.5 ("28 U.S.C. § 157(a) states that the district court may provide that any and all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district. . . . The United States District Court for the District of Delaware has so provided.").

**2.     The Receivers Have Failed To Show that *Younger* and *Burford* Abstention Are Appropriate.**

64.     The Ullico Receiver also argues that this Court should abstain, pursuant to both the *Younger* and *Burford* doctrines, from enjoining the Ullico Receiver's ability to pursue causes of action against the Debtors. Under the *Younger* doctrine, abstention is appropriate if:

> (1) there are ongoing state proceedings that are judicial in nature;
> (2) the state proceedings implicate important state interests; and
> (3) the state proceedings afford an adequate opportunity to raise the federal claims.

35

*PRS II*, 331 B.R. at 589 (quoting *Addiction Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399, 408 (3d Cir. 2005)).   While the Debtors do not contest that the state of Delaware has an important state interest in regulating the insurance industry and protecting the interests of policyholders and creditors, this case fails to meet the third requirement for application of the *Younger* doctrine.   As discussed above, the Court has exclusive jurisdiction for any claims that the Receivers may intend to assert against the Debtors, including a determination of whether the Debtors are in possession of property of the Ullico Receiver.   Furthermore, *Lazaridis v. Wehmer*, 591 F.3d 666 (3d Cir. 2010), cited by the Ullico Receiver (Ullico Obj. ¶¶ 37, 38), is inapposite. That case involved a father's federal complaint challenging the constitutionality of certain Delaware statutes governing child custody and seeking to vacate the order of a Delaware state court enforcing an order of a French court, awarding custody of the child to her mother.   As a result, the respective state courts would not be able to properly adjudicate the Debtors' property.

65.     Similarly, *Burford* abstention may be appropriate "when questions of state law in which the state has expressed a desire to establish a coherent policy on a matter of substantial public concern are raised."   *NYLife Distribs. v. Adherence Grp., Inc.*, 72 F.3d 371, 376 n.8 (3d Cir. 1995).   However, "[a]bstention is inappropriate in cases in which federal courts have exclusive jurisdiction over at least a portion of the claims presented."   *PRS II*, 331 B.R. at 589 (quoting *Chiropractic Am. v. Lavecchia*, 180 F.3d 99, 108 (3d Cir. 1999)).   To the extent that the Ullico Receiver objects to the Injunction because it intends to pursue property claims against the Debtors, this Court has exclusive jurisdiction pursuant to 28 U.S.C. § 1334(e)(1).   As one bankruptcy court noted:

> The determination of claims is among the most common proceedings dealt with by this Court.   The fact that [the insurance company] has been declared insolvent and placed into liquidation… does not change the nature of this claim

determination motion…. [I]t is black letter law that the liquidator of an insolvent insurance company steps into the shoes of the insurer, assuming all its rights and subject to all the defenses the insurer was subject to at the time of the insolvency. *Liquidation orders do not magically change the nature of debts and obligations in the ordinary case.*"

*In re Agway*, 357 B.R. 195, 204-05 (Bankr. N.D.N.Y. 2006) (declining to abstain per *Burford*) (emphasis in original); *see also In re Reliance Grp. Holdings, Inc.*, 273 B.R. 374, 402-03 (Bankr. E.D. Pa. 2002) (finding *Burford* not applicable even though "outcome of [] matter may affect the amount of assets in the [insurance company] liquidation proceeding (and in the Debtor's bankruptcy cases), it will not directly impact the state's regulation of insurers or the state's ability to establish rules for the orderly rehabilitation or liquidation of insolvent insurers"). As a result, *Burford* abstention is clearly inapplicable to confirmation of the Plan.

66. Finally, there is no merit to claims by the Ullico Receiver that it will be "entirely deprived of a forum to pursue its mandate of administering the Assets of Ullico" (Ullico Obj. ¶ 45), because the Ullico Receiver has put himself in this situation by its failure to abide by the clear rules of the Bankruptcy Code. The Ullico Receiver can file and litigate a proof of claim and its claims for turnover of property in the Bankruptcy Court. There is simply no reason why the issue of property must be litigated in the Delaware court, especially where the purported property is held by a debtor in bankruptcy.

### 3. The Ullico Receiver's Request for Relief from the Automatic Stay Should Be Denied.

67. The Ullico Receiver also seeks relief from the automatic stay in order to pursue a "complete accounting" and "turnover" of Ullico property. (*See, e.g.*, Ullico Mot. ¶ 60.) Relief from the automatic stay is inappropriate here because the three factors cited by the Ullico Receiver (*see* Ullico Mot. ¶ 59) all weigh against relief from the stay. First, the Debtors have already provided information responsive to the Ullico Receiver's discovery requests. Therefore,

37

the action in the Delaware state court will only serve to waste time and resources of the Debtors to the detriment of their creditors.  Second, the automatic stay does not prevent the Ullico Receiver from (i) filing a claim in these proceedings; or (ii) commencing an adversary proceeding for a determination as to the ownership of the property held by the Debtors, which is the proper vehicle for adjudicating this issue.  Third, the Ullico Receiver has no probability of prevailing on the merits, because, as evidenced by the discovery provided by the Debtors, the Restricted Account containing Ullico funds contains less than $8,000.

### F.     The UST Objection Should Be Overruled

68.     The UST Objection alleges that Article VIII.M of the Plan is improper because it provides that any late filed claims will be deemed disallowed unless the Court enters an Order allowing for the filing of the late claims.  (*See* UST Obj. ¶¶ 15-17.)  Article VIII.M of the Plan serves a key function by reducing the potential expense that would be incurred by the Plan Administrator if he were required to file formal objections to all potential late filed claims. These cost savings will inure to the benefit of the creditors of the Debtors.  Additionally, the Plan Administrator will be able to more efficiently administer the claims and distribution process as a result of the certainty as to the size of the claims pool that is provided by limitation on late claims contained in Article VIII.M.  Finally, despite the UST assertion to the contrary, Article VIII.M of the Plan does not deprive a late filed claimant of its right to a hearing or due process. First, the Debtors have provided notice of the Bar Date consistent with the Bar Date Order. Further, the Plan allows for a claimant to move the Court for permission to submit a late claim at which point they will have the opportunity to be heard by the Court.  For these reasons, Article VIII.M of the Plan constitutes a prudent cost saving procedure that will benefit the Debtors' creditors and should be approved.  *See In re Residential Capital, LLC*, No. 12-12020 (Bankr.

S.D.N.Y. Dec. 11, 2013) (approving similar provision in a chapter 11 plan providing for the disallowance of late filed claims).

69.     The UST Objection also alleges that Article VI.B.8 of the Plan is improper because it provides that the Litigation Trust Agreement will control to the extent that the terms of the Litigation Trust Agreement and the Plan are inconsistent.  The Litigation Trust Agreement was included in the Plan Supplement and constitutes an integral part of the Plan.  (*See* Plan art. I.A.88.)  Whereas Article VI of the plan provides a general summary of the structure and function of the Litigation Trust, the Litigation Trust Agreement provides a detailed accounting of the manner by which the Litigation Trust will be operated, the duties of the Litigation Trustee and Litigation Trust Oversight Board, and the rights of the Litigation Trust Beneficiaries.  Article VI.B.8 represents the sensible proposition that this detailed, specific document should govern over the general provisions of Article VI of the Plan.  Additionally, no potential beneficiaries of the Litigation Trust have objected to this provision of the Plan.  For these reasons, the UST objection to Article VI.B. of the Plan should be overruled.

## G.     The Debtors Have Attempted to Resolve the IRS Objection

70.     Prior to and following the filing of the IRS Objection, the Debtors engaged in discussions with the IRS to resolves the issues that were included in the IRS Objection.  In order to resolve its objection, the IRS proposed the following language for inclusion in the Proposed Confirmation Order:

> Notwithstanding anything to the contrary in the Plan, this Confirmation Order, or any documents implementing the Plan (collectively, the "Confirmation Documents"), nothing shall:  (a) affect the ability of the Internal Revenue Service ("IRS") to pursue any non-Debtors to the extent allowed by non-bankruptcy law for any liabilities that may be related to any federal tax liabilities owed by the Debtors or the Debtors' Estates; (b) affect the rights of the United States to assert setoff and recoupment and such rights are expressly preserved; (c) discharge any claim of the IRS described

39

in section 1141(d)(6) of the Bankruptcy Code; (d) cause an amendment to an IRS claim without prior authorization from the Bankruptcy Court or the Litigation Trustee to result in that claim being deemed disallowed or expunged pursuant to Article VIII(M) of the Plan; (e) require the IRS to file an Administrative Claim in order to receive payment for any liability described in section 503(b)(1)(B) and (C) of the Bankruptcy Code; or (f) confer exclusive jurisdiction over IRS claims and issues arising therefrom. To the extent the IRS's Priority Tax Claims (including any penalties, interest, or additions to tax entitled to priority under the Bankruptcy Code), if any, are not paid in full in cash on the Effective Date, the IRS's Priority Tax Claims shall accrue interest commencing on the Effective Date at the rate and method set forth in 26 U.S.C. sections 6621 and 6622 and, at a minimum, shall be paid in full in equal quarterly installment payments in cash over a period not to exceed five years after the date of the order for relief under section 301 of the Bankruptcy Code, all as required by 11 U.S.C. § 1129(a)(9)(C). Administrative Claims of the IRS allowed pursuant to the Plan or section 503 of the Bankruptcy Code, if any, shall be paid in full in cash as soon as practicable after the Effective Date and accrue interest and penalties as provided by non-bankruptcy law until paid in full. Moreover, without limiting the foregoing, nothing in the Confirmation Documents shall: (a) bind the IRS to any characterizations for tax purposes of any transaction or valuation of property as set forth in the Confirmation Documents and the Debtors and the Liquidation Trustee shall comply with the provisions of the Internal Revenue Code; (b) be construed as a compromise or settlement of any IRS claim or interest; (c) effect a release, discharge, or otherwise preclude any claim whatsoever against any Debtor by or on behalf of the IRS relating to any liability arising out of any unfiled prepetition or post-petition tax return or any pending audit or audit which may be performed with respect to any prepetition or post-petition tax return; or (d) enjoin the IRS from amending any Claim against any Debtor with respect to any tax liability arising as a result of the filing of an unfiled return or a pending audit or audit that may be performed with respect to any prepetition or post-petition tax return. Further, any liability arising as a result of an unfiled return or final resolution of a pending audit or audit which may be performed with respect to any pre-petition or post-petition tax return shall be paid in accordance with sections 1129(a)(9)(A) and (C) of the Bankruptcy Code.

71. The Debtors have included the majority of the IRS proposed language in the Confirmation Order subject to the following revisions:

Notwithstanding anything to the contrary in the Plan, this Confirmation Order, or any documents implementing the Plan (collectively, the "Confirmation Documents"), nothing shall: (a) affect the ability of the Internal Revenue Service ("IRS") to pursue any non-Debtors to the extent allowed by non-bankruptcy law for any liabilities that may be related to any federal tax liabilities owed by the Debtors or the Debtors' Estates; (b) affect the rights of the United States to assert setoff and recoupment and such rights are expressly preserved; (c) discharge any claim of the IRS described in section 1141(d)(6) of the Bankruptcy Code; (d) cause an amendment to an IRS claim without prior authorization from the Bankruptcy Court or the Litigation Trustee to result in that claim being deemed disallowed or expunged pursuant to Article VIII(M) of the Plan; (e) require the IRS to file an Administrative Claim in order to receive payment for any liability described in section 503(b)(1)(B) and (C) of the Bankruptcy Code; or (f) confer exclusive jurisdiction over IRS claims and issues arising therefrom. To the extent the IRS's Priority Tax Claims (including any penalties, interest, or additions to tax entitled to priority under the Bankruptcy Code), if any, are not paid in full in cash on the Effective Date, the IRS's Priority Tax Claims shall accrue interest commencing on the Effective Date at the rate and method set forth in 26 U.S.C. sections 6621 and 6622 and, at a minimum, shall be paid in full in equal quarterly installment payments in cash over a period not to exceed five years after the date of the order for relief under section 301 of the Bankruptcy Code, all as required by 11 U.S.C. § 1129(a)(9)(C). Administrative Claims of the IRS allowed pursuant to the Plan or section 503 of the Bankruptcy Code, if any, shall be paid in full in cash as soon as practicable after the Effective Date and accrue interest and penalties as provided by non-bankruptcy law until paid in full. Moreover, without limiting the foregoing, nothing in the Confirmation Documents shall: (a) bind the IRS to any characterizations for tax purposes of any transaction or valuation of property as set forth in the Confirmation Documents and the Debtors and the Liquidation Trustee shall comply with the provisions of the Internal Revenue Code; (b) be construed as a compromise or settlement of any IRS claim or interest; (c) effect a release, discharge, or otherwise preclude any claim whatsoever against any Debtor by or on behalf of the IRS relating to any liability arising out of any unfiled prepetition or post-petition tax return or any pending audit or audit which may be performed with respect to any prepetition or post-petition tax return; or (d) enjoin the IRS from amending any Claim against any Debtor with respect to any tax liability arising as a result of the filing of an unfiled return or a pending audit or audit that may be performed with respect to any prepetition or post-petition tax

return. Further, any liability arising as a result of an unfiled return or final resolution of a pending audit or audit which may be performed with respect to any pre-petition or post-petition tax return shall be paid in accordance with sections 1129(a)(9)(A) and (C) of the Bankruptcy Code.

72. The Debtors requested the revisions to the IRS Proposal as they believe that the deleted language is duplicative of language already included in the Plan or Proposed Confirmation Order, or simply recited treatment otherwise mandated by the Bankruptcy Code. For example, Article XI.E of the Plan, entitled "Discharge of Claims and Equity Interests," states that the discharge contained in the Plan is already subject to section 1141(d). Similarly, Article II.B.3 of the Plan already provides that Priority Tax Claims, to the extent they are not paid in full on the Effective Date, will be paid in accordance with section 1129(a)(9)(C). As such, the Debtors believe that the additional language requested by the IRS is duplicative and unnecessary. The Debtors have included the remaining language proposed by the IRS in the Confirmation Order, and otherwise reserve their rights with respect to the IRS Objection.

**H.      The Board Objection Is Baseless**

73. The Board Objection alleges that the Plan is improper because they have not been provided specific assurance that their fees, which they assert constitute Administrative Expense Claims, will be paid. (*See* Board Obj. ¶ 3.) The Plan specifically provides that Allowed Administrative Expense Claims will be paid in full. (*See* Plan art. III.A.2.) To the extent that the Board's fees constitute Administrative Expense Claims that are Allowed, they will be paid in accordance with Article III.A.2 of the Plan. The Board also alleges that the Plan is improper because it does not provide for the purchase of "tail" director and officer insurance. However, the Bankruptcy Code does not require that the Board be provided "tail" coverage. Thus, the Board's concern over the purchase of such insurance does not constitute a sufficient basis to deny confirmation of the Plan. Accordingly, the Board Objection should be overruled.

DOCS_DE:219128.1 69353/002

## I. The Missouri Department of Revenue Objection Is Baseless

74. The Missouri Department of Revenue Objection should be overruled as the Plan specifically provides that the Debtors will comply with the requirements of section 1129(a)(9)(C) of the Bankruptcy Code. (*See* Plan art. III.A.3.) This treatment is consistent with the Missouri Department of Revenue's rights under the Bankruptcy Code, and the Debtors will act in accordance with the Plan provision.

## J. The Lackawanna Casualty Objection Is Baseless

75. Lackawanna Casualty Corporation ("Lackawanna") asserts that the Debtors have not provided adequate assurance of future performance under the parties' Master Services Agreement (the "MSA"). The Lackawanna Casualty Objection fails as a matter of law and fact.

76. First, Lackawanna has failed to provide any basis for requiring "adequate assurance of future performance" under section 365 of the Bankruptcy Code because it has not alleged—much less demonstrated—that there has been any default under the MSA.[11] Section 365(b)(1) provides that, "*[i]f there has been a default in an executory contract* or unexpired lease of the debtor, the trustee may not assume such contract or lease unless . . . the trustee . . . provides adequate assurance of future performance under such contract or lease." 11 U.S.C. § 365(b)(1) (emphasis added). Accordingly, based upon the plain text of the statute, section 365(b)(1)(C)'s requirement of adequate assurance of future performance is applicable only when there has been a default. *See In re Nat'l Sugar Ref. Co.*, 26 B.R. 765, 768 (Bankr. S.D.N.Y. 1983) ("This Section provides that a debtor in possession has a right to assume an executory contract under which there has been no default without providing adequate assurance of future

---

11. To the extent there has been a default under an *ipso facto* clause, such a default would not trigger the requirements of section 365(b)(1). *See* 11 U.S.C. § 365(b)(2).

performance."); *see also* 3 Collier on Bankruptcy ¶ 365.06[1] (16th ed. 2018) ("If there has been no default, the trustee need not comply with the cure, compensation and adequate assurance requirements of section 365(b).").

77.     Second, even if adequate assurance of future performance were required, the Debtors have met that requirement.  Lackawanna has failed to demonstrate any basis for its assertion that there are unspecified "financial uncertainties surrounding the Debtors' cases." (Lackawanna Casualty Obj. ¶ 12.)   As described above, the Debtors—with the aid of their financial advisors—have prepared and submitted the Debtors' Financial Projections, demonstrating that the Reorganized Debtors will be financially viable post-Effective Date.

### K.     The Remaining Objections Have Been Addressed by the Debtors

78.     As set forth in the chart attached as <u>Exhibit A</u>, the Debtors have negotiated language with the remaining Objectors to resolve their claims or believe that they have addressed the remaining Objections as a result of the revisions included in the Plan, as amended, and in the Confirmation Order.

## II.     THE PLAN SATISFIES THE BANKRUPTCY CODE'S REQUIREMENTS FOR CONFIRMATION AND SHOULD BE APPROVED

79.     To achieve confirmation of the Plan, the Debtors must demonstrate that the Plan satisfies section 1129(a) of the Bankruptcy Code by a preponderance of the evidence. *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 616 n.23 (Bankr. D. Del. 2001).  The Plan satisfies all provisions of section 1129 of the Bankruptcy Code and complies with all other applicable sections of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>").

### A. Section 1129(a)(1): The Plan Complies with the Applicable Provisions of the Bankruptcy Code

80.     Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). The legislative history of section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code governing classification of claims and contents of the plan, respectively. *See* H.R. Rep. No. 95-595, First Session at 412 (1977); S. Rep. No. 95-989, at 126 (1978); *see also In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 223 (Bankr. D.N.J. 2000) ("The legislative history reflects that 'the applicable provisions of chapter 11 [includes sections] such as section 1122 and 1123, governing classification and contents of plan.'") (internal citations and quotation marks omitted).

### B. Section 1122: The Plan's Classification Structure Is Proper

81.     Section 1122(a) of the Bankruptcy Code provides as follows:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

11 U.S.C. § 1122(a). The Plan has nine Classes of Claims against and Equity Interests in the Debtors:[12] (i) Class 1A (Secured First Lien Lender Claims); (ii) Class 1B (First Lien Lender Deficiency Claims); (iii) Class 2 (Other Secured Claims); (iv) Class 3 (Priority Claims); (v) Class 4 (Continuing Vendor Claims and Continuing Retail Agent Claims); (vi) Class 5 (General Unsecured Claims); (vii) Class 6 (510(b) Claims); (viii) Class 7 (Intercompany Claims); and (ix) Class 8 (Old Equity Interests).

---

12. DIP Claims, Administrative Expense Claims, Priority Tax Claims, and U.S. Trustee Fees are not classified and are separately treated under the Plan.

82.     A plan proponent is afforded significant flexibility in classifying claims and interests into different classes, provided that there is a rational legal or factual basis to do so and all claims or interests within a particular class are substantially similar.  *See, e.g.*, *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158-59 (3d Cir. 1993) (noting that a classification scheme is permissible if a legal difference exists between the classes); *In re Kaiser Aluminum Corp.*, No. 02-10429 (JKF), 2006 WL 616243, at *5 (Bankr. D. Del. Feb. 6, 2006) (finding that the classification was proper under section 1122 of the Bankruptcy Code because the scheme reflected the "diverse characteristics" of those claims and interests), *aff'd*, 343 B.R. 88 (D. Del. 2006); *see also In re Chateaugay Corp.*, 89 F.3d 942, 949 (2d Cir. 1996) ("[C]lassification is constrained by two straight-forward rules:  Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason."); *In re Enron Corp.*, No. 01-16034 (AJG), 2004 Bankr. LEXIS 2549, at 203 (Bankr. S.D.N.Y. July 15, 2004).  The classification structure of the Plan is rational and complies with the Bankruptcy Code.  All Claims and Equity Interests within a Class have the same or similar rights against the Debtors.  The Plan provides for the separate classification of Claims against and Equity Interests in the Debtors based upon the differences in legal nature and/or priority of such Claims and Equity Interests.  Moreover, the Plan's classification scheme generally tracks the Debtors' prepetition capital structure and divides the applicable Claims and Equity Interests into Classes based on the underlying instruments giving rise to such Claims and Equity Interests. Accordingly, the classification scheme of the Plan complies with section 1122 of the Bankruptcy Code and should be approved.

### C. Section 1123(a): The Plan's Content Is Appropriate

83. Section 1123(a) of the Bankruptcy Code sets forth seven requirements that a chapter 11 plan (other than a plan of an individual) must satisfy. *See* 11 U.S.C. § 1123(a). The Plan fully satisfies each such applicable requirement:

- The Plan designates Classes of Claims and Classes of Equity Interests as required by section 1123(a)(1). (*See* Plan art. II.)

- The Plan specifies whether each Class of Claims and Equity Interests is impaired or unimpaired under the Plan as required by section 1123(a)(2). (*See* Plan art. II.C.)

- The Plan specifies the treatment of any Class of Claims or Equity Interests that is impaired as required by section 1123(a)(3). (*See* Plan art. III.)

- Except as otherwise agreed to by a holder of a particular Claim or Equity Interest, the opportunity for recovery for holders of each Claim or Equity Interest in each Class is the same as the opportunity for recovery for all holders in such Class, as required by section 1123(a)(4). (*See* Plan art. III.)

- Section 1123(a)(4) permits variations in the ultimate form of the recovery received by holders of interests in the same class, where the plan offers each such holder the same treatment options.[13] Indeed, a plan "does not require precise equality, only approximate equality."[14] This standard therefore allows for deviations in procedural recovery for holders of claims in the same class, where such deviations are based on legitimate reasoning.[15] Each of the Classes meet this standard. Accordingly, the Debtors have satisfied the requirements of section 1123(a)(4).

- The Plan provides adequate means for its implementation as required by section 1123(a)(5) through, among other things: (i) the issuance, or execution and delivery of New Equity Interests to the Holders (or designees) of Allowed Secured First Lien Lender Claims (Plan art. V.A); (ii) the continued corporate

---

13. *See In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3rd Cir. 2013) ("[C]ourts have interpreted the 'same treatment' requirement to mean that all claimants in a class must have 'the same opportunity' for recovery."); *In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2008) ("The key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity.").

14. *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (quoting *In re Quigley Co., Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007)); *see also In re Multiut Corp.*, 449 B.R. 323, 334 (Bankr. N.D. Ill. 2011) (same).

15. The "differences in the timing of distributions and other procedural variations that have a legitimate basis do not generally violate § 1123(a)(4) unless they produce a substantive difference in a claimant's opportunity to recover." *In re W.R. Grace & Co.*, 729 F.3d 311, 327.

47

existence and operation of each of the Debtors as a Reorganized Debtor after the Effective Date of the Plan, and the vesting of all property of each Debtor's Estate and any property acquired by the Debtors under the Plan free and clear of all Claims, liens, charges or other encumbrances or interests (Plan art. V.B.); (iii) the execution of any Restructuring Transactions as may be necessary or appropriate to effect the restructuring of the Debtors, deemed to occur on the Effective Date (Plan art. V.C); (iv) funding of the Exit Facility, New Term Loan Facility, and Litigation Trust Facility (Plan art. V.D); (v) the cancellation of existing securities and agreements (Plan art. V.E); (vi) the authorization and approval of all corporate actions set forth in the Plan on the Effective Date (Plan art. V.F); (vii) vesting of all rights and powers to implement the provisions of the Plan in the Plan Administrator on the Effective Date (Plan art. V.G); (viii) consummation of all transactions contemplated in the Equity Purchase Agreement on the Effective Date (Plan art. V.H); and (ix) the preservation of all Causes of Action not expressly waived, relinquished, exculpated, released compromised, settled, transferred, or assigned under the Plan and vesting of such Causes of Action in the Litigation Trust (Plan art. V.L).

- The form of the governing corporate documents of the Debtors have been or will be amended on or prior to the Effective Date to prohibit the issuance of non-voting equity securities, in accordance with section 1123(a)(6) of the Bankruptcy Code. (*See* Plan Supplement Ex. H.)

84. Accordingly, the requirements of section 1123(a) of the Bankruptcy Code have been satisfied.

### D. Section 1123(b): The Plan's Content Is Permitted

#### 1. Plan Permissive Provisions.

85. Section 1123(b) of the Bankruptcy Code sets forth permissive provisions that may be incorporated into a chapter 11 plan. Each provision of the Plan is consistent with section 1123(b):

- Section 1123(b)(1). As contemplated by section 1123(b)(1) of the Bankruptcy Code, Articles II and III of the Plan provide that: (i) Class 2 (Other Secured Claims) and Class 3 (Priority Claims) are Unimpaired, and (ii) Class 1A (Secured First Lien Lender Claims), Class 1(B) (First Lien Lender Deficiency Claims), Class 4 (Continuing Vendor Claims and Continuing Retail Agent Claims), Class 5 (General Unsecured Claims), Class 6 (510(b) Claims), Class 7 (Intercompany Claims), and Class 8 (Old Equity Interests) are Impaired;

- Section 1123(b)(2). Unless otherwise specified in the Plan, the Plan provides

for the rejection of all executory contracts and unexpired leases upon the Effective Date, except for any executory contract or unexpired lease that (a) is designated as a contract or lease to be assumed on the Assumption Schedule, (b) previously has been assumed, assumed and assigned, or rejected pursuant to a Final Order of the Bankruptcy Court, or (c) is the subject of a separate motion for assumption or rejection under section 365 of the Bankruptcy Code filed by the Debtors before the Confirmation Date. (*See* Plan art. VII.A.) There has been one objection to the Debtors' assumption of executory contracts and unexpired leases (or the applicable Cure amounts in connection thereto) pursuant to Article VII of the Plan;

- Section 1123(b)(3)(A) and (B). As permitted by section 1123(b)(3)(A) of the Bankruptcy Code, Article XI.G of the Plan provides for a release of claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, remedies, or liabilities, including any derivative claims, owned by the Debtor. Moreover, as permitted by section 1123(b)(3)(B) of the Bankruptcy Code, Article VI.B of the Plan vests the Litigation Claims in the Litigation Trust automatically on the Effective Date, except as otherwise provided in the Plan;

- Section 1123(b)(4). The Plan does not provide for the sale of all or substantially all of the property of the Debtors' estates;

- Section 1123(b)(5). The Plan modifies the rights of holders of Claims or Interests in the Impaired Classes, and leaves unaffected the rights of holders of Claims or Interests in the Unimpaired Classes;

- Section 1123(b)(6). Plan Articles XI.G and H contain certain release and exculpation provisions that are essential to the reorganization and consistent with the applicable provisions of the Bankruptcy Code and Third Circuit precedent. In addition, Article V.A of the Plan provides that the offer, issuance, and distribution of the New Common Stock and the New Warrants (and the New Common Stock issuable upon exercise thereof) to the holders of Allowed Secured First Lien Lender Claims (or their designees), as applicable, under Article V of the Plan; and

- Consistent with section 1123(d) of the Bankruptcy Code, Cure amount disputes will be resolved by the Debtors or Reorganized Debtors and the applicable counterparty in the ordinary course, and the agreed-upon amounts shall be paid by the Debtors or Reorganized Debtors in the ordinary course.

Accordingly, each of the foregoing permissive provisions is consistent with section 1123(b) of the Bankruptcy Code.

### E. Section 1129(a)(2): The Debtors Have Complied with the Bankruptcy Code

86. Section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(2). The legislative history to section 1129(a)(2) indicates that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code. *See* H.R. Rep. No. 95-595, at 412 (1977) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also PWS Holding Corp.*, 228 F.3d at 248; *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 759 (Bankr. S.D.N.Y. 1992) (citations omitted).

#### 1. Section 1125: Postpetition Disclosure Statement and Solicitation.

87. Section 1125(b) of the Bankruptcy Code provides, in pertinent part, that:

> An acceptance or rejection of a plan may not be solicited after the commencement of [a] case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

11 U.S.C. § 1125(b).

88. By entry of the Disclosure Statement Order on March 14, 2018, the Court approved the Disclosure Statement as containing "adequate information" pursuant to section 1125(b). As set forth in the Voting Certification, the Debtors solicited votes on the Plan consistent with the Court-approved solicitation procedures set forth in the Disclosure Statement Order. (*See* Voting Certification ¶ 4.) Further, in compliance with section 1125(b), the Debtors did not solicit acceptances of the Plan from any holder of a Claim or Equity Interest prior to entry of the Disclosure Statement Order.

### 2. Section 1126: Acceptance of the Plan.

89. Section 1126 of the Bankruptcy Code sets forth the procedures for soliciting votes on a chapter 11 plan and determining acceptance thereof. Pursuant to section 1126, only holders of allowed claims or equity interests, as the case may be, in impaired classes of claims or equity interests that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject such plan. Section 1126 provides, in pertinent part, that:

> (a) The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan.
>
> . . .
>
> (f) Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.
>
> (g) Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.

11 U.S.C. § 1126(a), (f), (g).

90. As discussed above, the only Impaired Classes entitled to vote on the Plan were Class 1A (Secured First Lien Lender Claims), Class 1B (First Lien Lender Deficiency Claims), Class 4 (Continuing Vendor Claims and Continuing Retail Agent Claims) and Class 5 (Unsecured Notes Claims) (the "Voting Classes"). As set forth in the Voting Certification and above, the Debtors solicited acceptances of the Plan from the holders in Class 1A/1B, Class 4,

and Class 5 in accordance with section 1126 of the Bankruptcy Code. (Voting Certification ¶¶ 5-6.)

91. The Debtors did not solicit votes for the Plan by any holder of Claims or Interests, as applicable, in (i) Class 2 (Other Secured Claims) and (ii) Class 3 (Priority Claims), as such Classes are Unimpaired and, therefore, deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

92. The Debtors also did not solicit votes for the Plan by any holder of Claims in (i) Class 6 (510(b) Claims), (ii) Class 7 (Intercompany Claims), and (iii) Class 8 (Old Equity Interests), as holders of such Claims did not receive or retain any property on account of their Claims under the Plan and, therefore, are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code.

93. The Debtors also did not solicit votes for the Plan by any holder of Claims in Class 4 (Continuing Vendor Claims and Continuing Retail Agent Claims) since the class was ultimately empty.

94. Section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance of a plan by impaired classes of claims entitled to vote to accept or reject the plan:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c).

95. As evidenced in the Voting Certification, the Plan has been 100 percent accepted by the holders of Allowed Claims in Classes 1A and 1B, in excess of two-thirds in amount and one-half in number of those holders who timely voted to accept or reject the Plan.

(Voting Certification Ex. A.)  Based on the foregoing, the Debtors submit that the requirements of sections 1125 and 1126 of the Bankruptcy Code have been satisfied, and thus, the Debtors have satisfied the requirement of section 1129(a)(2) of the Bankruptcy Code.

**F.      Section 1129(a)(3):  The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law**

96.      For the reasons stated in Section I above, the Debtors have acted with the best intentions for creditors in proposing the Plan and have satisfied the good faith requirement of section 1129(a)(3).

**G.      Section 1129(a)(4):  The Plan Provides That Professional Fees and Expenses Are Subject to Court Approval**

97.      Section 1129(a)(4) requires that "any payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."  11 U.S.C. § 1129(a)(4).  Section 1129(a)(4) has been construed to require that all payments of professional fees that are made from estate assets be subject to review and approval as to their reasonableness by the court.  *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 145 (Bankr. D.N.J. 2010) ("Under its clear terms, 'any payment' made or to be made by the plan proponent or the debtor for services 'in or in connection with' the plan or the case must be approved by or 'subject to the approval of' the bankruptcy court as 'reasonable.'"); *In re Lisanti Foods Inc.,* 329 B.R. 491, 503 (D. N.J. 2005) ("Pursuant to § 1129(a)(4), a Plan should not be confirmed unless fees and expenses related to the Plan have been approved, or are subject to the approval, of the Bankruptcy Court."), *aff'd sub nom. In re Lisanti Foods Inc.*, 241 F. App'x 1 (3d Cir. 2007).

98.      All payments for services provided to the Debtors during these Chapter 11 Cases must be approved by the Court as reasonable in accordance with section 1129(a)(4) of the

Bankruptcy Code.  Specifically, Article XI.A of the Plan provides that all fees incurred by retained professionals must be approved by the Court pursuant to final fee applications.  (*See* Plan art. XI.A.)  Further, Article X.A of the Plan provides that the Court shall retain jurisdiction to hear and determine all applications under Bankruptcy Code sections 330, 331, and 503(b) for awards of compensation and reimbursement of expenses incurred before the Confirmation Date. (Plan art. X.A.)  Based on the foregoing, the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

### H. Section 1129(a)(5):  The Debtors Have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders

99.     Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of the proposed officers and directors of the reorganized debtor; that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy; and, to the extent there are any insiders that will be retained or employed by the reorganized debtor, that there be disclosure of the identity and nature of any compensation of any such insiders.  *See* 11 U.S.C. § 1129(a)(5).  If, at the time of confirmation, the debtor is unable to identify these individuals by name, a debtor still satisfies this requirement so long as directors will be appointed consistent with the company's organizational documents and applicable state and federal law.  *In re Charter Commc'ns*, 419 B.R. 221, 260 n.30 (Bankr. S.D.N.Y. 2009) ("Although section 1129(a)(5) requires the plan to identify all directors of the reorganized entity, that provision is satisfied by the Debtors' disclosure at this time of the identities of the *known* directors."); *In re Am. Solar King Corp.*, 90 B.R. 808, 815 (Bankr. W.D. Tex.) ("The subsection does not (and cannot) compel the debtor to do the impossible, however.  If there is no proposed

slate of directors as yet, there is simply nothing further for the debtor to disclose under subsection (a)(5)(A)(i).").

100.     The Debtors have complied with section 1129(a)(5) of the Bankruptcy Code.  The identity and affiliations of the persons proposed to serve as members of the initial boards of the Reorganized Debtors were disclosed in the Plan Supplement, and the appointment to, or continuance in, such positions of such persons is consistent with the interests of creditors and equity security holders and with public policy.  With respect to officers of the Reorganized Debtors, the existing officers of each of the Reorganized Debtors will remain in office on and after the effective date.  The identity of any insider that will be employed or retained by the Reorganized Debtors and the nature of such insider's compensation have also been disclosed.

**I.     Section 1129(a)(6):  The Plan Does Not Contain Any Rate Changes**

101.     Section 1129(a)(6) of the Bankruptcy Code provides that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."  11 U.S.C. § 1129(a)(6).  Section 1129(a)(6) is inapplicable to this case, as the Plan does not provide for any rate changes by the Debtors.

**J.     Section 1129(a)(7):  The Plan Is in the Best Interests of All Creditors and Equity Interest Holders**

102.     Section 1129(a)(7) of the Bankruptcy Code requires that a plan be in the best interests of creditors and stockholders in the debtor—commonly referred to as the "best interests" test.  The best interests test focuses on potential individual dissenting creditors rather than classes of claims.  It requires that each holder of a claim or equity interest either accept the plan or receive or retain under the plan property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were

liquidated under chapter 7 of the Bankruptcy Code on such date. *See Bank of Am. Nat'l Trust &*

*Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999).

> 103.    Under the best interests test,
>
> the court must measure what is to be received by rejecting
> creditors . . . under the plan against what would be received by
> them in the event of liquidation under chapter 7.  In doing so, the
> court must take into consideration the applicable rules of
> distribution of the estate under chapter 7, as well as the probable
> costs incident to such liquidation.

*In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007), *appeal dismissed*,

371 B.R. 660 (S.D.N.Y. 2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008); *see also W.R. Grace & Co.*,

475 B.R. at 141 ("Under the test, every creditor to a Chapter 11 reorganization plan must receive

at least the liquidation value of its claim under the plan as it would in a Chapter 7 proceeding

against the debtor in order for the court to find the plan is in the creditors' best interest.").  The

Court must evaluate the liquidation analysis cognizant of the fact that "'[t]he hypothetical

liquidation entails a considerable degree of speculation about a situation that will not occur

unless the case is actually converted to chapter 7.'"  *In re Affiliated Foods, Inc.*, 249 B.R. 770,

788 (Bankr. W.D. Mo. 2000) (citations omitted); *W.R. Grace & Co.*, 475 B.R. at 142 ("[T]he

court need only make a well-reasoned estimate of the liquidation value that is supported by the

evidence on the record. It is not necessary to itemize or specifically determine precise values

during this estimation procedure. Requiring such precision would be entirely unrealistic because

exact values could only be found if the debtor actually underwent Chapter 7 liquidation.").  As

section 1129(a)(7) makes clear, the liquidation analysis applies only to non-accepting holders of

impaired claims or equity interests.  *See Drexel Burnham Lambert*, 138 B.R. at 761.

Accordingly, the best interests test does not apply to the holders of Claims or Equity Interests in

the Unimpaired Classes.  Similarly, the liquidation analysis does not apply to holders in Classes

1A (Secured First Lien Lender Claims) and 1B (First Lien Lender Deficiency Claims) who voted to accept the Plan.

104.    As set forth in the liquidation analysis attached to the Disclosure Statement as <u>Exhibit D</u> (the "<u>Liquidation Analysis</u>"), the best interests test is satisfied as to holders in Class 5 (Unsecured Notes Claims) who voted to reject the Plan or abstained from voting on the Plan and as to holders of Claims or Interests in Class 6 (510(b) Claims), Class 7 (Intercompany Claims) and Class 8 (Old Equity Interests).  Each holder of an impaired claim or impaired interest that has not accepted the Plan will receive or retain under the Plan on account of such claim or interest, property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.  Furthermore, a chapter 7 liquidation would have significant negative effects on the ultimate proceeds available for distribution in the Chapter 11 Cases, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the claims that would arise from the rejection of executory contracts and unexpired leases that have been assumed in the chapter 11 cases (iii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the forced-sale atmosphere that would prevail, and (iv) substantial increases in claims which would be satisfied on a priority basis or on a parity with creditors in a chapter 11 case.  It is clear that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is not less than such holder would receive or retain if the Debtors were liquidated under chapter 7.  Based upon the foregoing, the Plan satisfies the requirements of section 1129(a)(7).

DOCS_DE:219128.1 69353/002

105.    The Debtors' Liquidation Analysis is sound and reasonable and incorporates justified assumptions and estimates regarding the liquidation of the Debtors' assets and Claims against them, including the following:  (i) liquidation would take approximately six months, during which time all of the Debtors' assets would be sold or otherwise liquidated under the direction of a chapter 7 trustee; (ii) the absence of recoveries from the pursuit of any potential preferences, fraudulent conveyances or other causes of action that may exist, not including the estimated costs of pursuing those actions; (iii) the additional General Unsecured Claims that would arise in connection with the rejection of certain executory contracts and unexpired leases, and other potential claims that may arise in a chapter 7 liquidation; and (iv) additional costs and expenses that would be incurred by the Debtors as a result of a chapter 7 trustee's fees and retention of new professionals.  (*See* Liquidation Analysis at 2-4; Confirmation Decl. ¶ 38.)

106.    The assumptions and estimates in the Liquidation Analysis are appropriate in the context of this Chapter 11 Case and are based upon the knowledge and expertise of the Debtors' advisors.  (Confirmation Decl. ¶ 39.)  The Debtors' advisors have intimate knowledge of the Debtors' business and relevant industry and restructuring experience.  (*Id.*)  Accordingly, the Liquidation Analysis clearly demonstrates that the recoveries provided to creditors and equity holders by the Plan far exceed the recoveries they would receive in a hypothetical chapter 7 liquidation, and therefore, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

**K.      The Plan Has Been Accepted by an Impaired Class Entitled to Vote on the Plan, and as to Such Class, Requirements of Bankruptcy Code Section 1129(a)(8) Have Been Satisfied**

107.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired claims or interests accept the plan, as follows:  "With respect to each class of claims or interests—(A) such class has accepted the plan; or (B) such class is not impaired under the plan."

11 U.S.C. § 1129(a)(8).  As set forth above, the holders of Claims or Equity Interests in the Unimpaired Classes are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Section 1126 of the Bankruptcy Code provides that a plan is accepted by an impaired class of claims if the accepting class members hold at least two-thirds in amount and more than one-half in number of the claims in their respective class.  11 U.S.C. § 1126(c).

108.    The holders of Claims in Classes 1A (Secured First Lien Lender Claims) and 1B (First Lien Lender Deficiency Claims) have voted to accept the Plan in accordance with section 1126 of the Bankruptcy Code.  (*See* Voting Certification Ex. A.)  As discussed above, however, pursuant to section 1126(g) of the Bankruptcy Code, holders of Claims in Classes 6 (501(b) Claims) and 7 (Intercompany Claims) and holders of Equity Interests in Class 8 (Old Equity Interests) are conclusively deemed to reject the Plan.  Furthermore, holders of Claims in Class 5 (General Unsecured Claims) failed to satisfy the requirements of section 1126(c), although 65.08% of the class by number voted to accept the Plan (Voting Certification Ex. A), because the accepting votes did not satisfy the two-thirds amount requirement.  Nevertheless, as discussed more fully below, the Plan satisfies the "cram down" requirements under section 1129(b) of the Bankruptcy Code and, accordingly, may be confirmed notwithstanding the deemed rejection by Classes 6, 7, and 8, and the vote to reject by Class 5.

**L.      Section 1129(a)(9):  The Plan Provides for Payment in Full of All Allowed Priority Claims**

109.    Under Article III.A and Article XI.B of the Plan, holders of Allowed Administrative Expense Claims, Allowed DIP Claims, Allowed Priority Tax Claims, and U.S. Trustee Fees, respectively, except to the extent such holders agree to less favorable treatment, will be paid Cash in an amount equal to such Claims on, or as soon as is reasonably practicable

after the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim. (*See* Plan arts. III.A.2, XI.B.) The Plan, therefore, satisfies the requirements of section 1129(a)(9)(A) and (B).

110. The Plan also satisfies the requirements of section 1129(a)(9)(C) of the Bankruptcy Code in respect of the treatment of Priority Tax Claims. Pursuant to Article III.A.3 of the Plan, except as otherwise may be agreed, holders of Allowed Priority Tax Claims will be paid, at the option of the Reorganized Debtors and the First Lien Agents, (a) on the Effective Date, Cash equal to the due and unpaid portion of such Allowed Priority Tax Claim, (b) treatment in a manner consistent with Bankruptcy Code Section 1129(a)(9)(C), or (c) such different treatment as to which such Holder, the Debtors and the First Lien Agents shall have agreed upon in writing. (Plan art. III.A.3.) Accordingly, the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

## M. Section 1129(a)(10): At Least One Class of Impaired Claims Has Accepted the Plan

111. Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). As set forth above and in the Voting Certification, Classes 1A (Secured First Lien Lender Claims) and 1B (First Lien Lender Deficiency Claims) are impaired and have voted to accept the Plan, even excluding the acceptance of the Plan by any insiders in those Classes. Accordingly, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

DOCS_DE:219128.1 69353/002

### N.    Section 1129(a)(11):  The Plan Is Feasible

112.    Section 1129(a)(11) of the Bankruptcy Code requires the bankruptcy court to determine that a plan is feasible as a condition precedent to confirmation.  Specifically, it requires that confirmation is not likely to be followed by liquidation of the debtor, unless such liquidation is proposed in the plan.  11 U.S.C. § 1129(a)(11).  The feasibility test set forth in section 1129(a)(11) requires the bankruptcy court to determine whether a plan may be implemented and has a reasonable likelihood of success.  *See United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990); *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988).  Section 1129(a)(11) does not, however, require a guarantee of a plan's success; rather, the appropriate inquiry is whether a plan offers a reasonable assurance of success.  *See Am. Capital Equip.*, 688 F.3d at 162; *Tribune Co.*, 464 B.R. at 185; *In re Applied Safety, Inc.*, 200 B.R. 576, 584 (Bankr. E.D. Pa. 1996) (discussing the standard under 1129(a)(11) and stating that "it is not necessary for plan success to be guaranteed, nor is the feasibility requirement generally viewed as rigorous"); *see also Drexel Burnham Lambert*, 138 B.R. at 762 ("The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since a guarantee of the future is not required.") (citations omitted); *In re Texaco, Inc.*, 84 B.R. 893, 910 (Bankr. S.D.N.Y. 1988) ("All that is required is that there be reasonable assurance of commercial viability.").  A debtor must prove a chapter 11 plan's feasibility by a preponderance of the evidence.  *See Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 801 (5th Cir. 1997); *see also W.R. Grace & Co.*, 475 B.R. at 114 ("The debtor bears the burden of proof on this inquiry, and must show by a preponderance of the evidence that a reorganization plan is feasible."); *see also Exide Techs.*, 303 B.R. at 58 ("The plan proponent bears the burden of establishing the plan's compliance with each of the requirements set forth in § 1129(a)"); *Genesis Health Ventures*, 266

61

B.R. at 598-99 ("To confirm a proposed Chapter 11 plan of reorganization, the proponent bears the burden of establishing the plan's compliance with each of the thirteen elements of 11 U.S.C. § 1129(a).").

113.     The key element of feasibility is whether there is a reasonable probability that the provisions of the plan can be performed.  The purpose of the feasibility test is to protect against visionary or speculative plans.  *Pizza of Hawaii, Inc. v. Shakey's, Inc.* (*In re Pizza of Hawaii, Inc.*), 761 F.2d 1374, 1382 (9th Cir. 1985) ("The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.") (citations omitted); *see also W.R. Grace & Co.*, 475 B.R. at 114 ("The purpose of the feasibility requirement is to prevent court confirmation of 'visionary schemes.'").  In assessing feasibility, courts have identified, among others, the following probative factors:

(a)     the prospective earnings or earning power of the debtor's business;

(b)     the soundness and adequacy of the capital structure and working capital for the debtor's post-confirmation business;

(c)     the debtor's ability to meet its capital expenditure requirements;

(d)     economic conditions;

(e)     the ability of management and the likelihood that current management will continue; and

(f)     any other material factors that would affect the successful implementation of the plan.

*See, e.g.*, *Indianapolis Downs*, 486 B.R. at 298; *see also In re The Prudential Energy Co.*, 58 B.R. 857, 862-63 (Bankr. S.D.N.Y. 1986); *In re Clarkson*, 767 F.2d 417, 420 (8th Cir. 1985);

*In re Sound Radio, Inc.*, 93 B.R. 849, 856 (Bankr. D.N.J. 1988), *aff'd in part*, *remanded in part*, 103 B.R. 521 (D.N.J. 1989), *aff'd sub nom. In re Sound Radio Inc.*, 908 F.2d 964 (3d Cir. 1990).

114. For purposes of determining whether the Plan satisfies the above-described feasibility standards, the Debtors have analyzed their ability to fulfill their obligations under the Plan. (Confirmation Decl. ¶¶ 45-46.) As part of this analysis, the Debtors, with the assistance of their financial advisors, prepared projected financial information for the post-Effective Date period of fiscal years 2018 through 2020 (the "Projection Period") for the Post-Effective Date Debtors. (*Id.* ¶ 45.) These projections, and the assumptions on which they are based, are included in the Debtors' Financial Projections, as set forth in Exhibit F to the Disclosure Statement. (*Id.*) Based upon such projections and as set forth in the Confirmation Declaration, the Debtors submit that all payments required to be made pursuant to the Plan will be made and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization. (*Id.* ¶¶ 44, 46.) Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement imposed by the Bankruptcy Code.

115. Underlying the Projections is a set of sound, closely-examined assumptions. (*Id.* ¶ 45.) Key personnel from all of the Debtors' operating areas and across various functions provided input in the development of the Projections. (*Id.*) The Projections were also carefully reviewed by, and reflect the input of, the advisors of the First Lien Lenders. (*Id.*) In preparing the Projections, the Debtors incorporated material considerations pertaining to the current price environment, historical operating and production performance, and operating costs. (*Id.*) Further, the Projections anticipate sufficient liquidity to counter unanticipated economic downturns. (*Id.* ¶ 46.)

116. The Projections demonstrate that the Reorganized Debtors will be able to meet their obligations under the Plan. (*Id*.) Confirming the Plan will enable the Reorganized Debtors to refinance the prepetition Financing Agreement with Cerberus in full with the funds raised through the Exit Financing as well as the New Term Loan Facility. This agreement has been subject to default forbearances by the lenders, preventing the lenders from exercising their remedies in the wake of the Debtors' prepetition defaults for the duration of these Chapter 11 Cases. (*Id.* ¶ 25.) Refinancing this credit agreement will allow the Reorganized Debtors and their business enterprise as a whole to operate without risk of default on their secured debt. (*See id.* ¶ 46.) The Exit Financing will also supply the Reorganized Debtors with additional and necessary funding to operate their businesses and satisfy its obligations on a go-forward basis upon emergence. (*See id.*) As a result, after honoring their obligations under the Plan, the Reorganized Debtors will have sufficient capital and liquidity to operate their businesses and satisfy ongoing obligations as they become due. (*See id.*)

117. For these reasons, the Plan provides for an achievable scheme of reorganization and shows that the Plan carries a reasonable likelihood of success. Accordingly, the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code and should be approved.

### O.  Section 1129(a)(12):  All Statutory Fees Have or Will Be Paid

118. Section 1129(a)(12) requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan . . . ." 11 U.S.C. § 1129(a)(12). Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930] of title 28" are afforded priority as administrative expenses. 11 U.S.C. § 507(a)(2). In accordance with sections 507 and

1129(a)(12) of the Bankruptcy Code, Article XI.B of the Plan provides that on the Effective Date

and thereafter as may be required, such fees, if any, shall be paid by the Reorganized Debtors.

(*See* Plan art. XI.B.)

    **P.**    **Section 1129(a)(13): Continuation of Retiree Benefits**

    119.    Section 1129(a)(13) requires that:

> The plan provides for the continuation after its effective date of
> payment of all retiree benefits, as that term is defined in section
> 1114 of this title, at the level established pursuant to subsection
> (e)(1)(B) or (g) of section 1114 of this title, at any time prior to
> confirmation of the plan, for the duration of the period the debtor
> has obligated itself to provide such benefits.

11 U.S.C. § 1129(a)(13). The Debtors do not believe that they have any retiree benefit

obligations. Nevertheless, to the extent that the Debtors have any retiree benefit obligations, all

employee compensation and benefit plans of the Debtors shall be deemed to be, and will be

treated as, executory contracts under the Plan and, on the Effective Date, will be assumed.

(Confirmation Decl. ¶ 48.) Accordingly, the Plan satisfies the requirements of section

1129(a)(13).

    **Q.**    **Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16): Inapplicable Provisions**

    120.    Section 1129(a)(14) of the Bankruptcy Code relates to the payment of

domestic support obligations. The Debtors are not subject to any domestic support obligations.

Thus, section 1129(a)(14) does not apply. (*See* Confirmation Decl. ¶ 52.)

    121.    Section 1129(a)(15) of the Bankruptcy Code applies only in cases in

which the debtor is an "individual" (as that term is defined in the Bankruptcy Code). The

Debtors are not "individuals." Accordingly, section 1129(a)(15) is inapplicable. (*See id.*)

    122.    Section 1129(a)(16) of the Bankruptcy Code applies to transfers of

property by a corporation or trust that is not a moneyed, business, or commercial corporation or

trust.  The Debtors are commercial corporations.  Accordingly, section 1129(a)(16) is inapplicable.  (*See id.*)

**R.      Section 1129(b):  The Plan Satisfies the "Cram Down" Requirements for Non-Accepting Classes**

123.    Section 1129(b) of the Bankruptcy Code provides a mechanism (known colloquially as "cram down") for confirmation of a chapter 11 plan in circumstances where the plan is not accepted by all impaired classes of claims.  Under section 1129(b), the court may "cram down" a plan over the dissenting vote of an impaired class or classes of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.

124.    By its express terms, section 1129(b) of the Bankruptcy Code is only applicable to a class of creditors that rejects a plan.  *See* 11 U.S.C. § 1129(b) ("[T]he court . . . shall confirm the plan notwithstanding the requirements of [section 1129(a)(8)] if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, *and has not accepted*, the plan.") (emphasis added).  Accordingly, a dissenting creditor in an accepting class lacks standing to object to the plan on the basis of unfair discrimination or absolute priority.  *See Kane v. Johns-Manville Corp.*, 843 F.2d at 650 (refusing to consider objection of dissenting creditor in accepting class because 1129(b) did not need to be satisfied as to an accepting class); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1062 (3d Cir. 1987) (overruling cram down objection because objecting party was a member of an accepting class and therefore 1129(b)(1) afforded no protection to such party); *In re United Marine, Inc.*, 197 B.R. 942, 948 (Bankr. S.D. Fla. 1996) (overruling absolute priority objection of a dissenting creditor in an accepting class because "the absolute priority rule . . . only comes into play in the context of cram down of an impaired rejecting class").  As discussed above, the

66

holders of Claims in Classes 1A (Secured First Lien Lender Claims) and 1B (First Lien Lender Deficiency Claims) have voted to accept the Plan in accordance with section 1126 of the Bankruptcy Code and the Unimpaired Classes are deemed to accept the Plan. Accordingly, cram down is only relevant to the Classes that have rejected or have been deemed to reject the Plan— Class 5 (General Unsecured Claims), Class 6 (510(b) Claims), Class 7 (Intercompany Claims) and Class 8 (Old Equity Interests).

125.　As discussed below, the Plan may be confirmed as to each of these Classes pursuant to the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

### The Plan Does Not Discriminate Unfairly

126.　Section 1129(b)(1) does not prohibit all discrimination between classes. Rather, it prohibits discrimination that is unfair. Under section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where classes of similarly-situated claims or interests are treated differently without a reasonable basis for the disparate treatment. *See Armstrong*, 348 B.R. at 121 (noting that the "'hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination.'") (citing *In re Lernout & Hauspie Speech Prod., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003), *aff'd*, 308 B.R. 672 (D. Del. 2004)); *In re WorldCom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *59 (Bankr. S.D.N.Y. Oct. 31, 2003) (citing *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990)); *In re Johns-Manville Corp.,* 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, *In re Johns-Manville Corp.*, 78 B.R. 407 (S.D.N.Y. 1986), *aff'd sub nom. Kane v. Johns-Manville Corp.,* 843 F.2d 636 (2d Cir. 1988). As between two classes of claims or two classes of equity interests, there is no unfair discrimination if (i) the classes are comprised of dissimilar claims or interests, *see, e.g.*, *Johns-Manville Corp.*, 68 B.R. at 636, or (ii) taking into account the particular

facts and circumstances of the case, there is a reasonable basis for such disparate treatment. *See, e.g.*, *Drexel Burnham Lambert*, 138 B.R. at 715 (separate classification and treatment was rational where members of each class "possess[ed] different legal rights"); *Jersey City Med. Ctr.*, 817 F.2d at 1061 (approving classification of general unsecured creditors into different classes with different legal bases: doctors' indemnification claims, medical malpractice claims, employee benefit claims and trade claims).

127. The Plan does not discriminate unfairly with respect to any rejecting Class. Class 6 (510(b) Claims) was classified pursuant to the statutory mandate of section 510(b) of the Bankruptcy Code. Indeed, in order to comply with section 1129(a)(1) of the Bankruptcy Code, which requires that a plan comply with applicable provisions of the Bankruptcy Code, section 510 of the Bankruptcy Code must be enforced. Claims in Class 6 are not similarly situated to any other Claims, and the disparate treatment of such Class in comparison to other Classes of Claims that are not subordinated does not constitute "unfair discrimination." Classes 5 (General Unsecured Claims), 7 (Intercompany Claims), and 8 (Old Equity Interests) are legally distinct in nature from all other Classes. All Claims in Class 5 are classified together and afforded the same treatment under the Plan. Likewise, all Claims in Class 7 are classified together and afforded the same treatment under the Plan. All Equity Interests in Class 8 are classified together and afforded the same treatment under the Plan. Accordingly, there is no unfair discrimination among holders of Claims or Equity Interests in Classes 5, 6, 7 or 8. *See In re Rubicon U.S. REIT, Inc.*, 434 B.R. 168, 179 (Bankr. D. Del. 2010) (confirming plan where common stock equity interests were classified together and afforded same treatment under plan); *see also In re Extended Stay Inc.,* No. 09-13764 (JMP), 2010 WL 6561113, at *10 (Bankr.

S.D.N.Y. July 20, 2010) (plan did not unfairly discriminate with respect to rejecting class of equity interests where no holders of equity interests were treated differently).

128.    Accordingly, the Plan does not "discriminate unfairly" with respect to any Impaired Classes of Claims or Interests.

### The Plan Is Fair and Equitable

129.    Sections 1129(b)(2)(B)(ii) and (b)(2)(C)(ii) of the Bankruptcy Code provide that a plan is fair and equitable with respect to a class of impaired unsecured claims or interests if under the plan no holder of any junior claim or interest will receive or retain property under the plan on account of such junior claim or interest. *See* 11 U.S.C. § 1129(b)(2)(B)(ii), (C)(ii).

130.    Distributions under the Plan are made in the order of priority prescribed by the Bankruptcy Code and in accordance with the absolute priority rule. The Plan complies with the absolute priority rule as no Claims or Equity Interests junior to Equity Interests in Class 8 or Claims in Class 6 will receive recoveries under the Plan on account of such Claims or Equity Interests. No holders of Claims senior to those in Class 7 or Equity Interests senior to those in Class 8 will receive recoveries in excess of their respective entitlements under the Bankruptcy Code. Accordingly, the Plan is "fair and equitable" and, therefore, consistent with the requirements of section 1129(b) of the Bankruptcy Code.

### S.    Section 1129(c):  The Plan Is the Only Plan Currently on File

131.    The Plan is the only plan currently on file in this Chapter 11 Case and, accordingly, section 1129(c) of the Bankruptcy Code does not apply. (*See* Confirmation Decl. ¶ 52.)

DOCS_DE:219128.1 69353/002

**T.**     **Section 1129(d):  The Principal Purpose of the Plan Is Not the Avoidance of Taxes**

132.     The principal purpose of the Plan is not the avoidance of taxes or the avoidance of section 5 of the Securities Act of 1933, and no governmental unit has objected to confirmation of the Plan on any such grounds.  (*See id.*)  The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

**U.**     **Section 1129(e):  Inapplicable Provision**

133.     The provisions of section 1129(e) of the Bankruptcy Code apply only to "small business cases."  These Chapter 11 Cases are not "small business cases" as defined in the Bankruptcy Code.  (*See id.*)  Accordingly, section 1129(e) of the Bankruptcy Code is inapplicable in this case.

**V.**     **Section 1127:  Modification of the Plan**

134.     Pursuant to section 1127 of the Bankruptcy Code, a plan proponent may modify a plan at any time before confirmation so long as the plan, as modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the proponent of the modification complies with section 1125 of the Bankruptcy Code.  In addition, with respect to modifications made after acceptance but prior to confirmation of the plan, Bankruptcy Rule 3019 provides, in relevant part:

> [A]fter a plan has been accepted and before its confirmation, the proponent may file a modification of the plan.  If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

Fed. R. Bankr. P. 3019(a).

135.     As described above, the Debtors modified the Plan on March 30, 2018 and on the date hereof.  The Plan, as modified, complies with sections 1122 and 1123 of the Bankruptcy Code, and the Debtors have complied with section 1125 of the Bankruptcy Code.  Accordingly, the requirements of section 1127 have been satisfied.  Moreover, Bankruptcy Rule 3019 is satisfied because the modifications do not impact, let alone materially impact, any creditor's or equity holder's treatment.

## III.     GOOD CAUSE EXISTS TO WAIVE ANY STAY OF THE CONFIRMATION ORDER

136.     The Debtors respectfully request that the Court direct that the Confirmation Order shall be effective immediately upon its entry, notwithstanding the 14-day stay imposed by operation of Bankruptcy Rule 3020(e).  Bankruptcy Rule 3020(e) provides that: "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 3020(e).  The Advisory Committee notes to Bankruptcy Rule 3020(e) state, "the court may, in its discretion, order that Rule 3020(e) is not applicable so that the plan may be implemented and distributions may be made immediately." Fed. R. Bankr. P. 3020(e), Adv. Comm. Notes, 1999 Amend.

137.     Under the circumstances here, it is appropriate for the Court to exercise its discretion to order that Bankruptcy Rule 3020(e) is not applicable and permit the Debtors to consummate the Plan and commence their implementation without delay after the entry of the Confirmation Order.  All the conditions precedent to the Effective Date can be promptly fulfilled (or waived, as applicable).   Additionally, the Debtors are subject to a May 31 deadline to consummate the Plan.  Finally, the Debtors incur additional administrative and professional costs each day that they remain in chapter 11.  The Debtors believe that an expeditious effectuation of the Plan will reduce such costs and facilitate the maximization of value of the Debtors' estates.

DOCS_DE:219128.1 69353/002

Such relief is in the best interests of the Debtors' estates and creditors, and will not prejudice any parties in interest. *See, e.g.*, *In re Arctic Sentinel, Inc.*, No. 15-12465 (CSS) (Bankr. D. Del. Nov. 30, 2016) (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court); *In re Variant Holding Co., LLC*, No. 14-12021 (BLS) (Bankr. D. Del. May 10, 2016) (same); *In re Physiotherapy Holdings, Inc.*, No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013) (same); *In re Gatehouse Media, Inc.*, No. 13-12503 (MFW) (Bankr. D. Del. Nov. 6, 2013) (same); *In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013) (same); *In re Geokinetics Inc.*, No. 13-10472 (KJC) (Bankr. D. Del. Apr. 25, 2013) (same); *In re CHL, Ltd.*, No. 12-12437 (KJC) (Bankr. D. Del. Oct. 4, 2012) (same).

## IV.    CONCLUSION

138.    The Debtors submit that the Plan complies with all of the requirements of section 1129 of the Bankruptcy Code and should be confirmed.

139.    Accordingly, the Debtors respectfully request that the Court enter the Proposed Confirmation Order and grant such other and further relief as it may deem just and appropriate.

Dated: April 20, 2018  
      Wilmington, Delaware

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Peter J. Keane*  _____
Laura Davis Jones (DE Bar No. 2436)
James E. O'Neill (DE Bar No. 4042)
Peter J. Keane (DE Bar No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: ljones@pszjlaw.com
      joneill@pszjlaw.com
      pkeane@pszjlaw.com

  -and-

Kathryn A. Coleman
Christopher Gartman
Dustin P. Smith
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: (212) 837-6000
Facsimile: (212) 422-4726
Email: katie.coleman@hugheshubbard.com
      chris.gartman@hugheshubbard.com
      dustin.smith@hugheshubbard.com

*Attorneys for the Debtors and Debtors in Possession*

| D.I. | Respondent/Objector | Summary of Objection | Response to Objection |
|---|---|---|---|
| 416 | Quentin P. Smith, Jr., Charles H. Walsh, Michael J. Corey, and Christopher A. Pesch (collectively, the "<u>Former Ds&O</u>") | • The Plan fails to satisfy the "good faith" requirement of section 1129(a)(3) because it (i) grants New Equity Interest to Cerberus and (ii) contains Debtors Release in favor of Cerberus. | The Debtors have responded to these arguments in Section I.A of the Memorandum. |
| | | • The Debtor Releases are improper because they release Cerberus. | The Debtors have responded to these arguments in Section I.B of the Memorandum. |
| | | • The Debtor Release are improper because they impair the Former Ds&O contribution claims. | The Debtors have addressed this issue in language incorporated into Section II.XX of the Proposed Confirmation Order, and the revisions to Article XI.I of the Plan. |
| | | • The Exculpations are improperly broad. | The Debtors have responded to these arguments in Section I.C of the Memorandum. |
| 429 | Florida Department of Financial Services, Division of Rehabilitation and Liquidation (Department) as Receiver of Guarantee Insurance Company (the "<u>GIC Receiver</u>") | • The McCarran-Ferguson Act reverse preempts the Bankruptcy Code and prevents the Bankruptcy Court from exercising jurisdiction over certain property held by the Debtors. | The Debtors have responded to these arguments in Section I.D.1 of the Memorandum. |
| | | • The Plan's use of section 502(d) of the Bankruptcy Code is improper. | The Debtors have responded to these arguments in Section I.D.2 of the Memorandum. |
| 482 | Receiver of Ullico Casualty Company in Liquidation (the "<u>Ullico Receiver</u>") | • The Plan lacks good faith because it violates the McCarran-Ferguson Act and the *Younger* and *Burford* abstention doctrines. | The Debtors have responded to these arguments in Sections I.D.1 and I.E.2 of the Memorandum. |

---

1. Capitalized terms used herein but not defined have the meanings given to such terms in the Plan, the Proposed Confirmation Order, the Memorandum, or the relevant Objection, as applicable.

| D.I. | Respondent/Objector | Summary of Objection | Response to Objection |
|------|---------------------|----------------------|-----------------------|
| 548 | Missouri Department of Revenue | • Because the Plan lacks specificity as to timing of payments to Allowed Priority Tax Claims, it should be denied. | The Debtors have responded to these arguments in Section I.I of the Memorandum. |
| 559 | Ullico Receiver Motion for Abstention and Relief from Automatic Stay | • The Court should abstain from exercising jurisdiction pursuant to 28 U.S.C. §§ 1334(c)(2) and 1334(c)(1). | The Debtors have responded to these arguments in Section I.E.1 of the Memorandum. |
| | | • The Court should lift the automatic stay so that the Ullico Receiver can compel turnover of certain assets held by the Debtors. | The Debtors have responded to these arguments in Section I.E.3 of the Memorandum. |
| 565 | Fifth Third Bank | • The Debtors should classify Fifth Third Bank's Claim (No. 206), which is based on a letter of credit issued by Fifth Third Bank for the benefit of Berkley Insurance Company, for sums of $500,000, secured by security interest in bank account ($510,027.10). | The Debtors have addressed this issue in language incorporated into Section II.YY of the Proposed Confirmation Order. |
| | | • The Debtors should amend the Litigation Proceeds Waterfall to include a distribution to Old Equity Interests. | The Debtors have addressed this issue in amendments to Article VI.D of the Plan. |
| | | • The Debtors should exclude Fifth Third Bank's claims against the Mariano Non-Debtors from the broad scope of the Release Provision, the Exculpation Provision, and the Injunction Provision. | The Debtors have addressed this issue in language incorporated into Section II.YY of the Proposed Confirmation Order. |
| 575 | Steven M. Mariano | • The Liquidation Proceeds Waterfall should provide any excess to Old Equity. | The Debtors have addressed this issue in amendments to Article VI.D of the Plan. |
| 576 | Steven Mariano's Cautionary Objection | • The Plan prejudices certain of Mr. Mariano's potential claims and defenses. | The Debtors have addressed this issue in language incorporated into Section II.XX of the Proposed Confirmation Order, and the revisions to Article XI.I of the Plan. |

DOCS_DE:219128.1 69353/002

| D.I. | Respondent/Objector | Summary of Objection | Response to Objection |
|---|---|---|---|
| 585 | Austin Shanfelter, James O'Brien, Michael Purcell, and Jeffrey Rohr (collectively, the "<u>Former Directors</u>") | • The Release Provision may create third party releases, which may be used to bar the Former Directors from asserting claims (e.g., for contribution) against Cerberus and other Released Parties. | The Debtors have addressed this issue in language incorporated into Section II.XX of the Proposed Confirmation Order, and the revisions to Article XI.I of the Plan. |
| | | • The Exculpation Provision are impermissibly broad. | The Debtors have responded to these arguments in Section I.C of the Memorandum. |
| | | • The Injunction Provision should be modified to preserve the Former Directors' rights and defenses. | The Debtors have addressed this issue in language incorporated into Section II.XX of the Proposed Confirmation Order, and the revisions to Article XI.I of the Plan. |

DOCS_DE:219128.1 69353/002

| D.I. | Respondent/Objector | Summary of Objection | Response to Objection |
|------|---------------------|----------------------|----------------------|
| 586 | The Internal Revenue Service (the "IRS") | • The IRS objects to confirmation of the Plan unless and until all federal tax returns are filed.<br>• The IRS objects to the extent that the provisions of Article XI of the Plan limit third-party liability via Injunction or Release.<br> ○ The Bankruptcy Court may not have jurisdiction over all the Claims being released.<br>• The IRS objects to the Plan to the extent it fails to preserve setoff and recoupment rights of the United States, pursuant to section 553 of the Bankruptcy Code.<br>• The IRS objects to Article III.A.2 of the Plan to the extent that the Plan fails to provide for the payment of interest on IRS administrative expense claims.<br>• To the extent that the IRS priority tax claims are not paid in full in cash on the Effective Date, the IRS objects to Article III.A.3 for failure to comport with sections 1129(a)(9)(C) and 511 of the Bankruptcy Code.<br>• The IRS objects to the Plan to the extent that the Debtors seek prospective tax relief by specifying certain tax treatment in the Plan.<br>• The IRS objects to the discharge of debts insofar as they are exempted from discharge pursuant to section 1141(d)(6).<br>• The IRS objects to Article X to the extent that the Bankruptcy Court retains exclusive jurisdiction over matters involving the IRS.<br>• The IRS objects to Article IX.M of the Plan to the extent that it bars creditors from amending timely filed proofs of claims for any reason in accordance with applicable bankruptcy law.<br>• The IRS objects to the treatment of its claims in Article XI.F as a Bankruptcy Rule 9019 settlement, since the IRS is unable to determine the amount of its claims until the Debtors file their tax returns. | The Debtors have addressed this issue in language incorporated into Section II.WW of the Proposed Confirmation Order and have otherwise responded to the IRS Objection in Section I.G of the Memorandum. |
| 588 | CVI Investments, Inc. ("CVI") | • The Exculpation Provision should be modified to preserve CVI's rights and claims.<br><br>• The Injunction Provision should be expanded to permit creditors to use their Claims and Causes of Action defensively | The Debtors have addressed this issue in language incorporated into Section II.XX of the Proposed Confirmation Order, and the revisions to Article XI.I of the Plan. |

DOCS_DE:219128.1 69353/002

| D.I. | Respondent/Objector | Summary of Objection | Response to Objection |
|------|---------------------|----------------------|----------------------|
| 593 | United States Trustee (the "UST") | • The Debtor Releases must meet the standards articulated in *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994) and *In re Zenith Elecs. Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999). | The Debtors have responded to these arguments in Section I.B of the Memorandum. |
| | | • The Plan impermissibly disallows late-filed claims. | The Debtors have responded to these arguments in Section I.F of the Memorandum. |
| | | • Article VI.B.8 of the Plan inappropriately states that the Litigation Trust Agreement governs in the event of a conflict with the Plan. | The Debtors have responded to these arguments in Section I.F of the Memorandum. |
| 597 | Sean M. Bidic, M.D., Terry L. Coleman, Ernst N. Csiszar, Glenn T. Hibler, John R. Del Pizzo, and Thomas Shields (the "Board") | • The Plan must provide for the payment in full of all administrative claims, particularly the unpaid directors' fees of approximately $140,000 to $185,000, and may not be feasible. | The Debtors have responded to these arguments in Section I.H of the Memorandum. |
| | | • The Plan does not provide for the purchase of a "tail" Directors and Officers' Liability Policy. | |

DOCS_DE:219128.1 69353/002