## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | Chapter 11 |
| **PATRIOT NATIONAL, INC., *et al.*,**[1] | Case No. 18-10189 (KG) |
| **Debtors.** | (Jointly Administered) |

## DECLARATION OF JAMES S. FELTMAN IN SUPPORT OF CONFIRMATION OF THE DEBTORS' FOURTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION

I, James S. Feltman, under penalty of perjury, declare as follows:

1.    I am a Managing Director of Duff & Phelps, LLC ("Duff & Phelps"), the financial advisor to the above-captioned debtors and debtors in possession (collectively, the "Debtors" or "Patriot") in these chapter 11 cases (the "Chapter 11 Cases"). On October 18, 2017, Patriot engaged Duff & Phelps to provide turnaround management services to the Debtors in contemplation of the Chapter 11 Cases. Duff & Phelps is a diversified financial services firm which also offers corporate recovery services, investigative and dispute services, investment banking and similar financial services.

2.    Pursuant to the engagement, I was designated as the Chief Restructuring Officer ("CRO") of the Debtors. I have been intimately involved in the restructuring process and all aspects thereof since October 2017, including negotiations related to the Restructuring

---

1.    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtors' federal tax identification number, are: Patriot National, Inc. (1376); Patriot Services, LLC (1695); TriGen Insurance Solutions, Inc. (2501); Patriot Captive Management, LLC (2341); Patriot Underwriters, Inc. (0045); TriGen Hospitality Group, Inc. (6557); Patriot Risk Consultants, LLC (0844); Patriot Audit Services, LLC (5793); Patriot Claim Services, Inc. (9147); Patriot Risk Services, Inc. (7189); Corporate Claims Management, Inc. (6760); CWIBenefits, Inc. (0204); Forza Lien, LLC (7153); Contego Investigative Services, Inc. (0330); Contego Services Group, LLC (0012); Patriot Care Management, LLC (2808); Radar Post-Closing Holding Company, Inc. (2049); Patriot Technology Solutions, LLC (6855); and Decision UR, LLC (1826). The Debtors' headquarters are located at 401 East Las Olas Boulevard, Suite 1650, Fort Lauderdale, Florida 33301.

Support Agreement and supervision of the preparations for and filing of these Chapter 11 Cases. Furthermore, I have remained actively involved in the management of the Debtors throughout these Chapter 11 Cases.

3.    As CRO, I direct the activities of the Duff & Phelps' team, which is led by Robert Crisafulli, and receive regular reports from Duff & Phelps.   Based on my role as CRO and the reports I receive from Duff & Phelps, I have gained a detailed understanding of Patriot's day-to-day operations, books and records, and business and financial affairs.  I have nearly 30 years of experience in the restructuring industry, engaging businesses in workouts and turnarounds, operational restructuring, fiduciary and related matters.  I have substantial knowledge and experience advising large companies and assisting troubled companies with stabilizing their financial condition, analyzing their options, and developing appropriate business plans to accomplish restructuring initiatives.

4.    I submit this declaration (the "Declaration") in support of the Debtors' request for entry of the proposed order (the "Proposed Confirmation Order") confirming the *Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization*, dated April 20, 2018 (as supplemented by the Plan Supplement (defined below), and as otherwise amended in accordance with the terms thereof, the "Plan"), filed contemporaneously herewith, including the agreements and other documents set forth in the Plan Supplement, dated March 30, 2018 (Docket No. 473) (as the same has been or may be amended, modified, supplemented, or restated, the "Plan Supplement").  Together with the Debtors' legal counsel, I have reviewed, and I am generally familiar with, the terms and provisions of the Plan, the documents comprising the Plan Supplement, the *Third Amended Disclosure Statement of Patriot National, Inc., and Its Affiliated Debtors*, dated March 13, 2018 (Docket No. 383) (the "Disclosure Statement"), the Proposed

Confirmation Order, and the requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code.[2]

5.      Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' management and the Debtors' advisors, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  If called to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

6.      Additional information regarding the circumstances leading to the commencement of these Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in the *Declaration of James S. Feltman, Chief Restructuring Officer of Patriot National, Inc., in Support of First Day Relief* (Docket No. 4) (the "First Day Declaration"), which I incorporate herein by reference.  I am the declarant of the First Day Declaration, and if called to testify, I would testify competently to the facts set forth therein.

7.      Based on my personal involvement in the negotiation and implementation of the restructuring transactions embodied in the Plan, my discussions with the Debtors' advisors, and my review of the Plan, the Plan Supplement, and the Disclosure Statement, I believe that the Plan complies with the applicable provisions of the Bankruptcy Code, that the Plan was proposed in good faith, and that the Debtors, acting through their officers, directors, and professionals, have conducted themselves in a manner that complies with applicable law in relation to the formulation and negotiation of, and solicitation of votes on, the Plan.

---

2.      Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to them in the *Memorandum of Law and Omnibus Reply in Support of Confirmation of the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization* (the "Confirmation Brief"), the Proposed Confirmation Order, the Plan, the Plan Supplement, or the Disclosure Statement.

## I. BACKGROUND AND PLAN SUMMARY

8. The Plan before the Court has received complete support from the Debtors' First Lien Lenders, who possess security interests on substantially all of the Debtors' assets, and the Official Committee of Unsecured Creditors (the "Committee"). The Plan will provide the Debtors with liquidity to achieve the financial restructuring contemplated by the Plan, implement the Debtors' long-term business plan, and lead to healthier restructured companies that will benefit all future creditors doing business with the reorganized Debtors. The complete support of the First Lien Lenders and the Committee is indicative of the Plan's fairness and the arm's-length negotiations that culminated in this restructuring.

9. This outcome was made possible through extensive, arm's length negotiations with the First Lien Lenders to develop a comprehensive financing, restructuring, and recapitalization plan to be implemented through these Chapter 11 Cases. This agreement was memorialized in the Restructuring Support Agreement, dated November 27, 2017 (together with all exhibits and attachments thereto, the "Restructuring Support Agreement"), pursuant to which the First Lien Lenders agreed to support the Plan and the restructuring it contemplates.

10. The Plan includes three funding sources: Available Cash, the proceeds of the Litigation Trust and the Exit Financing.

11. The Plan was made possible as a result of the contributions and support of the First Lien Lenders, the Committee and other key constituents. Pursuant to the Plan, all of the issued and outstanding equity interests in Patriot National Inc. ("PNI") and each of its direct and indirect subsidiaries will be extinguished, and the First Lien Lenders will receive 100% of newly issued equity interests in Reorganized PNI and each of the Reorganized Subsidiary Debtors on account of their pro rata portion of the First Lien Lender Secured Claims. Allowed Priority

Claims and Allowed Other Secured Claims will be paid in full, reinstated, or otherwise rendered unimpaired. Allowed Continuing Vendor Claims and Allowed Continuing Retail Agent Claims will be paid in full in the ordinary course of business, or if such amounts are overdue on the Effective Date of the Plan, in two equal installments with the first such installment occurring on the Effective Date and the second occurring six months after the Effective Date.

12. The Plan provides for the creation of a Litigation Trust and for the transfer free and clear into the Litigation Trust of all of the Debtors' Litigation Claims, which include avoidance actions, commercial tort claims, including claims against certain of the Debtors' current and former officers and directors, claims against certain of the Debtors' former professionals, and other claims against third parties held by the Debtors. The proceeds from the settlement or successful prosecution of the causes of action transferred to the Litigation Trust, if any, will be distributed pursuant to the Litigation Proceeds Waterfall as follows:

- *First*, to the extent not previously paid from proceeds of the Litigation Trust Facility, all accrued and unpaid Litigation Trust Expenses included in the Litigation Trust Budget.

- *Second*, to the repayment of the aggregate amount of the outstanding obligations under the Litigation Trust Facility.

- *Third*, from the first $5 million available for distribution to the Holders of Allowed First Lien Lender Deficiency Claims and Allowed Class 5 General Unsecured Claims, ratably (a) 60% to the Holders of Allowed First Lien Lender Deficiency Claims and (b) 40% to the Holders of Allowed Class 5 General Unsecured Claims.

- *Fourth*, from the next $5 million available for distribution to the Holders of Allowed First Lien Lender Deficiency Claims and Allowed Class 5 General Unsecured Claims, ratably (a) 70% to the Holders of Allowed First Lien Lender Deficiency Claims and (b) 30% to the Holders of Allowed Class 5 General Unsecured Claims.

- *Thereafter*, from all funds available for distribution to the Holders of Allowed First Lien Lender Deficiency Claims and Allowed Class 5 General Unsecured Claims, ratably (a) 80% to the Holders of Allowed First Lien Lender Deficiency Claims and (b) 20% to the Holders of Allowed Class 5 General Unsecured Claims.

- To the extent that the Allowed First Lien Lender Deficiency Claims are fully satisfied, any additional recoveries will be distributed to the Holders of Allowed Class 5 General Unsecured Claims. To the extent that Holders of Allowed Class 5 General Unsecured Claims are fully satisfied, any additional recoveries will be distributed to the Holders of Allowed First Lien Lender Deficiency Claims. For the avoidance of doubt, no holder of an Allowed Claim will receive payment in excess of the Allowed amount of its Claim. Upon the satisfaction in full of Allowed Class 5 General Unsecured Claims and Allowed First Lien Lender Deficiency Claims (the "Trigger Event"), the Plan Administrator shall make any further distributions on account of Claims in the Deemed Rejecting Classes in accordance with the Bankruptcy Code, including Section 1129(b) thereof. Notwithstanding the foregoing, and for the avoidance of doubt, until the occurrence of the Trigger Event, none of the Litigation Trust, the Litigation Trustee, or the Plan Administrator shall have any obligations or liabilities to the Deemed Rejecting Classes and holders of Claims in the Deemed Rejecting Classes shall have no rights against the Litigation Trust, the Litigation Trustee, or the Plan Administrator for any amount due on or right created by such Claims, and holders of Claims in the Deemed Rejecting Classes shall not be Litigation Trust Beneficiaries.

13. It is my understanding that these recoveries would not be possible without the consensual deal between the Debtors and the First Lien Lenders memorialized in the Plan. The reorganization embodied in the Plan will significantly enhance the Debtors' long-term viability and competitive position, because it will reduce the Debtors' debt and interest obligations and allow the Debtors to emerge from bankruptcy relatively quickly and with a balance sheet equipped to capitalize on any opportunities that may arise. The Plan will also provide the Debtors with the liquidity necessary to withstand an extended industry downturn, allowing the Debtors to achieve success with their long-term business plan as the market recovers. In addition, consummation of the Plan will enable the Debtors' management team to rededicate their efforts to operational performance and value creation.

14. For the reasons set forth herein, I believe the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code. Accordingly, the Plan should be confirmed.

## II.     THE PLAN SATISFIES EACH REQUIREMENT FOR CONFIRMATION

15.     Based on my knowledge and advice from the members of the Debtors'

management team and the Debtors' professional advisors, I believe that the Plan complies with

all applicable provisions of the Bankruptcy Code.

### A.     The Plan Satisfies the Requirements of Bankruptcy Code Section 1129(a)(1)

16.     I understand that section 1129(a)(1) of the Bankruptcy Code requires the

Plan to comply with the applicable provisions of the Bankruptcy Code.  Based on my discussions

with the Debtors' advisors, I believe that the Plan satisfies this requirement.

#### 1.     The Plan Satisfies the Classification Requirements of Sections 1122 and 1123(a)(1) of the Bankruptcy Code

17.     Article II of the Plan provides for the separate classification of all Claims

and Interests into the following Classes, other than Administrative Expense Claims, Fee Claims,

the payment of certain fees and expenses, and Priority Tax Claims, which I understand need not

be classified under section 1123(a)(1) of the Bankruptcy Code.  The Plan classifies Claims and

Equity Interests as follows:

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| Class 1A | Secured First Lien Lender Claims | Impaired | Yes |
| Class 1B | First Lien Lender Deficiency Claims | Impaired | Yes |
| Class 2 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| Class 3 | Priority Claims | Unimpaired | No (presumed to accept) |
| Class 4 | Continuing Vendor Claims and Continuing Retail Agent Claims | Impaired | Yes |
| Class 5 | General Unsecured Claims | Impaired | Yes |
| Class 6 | 510(b) Claims | Impaired | No (deemed to reject) |

| Class 7 | Intercompany Claims | Impaired | No (deemed to reject) |
|---------|--------------------|---------|------------------------|
| Class 8 | Old Equity Interests | Impaired | No (deemed to reject) |

18.     Each of the above nine (9) Classes of Claims and Equity Interests differs from the Claims and Equity Interests in each other Class in a legal or factual way, or based on other applicable criteria.  Dissimilar Claims and Equity Interests are not classified together under the Plan.  Specifically, the Plan separately classifies Claims (rights to payment) from equity Interests (representing ownership in the business).  Therefore, based on the advice and guidance provided to me by the Debtors' professionals, I believe the Plan's classification scheme satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

**2.      The Plan Specifies Unimpaired and Impaired Classes and Provides the Same Treatment for Each Holder in a Particular Class as Required by Sections 1123(a)(2), (3), and (4) of the Bankruptcy Code**

19.     Article III of the Plan specifies each Unimpaired Class (Classes 2 and 3) and each Impaired Class (Classes 1A, 1B, 4, 5, 6, 7, and 8), as well as the treatment of all Claims and Interests that are Unimpaired or Impaired.  The Plan also provides the same treatment for each Claim and Equity Interest within a specific Class.  Accordingly, I believe that the Plan satisfies sections 1123(a)(2), (3), and (4) of the Bankruptcy Code.

**3.      The Plan Provides for Adequate Means of Implementation as Required by Section 1123(a)(5) of the Bankruptcy Code**

20.     I believe that the provisions of the Plan provide adequate means for the Plan's implementation.  Specifically, Article V of the Plan provides for, among other things: (i) the issuance, or execution and delivery of New Equity Interests to the Holders (or designees) of Allowed Secured First Lien Lender Claims (Plan art. V.A); (ii) the continued corporate existence and operation of each of the Debtors as a Reorganized Debtor after the Effective Date

of the Plan, and the vesting of all property of each Debtor's Estate and any property acquired by the Debtors under the Plan free and clear of all Claims, liens, charges or other encumbrances or interests (Plan art. V.B.); (iii) the execution of any Restructuring Transactions as may be necessary or appropriate to effect the restructuring of the Debtors, deemed to occur on the Effective Date (Plan art. V.C); (iv) funding of the Exit Facility, New Term Loan Facility, and Litigation Trust Facility (Plan art. V.D); (v) the cancellation of existing securities and agreements (Plan art. V.E); (vi) the authorization and approval of all corporate actions set forth in the Plan on the Effective Date (Plan art. V.F); (vii) vesting of all rights and powers to implement the provisions of the Plan in the Plan Administrator on the Effective Date (Plan art. V.G); (viii) consummation of all transactions contemplated in the Equity Purchase Agreement on the Effective Date (Plan art. V.H); and (ix) the preservation of all Causes of Action not expressly waived, relinquished, exculpated, released compromised, settled, transferred, or assigned under the Plan and vesting of such Causes of Action in the Litigation Trust (Plan art. V.L). Accordingly, I believe the Plan provides for adequate means of implementation as is required by section 1123(a)(5) of the Bankruptcy Code.

4. **Reorganized Debtors' Amended Organizational Documents Prohibit the Issuance of Non-Voting Securities as Required by Section 1123(a)(6) of the Bankruptcy Code**

21. As fully set forth in <u>Exhibit F</u> to the Plan Supplement, where not already prohibited by applicable law or by their existing organizational documents, the Debtors will amend on or prior to the Effective Date the organizational documents to the Reorganized Debtors to include a provision conforming to the requirements of section 1123(a)(6) of the Bankruptcy Code, which will prohibit the issuance of non-voting securities. Accordingly, I believe that the Plan satisfies section 1123(a)(6) of the Bankruptcy Code.

**5. The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code**

**(i) The Plan Permissive Provisions**

22. I have been advised that section 1123(b) of the Bankruptcy Code sets forth permissive provisions that may be incorporated into a chapter 11 plan and, as discussed in more detail below, I believe that each of the provisions of the Plan is consistent with section 1123(b).

(a) <u>Section 1123(b)(1) of the Bankruptcy Code.</u> As contemplated by section 1123(b)(1) of the Bankruptcy Code, Articles II and III of the Plan provide that: (i) Class 2 (Other Secured Claims) and Class 3 (Priority Claims) are Unimpaired, and (ii) Class 1A (Secured First Lien Lender Claims), Class 1B (First Lien Lender Deficiency Claims), Class 4 (Continuing Vendor Claims and Continuing Retail Agent Claims), Class 5 (General Unsecured Claims), Class 6 (510(b) Claims), Class 7 (Intercompany Claims), and Class 8 (Old Equity Interests) are Impaired.

(b) <u>Section 1123(b)(2) of the Bankruptcy Code.</u> With respect to section 1123(b)(2) of the Bankruptcy Code, Article VII.A of the Plan provides for the rejection of all executory contracts and unexpired leases upon the Effective Date, except for any executory contract or unexpired lease that (a) is designated as a contract or lease to be assumed on the Assumption Schedule, if any, (b) previously has been assumed, assumed and assigned, or rejected pursuant to a Final Order of the Bankruptcy Court, or (c) is the subject of a separate motion for assumption or rejection under section 365 of the Bankruptcy Code filed by the Debtors before the Confirmation Date. I understand that, in accordance with Article VII.C of the Plan, the Debtors will provide written notice to each counterparty of a contract on the Assumption Schedule and written notice of any amendments to the Assumption Schedule to the parties to the Executory Contracts or Unexpired Leases affected by the amendments, reflecting the Debtors'

intention to assume the contract or lease in connection with the Plan and setting forth the proposed Cure Claim amount (if any). To date, I understand that there has been one objection to the Debtors' assumption of executory contracts and unexpired leases (or the applicable Cure amounts in connection thereto) pursuant to Article VII of the Plan. (Docket No. 557.) Consistent with section 1123(d) of the Bankruptcy Code, Cure Claim amount disputes shall be resolved by the Debtors or Reorganized Debtors in the ordinary course, and the agreed-upon amounts shall be paid by the Debtors or the Reorganized Debtors in the ordinary course. To my knowledge, if there is a dispute pertaining to assumption of an executory contract or unexpired lease, such dispute shall be heard by the Bankruptcy Court.

(c)     Section 1123(b)(3) of the Bankruptcy Code.  As I understand it, as permitted by section 1123(b)(3) of the Bankruptcy Code, the Plan provides for a release of claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, remedies, and liabilities, including any derivative claims, owned by the Debtors, and preserves for the Reorganized Debtors any rights and defenses with respect to any Claims or Equity Interests, including alleged rights of setoff or recoupment, or other legal or equitable defenses, except as otherwise provided in the Plan.

(d)     Section 1123(b)(4) of the Bankruptcy Code.  The Plan does not provide for the sale, transfer, or assignment of all or substantially all of the Debtors' property and, therefore, as I understand it, section 1123(b)(4) of the Bankruptcy Code is inapplicable in this Chapter 11 Case.

(e)     Section 1123(b)(5) of the Bankruptcy Code.  As I understand it, as permitted by section 1123(b)(5) of the Bankruptcy Code, the Plan modifies the rights of holders

of Claims or Equity Interests in the Impaired Classes, and leaves unaffected the rights of holders of Claims or Equity Interests in the Unimpaired Classes.

(f)     Section 1123(b)(6) of the Bankruptcy Code.     It is my understanding that section 1123(b)(6) of the Bankruptcy Code provides that a plan may include any other appropriate provision not inconsistent with the applicable provisions of the Bankruptcy Code. As I understand it, in accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan:

- contains certain release and exculpation provisions (discussed in more detail below), which are essential to the reorganization and which, I am advised, are consistent with the requirements of the Bankruptcy Code and other applicable law, and

- in addition, Article V.A of the Plan provides that the issuance or execution and delivery of the New Equity Interests and the Reorganized Debtors Governing Documents shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under applicable securities laws.

23.     Accordingly, I believe that each of the foregoing permissive provisions is consistent with section 1123(b) of the Bankruptcy Code.

### (ii)  The Plan Releases Should Be Approved

24.     The Plan provides for releases of certain claims held by the Debtors and their Estates.  I believe that the release provision is an integral component of the Plan, and I have been informed, and based on my understanding of the Bankruptcy Code, believe that the release provision is consistent with the Bankruptcy Code and complies with applicable case law under the Third Circuit.  I believe such releases should be approved because they (i) were given in exchange for good and valuable consideration; (ii) were integral to the agreements among the various parties in interest, as reflected in the Restructuring Support Agreement; (iii) confer substantial benefits on the estates; (iv) are fair, equitable, and reasonable; and (v)  are in the best interests of the Debtors, their Estates, and all parties in interest in these Chapter 11 Cases.

25.     Article XI.G of the Plan provides for releases by the Debtors (the "Debtor Releases"), as of the Effective Date, of certain claims, rights, and causes of actions that the Debtors may have against each of the Released Parties,[3] including, among others, the First Lien Agents and Lenders.  Based on my participation in the negotiations regarding the Plan, I believe the Debtor Releases are an essential component of the Plan and constitutes a sound exercise of the Debtors' business judgment.  During the course of negotiations regarding the Plan and the related documents, it was clear that the Debtor Releases would be a necessary condition to entry into and consummation of the restructuring transaction embodied in the Plan.  I believe that without the Debtor Releases, the Debtors and their stakeholders would not have been able to secure the substantial benefits provided by the Restructuring Support Agreement, the Forbearance Agreement, and the Plan, including (i) the forbearance by Cerberus and the First Lien Lenders from exercising their remedies in the wake of the Debtors' prepetition defaults under the prepetition Financing Agreement, (ii) much-needed cash to fund the Debtors' operations until the filing of the Chapter 11 Cases through the Collateral Agent Advances and authorization to use the proceeds of certain tax refunds which were collateral of the First Lien Lenders, (iii) a commitment for a further $15.5 million in funding through the duration of the Chapter 11 Cases, and (iv) agreeing to convert a portion of the First Lien Lender Secured Claims into equity of the Reorganized Debtors.  I understand that Cerberus also provided invaluable

---

3.   "Released Parties" means (a) the Debtors' and the Reorganized Debtors' professionals that were retained in the Chapter 11 Cases, including the Debtors' chief restructuring officer, attorneys, financial advisors, investment bankers, consultants, representatives and other professionals, (b) the First Lien Agents, (c) the First Lien Lenders, (d) the DIP Agent, (e) the DIP Lenders, (f) any professionals of the DIP Agent or DIP Lenders, (g) the members of the Committee, but only in their capacity as such, (h) Conway MacKenzie Management Services, LLC, (i) the Debtors' independent director, and (j) with respect to the Persons identified in clauses (b) through (e), their respective directors, officers, principals, shareholders, partners, employees, members, participants, agents, representatives, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, management companies, fund advisors, other professionals, advisory board members, subsidiaries, affiliates, managed accounts or funds, other advisors, predecessors, successors or assigns, in each case in their capacity as such.

assistance to the Debtors in communicating the Plan to the Debtors' customers and clients (thereby helping to stabilize and preserve a viable business), and in transitioning the business to their current sustainable forms. I believe that the Debtor Releases were required by Cerberus throughout the process of negotiating the Plan as a prerequisite to supporting the Plan and that the Debtors' reorganization would not have been possible without the backing of Cerberus and the First Lien Lenders. Additionally, certain of the Released Parties assisted in the negotiation of the the prepetition Restructuring Support Agreement and ultimate formulation of the Plan, enabled the Debtors to stabilize their businesses and file the Chapter 11 Cases in an orderly and efficient manner, and/or assisted with the preservation of the Debtors' businesses as a viable enterprise.

26. In addition to the substantial consideration provided by the Released Parties, I believe that the Debtors' Releases also are appropriate because the released claims and causes of action have no material value to the Debtors and their estates, and the *de minimis* value of such claims certainly is not greater than, or even close to, the significant value and benefits provided by the Plan and its related transactions. The Debtors' management and advisors have informed me that, prior to the Petition Date, the Debtors, along with their professionals at that time, analyzed potential claims against certain Released Parties, namely Cerberus and the First Lien Lenders, as alleged in the complaint, as amended, filed in the Court of Chancery of the State of Delaware captioned *Henry Wasik, et al. v. Steven M. Mariano, et al.*, No. 12953-VCL (Del. Ch.) (the "Wasik Complaint"). After analyzing the Wasik Complaint, the Debtors concluded, among other things, that the claims against Cerberus were baseless and that the cost of pursuing claims against them would outweigh any potential benefit from pursuing such claims. The Debtors' management has also informed me that this conclusion informed their

decision to provide Cerberus with a release as part of the prepetition Forbearance Agreement, and further to provide Cerberus with releases under the Plan in exchange for the additional consideration provided to the Debtors by Cerberus.  Accordingly, I believe that there is ample justification for providing the Debtor Releases and they should be approved.

### (iii) The Plan Exculpations Should Be Approved

27.     In addition to the releases discussed above, I am advised that Article XI.H of the Plan contains an exculpation of the Exculpated Parties[4] from any act or omission in connection with, related to, or arising out of the Debtors' Chapter 11 Cases (including, among other things, the DIP Facility, Exit Facility, and Litigation Trust Facility and documents related thereto) and the agreements made in connection therewith (the "Exculpations").  I am further advised that the Exculpations do not exculpate acts or omissions that are determined in a final order to have constituted fraud, willful misconduct or gross negligence.  It is my view that the scope of the Exculpations are narrowly tailored to cover only the good-faith actions taken in connection with these Chapter 11 Cases, particularly in formulating and negotiating the Plan.  I believe that the Exculpations are necessary and appropriate to protect parties who have made substantial contributions to the Debtors' reorganization from collateral attacks related to good faith acts or omissions related to the Debtors' restructuring.  The Exculpated Parties' efforts in negotiating the prepetition Restructuring Support Agreement and ultimate formulation of the Plan enabled the Debtors to stabilize their businesses and file the Chapter 11 Cases in an orderly and efficient manner, which has preserved the Debtors' businesses as a viable enterprise.

---

4.  "Exculpated Parties" means (a) the Committee and its members (solely in their capacities as such), (b) the Debtors and their current officers, directors, and employees, (c) Conway MacKenzie Management Services, LLC, and its current officers and employees, (d) the Debtors' chief restructuring officer, (e) the Debtors' independent director, and (f) with respect to the Persons identified in clauses (a) and (b), to the extent retained in the Chapter 11 Cases, their respective financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and all other retained professionals.

Further, my understanding is that the expectation of exculpation was a significant point of negotiation in the Exculpated Parties' facilitation of the Plan.

**B.    The Plan Satisfies the Requirements of Section 1129(a)(2) of the Bankruptcy Code**

28.    I understand that section 1129(a)(2) of the Bankruptcy Code requires the Plan's proponents to comply with the applicable provisions of the Bankruptcy Code, including the disclosure and solicitation requirements of sections 1125 and 1126 of the Bankruptcy Code. Based on my understanding of those provisions, and advice I have received from the Debtors' advisors, I believe the Debtors has complied with those requirements.  Specifically, as set forth in the First Solicitation Affidavit (Docket No. 419), Plan solicitation occurred only after all creditors entitled to vote thereon were provided with a copy of the Plan and a court-approved Disclosure Statement.  In addition, I believe that the Debtors and their professionals have acted in good faith in all respects in connection with the solicitation of votes on the Plan and the tabulation of such votes.

**C.    The Plan Satisfies the Requirements of Section 1129(a)(3) of the Bankruptcy Code**

29.    The Debtors have proposed the Plan in good faith in consultation with the Debtors' legal and financial advisors, and the Plan is not by any means forbidden by law. I believe that, in satisfaction of their fiduciary duties, the Debtors developed the Plan in close consultation with their primary stakeholders following months of diligence and negotiation. More specifically, the Debtors conducted exhaustive reviews and analyses of Plan-related issues and the Debtors' business to provide for the Reorganized Debtors' viability upon emergence— which is in the best interests of all stakeholders.  The Plan (including all documents necessary to effectuate the Plan) is the result of months of discussions and negotiations between the Debtors

and the Consenting Lenders, which culminated in the execution of the Restructuring Support Agreement pursuant to which the Consenting Lenders agreed to support confirmation of the Plan.

30.　　Furthermore, as noted above, the Plan received the support of the Secured First Lien Lender Claims and the Committee, which is a further testament to its fairness and the good-faith efforts that went into the Plan negotiation process.　For these and other reasons, I believe that the Plan has been proposed by the Debtors in good faith and solely for the legitimate and honest purposes of reorganizing the Debtors' ongoing businesses and enhancing their long-term financial viability while providing recoveries to all of the Debtors' stakeholders.

**D.　　The Plan Satisfies the Requirements of Section 1129(a)(4) of the Bankruptcy Code**

31.　　I understand that payments made or to be made by the Debtors for services provided in connection with this Chapter 11 Case must be approved by the Court as reasonable pursuant to final fee applications.　Accordingly, I believe, based on discussions with the Debtors' legal counsel, that the Plan satisfies section 1129(a)(4) of the Bankruptcy Code.

**E.　　The Plan Satisfies the Requirements of Section 1129(a)(5) of the Bankruptcy Code**

32.　　I have been advised that section 1129(a)(5) of the Bankruptcy Code requires that a Plan proponent disclose the identity and affiliations of the proposed officers and directors of the Reorganized Debtors; that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy; and, to the extent there are any insiders that will be retained or employed by the Reorganized Debtors, that there be disclosure of the identity and nature of any compensation of

any such insiders. Based on my understanding of the Bankruptcy Code and the advice of counsel for the Debtors, I believe the Debtors have satisfied these requirements.

33. Exhibit G to the Plan Supplement, contemporaneously filed herewith, contains the identities of the new officers and directors of the Reorganized Debtors.

34. The Plan also provides that the officers of the Debtors immediately before the Effective Date shall serve as the initial officers of the Reorganized Debtors, in accordance with any applicable non-bankruptcy law, and that after the Effective Date such officers will serve at the pleasure of the New Board. I believe that the directors of the New Board and the officers of the Reorganized Debtors will be competent, will have relevant and valuable business and industry experience, and will provide continuity and fresh perspectives on running the Reorganized Debtors' businesses. Accordingly, I believe that the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

## F. The Plan Satisfies the Requirements of Section 1129(a)(6) of the Bankruptcy Code

35. The Plan does not provide for any rate changes by the Debtors that would be subject to approval by a governmental regulatory commission. Accordingly, I have been advised that the requirements of section 1129(a)(6) of the Bankruptcy Code are therefore inapplicable to the Plan.

## G. The Plan Satisfies the Requirements of Section 1129(a)(7) of the Bankruptcy Code

36. I have been advised that the Bankruptcy Code requires that, with respect to each impaired Class of Claims and Interests, each holder of such Claim or Interest must either (i) accept the Plan or (ii) receive or retain under the Plan on account of such Claim or Interest property having a present value, as of the Effective Date, that is not less than the amount that

such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date. For the purposes of determining whether the Plan meets this requirement, Duff & Phelps and the Debtors' other advisors, in consultation with the Debtors and their counsel, prepared the liquidation analysis attached to the Disclosure Statement as <u>Exhibit D</u> (the "<u>Liquidation Analysis</u>"), which I have reviewed and hereby incorporate by reference.

37.     I believe that the Liquidation Analysis demonstrates that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code. I understand that the Liquidation Analysis demonstrates that all Classes of Claims or Equity Interests will recover value equal to or in excess of what such Claims or Equity Interests would receive in a hypothetical chapter 7 liquidation. Notably, the Liquidation Analysis shows that holders of allowed claims in Classes 1A, 1B, 4, 5, 6, 7, and 8 would receive no distributions of property if the Debtors were liquidated under chapter 7 of the Bankruptcy Code as illustrated in the following chart:

| Class | Recovery Under Liquidation Analyses[5] | Recovery Under Plan |
|---|---|---|
| Class 1A | 0% | 100% |
| Class 1B | 0% | Proceeds from Litigation Trust Interest, if any |
| Class 4 | 0% | 100% |
| Class 5 | 0% | Proceeds from Litigation Trust Interest, if any |
| Class 6 | 0% | 0% |
| Class 7 | 0% | 0% |
| Class 8 | 0% | 0% |

38.     I believe that the Debtors' Liquidation Analysis is sound and reasonable and incorporates justified assumptions and estimates regarding the Debtors' assets and Claims

---

5.   The Liquidation Analysis assumes no recovery value from equity in foreign subsidiaries as the international subsidiaries generate little to negative EBITDA.

against them, such as (i) liquidation would take approximately six months, during which time all of the Debtors' assets would be sold or otherwise liquidated under the direction of a chapter 7 trustee; (ii) the absence of recoveries from the pursuit of any potential preferences, fraudulent conveyances or other causes of action that may exist, not including the estimated costs of pursuing those actions; (iii) the additional General Unsecured Claims that would arise in connection with the rejection of certain executory contracts and unexpired leases, and other potential claims that may arise in a chapter 7 liquidation; and (iv) additional costs and expenses that would be incurred by the Debtors as a result of a chapter 7 trustee's fees and retention of new professionals.

39.    I believe that the assumptions and estimates in the Liquidation Analysis are appropriate in the context of these Chapter 11 Cases, and I understand that they are based upon the knowledge and expertise of the Debtors' advisors, who have intimate knowledge of the Debtors' businesses and relevant industry and restructuring experience.  Accordingly, I believe that the best interests test is satisfied as to every single holder of a Claim against or Equity Interest in each Debtor.

**H.    The Plan Has Been Accepted by Impaired Voting Classes and Can Be Crammed Down on Impaired Classes Deemed to Reject the Plan**

40.    I understand that holders of Claims in Class 6 (510(b) Claims), Class 7 (Intercompany Claims) and Class 8 (Old Equity Interests) are not entitled to receive or retain any property on account of their Claims against the Debtors.  I am further advised that these Claims and Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  It is my further understanding that, based on the advice of the Debtors' counsel, that the Plan is nonetheless confirmable because it satisfies the "cram down" requirements of section 1129(b) of the Bankruptcy Code as to Classes 8 and 9.

## I. The Plan Satisfies the Requirements of Section 1129(a)(9) of the Bankruptcy Code

41. It is my understanding that the Plan satisfies sections 1129(a)(9) of the Bankruptcy Code. I understand that section 1129(a)(9) of the Bankruptcy Code requires the Plan to provide holders of Administrative Expense Claims, Fee Claims, and Priority Tax Claims with payment(s) in cash equal to the allowed amount of such Claims, except to the extent that the holder of a particular Claim has agreed to different treatment.

42. Article III.A of the Plan provides that Allowed Administrative Expense Claims, Allowed DIP Claims, Allowed Priority Tax Claims, and U.S. Trustee Fees, respectively, will be paid in cash equal to the allowed amount of such Claims, except to the extent that the holders of such Claims have agreed to different treatment. Accordingly, I believe that the Plan complies with section 1129(a)(9) of the Bankruptcy Code.

## J. The Plan Satisfies the Requirements of Section 1129(a)(10) of the Bankruptcy Code

43. I understand that section 1129(a)(10) of the Bankruptcy Code requires at least one impaired class of claims to have accepted the Plan without including any acceptance by an insider. As set forth in the Voting Certification, Classes 1A (Secured First Lien Lender Claims) and 1B (First Lien Lender Deficiency Claims) are Impaired and have voted to accept the Plan, even excluding the acceptance of the Plan by any insiders in such Class. Accordingly, I believe the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

## K. The Plan Satisfies the Feasibility Requirement of Section 1129(a)(11) of the Bankruptcy Code

44. I am advised that section 1129(a)(11) of the Bankruptcy Code permits a plan to be confirmed if it is feasible, *i.e.*, it is not likely to be followed by liquidation or the need

for further financial reorganization.  I understand that, in the context of the Plan, feasibility is generally established by demonstrating the Debtors' ability to implement the provisions of the Plan with a reasonable assurance of success.  I have been advised on the various factors courts have considered when assessing the feasibility of a plan.  Based upon my understanding of the Plan, the advice of the Debtors' advisors and counsel, and my experience with the Debtors' businesses and industry, I believe that the Plan is feasible.  The Plan embodies a meticulously-tailored restructuring that will provide for the continued viability of the Debtors' businesses.

45.     My opinion is based, in part, upon the Debtors' and their advisors' analysis of their ability to fulfill their obligations under the Plan (including the estimated costs of the Plan's administration), as well as financial projections that the Debtors has prepared with assistance from their advisors (the "Projections") for the period beginning fiscal years 2018 through 2020, as set forth in Exhibit F to the Disclosure Statement, which I have reviewed and hereby incorporate by reference.  The Projections were developed using a methodical, iterative process and are based on the extensive experience of the Debtors' management and historical trends and data, based on a set of set of sound, closely-examined assumptions.  Key personnel from all of the Debtors' operating areas and across various functions provided input in the development of the Projections.  I understand that the Projections were also carefully reviewed by, and reflect the input of, the advisors of the First Lien Lenders.  In preparing the Projections, the Debtors incorporated material considerations pertaining to the current price environment, historical operating and production performance, and operating costs.

46.     Based on the Projections, including the underlying assumptions which I believe are reasonable, and the unencumbered cash on hand and the proceeds from the Exit Facility, the Debtors can reasonably be expected to have sufficient cash flow to satisfy their

obligations under the Plan, service their indebtedness, and fund operations. I further believe that, as of the Effective Date, the Reorganized Debtors can, on a consolidated basis, reasonably be expected to be able to meet their debts as such debts mature and not be left with unreasonably small available capital to operate their business as a result of the Plan or any transactions contemplated by the Plan. Additionally, Projections anticipate sufficient liquidity to counter unanticipated economic downturns. Accordingly, it is my belief that, after honoring their obligations under the Plan, the Reorganized Debtors will have sufficient capital and liquidity to operate their businesses and satisfy ongoing obligations as they become due. For these reasons, I believe that the Plan provides for an achievable scheme of reorganization, which exceeds the Debtors' burden of showing that the Plan carries a reasonable likelihood of success and that confirmation of the Plan is unlikely to be followed by liquidation or the need for further financial reorganization. Accordingly, I believe that the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

**L.      The Plan Satisfies the Requirements of Section 1129(a)(12) of the Bankruptcy Code**

47.      I understand that section 1129(a)(12) of the Bankruptcy Code requires that all fees payable under section 1930 of title 28 of the United States Code have been paid or that the Plan provides for payment of all such fees on the Effective Date. Article XI.B of the Plan provides for the payment of all applicable fees by the Debtors on the Effective Date and thereafter as may be required, until the Debtors' cases have been closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. Accordingly, I believe the Plan satisfies section 1129(a)(12) of the Bankruptcy Code.

**M.** **The Plan Satisfies the Requirements of Section 1129(a)(13) of the Bankruptcy Code**

48.     I have been advised that section 1129(a)(13) of the Bankruptcy Code requires that the Plan provide for the continuation after the Effective Date of payment of all retiree benefits at the level established under section 1114 of the Bankruptcy Code.  To the extent that the Debtors have any retiree benefit obligations, I understand that all employee compensation and benefit plans of the Debtors will be deemed to be, and will be treated as, executory contracts under the Plan and, on the Effective Date, will be assumed.  Accordingly, I believe the Plan satisfies section 1129(a)(13) of the Bankruptcy Code.

**N.** **The Plan Satisfies Section 1129(b) of the Bankruptcy Code**

49.     I have been advised that sections 1129(b)(2)(B)(ii) and (b)(2)(C)(ii) of the Bankruptcy Code provide that a chapter 11 plain is fair and equitable with respect to a class of impaired unsecured claims or interests if under the plan no holder of any junior claim or interest will receive or retain property under the plan on account of such junior claim or interest. I understand that distributions under the Plan are made in the order of priority prescribed by the Bankruptcy Code and in accordance with the absolute priority rule.  For these reasons and others, I believe that the Plan is "fair and equitable" and, therefore, consistent with the requirements of section 1129(b) of the Bankruptcy Code.

**O.** **Good Cause Exists to Waive any Stay of the Confirmation Order.**

50.     I am advised that, generally, Bankruptcy Rule 3020(e) imposes a 14-day stay of the effectiveness of an order confirming a chapter 11 plan of reorganization, unless the bankruptcy court orders otherwise.  I believe that a waiver of the stay, which would permit the Debtors to consummate the Plan and commence its implementation without delay after the entry

of the Proposed Confirmation Order, is in the best interests of the Debtors' Estate and creditors and will not prejudice any parties in interest.

### P. Modifications to the Plan

51.     On April 20, 2018, the Debtors filed herewith *Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization*, dated April 20, 2018, filed contemporaneously herewith. The modifications made to the Plan since the solicitation were minor and technical in scope.

### Q. Certain Other Requirements Are Inapplicable

52.     I understand that the Bankruptcy Code contains certain requirements for confirmation that are inapplicable to the Plan. In particular, (i) the Debtors are not individuals; (ii) the Debtors are not required to pay any domestic support obligations; (iii) the Debtors are moneyed, business, or commercial corporations; (iv) the Plan is the only plan currently on file in this Chapter 11 Case; (v) the principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act; and (vi) the Debtors are not small business debtors. As a result, I understand that sections 1123(a)(8), 1129(a)(14)–(16), and 1129(c)–(e) of the Bankruptcy Code are inapplicable to the Plan.

### III. VALUATION ANALYSIS IN CONNECTION WITH THE PLAN

53.     Duff & Phelps advised the Debtors with respect to the enterprise value of the Reorganized Debtors on a reorganized, going-concern basis. Based on Duff & Phelps' analysis, the estimated range of reorganization value of the Reorganized Debtor is between $70.8 million to $81.5 million (with a midpoint estimate of approximately $ 76.12 million, the "Adjusted Enterprise Value") as of an assumed Effective Date of May 30, 2018 (the "Assumed Effective Date").

54.     The valuation analysis is based on the facts and conditions known and existing as of March 9, 2018 and (ii) the projections provided by the Debtors' management and set forth in Exhibit F of the Disclosure Statement (the "<u>Financial Projections</u>") for the period beginning January 1, 2018 through December 31, 2020 (the "<u>Projection Period</u>").

A.     **Valuation Assumptions**

55.     In arriving at estimated enterprise value, Duff & Phelps reviewed the Financial Projections and believes they are good faith judgments of the Debtors as to the future operating and financial performance of the Post-Effective Date Debtors.

56.     In preparing the valuation analysis, Duff & Phelps (i) reviewed certain internal financial and operating data of the Debtors, including projections provided by management relating to the Debtors' businesses and prospects; (ii) conducted phone calls with certain members of the Debtors' senior management to discuss operations, capital structure considerations and future prospects; (iii) reviewed publicly available financial data and considered the market value of public companies that Duff & Phelps deemed generally comparable to the operating businesses of the Debtors; (iv) considered certain economic and industry information relevant to the Debtors' operating businesses; and (v) conducted such other studies, analyses, inquiries and investigations as deemed appropriate by Duff & Phelps.

B.     **Valuation Methodology**

57.     In conducting its analysis of Adjusted Enterprise Value, Duff & Phelps employed both the peer group trading analysis ("<u>Guideline Company Analysis</u>") and discounted cash flow ("<u>DCF</u>") methodologies. Duff & Phelps considered, but did not employ, the precedent transactions methodology because of a lack of sufficiently comparable transactions whether due to scope and/or timing of particular transactions.

58.     The Guideline Company Analysis estimates enterprise value based on a comparison of the subject company's actual and projected financial statistics with those actual and projected financial statistics for similar publicly-traded companies.  Criteria for selecting comparable companies for the valuation analysis include, among other relevant characteristics, similar lines of businesses, business risks, growth prospects, maturity of businesses, market presence, and size and scale of operations.  The analysis establishes benchmarks for valuation by deriving financial multiples and ratios for the comparable companies.  In performing the Guideline Company Analysis for the Debtors, Duff & Phelps focused on similar publicly-traded companies in the insurance industry.  Duff & Phelps deemed revenue and earnings before interest, taxes, depreciation and amortization expense ("EBITDA") multiples as most relevant for deriving a value estimate for the Debtors based on various factors, included size and margins of the comparable companies.  Duff & Phelps applied a revenue multiple range of 1.0x to 1.1x the Debtors' estimated revenue, and 6.5x to 7.5x the Debtors' estimated normalized EBITDA to arrive at enterprise values consistent with the range of the results from the DCF Analysis:  $68.5 million to $81.9 million.

59.     The DCF analysis estimates the value of the Debtors' business by calculating the present value of expected future cash flows to be generated by that asset or business assuming that the Financial Projections are realized.  The DCF calculations were performed based on unlevered, after-tax free cash flows for the period beginning May 30, 2018 through December 31, 2027 and are discounted to May 30, 2018.  The discount rates utilized ranged from 12.6% to 14.6%, reflecting a number of company- and market-specific factors.  Duff & Phelps used a long-term growth rate range of 2.3% to 3.5%.  The DCF analysis resulted in an enterprise value of $70.8 million to $81.5 million.

60.     As indicated above, based on the Guideline Company Analysis and DCF methodologies, Duff & Phelps estimates the Adjusted Enterprise Value of the Reorganized Debtors to be approximately $70.8 million to $81.5 million, with a mid-point of $76.154 million, as of the Assumed Effective Date.

61.     Accordingly, for the reasons set forth herein, I believe that Duff & Phelps's valuation analysis of the Reorganized Debtors on a reorganized, going-concern basis is based upon relevant sources of information and appropriate valuation assumptions.

## IV.     CONCLUSION

62.     In light of the foregoing, I believe that: (i) the Plan and the transactions embodied therein have been structured to accomplish the Debtors' goal of maximizing returns to stakeholders and effectively reorganizing the Debtors; (ii) the Plan has been proposed by the Debtors in good faith; and (iii) confirmation of the Plan is in the best interests of the Debtors, their estates, creditors, and other parties in interest in this Chapter 11 Case.  Accordingly, I believe that the Plan satisfies the requirements of the Bankruptcy Code, the Bankruptcy Rules and other applicable non-bankruptcy laws as they have been explained to me and thus should be approved.


[SIGNATURE PAGE FOLLOWS]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Dated: April 20, 2018
        Wilmington, Delaware

                                        _/s/ James S. Feltman_____
                                        James S. Feltman
                                        Managing Director
                                        Duff & Phelps, LLC